# EXHIBIT

# B
# (Part 1)



UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/006,438 | 10/28/2002 | 6323899 | Sony 3.6-080 | 2695 |

7590      06/20/2005

Gordon Harris, Jr.
Harness Dickey & Pierce
5445 Corporate Drive Suite 400
Troy, MI  48098

| EXAMINER |
|---|
|  |

| ART UNIT | PAPER NUMBER |
|---|---|
|  |  |

DATE MAILED: 06/20/2005

Please find below and/or attached an Office communication concerning this application or proceeding.

*cc'd : 3rd Party Requester,*
*as attached*



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

LERNER, DAVID, LITTENBERG, KRUMHOLZ & MENTLIK
600 SOUTH AVENUE WEST
WESTFIELD, NJ  07090

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/006,438*.

PATENT NO. *6323899*.

ART UNIT *2600*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

| **Office Action in Ex Parte Reexamination** | **Control No.** 90/006,438 | **Patent Under Reexamination** 6323899 |
|---|---|---|
| | **Examiner** Brian C. Genco | **Art Unit** 2615 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

a ☒ Responsive to the communication(s) filed on <u>23 October 2000</u> .        b ☐ This action is made FINAL.

c ☐ A statement under 37 CFR 1.530 has not been received from the patent owner.

A shortened statutory period for response to this action is set to expire <u>2</u> month(s) from the mailing date of this letter.
Failure to respond within the period for response will result in termination of the proceeding and issuance of an *ex parte* reexamination certificate in accordance with this action. 37 CFR 1.550(d). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**
If the period for response specified above is less than thirty (30) days, a response within the statutory minimum of thirty (30) days will be considered timely.

Part I    THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1.  ☒ Notice of References Cited by Examiner, PTO-892.        3.  ☐ Interview Summary, PTO-474.

2.  ☒ Information Disclosure Statement, PTO-1449.        4.  ☐ _____.

Part II    SUMMARY OF ACTION

1a. ☒ Claims <u>1 - 4</u> are subject to reexamination.

1b. ☐ Claims _____ are not subject to reexamination.

2.  ☐ Claims _____ have been canceled in the present reexamination proceeding.

3.  ☒ Claims <u>3 and 4</u> are patentable and/or confirmed.

4.  ☒ Claims <u>1 and 2</u> are rejected.

5.  ☐ Claims _____ are objected to.

6.  ☐ The drawings, filed on _____ are acceptable.

7.  ☐ The proposed drawing correction, filed on _____ has been  (7a)☐ approved  (7b)☐ disapproved.

8.  ☐ Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All  b)☐ Some*  c)☐ None        of the certified copies have

    1☐ been received.

    2☐ not been received.

    3☐ been filed in Application No. _____ .

    4☐ been filed in reexamination Control No. _____.

    5☐ been received by the International Bureau in PCT application No. _____.

    * See the attached detailed Office action for a list of the certified copies not received.

9.  ☐ Since the proceeding appears to be in condition for issuance of an *ex parte* reexamination certificate except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte* Quayle, 1935 C.D. 11, 453 O.G. 213.

10. ☐ Other: _____

cc: Requester (if third party requester)

Application/Control Number: 90/006,438                                    Page 2

Art Unit: 2615

Examiner notes Requester's comments on pages 3-6 regarding the court ordered

definition of terms.  While the court adopted the definition of terms proposed by the patentee, the

Examiner is instructed to give claims their broadest reasonable interpretation in light of the

supporting disclosure and claims are not to be evaluated in a vacuum.  See MPEP 2106(II)(C).

Examiner is in agreement with the comments made by the Requester on pages 6-11, that in light

of the disclosure a very different interpretation that that adopted by the court must be made.

In particular, Examiner notes the disclosure of USPN 5,138,459 to Roberts et al.

Examiner notes that the patentee indicated that the field of the invention is that in which a still

camera converts a still picture into an operator selectable compressed digital signal format ...,

formatted into Personal Computer (PC) compatible format.  This is accomplished by formatting

an already compressed digital frame into "either an IBM PC/Clone (such as GIFF) or Apple

Macintosh (such as PICT II) image file format depending on the setting selected by the operator

for a user switch 17 (Fig. 6) position on the control panel 2." (column 4, line 68 – column 5, line

4).

Examiner believes the confusion of the interpretation of the claim language arises out of

the apparent disclosure that a user is selecting between two different image file types, such as

between GIFF or PICT II.  However, upon further inspection of the disclosure this is not found

to be the case.  Examiner notes that the disclosure goes on to teach that the user selects "the

desired PC format (IBM PC/Clone or Apple Macintosh, etc.) via switch 17 (Fig. 6) on the

control panel 2." (column 6, lines 42-45)  As such, a user is selecting between the PC format by

using switch 17, not the image file type.  It appears that the equalization between the IBM

PC/Clone and the GIFF image file as well as the equalization between the Apple Macintosh and

Application/Control Number: 90/006,438                                   Page 3

Art Unit: 2615

the PICT II image file arises out of the disclosure that "PICT and GIFF are the most common for

the APPLE and IBM PC's and are therefore the preferred formats" (column 11, lines 37-39).

In looking at the disclosure on the whole a user is given an option for selecting between

PC formats by using switch 17, wherein a particular image file type is assigned to each of the PC

formats. For example, a user may select to format the compressed digital frame into IBM

PC/Clone where the GIFF image file format has been assigned to the IBM PC/Clone format. As

such, the image file is output as an IBM PC/Clone GIFF file. While Examiner notes that Roberts

et al. discloses that other formats can be used this is accomplished by "changing the software

format routines", i.e., reprogramming the camera. There is no disclosure in the Roberts et al.

patents to suggest that once the user selects that the image is to be output as an IBM PC/Clone,

for example, that the user is further given the option of selecting between various image file

formats such as GIFF, TIFF, BMP, JFIF, etc.

As such, in light of the specification, the claim limitation "formatting the digital image

signal in one of a plurality of computer image file formats" is interpreted to mean formatting the

image signal as one of an IBM PC/Clone, Apple Macintosh, or other PC format.

**A.**    With regards to the Kühberger reference provided by Requester, Examiner notes that this

reference anticipates claims 1 and 2 as detailed in the rejection below.

**B-J.**    Examiner notes that none of the references supplied in these grounds of rejection disclose

formatting the image signal as one of an IBM PC/Clone, Apple Macintosh, or other PC format.

Application/Control Number: 90/006,438                                Page 4

Art Unit: 2615

### *Claim Rejections - 35 USC § 102*

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this
or a foreign country, before the invention thereof by the applicant for a patent.

Claims 1and 2 are rejected under 35 U.S.C. 102(a) as being anticipated by (WO 90/09717

to Kühberger).

In regards to claim 1 Kühberger discloses an electronic camera having an image pick-up

unit and a storage device, a process for taking pictures and storing digital pictures, the process

comprising:

generating a digital image signal corresponding to an image incident on the image pick-

up unit (e.g., page 7, lines 7-12 of the translation);

formatting the digital image signal in one of a plurality of computer image file formats

(e.g., page 4, lines 18-21; page 6, line 11-13, wherein Examiner notes that at the time of the

invention at least the TIF image file format was platform independent and could be used in either

an IBM PC/Clone or Apple Macintosh computer.  Therefore Kühberger discloses that the image

data can be output in a format readable by a standard computer, such as the TIF format, wherein

at least the TIF image file format can be used in one of a plurality of computers, i.e., IBM

PC/Clone or Apple Macintosh.  As such, Kühberger discloses to format said digital image signal

in one of a plurality of computer image file formats.  See cited Tag Image File Format Revision

4.0 published April 31, 1987 for proof of TIF image file format being platform independent); and

storing the formatted image file in the storage device (e.g., page 7, lines 11-12 of the

translation).

Application/Control Number: 90/006,438                                          Page 5
Art Unit: 2615

In regards to claim 2 Kühberger discloses a process as in claim 1, wherein the storage device is removable (e.g., Kühberger discloses using a floppy disk; page 8, lines 15-21 and page 9, lines 1-2 of the translation).

## STATEMENT OF REASONS FOR PATENTABILITY AND/OR CONFIRMATION

The following is an examiner's statement of reasons for patentability and/or confirmation of the claims found patentable in this reexamination proceeding:

Claims 3 and 4 are still deemed allowable over the prior art of record. In particular, while Kühberger discloses to output the image in a computer readable format Kühberger does not disclose to select one of a plurality of computer formats to output the image into, i.e., Kühberger does not disclose to select whether to encode the TIF file for use on an IBM/PC Clone or an Apple Macintosh personal computer.

Claim 4 depends from claim 3.

Any comments considered necessary by PATENT OWNER regarding the above statement must be submitted promptly to avoid processing delays. Such submission by the patent owner should be labeled: "Comments on Statement of Reasons for Patentability and/or Confirmation" and will be placed in the reexamination file.

## *Conclusion*

In order to ensure full consideration of any amendments, affidavits or declarations, or other documents as evidence of patentability, such documents must be submitted in response to

Application/Control Number: 90/006,438                                          Page 6

Art Unit: 2615

this Office action. Submissions after the next Office action, which is intended to be a final

action, will be governed by the requirements of 37 CFR 1.116, which will be strictly enforced.

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Brian C. Genco who can be reached by phone at 571-272-7364 or

by fax at 571-273-7364. The examiner can normally be reached on Monday thru Friday 8:30am

to 4:30 pm.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, James Groody can be reached at 571-272-7950. The fax phone number for the

organization where this application or proceeding is assigned is (703) 872-9306.

Any inquiry of a general nature or relating to the status of this application or proceeding

should be directed to the customer service office whose telephone number is 571-272-2600.

Information regarding the status of an application may be obtained from the Patent

Application Information Retrieval (PAIR) system. Status information for published applications

may be obtained from either Private PAIR or Public PAIR. Status information for unpublished

applications is available through Private PAIR only. For more information about the PAIR

system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR

system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).

Brian C Genco
Examiner
Art Unit 2615

May 31, 2005

WENDY R. GARBER
SUPERVISORY PATENT EXAMINER
TECHNOLOGY CENTER 2600

James J. Groody
Supervisory Patent Examiner
Art Unit 262 2615

Patent and Trademark Office

Address: ASSISTANT COMMISSIONER FOR PATENTS
Washington, D.C. 20231

| APPLICATION NO./ CONTROL NO. | FILING DATE | FIRST NAMED INVENTOR / PATENT IN REEXAMINATION | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 90/006438 | 10/28/02 | 6323899 | Sony 3.6-080 |

GORDON HARRIS, JR.
HARNESS, DICKEY AND PIERCE
5445 CORPORATE DRIVE, SUITE 400
TROY, MI  48098

| EXAMINER |
|---|
| NGOC-YEN VU |

| ART UNIT | PAPER |
|---|---|
| 2612 | 5 |

DATE MAILED: 08 JAN 2003

**Please find below and/or attached an Office communication concerning this application or proceeding.**

Commissioner of Patents and Trademarks

PTO-90C (Rev.3-98)

| *Order Granting / Denying Request For Reexamination* | Control No. | Patent Under Reexamination |
|---|---|---|
| | 90/006,438 | 6323899 |
| | **Examiner** | **Art Unit** | |
| | Ngoc-Yen VU | 2612 | |

---

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

The request for reexamination filed <u>28 October 2002</u> has been considered. Identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments: a)☐ PTO-892,    b)☒ PTO-1449,    c)☐ Other: _____

1. ☒ The request for reexamination is GRANTED.

RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional): TWO MONTHS from the mailing date This communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(C).**

For Requester's Reply (optional): TWO MONTHS from the date of service of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), no reply by requester is permitted.

2. ☐ The request for reexamination is DENIED.

This decision is not appealable (35 U.S.C. 303 ( c )).  Requester may seek review by petition to the Commissioner within ONE MONTH from the mailing date of this communication (37 CFR 1.515( c )). **EXTENSION OF TIME ARE AVAILABLE ONLY BY PETITION TO SUSPEND OR WAIVE THE REGULATIONS UNDER 37 CFR 1.183.**

In due course, a refund under 37 CFR 1.26 ( c ) will be made to requester:

a)☐ by Treasury check or,

b)☐ by credit to Deposit Account No. _____,  unless otherwise notified (35 U.S.C. 303 ( c )).

*cc:Requester ( if third party requester )*

Application/Control Number: **90/006,438**                                      Page 2

Art Unit: **2612**

<u>**DECISION**</u>

A substantial new question of patentability affecting claims 1-4 of United States Patent Number 6,323,899 to Roberts et al. (hereinafter referred to as "the Roberts et al. patent") is raised by the request for reexamination.

Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a reexamination proceeding.  Additionally, 35 U.S.C. 305 requires that reexamination proceedings "will be conducted with special dispatch" (37 CFR 1.550(a)).  Extension of time in reexamination proceedings are provided for in 37 CFR 1.550(c).

The request indicates that the Requester considers that claims 1-4 are unpatentable over the published international application WO 90/09717 to Kühberger (hereinafter referred to as "Kühberger").

It is agreed that the consideration of "Kühberger" raises a substantial new issue of patentability as to claims 1-4 of the Roberts et al. patent.  In regard to "Kühberger", the examiner is adopting the reasons as provided by the Requester in details on pages 12-15 of the request.  Since "Kühberger" was not considered prior to the grant of the Roberts et al. patent, "Kühberger" is not cumulative.  There is a substantial likelihood that a reasonable examiner would consider the teaching of "Kühberger" in deciding whether or not the claims are patentable.  Accordingly,

Application/Control Number: **90/006,438**                                    Page 3

Art Unit: **2612**

"Kühberger" raises a substantial new question of patentability as to claims 1-4, which question has

not been decided in a previous examination of the Roberts et al. patent.

The request also indicates that the Requester considers that claims 1-4 are unpatentable

over the following references and combination of the references as discussed in details on pages

15-33 of the request:

Sano et al., U.S. Patent No. 4,935,821 (hereinafter referred to as Sano '821);

Sano '821 in view of "Henning";

Sano '821 in view of The Agema 1989 Manual;

Sasaki et al., U.S. Patent No. 5,018,017 ("Sasaki '017);

Sasaki et al., U.S. Patent No. 5,034,804 ("Sasaki '804);

Sasaki '017 or Sasaki '804 in view of "Izawa et al." or "Sasaki et al. article";

Sasaki '017 or Sasaki '804 in view of Kuchta et al., U.S. Patent No. 5,164,831

("Kuchta");

Sasaki '017 or Sasaki '804 in view of "Izawa et al.", and further in view of Admitted Prior

Art;

Kuchta et al., U.S. Patent No. 5,164,831 ("Kuchta");

"Kuchta" in view of the Admitted Prior art;

"Kuchta" in view of Sasaki '017 or Sasaki '804;

"Kuchta" in view of the Admitted Prior art, and further in view of Sasaki '017 or Sasaki

'804.

Application/Control Number: **90/006,438**                                    Page 4

Art Unit: **2612**


    In granting the decision, the examiner is required to identify at least one substantial new

question of patentability.  Accordingly, it is agreed that "Kühberger" raises a substantial new

question of patentability as to claims 1-4 of the Roberts et al. patent.


NGOC-YEN VU
PRIMARY EXAMINER

90/006436

PTO/SB/0(12b)/02
Approved for use through 01/31/2004   OMB 0651-0033
U.S. Patent and Trademark Office, U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

(Also referred to as FORM PTO-1465)

# REQUEST FOR *EX PARTE* REEXAMINATION TRANSMITTAL FORM

Address to:
**Commissioner for Patents**
**Box Reexam**
**Washington, D.C. 20231**

Attorney Docket No.:   Sony 3.6-080

Date:   October 28, 2002

1. [X] This is a request for *ex parte* reexamination pursuant to 37 CFR 1.510 of patent number ___6,323,899___ issued ___November 27, 2001___ . The request is made by:

   [ ] patent owner.   [X] third party requester.

2. [X] The name and address of the person requesting reexamination is:

   Sony Corporation
   6-7-35 Kitashinagawa
   Shinagawa-ku
   Tokyo 141-001 JAPAN

3. [ ] a. A check in the amount of $ _____ is enclosed to cover the reexamination fee, 37 CFR 1.20(c)(i);

   [X] b. The Commissioner is hereby authorized to charge the fee as set forth in 37 CFR 1.20(c)(i)
   to Deposit Account No. ___12-1095___ ; or

   [ ] c. Payment by credit card. Form PTO-2038 is attached.

4. [X] Any refund should be made by [ ] check or [X] credit to Deposit Account No. ___12-1095___
   37 CFR 1.26(c)

5. [X] A copy of the patent to be reexamined having a double column format on one side of a separate paper
   is enclosed. 37 CFR 1.510(b)(4)

6. [ ] CD-ROM or CD-R in duplicate, Computer Program (Appendix) or large table

7. [ ] Nucleotide and/or Amino Acid Sequence Submission
   *If applicable, all of the following are necessary*

   a. [ ] Computer Readable Form (CRF)

   b. Specification Sequence Listing on:

      i. [ ] CD-ROM (2 copies) or CD-R (2 copies); **or**

      ii. [ ] paper

   c. [ ] Statements verifying identity of above copies

8. [X] A copy of any disclaimer, certificate of correction or reexamination certificate issued in the patent is
   included. **NONE EXIST**

9. [X] Reexamination of claim(s) ___1-4___ is requested.

10. [X] A copy of every patent or printed publication relied upon is submitted herewith including a listing thereof
    on Form PTO-1449.

11. [X] An English language translation of all necessary and pertinent non-English language patents and/or
    printed publications is included.

396993_1.DOC

PTO/SB/57 (02-01)
Approved for use through 01/31/2004. OMB 0651-0033
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number

12. [X] The attached detailed request includes at least the following items:

    a.    A statement identifying each substantial new question of patentability based on prior patents and printed publications. 37 CFR 1.510(b)(1)

    b.    An identification of every claim for which reexamination is requested, and a detailed explanation of the pertinency and manner of applying the cited art to every claim for which reexamination is requested. 37 CFR 1.510(b)(2)

13. [ ] A proposed amendment is included (only where the patent owner is the requester). 37 CFR 1.510(e)

14. [X] a.    It is certified that a copy of this request (if filed by other than the patent owner) has been served in its entirety on the patent owner as provided in 37 CFR 1.33(c). The name and address of the party served and the date of service are:

> Gordon Harris, Jr. (Reg. No. 28615) (current attorney of record) (service by first-class mail)
> Harness, Dickey & Pierce
> 5445 Corporate Drive, Suite 400
> Troy, MI 48098

    Date of Service:     October 28, 2002 by U.S.Mail   ; or

    [ ] b.    A duplicate copy is enclosed since service on patent owner was not possible.

15. [X] Correspondence Address: Direct all communication about the reexamination to:

    [X] Customer Number     | 000530 |

    *Customer Number*

    000530

    *Customer Number Bar Code*

    OR

| [ ] Firm or Individual Name | |
| Address | |
| City | State | Zip |
| Country | Telephone | Fax |

16. [X] The patent is currently the subject of the following concurrent proceeding(s):

    [ ] a. Copending reissue Application No. _____ .

    [X] b. Copending reexamination Control No.     (See below *) _____ .

    [ ] c. Copending Interference No. _____

    [X] d. Copending litigation styled:
    St. Clair Intellectual Property Consultants, Inc. v. Sony Corporation and Sony Corporation of America, U.S. Dist. Ct.,District of Delaware, No. Civ. 01-557(JJF)

_____
*Authorized Signature*

Marcus J. Millet, Reg. No. 28,241
*Typed or Printed Name*

_____
October 28,2002
*Date*

[ ] *For Patent Owner Requester*

*REQUESTS FOR REEXAMINATION BEING FILED
CONCURRENTLY HEREWITH IN RELATED PATENTS 6,233,010;
5,138,459; AND 6,094,219

[X] *For Third Party Requester*

396993_1.DOC

SONY 3.6-080
U.S. PATENT

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re U.S. Patent No.<br>  6,323,899 | : |
| | : |
| | : |
| Inventor: Roberts *et al.* | : |
| | : |
| Issued:  November 27, 2001 | : |
| | : |
| | : |
| For:  PROCESS FOR USE IN | : |
|     ELECTRONIC CAMERA | : |
|  | x |

BOX REEXAM
Commissioner For Patents
Washington, D.C.  20231

### REQUEST FOR REEXAMINATION

Sir:

    *Ex parte* reexamination of U.S. Patent 6,323,899 ("the '899 patent") pursuant to 35 U.S.C. §§ 302-307 and 37 C.F.R. § 1.510 is respectfully requested on behalf of Sony Corporation (hereinafter "Requester").  The '899 patent issued November 27, 2001, and has not yet expired.

## I.   IDENTIFICATION OF CLAIMS FOR WHICH REEXAMINATION IS SOUGHT

    Reexamination is requested with respect to claims 1-4 of the '899 patent.  Reexamination is requested on the basis of the following references:

    (1) *Kühberger*, PCT International Publication WO 90/09717 ("*Kühberger*");

    (2) *Sano*, U.S. Patent 4,935,821 ("*Sano*");

    (3) Henning, Edward, *Getting the Picture*, PC User No. 120, November 22, 1989 at 93 (ISSN 0263-5720)("Henning").

    (4) Agema Infrared Systems, *Thermovision® 400 Series Operating Manual* ("Agema 1989 manual");

    (5) *Sasaki*, U.S. Patent 5,034,804 ("*Sasaki '804*");

(6) *Sasaki*, U.S. Patent 5,018,017 ("*Sasaki* '017");

(7) Izawa, F. *et al.*, *Digital Still Video Camera Using Semiconductor Memory Card*, 36 (No. 1) IEEE Transactions on Consumer Electronics, February 1990 at 1-9 (ISSN 0098-3063) ("Izawa *et al.*");

(8) *Kuchta et al.*, U.S. Patent 5,164,831 ("*Kuchta*"); and

(9) Sasaki, Minoru *et al.*, *Digital Electronic Still Camera System*, 13 (No. 22) ITEJ Technical Report (March 1989) at 17-22 ("Sasaki *et al.* article").

A copy of each of these references is enclosed, along with English translations of the foreign-language references.    These references also are listed on the accompanying form PTO-1449.

## II.  <u>INTRODUCTION</u>

It is respectfully requested that the present Request For Reexamination be assigned to Primary Examiner Tuan V. Ho, notwithstanding the general policy stated in M.P.E.P. § 2236.   Examiner Ho was the original examiner throughout the eleven-year chain of continuing applications encompassing several thousand pages of prosecution history, leading to the '899 patent. He also examined the three related patents which are the subject of concurrently filed reexamination requests.

Before addressing the specific new issues raised by the new references cited above, Requester notes that the present reexamination arises in the context of infringement litigation between the patent owner and the Requester involving the '899 patent and four related patents, all having the same specification.[1]   *St. Clair Intellectual Property Consultants, Inc. v. Sony Corporation and Sony Corporation of America*, No. Civ. 01-557(JJF), U.S. District Court, District

---

[1] U.S. Patents 5,138,459; 5,576,757; 6,094,219; and 6,233,010.

394901_1.DOC

of Delaware.  In the course of that litigation, in connection with a *Markman* hearing, the patentee filed a brief with an annexed proposed order (copy of proposed order with partial copy of brief enclosed herewith as Annex A) urging the court to adopt certain broad and sweeping definitions of claim terms, and the court adopted those definitions in an order filed September 3, 2002 (Mem. Opin. & Order (Annex B hereto)).

The patentee urged, and the court accepted, the definition of the recitation "formatting said digital image signal in one of a plurality of computer formats," as used in the only claim of the patentee's related U.S. Patent No. 6,233,010 ("the '010 patent"), as meaning "arranging digital image data into one of a plurality of image file formats, including at least, JPEG, GIF, TIFF, PICT, MPEG, BMP, JFIF and DCF."  (Annex A, ¶ 3.)[2]  The term "image file format" was defined by the patentee as "an arrangement of digital image data in a file and includes, at least, the file formats JPEG, GIF, TIFF, PICT, MPEG, BMP, JFIF AND DCF."  (Annex A, ¶ 2.) Thus, the definition urged by the patentee and adopted by the district court, of the term "formatting the digital image signal in one of a plurality of image file formats" is simply <u>formatting the digital image signal in one of a plurality of arrangements of digital image data in a file</u>.  The same construction by the patentee applies to the term "formatting the digital image signal in one of a plurality of computer image file formats" used in claim 1 of the '899 patent and to the corresponding language of '899 claim 3.  The patentee did not differentiate between the '899 term and the '010 patent term, though both patents were in issue before the court.

---

[2] Although the order as entered by the court (Annex B) omits the word "image" which is included in the claim term "digital image signal," this is a typographical error; the order as proposed by the patentee (Annex A) includes the word "image," and the term without the word "image" is not used in the claims at issue before the court.

394901_1.DOC

Further, in original prosecution, the patentee represented to the Examiner that the '899 claims were "analogous to" the '010 patent claim. (U.S. App. Ser. No. 09/541,285, 5/31/01 Amendment at 3.)

The claim construction adopted by the patentee is broad enough to encompass _any_ sort of "arrangement" of digital image data; it imposes no requirement as to the manner in which the plural "arrangements" of image data must differ from one another. Although the definitions adopted by the patentee state that certain enumerated file formats are _included_ within the scope of the definition, the definitions do not state that their scope is _limited to_ the enumerated file formats. To the contrary, both definitions state that they include "at least" the enumerated formats, _i.e._, that they are _not_ limited by the enumerated formats.

The patentee's actions in the district court necessarily influence the claim construction that must be applied as part of the reexamination process. The patentee cannot escape invalidation in reexamination on the art by alleging a narrower construction than he himself advanced before the district court. Stated another way, the patentee's assertions before the district court as to what the claim language encompasses constitute an admission as to a "matter affecting patentability" and can be applied against the patentee in reexamination in conjunction with prior art both to establish a substantial new question of patentability and to sustain a rejection. 37 C.F.R. § 1.104(c)(3); M.P.E.P. § 2258(F). The patentee cannot retract its admission by explaining or supplementing the definition which the patentee sought and obtained before the district court. The definition advanced by the patentee was explicit and unqualified, and did not contain any explanations or additions.

Under the doctrine of judicial estoppel, moreover, the patentee is precluded from retracting such admission. As

394901_1.DOC

the Federal Circuit explained in *Data General Corp. v. Johnson*, 78 F.3d 1556 (Fed. Cir. 1996):

> The doctrine of judicial estoppel is that where a party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed . . . Judicial estoppel is designed to prevent the perversion of the judicial process and, as such, is intended to protect the courts rather than the litigants.

*Id.* at 1565 (citations omitted); *see also Wang Labs., Inc. v. Applied Computer Scis., Inc.*, 958 F.2d 355, 358, 22 U.S.P.Q. 1055, 1058 (Fed. Cir. 1992) (judicial estoppel posits that "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position" (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)). Also, the Supreme Court has stated, where a patentee sought and obtained broad construction of his claims, he is barred from asserting a narrow construction to avoid anticipation. *Smith v. Hall*, 301 U.S. 216, 231-32 (1937).

While the PTO is not a court, as an administrative agency, it has authority to apply the doctrine of judicial estoppel in an appropriate case. *See Data General*, 78 F.3d at 1565. Moreover, although St. Clair has not obtained a favorable final judgment, it has successfully urged its broad claim construction in the Delaware action by virtue of the district court's *Markman* ruling. *Cf. Bosies v. Benedict*, 27 F.3d 539, 544, 30 U.S.P.Q.2d 1862, 1866 (Fed. Cir. 1994) (party was deemed to have obtained benefit from initial argument where examiner-in-chief in interference proceeding granted party's motion based on such argument).

Requester maintained before the district court, and continues to maintain, that the patentee's claim construction should not have been adopted giving full consideration to the

specification and prosecution history. However, this does not change the fact that the patentee has obtained a broad claim construction that renders the claims unpatentable. *Cf.* *Laitram Corp. v. Morehouse Ind., Inc.*, 143 F.3d 1456, 1462, 46 U.S.P.Q.2d 1609, 1614 (Fed. Cir. 1998)("Admission" by Requester in reexamination irrelevant to claim construction in litigation). Obviously, the present request does not require that the Examiner decide whether the district court was correct or incorrect in adopting the patentee's view advanced in the litigation. Still some background is believed helpful.

Requester believes that the expression, "computer image file formats," as used in the claims of the '899 patent, should have been held to refer to the different storage formats used to organize files for storage on the storage medium of a particular computer, as opposed to the manner in which the image data within a file is arranged for use by a particular computer program running on the computer. The FAT storage format used by IBM personal computers using the Disk Operating System (DOS) and the Hierarchical File System (HFS) used by Apple Macintosh personal computers using the Mac OS operating system are examples of such different storage formats, *i.e.*, different computer disk formats. These formats are unique to these computers. On the other hand, a particular manner of arranging image data within a file is not related to any particular type of computer. For example, GIF data can be used by Macintosh, IBM and other computers. In the Requester's view, the specification and prosecution history strongly support this construction, and this construction was the basis upon which the Examiner allowed the subject claims.

The specification for the '899 patent discloses an electronic camera in which a "format switch" on the camera, identified as switch 17 and labeled "IBM" or "Apple" in Fig. 6, is used to select a storage format for storing image data

-6-

generated by the camera "on a standard removable magnetic diskette common to personal computers." (Col. 2, lns. 14-15.) Upon making a selection using this switch, the image data is automatically organized and stored on the diskette in the selected storage format for recognition and use by a computer program capable of running on the selected computer. While different arrangements of image data (GIF and PICT in the preferred embodiment) are associated with the different storage formats, the specification provides no disclosure for selecting arrangements of image data independently of selecting the storage format. Nor does the specification disclose how selecting only an arrangement of image data within the file would ensure compatibility with PC or Apple computers - the fundamental objective of the invention as originally disclosed.

During the entire chain of continuation applications culminating in the '899 patent, all of which were examined by the same Examiner, the patentee repeatedly distinguished its claimed invention over the prior art on the basis of the invention's ability to provide a selected data format compatible with a particular computer, not a selected arrangement of image data within a file. For example, the patentee argued that its invention provided "a simple apparatus or process which permits the electronic still camera to designate or select one of a plurality of digital data formats as the camera is being utilized to ensure <u>direct data format compatibility for input into a selected model personal computer apparatus</u>." (U.S. App. Ser. No. 07/615,848, 6/19/91 Amendment at 9-10 (emphasis added).) The patentee further argued that, unlike the prior art, its "improved electronic camera structure and function . . . permits the ready removal of a memory disc from the camera with the stored video data <u>properly formatted to permit direct input thereof as an input data file into a predetermined type of data processing</u>

-7-

394901_1.DOC

apparatus." (U.S. App. Ser. No. 08/098,787, 1/23/95 Amendment at 9-10 (emphasis added).) Numerous similar arguments were made during the course of many years of prosecuting these applications.

The patentee's prosecution of U.S. Patent Application Serial No. 08/651,562 ("the '562 application"), the parent of the '285 application, which issued as the '899 patent, is particularly revealing. During the prosecution of that application, the patentee specifically sought claims directed to formatting data into "<u>different data file formats for different types of computer programs</u>." This language would have encompassed "different arrangements of digital image data in a file." Those claims were canceled on October 29, 1998, however, in response to a rejection of the claims for obviousness over the prior art. The application for the '899 patent was filed on April 3, 2000. The appropriate language for claiming the ability to format a "digital image signal" in one of a plurality of arrangements of data within a file, compatible with a particular computer program, therefore, was clearly known to both the patentee and the Examiner when the application for the '899 patent was filed and prosecuted. This language was not allowed, however, or used in the claims of the '899 patent.

To the contrary, during prosecution of U.S. Patent Application No. 09/253,831 which issued as the '010 patent, the Examiner proposed different language for application claim 31, which was later redrafted as application claim 35 and issued as patent claim 1, to distinguish this claim over *Sasaki* '804. As discussed above, claim 1 of this patent recites "a digital control unit for formatting said digital image signal in one of a plurality of computer formats." *Sasaki* '804, as discussed below, discloses a digital control unit for "formatting said digital image signal in one of a plurality of arrangements of digital image data in a file."

-8-

The Examiner proposed that application claim 31 could be distinguished over *Sasaki* '804 by adding "new limitations such as 'a user selects computer formats'." (2/1/01 Interview Summary, Paper No. 18.) This proposal is understandable if, and only if, the expression "computer format" was then understood by the Examiner as referring to a format selected for compatibility with a particular type of computer having a particular storage format system, such as the IBM and Apple storage formats referred to in the specification and drawings of the '831 application and '010 patent.

The reasoning and arguments advanced during this stage of the original prosecution were never formally recorded; as indicated above, claim 1 of the '010 patent as issued was application claim 35, which was inserted by Examiner's Amendment accompanying the Notice of Allowability to replace former claim 31 after a telephone interview. (Paper No. 118.) Numerous differences between claim 31 and claim 35 are entirely unexplained in the formal record. However, handwritten notes, apparently made by Examiner Ho (Annex C) in relation to the telephone interview appear in the file jacket of the '831 application. These notes indicate that alternative claim language – "one of a plurality of digital data formats" - was considered and rejected by Examiner Ho at some time during this process. That rejected language is essentially identical to what the patentee now alleges as the meaning of "a plurality of computer formats," namely, a plurality of different arrangements of image data within a file.

During prosecution of the '285 application which issued as the '899 patent, the patentee, in response to a requirement for restriction, cancelled all of the pending claims and presented new claims 37-40. These new claims issued as, respectively, patent claims 1-4. In its remarks, the patentee stated that these new claims are "process claims

394901_1.DOC

<u>analogous to the apparatus claim of Applicants' newly issued</u>
<u>U.S. Patent No. 6,233,010 (Application Serial No. 09/253,831)</u>
<u>and are therefore believed to be in condition for allowance</u>.
('285 application, 5/31/01 Amendment at 3 (emphasis added).)
As discussed above, the Examiner clearly understood claim 1 of
the '010 patent as being directed to selected computer formats
for compatibility with a particular type of computer, such as
the IBM or Apple formats.

The patentee's new-found claim construction is
understandable in light of its desire to stretch the claims to
allegedly encompass cameras such as Requester's Sony® Mavica®
digital cameras that format data in the FAT storage format
associated with IBM PC compatable computers.  Such cameras do
not take advantage of or employ the features of permitting one
camera to be used by owners of different types of computers.
However, many of Requester's latest cameras do permit a user
to select more than one arrangement of digital data in a file
and put such arrangement on a DOS-formatted disk.

However improper, the patentee's newly adopted claim
construction still stands as a new admission as to the scope
of the claims.  Because the patentee has admitted that the
claim terms broadly encompass formatting the digital image
signal into one of a plurality of arrangements of digital
image data that differ in any way from one another, the
patentee cannot properly assert here that this broad
construction requires a narrower scope in order to avoid a
finding of unpatentability.

As Requester demonstrates below, the new references
cited in the present request are replete with electronic
cameras that offer users a choice of arrangements of digital
image data in a file and, therefore, that meet the claims as
construed by the patentee.  In addition to the new issues
raised by the new references, the patentee's new admission
raises new issues of patentability as to previously-considered

-10-

references; *inter alia*, it causes the claim to read directly on the *Sasaki* '804 reference considered during prosecution.

Notably, under the intellectual property provisions of the Justice Department Authorization Act of 2002, consideration of a reference in original prosecution does **not** preclude the existence of a substantial new question of patentability based on that reference.   The new act amends 35 U.S.C. §§ 303(a) and 312(a) to provide that "[t]he existence of a substantial new question of patentability is not precluded by the fact that a patent or printed publication was previously cited by or to the Office or considered by the Office."[3]   Because the new statute abolishes the Portola Packaging doctrine referenced in M.P.E.P. § 2242, that section of the manual is no longer current.

### III.  EXPLANATION OF PERTINENCY AND MANNER OF APPLYING CITED PRIOR ART TO EVERY CLAIM FOR WHICH REEXAMINATION IS REQUESTED

Claim 3 of the '899 patent is essentially identical to claim 1, except that claim 3 includes the additional step of "selecting one of a plurality of computer image file formats in the camera." Except for the dependency of claims 2 and 4 on claims 1 and 3, respectively, claims 2 and 4 are identical.   In the analysis below, therefore (except for the discussion in sections I.-L.), Requester applies the cited references against only claims 3 and 4.   Since these references anticipate, or render obvious, claims 3 and 4, they also clearly anticipate, or render obvious, broader claims 1 and 2.

---

[3] H.R. 2215, 107th Cong.; P.L.__, § 13105(a).  As of the writing of this request, the Bill is awaiting signature by the President and is expected to be signed and hence "enacted" before the present request reaches the Examiner.   This amendment applies "with respect to any determination . . . [as to the existence of a substantial new question] . . . made under section 303(a) or 312(a) . . . on or after the date of enactment of this Act." H.R. 2215, 107th Cong.; P.L.___, § 13105(b), and accordingly applies to the present request.

394901_1.DOC

**A.    The '899 Patent Claims Should Be Rejected Under 35 U.S.C. § 102 As Anticipated By *Kühberger***

**3. For use in an electronic camera having an image pick-up unit and a storage device, a process for taking and storing digital pictures, the process comprising:**

*Kühberger* teaches an electronic camera having "a conventional image sensor 4, *e.g.*, a so-called CCD (charge-coupled device)" that takes digital pictures and stores them on a removable floppy disk. (*Kühberger* Translation at 7.) As stated in *Kühberger*, "a video camera . . . is equipped . . . with a drive for an exchangeable storage medium as normally used in standard personal computers." (*Kühberger* Translation at 6.) The system performs a process that includes "the digitizing and the storage of the image." (*Kühberger* Translation at 5.)

**selecting one of a plurality of computer image file formats in the camera;**

As explained in *Kühberger*:

[T]he camera is equipped . . . with a microcomputer, which is connected to the one or more control elements, to the analog/digital converter, and to the drive. The microcomputer also contains a program <u>for determining the position of the one or more control elements</u> and a processing or control program, which controls the optical-electronic system <u>according to the determined position of the control element</u>, converts the output signals of the a/d converter <u>to a format that can be read by standard personal computers, such as the GEM format, paintbrush format, PCX, or TIF</u>, and actuates the drive so that it will store the data thus obtained on the storage medium in a file format conventional for standard personal computers.

(*Kühberger* Translation at 6 (emphasis added).)

As further explained in *Kühberger*:

According to the second essential feature of the method according to the invention, an additional step is inserted before or between the digitizing of

-12-

the data of the scanner 5 and the storage of the digitized data.    In this step, <u>one of several possible data formats, such as the GEM format, paintbrush format, PCX, TIF, etc., which can be read directly by standard personal computers, is selected</u>.    For this purpose, as previously described, <u>the position of a control element 10'</u>, possibly identical to the previously mentioned element 10, <u>is determined</u> by an interrogation program in the microcomputer 9 and transmitted to the processing and control program.    In correspondence with the current position of the control element 10', the processing program of the microcomputer converts the output data of the analog/digital converter 6 to the selected format and ultimately actuates the drive 7 of the camera, so that the digitized and formatted data are stored on the storage medium 8 in a file format conventional for standard personal computers.

(*Kühberger* Translation at 7-8  (emphasis added).)

*Kühberger*, therefore, clearly discloses the step of "selecting one of a plurality of computer image file formats in the camera" as recited in claim 3.

**generating a digital image signal corresponding to an image incident on the image pick-up unit;**

As stated in *Kühberger*, "[t]he object or the like to be recorded is captured on a conventional image sensor 4, *e.g.*, a so-called CCD (charge-coupled device) in the camera, and the image sensor 4 is scanned, in turn, line-by-line by a scanner 4 [sic; 5] in the camera.    Then the scanner signals are digitized by an analog/digital converter 6 and stored on a replaceable, preferably reusable, storage medium 8 in a drive 7 of the camera."  (*Kühberger* Translation at 7.)

**formatting the digital image signal in the selected computer image file format; and**

As explained in *Kühberger*, "[i]n correspondence with the current position of the control element 10', the processing program of the microcomputer <u>converts the output data of the analog/digital converter 6 to the selected format</u>

-13-

and ultimately actuates the drive 7 of the camera, so that the digitized and formatted data are stored on the storage medium 8 in a file format conventional for standard personal computers." (*Kühberger* Translation at 8 (emphasis added).)

>    **storing the formatted computer image file in the storage device.**

As further explained in *Kühberger*, the microcomputer "ultimately actuates the drive 7 of the camera, so that the digitized and formatted data <u>are stored on the storage medium 8 in a file format conventional for standard personal computers</u>." (*Kühberger* Translation at 8 (emphasis added).)

>    **4. A process as in claim 3, wherein the storage device is removable.**

As discussed above, the storage device disclosed in *Kühberger* is "an exchangeable storage medium as normally used in standard personal computers." (*Kühberger* Translation at 6.)

As pointed out above, *Kühberger* constitutes a full anticipation of the claimed invention. It is available as prior art under 35 U.S.C. § 102(a) by virtue of its August 23, 1990, publication date, some three months prior to the patentee's earliest alleged effective filing date of November 20, 1990. Moreover, apart from its role as statutory prior art, this reference demonstrates that other independent workers in the art were fully capable of making the alleged invention as of *Kühberger*'s 1989 priority date and February 19, 1990, international filing date. Independent creation of the alleged invention by others, even if shortly <u>after</u> the patentee's filing date and not available as statutory prior art, constitutes "strong evidence of what constitutes the level of ordinary skill in the art" and a "secondary consideration factor" which "favors obviousness." *Ecolochem Inc. v. Southern California Edison*, 227 F.3d 1361, 1379, 56 U.S.P.Q.2d 1065, 1079 (Fed. Cir. 2000). *Kühberger*'s

-14-

independent creation _before_ the patentee's alleged invention constitutes even more compelling evidence as to level of skill in the art, which must be considered in connection with the § 103 rejections on other references discussed below.

References to "simultaneous invention" in the present request should not be taken as an admission by Requester that the patentee here actually invented or disclosed in the '899 patent the invention according to the patentee's present claim construction. The '899 patent does not disclose the concept of providing a camera with the capability of selecting more than one image file format for one computer disk format. (The patent teaches the selection of a computer disk format with its accompanying, predesignated image file format.)

**B.    The '899 Patent Claims Should Be Rejected Under § 102 As Anticipated By _Sano___**

**3.    For use in an electronic camera having an image pick-up unit and a storage device, a process for taking and storing digital pictures, the process comprising:**

_Sano_ includes all of the elements of an electronic digital camera for taking and storing digital pictures as defined by this preamble, _e.g._, it includes a CCD 38 and stores image data in digital form on floppy disk 134, _i.e._, a removable storage device. The word "camera" is not limited to a camera of specific size or purpose. As commonly used in the art, the term "camera" encompasses a device that captures images of a document, also referred to as a "scanner." (_See_, for example, _Schneider et al._, U.S. Patent 4,571,638, entitled "Random-access Electronic Camera" which discloses such a special-purpose camera.) During prosecution of U.S. Patent Application Serial No. 08/098,787 ("the '787 application"), an application in the chain of applications leading to the '899 patent, the patentee specifically characterized _Schneider_

*et al.* as including an "optical scanning camera." ('787 application, 10/93 IDS.)

The Examiner in original prosecution of the related applications repeatedly applied rejections that implicitly relied on a construction of the term "camera" as including special-purpose cameras for capturing documents (*i.e.*, "scanners"), and the patentee never disputed this point. For example, the Official Action of March 27, 1991 in the '848 application rejected claim 1, then reciting a combination "in an electronic still image camera comprising: an optical lens, a shutter mechanism . . .," on *Schneider* '638 in conjunction with other references. The Examiner asserted that *Schneider* taught "all of the claimed subject matter" apart from specifics of "pixel multiplexing means, digital data compression means and removable mounted memory means." The patentee never disputed that *Schneider* met the "camera" recitations. In related U.S. Patent Application Serial No. 08/651,562 (U.S. Patent 6,094,219),[4] the Examiner cited a news release from Eikonix[5] disclosing a scanner as teaching "a digital camera system" ('562 application, 6/8/99 Official Action at 6), and the patentee never disputed that the Eikonix scanner is an "electronic camera" as recited in then-pending claim 47. The Eikonix press release refers to a "family of . . . scanners" that "includes the Eikonix 1412 Digital Imaging Camera System" and to "the entire family of cameras," thus further confirming that the term "camera" does not exclude a device specifically adapted to capture an image of a document. The Eikonix teachings were also applied by the Examiner in related U.S. Patent Application Serial No. 08/712,493 as disclosing a "digital imaging camera system"

---

[4] U.S. Patent Application Serial No. 08/651,562 is the parent of the '285 application which issued as the '899 patent.

[5] *Eikonix Introduces New Digital Camera Interface Support for Macintosh II, PS/2, Targa, Truevista, and Colorboard 64*, 9/29/88 News Release, Atlanta, GA.

-16-

(3/2/99 Examiner's Answer, Paper No. 24 at 6), and neither the patentee nor the Board of Appeals and Interferences disputed this fact; the rejection was reversed on other grounds.

Moreover, the elements and steps recited in the preamble are admitted to be present in the prior art by virtue of the patentee's admissions regarding prior art in the specification. (*E.g.,* Fig. 1.)

> **selecting one of a plurality of computer image file formats in the camera;**

*Sano*'s system includes a "floppy disk memory or FDM" 16 that is "physically present within the unit 10" along with an image reader or scanner 14. The FDM 16 is arranged to record "the image signal from the scanner 14." (Fig. 2; col. 3, lns. 20-40.) FDM 16 includes an electronic control circuit 148 (Fig. 9) "[b]asically implemented as a common microcomputer system" (col. 5, lns. 55-57). Control circuit 148 incorporates a microprocessor 156, page memory 166, code memory 180 and physical floppy disk drives 142, 144 and 146. (Col. 5, lns. 55-65.) The page memory 166 of control circuit 148 receives the digital image signal from scanner 14. (Col. 5, ln. 68 to col. 6, ln. 5.)

In operation, elements of control circuit 148 operate to store the image signal either in a raster format or in a vector format on a floppy disc, using the program depicted in the flow chart of Fig. 14. The specification states:

> Subsequently, the program determines whether the vector conversion has been <u>selected</u> (step 6) and, if it has not been <u>selected</u>, *i.e.,* if raster data are to be printed out as they are, the content of the page memory 166 is recorded in the floppy disc (step 7). If the vector conversion has been <u>selected</u>, the data developed in the page memory 166 are converted into vector data by a conversion program which is stored in the ROM 164 (step 8) and then stored in the code memory 180. As soon as all the raster data are converted into vector data, the vector data are read out of the code memory 180 and

recorded in the floppy disc (step 10). Such a recording operation is executed through the FD I/F 160.

(Col. 9, ln. 62 to col. 10, ln. 7 (emphasis added).)

The claim, given the construction adopted by the patentee, does not require that the selected "computer image file formats" have any relation to usability by any particular type of computer. Solely out of an abundance of caution, Requester notes that *Sano*'s FDM itself includes "a common microcomputer system" (col. 5, lns. 61-63) and is capable of reading, as well as writing, files in the vector and raster formats (col. 10, ln. 8 to col. 11, ln. 17). Thus, a *Sano* machine reading the files is a "computer," and the files generated by the machine are compatible with that computer.

Moreover, it is manifest from *Sano*'s entire disclosure that the machine taught therein is intended to interact with other computer systems.

> With this type of copier, it is possible to store images (including characters) which are read from an original document by a scanner in, for example, a floppy disk and reproduce them on any desired number of papers as needed and to allow such a floppy disk to be used with another copier for reproducing the image data on papers. <u>Another possibility is reproducing data recorded by a different kind of data processing equipment (*e.g.* computer, word processor or work station) by using the copier</u>.

('821 patent, col. 1, lns. 16-26 (emphasis added).)

Additionally, *Sano* notes the problems encountered in handling large files in "raster format" when the image is "read from an original document by a scanner" for use in a "<u>workstation</u>," in that such files are "often too large to be accommodated in a floppy disk" and hence require use of "mass storage such as magnetic tape or an optical file." (Col. 1, lns. 28-33 (emphasis added).) As defined in the *McGraw-Hill Electronics Dictionary* (6th Ed. 1997), a "workstation" is a "a

-18-

desktop <u>computer</u> optimized to run computer-aided design (CAD) programs for engineering applications" (emphasis added).

To solve this problem, *Sano* sets as one "object" of the invention "to provide an image processing apparatus applicable to a multi-media copying machine which allows a large amount of image data to be stored in a single external storing medium." (Col. 1, lns. 55-59.) One of ordinary skill would appreciate that *Sano* is proposing his system as the solution to the problem encountered in the operation of workstations (*i.e.*, computers) by providing a device that can capture a file for a workstation on a floppy disk. Still further, *Sano* has a further object to facilitate "rotation, magnification change and other similar editing operations of a document or drawing" (col. 1, lns. 60-64; col. 12, lns. 55-57) but provides no facility within the system to accomplish these operations. One skilled in the art would understand that *Sano* facilitates these operations by facilitating transfer of the document to a "work station" that can perform normal computer graphics operations on the image data.

Accordingly, *Sano* alone would suggest that the selectable raster and vector formats that are placed on the disk should be readable by other computer systems. Thus, even if the construction of the claim could be narrowed to something less than that adopted by the patentee in litigation, to require that the computer image file formats are readable by some other form of computer system, *Sano* still would be anticipatory.

**generating a digital image signal corresponding to an image incident on the image pick-up unit;**

*Sano* includes a CCD sensor 38 that receives a "light image," the CCD sensor being linked to an analog-to-digital converter 46 that converts the signals from CCD sensor 38 to a "digital image signal." (Fig. 5; col. 3, lns. 47-54, col. 4,

-19-

lns. 5-8.)  These elements are incorporated in the "image reader" or "scanner" 14.  (Fig 2; col. 3, lns. 15-40.)

> **formatting the digital image signal in the selected computer image file format; and**

As discussed above, *Sano*'s control circuit 148 formats the digital image signal as sent to the floppy disc in the selected one of two different arrangements of image data in a file - raster or vector.

> **storing the formatted computer image file in the storage device.**

As discussed above, control circuit 148 operates to store the selected arrangement of image data on floppy disk 134, a removable storage device.

> **4. A process as in claim 3, wherein the storage device is removable.**

As discussed above, floppy disk 134 is a removable storage device.

### C.    The '899 Patent Claims Should Be Rejected Under § 103 On *Sano* In View Of Henning

Again, even if the construction of the claims could be narrowed to require that the computer image file formats are readable by some other form of computer system, the claims still should be found invalid.  The raster and vector formats referred to by *Sano* were exactly the types of formats used by common personal computer image handling systems as explained, for example, in Henning.  Moreover, as evidenced by Henning, it was common knowledge that scanners commonly are employed to capture "scanned images from an existing artwork or photograph" to be used in the image handling software operated on personal computers, and hence that *Sano*'s system could be employed for capturing images to be imported into a personal computer system.  This knowledge would motivate a person of ordinary skill to select particular details of the raster and

-20-

394901_1.DOC

vector formats for use in *Sano*'s system that are compatible with the software used in a personal computer.

### D. The '899 Patent Claims Should Be Rejected Under § 103 On *Sano* In View Of The Agema 1989 Manual

As pointed out above, *Sano*'s device is, in fact, an "electronic camera" as referred to in the preamble of claim 3. The Agema 1989 manual depicts (Fig. 1) a portable camera of more conventional appearance that, like *Sano*, includes "image recording directly onto diskette using built-in disk drive" (Agema 1989 manual at 1.2).[6]  The disk drive assembly "is entirely self-contained within the Thermovision® camera, eliminating the need to carry separate recording equipment." (Agema 1989 manual at 4.1.)  The disks used in the camera are in a personal computer format (Agema 1989 manual at 4.2), so that images recorded by the camera "digitally" can be transferred to a computer using the disk or "diskette" (Agema 1989 manual at 8.1).  The '899 patent explicitly acknowledges that the term "camera" includes an infrared camera ('899 patent, col. 2, lns. 38-46), as referred to in the Agema 1989 manual.  The camera described in the Agema 1989 manual, like *Sano*, is a microcomputer-based system (Fig. 3.2) operative to record images onto a floppy disk for insertion into a computer.  One skilled in the art would appreciate from *Sano* that the Thermovision® camera should be provided with the same multi-formatting capability as the *Sano* camera.

### E. The '899 Patent Claims Should Be Rejected Under § 102 By Either One Of *Sasaki* '017 Or *Sasaki* '804

It is noted that *Sasaki* '804 was cited by the Examiner and considered in the original examination of the '899 patent.  Again, under the Justice Department

---

[6] Deposition transcript confirming the date of the Agema 1989 manual is provided as Annex D.

Authorization Act of 2002, this fact <u>does not</u> preclude the existence of a substantial new question of patentability. The new act amends 35 U.S.C. §§ 303(a) and 312(a) to provide that "[t]he existence of a substantial new question of patentability is not precluded by the fact that a patent or printed publication was previously cited by or to the Office or considered by the Office." Here, a substantial new question of patentability arises because the patentee's admissions as to claim construction contradict the claim construction applied during the original examination and establish that each of the *Sasaki* patents anticipate the claims.

> **3. For use in an electronic camera having an image pick-up unit and a storage device, a process for taking and storing digital pictures, the process comprising:**

Each one of *Sasaki* '804 and *Sasaki* '017 teaches an "electronic still camera 10" having a CCD 26 (*Sasaki* '804 Fig. 1; col. 4, ln. 6; *Sasaki* '017 Fig. 1; col. 5, lns. 11-12) adapted to take and store digital pictures on a removable "semiconductor memory card 15" (*Sasaki* '804 Fig. 1; col. 4, lns. 8-11 and 52-57; *Sasaki* '017 Fig. 1; col. 5, lns. 15-16 and 63-68).

> **selecting one of a plurality of computer image file formats in the camera;**

Both *Sasaki* '804 and *Sasaki* '017 include digital elements that perform this step. These elements include control circuit 24 (Fig. 2 of each reference) which incorporates CPU $24_1$, (Fig. 6A of each reference), together with signal processing circuit 31 (Fig. 2 of each reference) which incorporates elements $31_1$ to $31_7$ (Fig. 6B of each reference; *see* *Sasaki* '804 col. 3, lns. 32-34; *Sasaki* '017 col. 4, lns. 24-26).

-22-

These elements arrange image data in "one of a plurality of computer image file formats in the camera" in response to a user's selection using "mode switch 12." As explained in the *Sasaki* references, "[p]rior to the photographing, the user can <u>selectively</u> set the format of data to be stored in semiconductor memory card 15 by operating mode switch 12." (*Sasaki* '804 patent, col. 4, lns. 58-60; *Sasaki* '017 patent, col. 6, lns. 1-3 (emphasis added).)

In the '804 disclosure, the different modes include (A) full or uncompressed, (B) subsampled and filtered, (C) and (D) subsampled, filtered and compressed. ('804 patent col. 4, ln. 58 to col. 5, ln. 12; col. 7, lns. 30-46.) In the compressed modes (C) and (D), differential pulse code modulation ("DPCM") is employed so that in the formatted signal either 4 bits [mode (C)] or 2 bits [mode (D)] represent a difference between a luminance ("Y") value for a particular part of the image and a luminance value for another part of the image ("a difference between the sampling data and receding sampling data") ('804 patent, col. 7, lns. 20-22). These 4-bit or 2-bit difference values ("Y3") then are written into the file of information on the memory card 15. ('804 patent, col. 7, lns. 39-46.) The color value signals are similarly converted into difference values. By contrast, in the uncompressed mode (A), the values that are recorded in the file of information on memory card 15 are simply "linearly quantized data" or luminance values ("Y1") for individual points or pixels captured by the CCD, and the corresponding individual-pixel color value data. ('804 patent, col. 6, lns. 60-63; col. 7, lns. 32-36.) *Sasaki* '017 contains all of the teachings discussed above with respect to *Sasaki* '804. (*E.g.*, col. 8, ln. 21 to col. 9, ln. 21.)

Thus, when mode (A) is selected, the stored luminance data includes a set of individual pixel values. When a compressed mode (C) or (D) is selected, the stored

394901_1.DOC

luminance data includes a set of difference values denoting differences between pixel values.

A set of individual pixel values and a set of difference values constitute two different arrangements of digital data in a file. Given the patentee's new admissions before the district court, selection of these arrangements is all that is required to meet the recitation of "selecting one of a plurality of computer image file formats in the camera."

The examples appended to the patentee's definition of claim terms adopted by the district court confirm the anticipation. According to the patentee, the recitations of "a plurality of computer formats" and "image file formats" are broad enough to read on "BMP" as one format and "GIF" as another format. BMP, in original (Windows 1.0) form, had image data arranged in an uncompressed bitmap or raster; whereas, in GIF the image data is a compressed bitmap or raster compressed according to the LZW algorithm. *See Environments - What's New In Bitmap Formats: A Look At Windows And OS/2*, 9 (No. 15) PC Magazine, September 1990 at 403-410 ("Environments"), also cited in the present request. The difference in the formatting of image data between the BMP format and the GIF format, therefore, is the same as the difference between the compressed and uncompressed formats disclosed in *Sasaki* '804 and *Sasaki* '017.

Although the BMP and GIF file formats may also include different header data, a difference in header data is not a requirement of the claim. The patentee's definition of the claim term includes only arrangements of digital "image data"; it does not relate to any other data that also might be present in the file. Thus, insofar as pertinent to the claim limitations as construed by the patentee and the court, the difference between the compressed and uncompressed formats of both *Sasaki* references is identical to the difference between BMP and GIF formats. Even if differences in header data were

-24-

required to constitute different "computer image file formats," moreover, such requirement would be fully met by the teaching of both *Sasakis'* patents of recording different "information relating to the selected mode" in the memory card along with the image data, such that different codes are stored to indicate the different compression modes. (*Sasaki* '804 patent, col. 7, lns. 48-51; *Sasaki* '017 patent, col. 9, lns. 22-26.) Thus, the image information recorded in each arrangement is accompanied by different header data.

As pointed out above, the patentee's interpretation of the recitation "a plurality of computer image file formats" merely requires the placing of digital image data into one of a plurality of "arrangements," and does not require that any of these "arrangements" be compatible with any particular type of computer apparatus, such as a general-purpose computer as opposed to a special-purpose computer. In any event, the "reproducing unit" discussed in each of *Sasaki* '804 and *Sasaki* '017 (*Sasaki* '804, Fig. 11; col. 9, lns. 36 *et seq.*; *Sasaki* '017, Fig. 11; col. 11, lns. 62 *et seq.*) manifestly is a special-purpose "computer;" it is a digital device that includes elements such as a CPU 102, I/O devices including a keyboard 104 and display 105. The CPU of the reproducing unit clearly operates under program control.

> **generating a digital image signal corresponding to an image incident on the image pick-up unit;**

As discussed above, both *Sasaki* '804 and *Sasaki* '017 teach an "electronic still camera 10" having a CCD 26. Pre-processing circuit 27 and analog-to-digital converter 28 generate a digital image signal corresponding to the image incident on CCD 26. (*Sasaki* '804, Fig. 2, col. 4, lns. 41-49; *Sasaki* '017, Fig. 2, col. 5, lns. 49-60.)

> **formatting the digital image signal in the selected computer image file format; and**

394901_1.DOC

As discussed above, both *Sasaki* '804 and *Sasaki* '017 include digital elements that perform this step. These elements include control circuit 24 (Fig. 2 of each reference) which incorporates CPU $24_1$, (Fig. 6A of each reference), together with signal processing circuit 31 (Fig. 2 of each reference) which incorporates elements $31_1$ to $31_7$ (Fig. 6B of each reference; *see* *Sasaki* '804 col. 3, lns. 32-34; *Sasaki* '017 col. 4, lns. 24-26). These elements arrange the image data in the selected compressed or uncompressed mode in response to a user's selection using "mode switch 12."

**storing the formatted computer image file in the storage device.**

As discussed above, both *Sasaki* '804 and *Sasaki* '017 store the selected formatted image data on a removable "semiconductor memory card 15." (*Sasaki* '804 Fig. 1; col. 4, lns. 8-11, 52-57; *Sasaki* '017 Fig. 1; col. 5, lns. 15-16, 63-68.)

**4. A process as in claim 3, wherein the storage device is removable.**

"Semiconductor memory card 15" is a removable storage device.

**F.    The '899 Patent Claims Should Be Rejected Under § 103 Over Sasaki '804 Or Sasaki '017 In View Of Izawa *et al*. Or The Sasaki *et al*. Article**

Like the *Sasaki* patents, Izawa *et al*. teaches a digital still camera employing a memory card. Izawa *et al*. explicitly says, moreover, that the memory card from the camera can be used with a "personal computer" as well as with a special-purpose "playback unit" (Fig. 4), and states explicitly that the digital still system "will spread over the telecommunication and computer industries through the digital network" as indicated in Fig. 4. (Izawa *et al*. at 3.) The Sasaki *et al*. article states that one of the "merits" of

-26-

recording a video signal "into a semiconductor memory as a digital signal" is that "[t]he technique offers easy connection of the semiconductor memory to a computer or a peripheral such as a transmission apparatus." (Sasaki *et al.* article Translation at 3.)   The specific camera described in the Sasaki *et al.* article appears to be identical in all respects to the camera described in greater detail in the *Sasaki* '804 and *Sasaki* '017 patents.

Again, the patentee's construction of the claim does not require compatibility of the different "arrangements" of digital image data with a personal computer.  However, even if the construction did impose such a requirement, it is apparent from either *Sasaki* patent, taken in conjunction with either the Sasaki *et al.* article or Izawa *et al.*, that the arrangements used in *Sasaki* '804 and *Sasaki* '017 are, or should be, compatible with a personal computer.  Additionally, both *Sasaki* '804 and *Sasaki* '017 teach that the camera can use additional methods of data compression, beyond the DPCM compression used in the preferred embodiment, provided that the data written into the memory card or "mode information" includes an indication as to the type of compression used. (*Sasaki* '804 patent, col. 11, lns. 27-37; *Sasaki* '017 patent, col. 13, ln. 64 to col. 14 ln. 6; col. 15, lns. 25-32.)  Thus, even if some other arrangement of data were required for compatibility with a particular format used by a personal computer having particular application software, it is fully within the ambit of either *Sasaki* patent to provide such a different arrangement.

### G. The '899 Patent Claims Should Be Rejected Under § 103 Over *Sasaki* '804 Or *Sasaki* '017 In View Of *Kuchta*

As further discussed herein in connection with anticipation by *Kuchta*, this reference teaches a digital camera that records image data in various formats on a solid-

-27-

state memory card, and teaches that "a personal computer" can be programmed to accomplish the functions of a special purpose reader or "dedicated player." (*Kuchta*, col. 7, lns. 52-58.) Thus, even if compatibility with a personal computer were a requirement of the claims, it would have been obvious to provide a personal computer programmed to read the formats written by *Sasaki* '804 or *Sasaki* '017.

> **H.    The '899 Patent Claims Should Be Rejected Under § 103 Over *Sasaki* '804 Or *Sasaki* '017 In View Of Izawa *et al*. Or The Sasaki *et al*. Article *And Further* In View Of Admitted Prior Art**

Again, compatibility with a personal computer, much less with standard, commercially-available formats, is simply not a requirement of the claims. However, the '899 patent itself admits that "it should be noted that a large number of image formats for PC's exist," including PICT and GIF. (Col. 11, lns. 5-6). The host of commercially-available image file formats were known to include file formats that stored uncompressed images, *e.g.*, BMP, and file formats that stored only compressed images, *e.g.*, GIF. As noted above, *Sasaki* '804 and *Sasaki* '017 specifically teach that compression schemes other than that specifically contemplated by the preferred embodiment can be used in the camera. A worker of ordinary skill seeking to make either *Sasaki* '804 or *Sasaki* '017 camera usable with a commercially-available personal computer, as in Izawa *et al*. or the Sasaki *et al*. article, would appreciate that any of these commercially-available formats were art-recognized equivalents, within the scope of the express suggestion in *Sasaki* '804 or *Sasaki* '017 to use different schemes. It would therefore have been obvious to one of ordinary skill in the art at the time of the invention to place *Sasaki's* uncompressed image data in any then commercially-available uncompressed format such as BMP, and to place the compressed image data in any then commercially-

-28-

available format such as GIF. Specific motivation to adopt art-recognized alternatives is not required. M.P.E.P. § 2144.06. However, to the extent motivation is required, a person of ordinary skill would realize that using a commercially-available format would avoid the necessity of designing a proprietary format or software to read a proprietary format.

I.   **The'899 Patent Claims 1 And 2 Should Be Rejected Under § 102 As Anticipated By _Kuchta_**

**1. For use in an electronic camera having an image pick-up unit and a storage device, a process for taking and storing digital pictures, the process comprising:**

_Kuchta_ teaches "an electronic still camera" that "employs digital processing of image signals . . . and storage of the processed image signals in a removable . . . memory card." (Abstract.) The memory card is shown as element 24 in Fig. 1A. (_See_ col. 4, lns. 5-12.) The files saved on the memory card may be played, viewed and printed either on a specialized "still video player" (Fig. 3A; col. 7, lns. 4-31) or on a personal computer having the proper software (col. 7, lns. 52-55).

**generating a digital image signal corresponding to an image incident on the image pick-up unit;**

_Kuchta_ includes CCD 12 linked to an analog-to-digital converter 16 (Fig. 1A; col. 3, lns. 31-55) so as to provide "a digital image signal" in response to the image incident on CCD 12 (col. 3, lns. 53-54).

**formatting the digital image signal in one of a plurality of computer image file formats; and**

_Kuchta_'s camera includes a "digital signal processor 22" that receives the digital image signals via buffer 18. (Fig. 1A; col. 4, lns. 1-5.) The digital signal processor stores both full and reduced resolution images as digital files on memory card 24. This process produces a "multi-

-29-

format image file" that contains image data in two different
arrangements, *i.e.*, a "thumbnail" or reduced-resolution format
and a full resolution format. (*Kuchta,* col. 4, lns. 43-58.)
Moreover, although *Kuchta* refers to the composite record
containing both the thumbnail and the full resolution data as
a "multi-format image file," the reference explicitly states
that the thumbnail image is itself a "much smaller data file"
(col. 6, lns. 31-33), *i.e.*, that the "multi-format image file"
is in fact an assemblage of two separate files - thumbnail and
full resolution.

In forming the full resolution image file format,
the image is compressed by digital signal processor 22 by
discrete cosine transformation ("DCT") (col. 5, lns. 19-28)
followed by additional steps such as "rearranging" the data in
a block-to-serial conversion involving "arranging the discrete
cosine transform coefficients in order of increasing spatial
frequency," followed by thresholding/normalization/
quantization and minimum redundancy encoding (Fig. 1B; col. 5,
lns. 36-59). In forming the thumbnail image file format, two
different possible averaging algorithms may be used; one which
uses the generated "average or dc" values from the DCT
algorithm, without the "rearranging" and other processing
steps used for the full resolution format (Fig. 1B; col. 5,
lns. 29-35; col. 6, lns. 54-64) or one that simply averages
raw pixel values over blocks of pixels (col. 5, lns. 7-13;
col. 6, lns. 44-49), also without the "rearranging" step used
for the full image.

Regardless of which algorithm is used for forming
the thumbnail image, the data constituting the thumbnail image
will be arranged differently than the data constituting the
full resolution image. Further, this difference in data
arrangement requires different hardware or software to read
the different files. The full image requires the sequence of
steps in "expander" 106 (Figs. 3A, 3B), whereas the thumbnail

-30-