# EXHIBIT

# B
# (Part 2)

image bypasses those steps and passes directly to sector 104 (Fig 3A; col. 7, lns. 4-33).

Again, according to the patentees' own admissions, the expression "formatting the digital image signal in one of a plurality of computer image file formats" merely requires formatting the digital image signal in one of a plurality of different arrangements of data in a file. Thus, in creating a single record including both thumbnail and full-resolution information in different arrangements, the digital signal processor 22 receives the digital image signal and formats the digital image signal in two computer image file formats; it uses "a plurality of computer image file formats." The processor in *Kuchta*, therefore, performs the step of formatting the image signal in a first one of the plural formats used by the processor (*e.g.*, the full resolution arrangement) as recited in the claim and performs the <u>additional</u> step of formatting the image signal in a second one of the plural formats. Nothing in the claim excludes a method in which the processor performs such an additional step, and hence the reference anticipates the claim.

Additionally, *Kuchta* expressly teaches formatting the "multi-format" images in two distinct file structures, with different arrangements of image data and ancillary data such as directories and headers. (*Kuchta,* Figs. 2A, 2B.)

> **storing the formatted image file in the storage device.**

As discussed above, the *Kuchta* electronic still camera stores "the processed image signals in a removable . . . memory card." (Abstract.)

> **2. A process as in claim 1, wherein the storage device is removable.**

As discussed above, memory card 24 is removable.

394901_1.DOC

**J.**   **'899 Patent Claims 1 And 2 Should Be Rejected Under § 103 As Obvious Over *Kuchta* In View Of Admitted Prior Art**

Again, as discussed above, compatibility with a personal computer, much less with standard, commercially-available formats, is simply not a requirement of the claims. However, the '899 patent itself admits that "it should be noted that a large number of image formats for PC's exist," including PICT and GIF. (*Kuchta*, Col. 11, lns. 5-6.) The host of commercially-available image file formats were known to include file formats that stored uncompressed images, *e.g.*, BMP, and file formats that stored compressed images, *e.g.*, GIF. *Kuchta* teaches playing the image files back on a personal computer. Accordingly, it would have been obvious to one of ordinary skill in the art at the time of the invention to place *Kuchta's* uncompressed image data in any then commercially-available file format for uncompressed data such as BMP, and to place the compressed image data in any then commercially-available file format for compressed data such as GIF, in order to avoid the necessity of designing a proprietary format or in order to increase market penetration.

**K.**   **The '899 Patent Claims 3 And 4 Should Be Rejected Under § 103 As Obvious Over *Kuchta* In View Of *Sasaki* '804 Or *Sasaki* '817**

Claim 3 adds the additional step of "selecting one of a plurality of computer image file formats in the camera." Each of the *Sasaki* patents teaches <u>selecting</u> different data formats. In light of such teaching and *Kuchta's* teaching of multi-format files, transmitting a multi-format file in one format, and using the different formats for different purposes, it would have been obvious to one of ordinary skill in the art at the time of the invention to provide the user of *Kuchta's* camera with the option of selecting either only the thumbnail format or only the full resolution format, so as to

-32-

permit the user to select between two different compressed data formats.

**L.   '899 Patent Claims 3 And 4 Should Be Rejected Under § 103 As Obvious Over *Kuchta* In View Of The Admitted Prior Art And Further In View Of *Sasaki* '804 And *Sasaki* '017**

For the same reasons as discussed above, in connection with claims 1 and 2 (Section J., above), the admitted prior art suggests the use of any of the commercially-available formats in the combined *Kuchta*/*Sasaki* '804 or *Sasaki* '017 structure discussed above (Section K.) with regard to claims 3 and 4.

**IV.   NEW ISSUES OF PATENTABILITY**

None of the references discussed above as anticipating, or rendering obvious, claims 1-4 of the '899 patent were considered with regard to the '899 claims in the original prosecution, apart from *Sasaki* '804. *Kuchta, Sasaki* '017 and *Izawa et al.* were cited in certain related applications, but were never considered in relation to the '285 application or the claims of the '899 patent.

The anticipatory nature of each of the newly-cited references pointed out in detail above creates a substantial new question of patentability. Merely by way of example, the issue of whether raster and vector formats constitute different "computer image file formats" raised by newly-cited *Sano* was never considered in original prosecution. Likewise, the issues posed by newly-cited *Kühberger's* camera saving images on a disk in formats such as paintbrush or TIFF were never considered. Moreover, as to the *Sasaki* '804 and '017 references, a substantial new question of patentability is presented by each of these references taken in conjunction with additional references as discussed above. Still further new issues are presented by *Sasaki* '804 or *Sasaki* '017, even

394901_1.DOC

without other references, in conjunction with the patentee's new admissions as to the meaning of the claims.

## V.    ADDITIONAL CONSIDERATIONS

Based on the patentee's contentions advanced during litigation, it is expected that the patentees will allege that commercial success of Requester's Mavica® brand cameras somehow evidences commercial success of the claimed invention. Commercial success, of course, is irrelevant to anticipation. M.P.E.P. § 2131.04. Moreover, even as to obviousness under § 103, any such argument is instantly refuted by the patentee's further admissions in prosecution of the parent '562 application. The '562 application contained claims to a camera incorporating a disk drive. In that application, the patentee explicitly attributed the commercial success of the Sony Mavica® to "a single factor, *i.e.,* the use of a standard, 3.5" floppy disk in the camera." ('562 application, 1/7/00 Appeal Br., Paper No. 32 at 16 (emphasis added).) The use of a standard 3.5" floppy disk storage medium, as opposed to other types of removable storage media, is not a feature of the claimed invention in the '899 patent. Thus, by the patentee's own admission, the commercial success of the Sony Mavica® camera is unrelated to the claimed invention of the '899 patent and hence irrelevant to obviousness of the claimed invention. M.P.E.P. § 716.03(b).

## VI.    CONCLUSION

A substantial new question of patentability regarding claim 1-4 of the '899 patent exists for the reasons given above. The claims should be rejected for the reasons given above.

-34-

Should the Examiner have any questions regarding the present request for reexamination, the Examiner is encouraged to contact the undersigned at (908) 654-5000.

Dated:  October 28, 2002          Respectfully submitted,

                                  By_____
                                  Marcus J. Millet
                                  Registration No.: 28,241
                                  LERNER, DAVID, LITTENBERG,
                                    KRUMHOLZ & MENTLIK, LLP
                                  600 South Avenue West
                                  Westfield, New Jersey  07090
                                  (908) 654-5000

                                  Attorneys for Requester

-35-

394901_1.DOC

# ANNEX INDEX
## REEXAMINATION PETITION
### U.S. PATENT NO. 6,323,899

| Annex | Document |
|---|---|
| A | Excerpt from Plaintiff St. Clair's Corrected Opening Claim Construction Brief and proposed order filed in *St. Clair Intellectual Property Consultants, Inc. v. Sony Corporation and Sony Corporation of America*, No. Civ. 01-557(JJF) |
| B | Memorandum Opinion and Order issued in *St. Clair Intellectual Property Consultants, Inc. v. Sony Corporation and Sony Corporation of America*, No. Civ. 01-557(JJF) |
| C | Examiner Ho's handwritten notes |
| D | Excert from deposition testimony of Denis Engstrom |

396284_1 DOC

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ST. CLAIR INTELLECTUAL PROPERTY
CONSULTANTS. INC.

Plaintiff,

v.

SONY CORPORATION, and SONY
ELECTRONICS INC., and SONY
CORPORATION OF AMERICA,

Defendants.

Civil Action No. 01-557-JJF

CONFIDENTIAL
FILED UNDER SEAL
ATTORNEYS' EYES ONLY

## PLAINTIFF ST. CLAIR'S CORRECTED
## OPENING CLAIM CONSTRUCTION BRIEF

OF-COUNSEL:
Ronald J. Schutz
Jake M. Holdreith
Becky R. Thorson
Carrie M. Smith
ROBINS, KAPLAN, MILLER & CIRESI
L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
(612) 349-8500

Frederick L. Cottrell, III (#2555)
Thomas H. Kovach (#3964)
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(302) 651-7700

ATTORNEYS FOR PLAINTIFF ST.
CLAIR INTELLECTUAL PROPERTY
CONSULTANTS, INC.

Dated: July 1, 2002

E.    The Meaning of "Computer Apparatus"

"Computer apparatus"[17] means 'a computer and any operating system or application software loaded on the computer.' And "different types" can thus, include a difference at the hardware level, the operating system level, and/or the application software level. Two computers with the same hardware and the same operating system are "different types of computer apparatus" if they are running different application software. A computer is an apparatus , i.e. designed for a particular use, when it has been programmed with both an operating system and application software, and any change in either hardware or software (operating system or application) changes the apparatus. CCS Fitness, Inc. 288 F.3d at 1366.

St. Clair's construction, which allows either or both operating system and application software to distinguish one "computer apparatus" from another, is confirmed by the entirety of the intrinsic evidence. As stated up front in the BACKGROUND OF THE INVENTION, a key purpose of the invention is to format a digital image "for immediate use with word processing, desk top publishing, data base, and multi-media applications." '899 patent, C. 1, l. 30-32 (emphasis added). The "data file format" must be ready for direct incorporation into different types of computer apparatus, including the software applications disclosed in the BACKGROUND OF THE INVENTION and throughout the specification.

> It is a further object of this invention to provide an improved electronic still camera that provides digital image files for immediate and direct incorporation into popular word processing, desktop publishing, and other software programs on PCs.

'899 patent, C. 2, l. 16-20 (emphasis added). Sony's effort to arbitrarily limit the different types of computer apparatus to those running separate operating system software is inconsistent with the

---

[17]    '219 patent: 10.d.
        '459 patent: 16.d.

## IX.    CONCLUSION

In conclusion, the Court should adopt St. Clair's claim construction.  A proposed form of order is attached hereto as Exhibit B.

OF COUNSEL:

Ronald J. Schutz
Jake M. Holdreith
Becky R. Thorson
Nicholas S. Boebel
Carrie M. Smith
ROBINS, KAPLAN, MILLER & CIRESI
L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
(612) 349-8500


Dated: July 1, 2002

Frederick L. Cottrell, III (#2555)
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(302) 651-7700

ATTORNEYS FOR PLAINTIFF ST. CLAIR
INTELLECTUAL    PROPERTY
CONSULTANTS, INC.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---

ST. CLAIR INTELLECTUAL PROPERTY
CONSULTANTS, INC.

Civil Action No.01-557-JJF

Plaintiff,

v.

SONY CORPORATION, and SONY
ELECTRONICS INC., and SONY
CORPORATION OF AMERICA,

ST. CLAIR'S PROPOSED CLAIM
CONSTRUCTION ORDER

Defendants.

---

## ORDER

For the reasons set forth in the Opinion issued this date;

IT IS HEREBY ORDERED that

1.    The terms "file format," "data file format," and "data format" mean 'the arrangement of digital data in a file, including image, audio, text or other data and includes, at least, MPEG, JPEG, GIF, TIFF, PICT, BMP, JFIF, DCF, TXT, DOC, WPD and WAV.'

2.    The term "image file format" means 'an arrangement of digital image data in a file and includes, at least, the file formats JPEG, GIF, TIFF, PICT, MPEG, BMP, JFIF and DCF.'

3.    The term "formatting said digital image signal in one of a plurality of computer formats" means 'arranging digital image data into one of a plurality of image file formats, including, at least, JPEG, GIF, TIFF, PICT, MPEG, BMP, JFIF and DCF.'

RLF1-2478534-1                                1

4.     The term "output data format code" means 'a code stored in the camera that corresponds to a data file format.'

5.     The term "computer apparatus" means 'a computer and any operating system or application software loaded on the computer.'

6.     The terms "information handling apparatus" and "information handling systems" mean 'a collection of hardware and software for the purpose of handling information that includes both computers and peripheral devices.'

SO ORDERED this _____ day of _____, 2002.

_____
JUDGE

B

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

2002 SEP -3 PM 3: 30

ST. CLAIR INTELLECTUAL PROPERTY    :
CONSULTANTS, INC.,                 :
                                   :
            Plaintiff,             :
                                   :
      v.                           :  Civil Action No. 01-557-JJF
                                   :
SONY CORPORATION, SONY             :
ELECTRONICS, INC., and SONY        :
CORPORATION OF AMERICA,            :
                                   :
            Defendants.            :

---

Frederick L. Cottrell, III and Thomas H. Kovach, Esquires of
RICHARDS, LAYTON & FINGER, Wilmington, Delaware.
Of Counsel: Ronald J. Schutz, Jake M. Holdreith, Becky R.
Thorson, and Carrie M. Smith, Esquires of ROBINS, KAPLAN, MILLER
& CIRESI, L.L.P., Minneapolis, Minnesota.
Attorneys for Plaintiff.

Josy W. Ingersoll and Adam W. Poff, Esquires of YOUNG CONAWAY
STARGATT & TAYLOR, L.L.P., Wilmington, Delaware.
Of Counsel: Sidney David, Joseph S. Littenberg, Jonathon A.
David, Jeffrey S. Dickey, and April M. Mayo, Esquires of LERNER,
DAVID, LITTENBERG, KRUMHOLZ & MENTLIK, L.L.P., Westfield, New
Jersey.
Attorneys for Defendants.

---

**MEMORANDUM OPINION**

September 3 , 2002
Wilmington, Delaware

FARNAN, District Judge.

Plaintiff, St. Clair Intellectual Property Consultants, Inc. (hereinafter "St. Clair") filed this action against Defendant, Sony Corporation, Sony Electronics, Inc., and Sony Corporation of America (collectively "Sony") alleging willful infringement of United States Patent Nos. 5,138,459 (the "'459 Patent"), 6,094,219 (the "'219 Patent"), 6,233,010 (the "'010 Patent"), and 6,323,899 (the "'899 Patent") (collectively the "patents-in-suit").[1]  Sony responds to these allegations asserting defenses of noninfringement, invalidity and laches.  Sony also asserts counterclaims, including patent misuse and unfair competition. (D.I. 56 at 1).

Currently before the Court is the issue of claim construction.  The parties briefed their positions on claim construction and the Court held a <u>Markman</u> hearing on August 14, 2002.

## I.     BACKGROUND

The patents-in-suit relate to digital camera technology; specifically the asserted claims cover electronic cameras that can save digital photographs in one of at least two file formats on a memory element.  Each of the patents-in-suit has a common

---

[1]St. Clair initially alleged infringement of United States Patent No. 5,576,757 but subsequently withdrew that patent from the litigation. (D.I. 51 at 1).

1

specification, whereby each patent claims different variations of the multiple inventive aspects and embodiments of the technology.

St. Clair is asserting the following independent claims of the patents-in-suit: the '459 Patent, claim 16; the '219 Patent, claims 1, 10, and 16; the '010 Patent, claim 1; and the '899 Patent, claims 1 and 3. (D.I. 51 at 14). The parties dispute whether the asserted claims are limited to cameras that can select among different "computer formats" associated with different manufacturer's computers, or whether the asserted claims cover cameras that allow the user to select among different "image file formats."

## II. THE LEGAL PRINCIPLES OF CLAIM CONSTRUCTION

Claim construction is a question of law. Markman v.Westview Instruments, Inc., 52 F.3d 967, 977-78 (Fed. Cir. 1995), aff'd, 517 U.S. 370, 388-90 (1996). When construing the claim of a patent, a court considers the literal language of the claim, the patent specification and the prosecution history. Markman, 52 F.3d at 979. A court may consider extrinsic evidence, including expert and inventor testimony, dictionaries, and learned treatises, in order to assist it in construing the true meaning of the language used in the patent. Id., at 979-80 (citations omitted). A court should interpret the language in a claim by applying the ordinary and accustomed meaning of the words in the

2

claim.  <u>Envirotech Corp. v. Al George, Inc.</u>, 730 F.2d 753, 759
(Fed. Cir. 1984).  However, if the patent inventor clearly
supplies a different meaning, the claim should be interpreted
accordingly.  <u>Markman</u>, 52 F.3d at 980 (noting that patentee is
free to be his own lexicographer, but emphasizing that any
special definitions given to words must be clearly set forth in
patent).  If possible, claims should be construed to uphold the
validity of a patent.  <u>In re Yamamoto</u>, 740 F.2d 1569, 1571 & n.*
(Fed. Cir. 1984) (citations omitted).

**III. DISCUSSION**

In this case, the parties dispute the meaning of the word
"format."  To resolve the dispute, the Court must determine
whether, as Sony contends, the asserted claims are limited to
cameras that can select among different "computer formats"
associated with different manufacturer's computers, or whether,
as St. Clair contends, the asserted claims cover cameras that
allow the user to select among different "image file formats."

After considering the claim language, patent specification,
and hearing the attorneys' arguments, the Court concludes that
the patents-in-suit teach the selection of different image file
formats.  (D.I. 52, Ex. A, B, C, D). The Court believes that two
paragraphs of the common specification support its conclusion:

(1) The compressed digital frame is then formatted into

3

either an <u>IBM PC/Clone</u> (<u>such as GIFF</u>) or <u>Apple Macintosh</u> <u>such as PICT II</u>) image file format depending on the setting selected by the operator for a user switch 17 (Fig. 6) position on the control panel 2. <u>After formatting</u>, the file is written into the temporary memory buffer within the disk input/output (I/O) interface circuit 13 which, under the command of the digital control unit 9, controls the high density (1.4 Mbyte storage capacity) disk drive unit 5.

(D.I. 52, Ex. D, col. 4, ln. 61 - col. 5, ln. 2) (emphasis

added).

(2) As shown in FIG. 7, the output of the image compression processor 12 is routed to the RAM memory 24 where the compressed image is formatted for either the <u>PICT II or GIFF</u> <u>format depending on the setting of format switch 17</u> (FIG. 6). It should be noted that a large number of image formats for PCs exist, PICT and GIFF are the most common for the Apple and IBM PC's and therefore the preferred formats for the present invention although other formats can be easily incorporated into the design by changing the software format routines.

(D.I. 52, Ex. D, col. 11, ln. 1-10) (emphasis added).

From the paragraphs quoted above, as well as the claim language

and remaining patent specification, the Court concludes that

Switch 17 allows the user to select a particular image file

format, such as PICT, GIFF, or JPEG, compatible with operating

systems, such as Apple and IBM, and their required memory

formats. (D.I. 52, Ex. D, col. 4, ln. 61 - col. 5, ln. 2, col.

11, ln. 1-10). After the image file is formatted, per the user's

selection, the image file is then written onto the memory device.

In sum, the Court concludes that the term "format" relates to the

image signal, and not the computer hardware.

An appropriate Order will be entered.

4

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

IN THE UNITED STATES DISTRICT COURT

2002 SEP -3  PM 3: 30

FOR THE DISTRICT OF DELAWARE

ST. CLAIR INTELLECTUAL PROPERTY  :
CONSULTANTS, INC.,               :
                                 :
          Plaintiff,             :
                                 :
     v.                          :    Civil Action No. 01-557-JJF
                                 :
SONY CORPORATION, SONY           :
ELECTRONICS, INC., and SONY      :
CORPORATION OF AMERICA,          :
                                 :
          Defendants.            :

**O R D E R**

At Wilmington this 3 day of September, 2002, for the
reasons set forth in the Memorandum Opinion issued this date, IT
IS HEREBY ORDERED that:

1.  The terms "file format," "data file format," and "data
format" mean "the arrangement of digital data in a file,
including image, audio, text or other data and includes, at
least, MPEG, JPEG, GIF, TIFF, PICT, BMP, JFIF, DCF, TXT, DOC, WPD
and WAV."

2.  The term "image file format" means "an arrangement of
digital image data in a file and includes, at least, the file
formats JPEG, GIF, TIFF, PICT, MPEG, BMP, JFIF and DCF."

3.   The term "formatting said digital signal in one of a plurality of computer formats" means "arranging digital image data into one of a plurality of image file formats, including, at least, JPEG, GIF, TIFF, PICT, MPEG, BMP, JFIF and DCF."

4.   The term "output data format code" means "a code stored in the camera that corresponds to a data file format."

5.   The term "computer apparatus" means "a computer and any operating system or application software loaded on the computer."

6.   The terms "information handling apparatus" and "information handling systems" mean "a collection of hardware and software for the purposes of handling information that includes that includes both computers and peripheral devices."

UNITED STATES DISTRICT JUDGE

C

09/253,931

31. (NEW)  A digital camera for taking pictures and storing them in ~~an applied storage~~ *a removeable storage* device in the camera, said apparatus comprising:

an image pick-up unit for generating and outputting a digital image signal photoelectrically converted from an image incident thereon, *and*

a digital control unit for formatting said digital image signal in ~~a format~~ dependent ~~upon the type of said applied storage device.~~

an initialization control switch on said digital camera for commencing operation for initialization of the applied storage device, and

an erase mode control switch for selectively erasing and recording over digital image data stored on said applied storage device.

D

In the Matter of:

*ST. CLAIR v.*
*SONY CORPORATION*

---

*DENNIS ENGSTROM*
*September 25, 2002*

---

*MARS COMPUTER REPORTING, INC.*
*875 AVENUE OF THE AMERICAS*
*NEW YORK, NY 10001*
*888.845.8700*

*www.MarsReporting.com*

*Original file 092502de, 293 pages*

**Word index included**
**with this condensed transcript**

Page 113

D. Engstrom

1
2  not. I'm not sure about this power supply is
3  included in the package or not, but that's the
4  detail.
5       MR. DAVID:  I'm going to mark as
6  the next numbered Exhibit, 203, a
7  multi-page document produced under Sony
8  Bates numbers 150541 through 150575, a
9  document entitled Agema Infrared
10  Systems, Thermovision 400 Series
11  Operating Manual.
12       On the rear page of which --
13  change that. It's on the front page of
14  this document, but which would be the
15  rear page of the brochure when folded
16  over, it says a number, John Carr &
17  Associates Printed in England.  Would
18  you mark it?
19       (Whereupon, Defendant's Exhibit
20  203 was received and marked for
21  Identification.)
22       MR. DAVID:  I would note for the
23  record also that on page Bates numbered
24  150543 it says Copyright 1989.
25       Q.  Now, a few moments ago,

Page 114

D. Engstrom

1
2  Mr. Engstrom, we were talking about operating
3  manuals.
4       A.  Yes.
5       Q.  And a picture of one was shown on
6  a previous document that you held up for the
7  videographer.
8       From your own personal knowledge
9  was it, in fact, the practice of your company
10  to provide an operating manual when you sold
11  the product?
12       A.  Yes.
13       Q.  Okay. And this particular
14  operating manual that we have marked
15  Exhibit 203, where was this particular one
16  obtained from?
17       A.  This particular one is also from
18  marketing department.
19       Q.  And just to go through the same
20  questions I -- I asked you before, was it the
21  practice of the company to produce operating
22  manuals at or near the time the product was
23  being sold?
24       A.  Yes.
25       Q.  And would the operating manual

Page 115

D. Engstrom

1
2  have been made from information transmitted by
3  persons, people or persons with knowledge of
4  the subject matter?
5       A.  Yes.
6       Q.  And was it kept -- are operating
7  manuals kept in the course of regularly
8  conducted business activity?
9       A.  Yes.
10       Q.  And was it the regular practice of
11  your company to, in fact, make these types of
12  documents?
13       A.  Yes.
14       Q.  Namely the operating manuals?
15       Okay. And this says Thermovision
16  400 series. Earlier you mentioned that you had
17  a 450 that preceded the 470?
18       A.  Yes.
19       Q.  Okay. With this manual, was this
20  manual intended to cover both?
21       A.  Yes.
22       Q.  Okay. Can you point out for us
23  where it would be -- start to become unique for
24  the -- for the 470?
25       A.  There is a Section 4 in this

Page 116

D. Engstrom

1
2  manual called Image Recording. And I imagine
3  it would be different between the two systems.
4       Q.  Okay. Could I draw your attention
5  to the Bates number 150562, section -- is that
6  the Section 4, recording section that you were
7  referring to?
8       A.  6 --
9       Q.  150562.
10       A.  61, 62 -- yes, it is.
11       Q.  Okay. Now, if you turn the page
12  to Sony 150563, it has a heading Image
13  Recording, and then -- then the second full
14  paragraph it says Floppy Disk Recording (470
15  model only).
16       A.  Yes.
17       Q.  Okay. Is this the portion of
18  the -- strike that.
19       In fact, lower on the page, could
20  you hold that up to the videographer. Does the
21  operating manual, in fact, include a black and
22  white drawing of the very -- 470 camera that we
23  marked as 194? I don't mean the very same one,
24  but the same type of product?
25       A.  Yes, it is.

Page 121

D. Engstrom
1
2    MR. DAVID:  Good time for a break.
3    VIDEO TECHNICIAN:  We are going
4  off the record, it is 10:28.
5    (Whereupon, a short recess was
6  taken.)
7    VIDEO TECHNICIAN:  We are
8  officially going back on the record, the
9  time is now 10:45.
10 BY MR. DAVID:
11   Q.  Back on the record, we were
12 discussing the operators' manual, operating
13 manual, Exhibit 203 before the break, correct?
14   A.  Yes.
15   Q.  Couple of questions I wanted to
16 ask you in terms of the -- the practice of your
17 company to include a -- an operating manual.  I
18 think I asked you was it the practice of your
19 company to include an operating manual with the
20 sale of each product?
21   A.  Yes, you did, and I said yes.
22   Q.  Okay.  That would include to the
23 United States as well?
24   A.  Sure.
25   Q.  Now, continuing with the operating

Page 122

D. Engstrom
1
2  manual, I would like to draw your attention to
3  page -- which is Bates numbered 150559.
4    Earlier this morning when you were
5  describing the functions of the 470 camera we
6  had discussed the magnification option; do you
7  recall?
8    A.  Yes.
9    Q.  Okay.  And is that indicated in
10 the instruction manual as well on this page?
11   A.  Yes, it is.
12   Q.  Okay.  Could you indicate what --
13 just read into the record where it says
14 magnification?
15   A.  "Press the switch to select x2
16 magnification function.  This switch has a
17 toggle function between normal image and x2
18 magnification."
19   Q.  Okay.  And is that accomplished in
20 the manner you described this morning?
21   A.  Yes.
22   Q.  Okay.  I just want to -- if you
23 could, could you demonstrate that on the actual
24 model that we have here, Exhibit 194, how you
25 actually toggle between the mag -- or not

Page 123

D. Engstrom
1
2  mag --
3    A.  Just press once and again.
4    Q.  That's the toggle switch between
5  magnification and regular?
6    A.  Yes, it is.
7    Q.  Also, I'd like to draw your
8  attention to page 150555 and -- and also the
9  first half of the next page.  I seem to see a
10 lot of images reproduced.
11     What -- what are shown on those
12 pages?
13   A.  The different images shows
14 different -- I'll say different pallets, if you
15 would call it like that.
16   Q.  Okay.  And -- and are they actual
17 screen shots?
18   A.  Yes.
19   Q.  Okay, good.  I wonder if you could
20 hold that page up for the video and point to
21 the actual screen shots that you're referring
22 to.
23     And by screen shots, do you mean a
24 photograph of the actual display?
25   A.  I'm not sure how this is done, but

Page 124

D. Engstrom
1
2  I would say it's a -- it's a photograph.
3    Q.  And is the date that those various
4  photographs -- do they appear in the screen
5  shots themselves?
6    A.  They appear, yes, they do.
7    Q.  Could you read the dates that
8  those screen shots appear on those images?
9    A.  They're all from January 19, 1989.
10 And they have different seconds and minutes on.
11   Q.  Was your department and you
12 particularly involved in providing either
13 input, or reviewing, and making sure that books
14 described in these operating manuals was
15 accurate?
16   A.  Yes.
17   Q.  Okay.  And this has been
18 something -- and this is a document, then, that
19 you would review at or about the time?
20   A.  I don't recall if I reviewed it,
21 but someone would have brought it in.  It could
22 have been a product leader.
23   Q.  And at the time that this went
24 out, were you comfortable that this accurately
25 represented a product being sold?

31 (Pages 121 to 124)

Page 125

```
                  D. Engstrom
1
2      A.  Yes.
3      Q.  Being sold in 1989?
4        MR. HOLDREITH:  Objection to form
5    and foundation.
6      A.  Again, please.
7      Q.  Yes.  At the time that this was
8    prepared, based on your review of either drafts
9    or information that was going into it, were you
10   comfortable that the manual was accurately
11   describing the camera at the time?
12     A.  Yes.
13       MR. HOLDREITH:  Objection to form,
14   foundation.  Misstates testimony.
15     Q.  And you answered yes?
16     A.  Yes.
17     Q.  Okay, fine.
18       And how about today in terms of
19   your review of this manual, have you found that
20   it's generally accurate with respect to the
21   product that was being sold in 1989?
22     A.  Yes, it is.
23     Q.  Okay.  Lastly with respect to this
24   particular model that we have marked as
25   Exhibit 194 that's on the table right here now,
```

Page 126

```
                  D. Engstrom
1
2    it is correct that you cannot verify that this
3    was a product that was actually sold in 1989,
4    correct?
5      A.  I can't do that personally, no.
6      Q.  You cannot do that personally?
7      A.  No.
8      Q.  And as you sit here right now, you
9    cannot say that this product itself was a
10   product that was actually built and sold in
11   1989; is that correct?
12     A.  This unit?
13     Q.  Yes, this very unit.
14     A.  I can't say that.
15     Q.  You cannot say that?
16     A.  No.
17     Q.  Correct, okay.  I understand that.
18       But what I wanted to ask you is
19   whether or not in terms of the -- the features
20   that you've described, in the manner of
21   operation that you've described as you've
22   testified with respect to this type of product
23   represented by Exhibit 194, was your testimony
24   accurate to the extent that this product, which
25   is marked 194, may be said to be representative
```

Page 127

```
                  D. Engstrom
1
2    of the products that you know were sold in
3    1989?
4      A.  Yes.
5        MR. HOLDREITH:  Objection to form.
6    I'm sorry, Mr. Engstrom.  I need to get
7    those objections on the record so we can
8    sort them out later with the court.  I
9    don't mean to interrupt you.
10       MR. DAVID:  Okay.  Oh, I did want
11   to mark another exhibit here during a
12   break.  And I showed Mr. Holdreith --
13   a notice of deposition that was filed
14   with the clerk's office in Delaware, and
15   indicated it as being served on his
16   local counsel and Jake himself back in
17   September 13th.
18       So I ask the reporter to mark
19   this, we'll say -- we'll mark it 193A, a
20   copy of the -- actually the filed notice
21   of deposition indicating service on both
22   Mr. Holdreith and his local counsel.
23       (Whereupon, Defendant's Exhibit
24   193A was received and marked for
25   Identification.)
```

Page 128

```
                  D. Engstrom
1
2      Q.  And for the record, the difference
3    between the two, 193A and 193, the Bates
4    numbers of the documents appear on
5    Exhibit 193A.  Okay.
6        MR. HOLDREITH:  Counsel, just for
7    a clear record, you had already
8    substituted a copy with Bates numbers as
9    Exhibit 193.
10       MR. DAVID:  I'm sorry.
11       MR. HOLDREITH:  The difference I
12   observe is 193A appears to be executed
13   by your Delaware counsel and appears to
14   be good service.
15       MR. DAVID:  Okay, that's fine.
16   That's accurate.  That's appropriate.
17   BY MR. DAVID:
18     Q.  Let me go back a little bit.  I'd
19   like to finish up your testimony, Mr. Engstrom,
20   with a little bit of the history leading up to
21   the 470 that you have alluded to in some of
22   your deposition.
23       And in particular, you did mention
24   a TIC-8000, and there's a rudder system,
25   correct?
```

32 (Pages 125 to 128)

US006323899B1

(12) **United States Patent**
Roberts et al.

(10) Patent No.: **US 6,323,899 B1**
(45) Date of Patent: **\*Nov. 27, 2001**

(54) **PROCESS FOR USE IN ELECTRONIC CAMERA**

(75) Inventors: **Marc K. Roberts**, Burke; **Matthew A. Chikosky**, Springfield; **Jerry A. Speasl**, Vienna, all of VA (US)

(73) Assignee: **St. Clair Intellectual Property Consultants, Inc.**, Grosse Pointe, MI (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/541,285**

(22) Filed: **Apr. 3, 2000**

**Related U.S. Application Data**

(63) Continuation of application No. 08/651,562, filed on May 22, 1996, now Pat. No. 6,094,219, which is a continuation of application No. 08/098,787, filed on Jul. 29, 1993, now Pat. No. 5,576,757, which is a continuation of application No. 07/878,603, filed on May 5, 1992, now abandoned, which is a continuation of application No. 07/615,848, filed on Nov. 20, 1990, now Pat. No. 5,138,459.

(51) Int. Cl.[7] .............................................. H04N 5/225
(52) U.S. Cl. .......................... 348/220; 348/231; 348/207
(58) Field of Search .................................... 348/207, 220, 348/221, 222, 230, 232, 233, 239, 231, 552; 358/909, 906.1; H04N 5/225

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,758,883 | * 7/1988 | Kawahara et al. | 348/222 |
| 5,016,107 | * 5/1991 | Sasson et al. | 348/231 |
| 5,034,804 | * 7/1991 | Sasaki et al. | 348/232 |
| 5,153,730 | * 10/1992 | Nagasaki et al. | 348/231 |
| 5,764,286 | 6/1998 | Kawamura et al. | 348/232 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 1-114286 | 5/1989 | (JP) . |
| 1-248785 | 10/1989 | (JP) . |
| 2-146874 | 6/1990 | (JP) . |
| 2-202782 | 8/1990 | (JP) . |
| 2-208779 | 8/1990 | (JP) . |
| 2-222385 | 9/1990 | (JP) . |
| 2-257780 | 10/1990 | (JP) . |

* cited by examiner

*Primary Examiner*—Tuan Ho
(74) *Attorney, Agent, or Firm*—Harness, Dickey & Pierce, P.L.C.

(57)                  **ABSTRACT**

A process for use in an electronic camera generates a digital image signal corresponding to an image incident on an image pick-up unit of the camera, formats the digital image signal in one of a plurality of computer image file formats and stores the formatted image file in a storage device of the camera.

**4 Claims, 11 Drawing Sheets**



Case 1: Patent 436-JJ   Document 36-1   Filed 07/13/2005   Page 30 of 46



FIG. 1

PRIOR ART

FIG. 2

Case 1:04-cv-01436-JJF    Document 59-5    Filed 07/13/2006    Page 31 of 46



FIG. 2A

Case 1:04-cv-01436-JJF    Document 50-4    Filed 07/13/2005    Page 32 of 46



FIG. 3





FIG. 5 A

PIXEL BUFFER 10    FRAME BUFFER 11

FROM CCD ARRAY 1

PIXEL MULTIPLEXER 7

SE    S/H 18    A/D R    8

SE    G    S/H    A/D G

SE    B    S/H    A/D B

TO COMPRESSION PROCESSOR 12

PC    SC ADDRESS & CONTROL LINES    CE    CC    PB    FB

RST    RST    RST    RST

AO-A32 DO-D16    TO DCU 9

780 PIXELS

480 PIXELS

1

VERTICAL ADDRESS & CONTROL LINES

HORIZONTAL ADDRESS & CONTROL LINES

FIG. 4

PS    PIXEL SELECT

SE    SAMPLE ENABLE

CE    A/D CONVERT ENABLE

CC    CONVERT COMPLETE

SC    SAMPLE CLEAR

PB    PIXEL BUFFER ENABLE

RST    RESET

PB    FRAME BUFFER ENABLE

CLOCK

FIG. 5B



FIG. 6

FIG. 6A

FIG.6B

Case 1:04-cv-01436-JJF    Document 50-6    Filed 07/13/2005    Page 35 of 46



FIG. 6C

FIG. 7

Case 4:04-cv-01436-JJF    Document 56-8    Filed 07/13/2006    Page 37 of 46



INPUT IMAGE FRAME

RGB TO CHROMINANCE/LUMINANCE CONVERSION

PERFORM DISCRETE COSINE TRANSFORM (DCT)

FORMAT OUTPUT COEFFICIENTS

PERFORM HUFFMAN CODING

PERFORM OUTPUT FORMATTING

OUTPUT COMPRESSED IMAGE TO MEMORY

FIG. 8

FROM 10 PIXEL BUFFER

FRAME BUFFER STACK 11A

MOST RECENT IMAGE FRAME (LAST)

FIRST IMAGE FRAME

IMAGE FRAMES

TO 12 COMPRESSION PROCESSOR

RAM MEMORY

FIG. 13

Commercial Still Video Camera    Video Diskette (Analog format)    Video Format Translator    Diskette (Digital format)    PC

FIG. 10

U.S. Patent    Nov. 27, 2001    Sheet 8 of 11    US 6,323,899 B1



FIG. 9

FIG. 11

Case 3:04-cv-01436-JM    Document 30-4    Filed 07/13/2005    Page 38 of 46



FIG. 12

Case 1:04-cv-01436-JJF    Document 53-5    Filed 07/13/2006    Page 39 of 46



FIG. 14A



FIG. 14B

1

# PROCESS FOR USE IN ELECTRONIC CAMERA

This is a continuation of U.S. patent application Ser. No. 08/651,562, filed May 22, 1996, U.S. Pat. No. 6,094,219, which is a continuation of U.S. patent application Ser. No. 08/098,787 filed Jul. 29, 1993, U.S. Pat. No. 5,576,757 which is a continuation of U.S. patent application Ser. No. 07/878,603, filed May 5, 1992, now abandoned, which is a continuation of U.S. patent application Ser. No. 07/615,848, filed Nov. 20, 1990 and now U.S. Pat. No. 5,138,459.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

This invention generally relates to an electronic still video camera and in particular to an improved electronic still camera which converts a still picture of an object or scene into an operator selectable compressed digital signal format for storage utilizing a compression/decompression algorithm, such as the Joint Photographic Experts Group (JPEG) algorithm standard for example, formatted into Personal Computer (PC) compatible format retaining the images' color information, and stored on a PC compatible memory diskette. For example, the diskette can be a three and a half (3½) inch digital diskette. The digital diskette is removeable from the electronic camera for direct insertion into a PC which contains the previously loaded corresponding decompression algorithm whereby the digital image is in a format compatible for immediate use with word processing, desk top publishing, data base, and multi-media applications.

### 2. Description of the Prior Art

FIG. 1 is a schematic block diagram showing structure of a conventional prior art electronic still camera system, in which a CCD image sensor element 1a converts a still image of an object into an analog color video signal when the shutter control circuitry 2a is activated. The output color video signal of the image sensor element is then routed to the signal processing subsystem 3a where the signal is converted to National Television System Committee (NTSC) or other composite video formats (such as the European video standard Phase Alternating Line-PAL) and logged in analog format onto a mass memory storage device such as an analog video floppy disk, Electrically Erasable Programmable Read Only Memory (EEPROM), analog audio cassette, bubble memory, or other storage device 5a. Power is supplied by a rechargeable/removeable battery system 4a.

An electronic camera that converts an image into electronic image signals and transferred to a memory storage device is disclosed in the following: U.S. Pat. Nos. 4,131,919; 4,456,931; 4,758,883; 4,803,554; and 4,837, 628.

Conventional prior art electronic still cameras, for example of the types disclosed in the aforementioned references, produce an electronic signal corresponding to a desired image in analog format such as the National Television System Committee (NTSC) or similar on magnetic or electronic storage media for either permanent or temporary storage to facilitate viewing on a television or video monitor. With the current state of the art, it is expensive and time consuming to convert the analog image equivalent to a digital format for direct utilization with PC software applications. Currently, to convert an image captured on an electronic still camera to a PC compatible format one must convert the signal back to either a composite NTSC or RGB video signal and use a conversion device such as a "frame grabber" (a digital circuit board installed into PCs that

2

convert video images into PC compatible formats) of the type sold commercially by Aapps Corporation, Orange Micro, RasterOps, and others or convert the image to a hard-copy print (a photograph) and utilize an electronic "scanner", a piece of equipment that connects to a PC, which converts an image into a digital format. The later technique is employed extensively within the desktop publishing industry.

## SUMMARY OF THE INVENTION

It is the object of this invention to provide an improved electronic still camera with operator selectable picture compression in one of a plurality of operator selectable digital data formats recordable on a standard removeable magnetic diskette common to personal computers.

It is a further object of this invention to provide an improved electronic still camera that provides digital image files for immediate and direct incorporation into popular word processing, desktop publishing, and other software programs on PCs.

It is another object of this invention is to provide an improved electronic still camera that, under user selection, can record and store still images selectively compressed in a directly insertable digital memory storage device into a PC in either color or black and white formats thus facilitating storage of a large number of images with the signal flag indicating the degree of compression selected by the operator as well as the color/black and white mode selection being stored as digital values on the digital memory storage device with each image frame.

An additional object of this invention to provide an electronic still camera device that can rapidly capture a series of images automatically as well as singularly. Also, this camera provides multiple outputs in both video format for monitor and display of images and digital formats to facilitate data transmission, additional processing, or storage to a variety of storage media.

It is still another object of this invention is to provide a more efficient electronic still camera that can take a still picture with operator selectable high, medium, or low resolution in either color or black and white by electronic shutter and exposure control by utilizing a variety of electro-optical sensors including Charge Coupled Devices (CCD), Infrared (IR), and Ultra Violet (UV) which can be directly or remotely controlled by analog, digital, or radio frequency (RF) control signals.

A further object of this invention is to provide a programmable video picture translator device for efficiently converting electronic still images in analog composite video format into digital data format readable by a PC. This translator device also provides additional video inputs and outputs for capturing video images, monitoring video images on monitors and displays, and can transmit either compressed or unprocessed digital image data through a variety of output I/O channels in various formats such as serial, parallel, etc. Also, this invention can incorporate sound/voice with images thru additional interface circuitry and audio digitizers.

Finally, it is the object of this invention to provide an electronic still camera that is efficient in design and permits extended periods of portable operation and which provides the user with operational status through the use of continuous internal self-test software routines and operator displays.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic block diagram of a conventional prior art electronic still camera.

3

FIG. 2 is a schematic block diagram of the of the overall structure of an electronic still camera embodying the present invention.

FIG. 2A is an illustration showing one embodiment of an audio data file, data format flag, compression level, and color/black and white mode selection values stored on a digital memory diskette storage device.

FIG. 3 is a flowchart showing the power-up and continuous self-test sequence in accordance with one aspect of the present invention.

FIG. 4 is an example of a ½" CCD array utilizable in accordance with one aspect of the present invention.

FIG. 5A is a schematic block diagram showing the image signal to digital signal conversion logic in accordance with one aspect of the present invention.

FIG. 5B is a logic and timing diagram for the image signal to digital signal conversion logic in accordance with one aspect of the present invention.

FIG. 6 is an example of the control panel logic in accordance with one aspect of the present invention.

FIG. 6A is an example of one embodiment of switch logic of the control panel switches and controls utilizable in accordance with one aspect of the present invention.

FIG. 6B is an example of the PICT image file format based upon the published standard provided by Apple Computer, Inc.

FIG. 6C is an alternate embodiment of the current invention embodying remote operation.

FIG. 7 is a simplified block diagram of the digital control unit in accordance with one aspect of the present invention.

FIG. 8 is a flowchart showing the steps of the image compression algorithm in accordance with one aspect of the present invention.

FIG. 9 is a block diagram of a video format translator device in accordance with one aspect of the present invention.

FIG. 10 is a block diagram illustrating the operation of a translator device in accordance with one aspect of the present invention.

FIG. 11 is an alternative embodiment of the video format translator in accordance with another aspect of the present invention showing additional video inputs and data outputs.

FIG. 12 is an alternate embodiment of the invention showing an optional diskette format utility flowchart.

FIG. 13 is an alternate embodiment of a frame buffer utilizable in accordance with another aspect of the present invention showing a frame buffer stack permitting multiple shot mode.

FIG. 14A is a block diagram of an embodiment of the format select logic in accordance with one aspect of the present invention.

FIG. 14B is a flow diagram illustrating the steps of the format selection logic operations.

DESCRIPTION OF THE PREFERRED EMBODIMENT

FIG. 2 is a schematic block diagram of the preferred embodiment of an electronic still camera in accordance with the principals of the invention. Referring to FIG. 2, an image optical pick-up element 1, which for example could be a Charge Coupled Device (CCD) (or an Infrared (IR) or Ultraviolet (UV) sensor), converts a still image of an object into an electric signal when a picture "shoot" command is

4

initiated by the operator via control panel 2. When taking a picture, focusing and shutter speed are controlled by a lens system and shutter speed selection mechanism under control of the digital control unit 9. The camera, like other still video cameras, employs an electronic shutter system that controls a charge storage time in a CCD array onto which an image of an object is focused through the lens system.

When the "shoot" control 6 is half depressed (see FIG. 6), a power supply voltage is supplied from the rechargeable batteries 4 to the electronic circuits and digital control unit 9, control panel 2, and the disk drive assembly 5. The exposure control circuitry not shown generates appropriate horizontal and vertical transfer pulses as well as field shift pulses under control of the reference clock timing and control signals provided by the digital control unit 9 type for driving the CCD device and pre-processing circuitry. This design may be of any type well known in the art for example those cited in U.S. Pat. Nos. 4,131,919 and 4,456,931 and any similar designs well known in the prior art.

An alternate embodiment of the present invention that provides remote operation of the camera is shown in FIG. 6C. When remote "Shoot" control 30 is activated by any means for example manually, or by radiant, or electronic energy, a control signal is generated and routed through the external jack 31, located on the external camera body. The external control 30 is electrically connected to the external jack 31 by a twisted-pair conductive cable assembly that is familiar to those skilled in the art. Upon receipt of the externally generated "shoot" command, the relay switch 32 is activated and provides internal switch closure. This closure of switch 32 then initiates the process previously described and provides the half V+ voltage previously described. The full V+ is provided via the fixed delay 33, the value chosen to allow the diskette drive assembly 5 (FIG. 2) and associated control circuitry to initialize prior to receiving image data.

When the "shoot" control is fully depressed in either embodiment, the shutter controller 15 (FIG. 6) generates a shutter pulse that generates control signals for the A/D converters 8 allowing the image/picture data signal in the sample and hold circuitry of the pixel multiplexer 7 to be converted into a digital signal. Control and address instructions of the type well known in the art are generated from the digital control unit 9 to facilitate the storage of the digital image data within the pixel buffer 10 and frame buffer 11. Upon completion of image conversion, the contents of the frame buffer are transferred to the compression processor 12 which for example may be of the many versions currently offered commercially such as C-Cube's (San Jose, Calif.) four chip Application Specific Integrated Circuit (ASIC) set. In the compression processor 12, the Joint Photographic Experts Group (JPEG), a part of the International Standards Organization (ISO) which is a subset of the International Telegraph and Telephone Committee (CCITT), image compression algorithm fully described in Report # JTC1/SC2/WG8 dated 1985 is performed under control of the digital control unit 9 to compress the size of the image. A variable selectable compression ratio of up to 50:1 is performed on the digital image frame. Other compression ratios are operator selectable via the control panel 2 switches 14A and 14B (FIG. 6). The compressed digital frame is then formatted into either an IBM PC/Clone (such as GIFF) or Apple Macintosh (such as PICT II) image file format depending on the setting selected by the operator for a user switch 17 (FIG. 6) position on the control panel 2. After formatting, the file is written into a temporary memory buffer within the disk input/output (I/O) interface circuit 13 which, under the

5

command of the digital control unit 9, controls the high density (1.4 Mbyte storage capacity) disk drive unit 5. Following file transfer to the diskette e.g., the frame counter display 22 on the control panel 2 is updated by appropriate control signals and the camera is ready to undergo the same procedure for the next image. Power to the electronic circuits and disk drive system is terminated following release of the "shoot" control switch 6.

In accordance with the preferred embodiment of this invention, it is permissible for the user to select various resolution quality image recording levels with the higher levels being at the expense of memory diskette storage capacity. The position of switches 14A and 14B for example could represent a unique digital mark or word that denotes the respective switch position and is sensed during initial power application and periodically during operation. FIG. 6A illustrates typical logic AND gate circuits 60a and 60b utilizable in conjunction with switches 14A and 14B or switch 17 to generate appropriate signals to designate respective switch positions and generate appropriate control signals from. The switch positioned in the High position for high resolution allows only four to five images to be stored, while Med. switch position for medium resolution allows approximately twenty five images to be stored, and Low for low resolution allows up to fifty images to be stored on a single diskette. Also, by selecting black and white mode instead of color via switch 14B, the operator may select additional storage capacity since storage is increased by a factor greater than three (one element per pixel versus three for color). Various image resolution combinations are permissible because the operator can select a different resolution and mode setting for each image prior to image signal capture. This is accomplished by marking or "tagging" each image frame data information signal with the resolution and mode of each image as it is written onto the memory diskette in any suitable manner, for example as shown in FIG. 2A. With reference to FIG. 2A, diskette 50 has tracks 51a, 52b, . . . 52n. With reference to track 52b there is shown a representative portion of segment 53 depicting a typical image file information format having digital bit 54 depicting color mode, and digital bits 55 representing compression resolution level markings or tags. With reference to color mode tag 54 it can be seen that if switch 14B is in the color position tag 54 is recorded as a logical "one" or true-conversely if bit 54 is recorded as a logical "zero" it corresponds to the black and white position of switch 14B. Similarly as shown switch 14A would record in memory position 55 a binary "zero" for low resolution, a binary "one" for medium resolution and a binary "two" for high resolution selections by the operator. By incorporating this "tagging" approach, it is possible for the decompression algorithm, loaded into any PC prior to use or written onto the memory storage diskette along with the image data, to automatically determine the appropriate level of compression associated with image file and execute decompression efficiently.

Still another alternate embodiment in accordance with this invention incorporates an acoustic digitizer circuit which digitizes sound. There are several digitizers commercially available such as the Apple Computer Inc. Musical Instrument Data Interface (MIDI) adaptor. The output of this digitizer may be selectively connected to the CPU 20 (FIG. 7) via an additional I/O interface similar to the auxiliary I/O interface 80. The sound or audio associated with each image can be recorded, digitized, and stored on the diskette device on available tracks in an identical manner previously described (FIG. 2A). An image file in accordance with this

6

embodiment would be appropriately marked or tagged with the corresponding digitized audio file 56 (FIG. 2A). Upon playback on a sound configured PC, both the image and the corresponding audio would then be viewed and heard simultaneously.

It should be noted that a major advantage a camera in accordance with the present invention has over conventional still video cameras is that a camera according to this invention is capable of storing multiple digital images in semiconductor memory temporarily at a rapid rate while, simultaneously, the image compression processor 12, file formatter software algorithm, and disk I/O interface 13 that stores formatted files continue to function in concert together at a slower rate. This efficient design coupled with VLSI low power, high speed semiconductor memory devices (10 & 11 FIG. 5A and 24 FIG. 7) allows this operational capability.

Like most other still video and conventional film cameras, when the "shoot" control 6 (FIG. 6) is fully depressed, a control signal is generated from the digital control unit 9 that generates a trigger signal on the control panel 2 to cause a flash unit 16 (FIG. 6) to irradiate a flash of light onto the subject image.

During initial camera operation, the user first inserts a diskette such as a standard three and a half inch or similar storage medium. Various memory diskette sizes and formats are suitable for the invention. However, for the preferred embodiment either a double-density (800 Kbytes of storage) or a high-density (1.4 Mbytes of storage) diskette in a three and a half inch format which are readily available from various commercial sources such as Sony, Maxell, and Verbatim. The user must then select the desired PC format (IBM PC/Clone or Apple Macintosh, etc.) via switch 17 (FIG. 6) on the control panel 2. As shown in FIG. 3; after turning on the power switch or inserting a diskette 50, the digital control unit 9 performs a self test of all internal circuitry, battery, disk drive unit, and control panel. Should any failures be detected, an appropriate error indicator is illuminated on the control panel. During the power-on sequence (see FIG. 3 and FIG. 12), the inserted diskette 50 is automatically checked for formatting consistencies in accordance with the format selected by the format switch 17 on the control panel 2 (IBM/Apple/etc.) and for available storage space by checking the boot block on the diskette, a technique that will be familiar to those skilled in the art. Should any inconsistencies be detected, an error indicator is illuminated on the control panel (ie, disk full, unformatted, etc.). The operator frame counter display 22 (FIG. 6) is then updated to show the maximum number of pictures available based upon indicated operator selections (color/black and white), diskette type (double versus high density), and capacity (partially full versus empty diskette). During operation, the operator can selectively erase a frame and record over it if desired by selecting the erase mode of operation from the control panel and toggling the forward/reverse control.

The optics for the preferred embodiment of the invention is a commercially available one-half inch (½") color CCD device having a pixel grid array of 780×488 as pictorially depicted in FIG. 4. This results in 380,640 pixel elements which results in a commercially acceptable quality resolution image as will be understood by those skilled in the art. In a color imaging device (CCD array) photoelectric elements, such as photodiodes, are arranged in a two dimensional array with optical filters for R (red), G (green), and B (blue). Various arrangements of optical filters are well known and the arrangement of optical filters is not limited to

7

a particular one with this invention. During operation each pixel stores a charge corresponding to the amount of incident light. The RGB components of each pixel's charge is sequentially read out via a horizontal/vertical addressing scheme that will be familiar to those skilled in the art.

As shown in FIG. 5A; each charge, when addressed, is amplified and processed in a sample and hold (S/H) circuit 18. The analog voltage in each S/H circuit is digitized by an associated analog to digital (A/D) converter 8. The digital values are routed and collected in the pixel buffer 10. Following completion of discrete pixel element conversion and subsequent formatting in the pixel buffer which is under Control Processor Unit (CPU) 20 software control, the output of the full pixel buffer is routed to the frame buffer 11 by digital control unit 9. This process continues until a complete frame is collected within the frame buffer. The general digital logic and timing and control signals for this circuitry is shown in FIG. 5B. The timing is provided by a master clock that is an integral part of the CPU microprocessor. For example, the MOTOROLA 68040 microprocessor has a clock speed of approximately 40 Megahertz (MHZ) which results in a clock period of 25 nanoseconds (nsec.). This clock pulse is used by the function and address decoder 19 (FIG. 6) to generate the address and control signals shown in FIG. 5B as would be understood by those skilled in the art. The circuit of the present invention may be designed by one skilled in the art to function with a variety of microprocessor architectures and is not limited to any one in particular. One can see from the timing chart that the S/H circuit is allowed (via the SE command) to charge to a voltage level indicative of the analog voltage impinging upon the pixel element (via the PS command). After a fixed time period, the A/D converters are enabled(via the CE command) to begin conversion of the analog voltage value on the S/H. Upon completion of conversion, a conversion completion signal (CC) is generated by the A/D and routed back to the S/H circuit (via the SC command which is generated by the function and address controller 19) to discharge the stored analog voltage in anticipation of the next pixel element conversion process. Next, the output of the A/D converter 8 is clocked into the pixel buffer 10 (via the PB command). When the pixel buffer 10 is full, the output is clocked out to the frame buffer 11 (via the FB command) and the pixel multiplexer address circuitry selects the next pixel for conversion. Reset signals (RST) are sent to all circuit elements to allow these devices to reset prior to receiving the next analog value.

Another novel concept of the present invention as illustrated in FIGS. 5A and 5B utilizes a technique of paralleling the S/H and A/D devices for each pixel element thus accelerating the image signal analog-to-digital conversion process. This is accomplished by eliminating the serial S/H and A/D path typical of prior art still video camera designs. In addition, high-speed, low-power devices available from Sony, Burr-Brown, Datel, Analog Devices, and others facilitate the increased conversion throughput of the S/H and A/D circuits with pixel conversion times of less than 150 nanoseconds (nsec.). For example, Sony's video A/D converter Device part number CXA1016P/K performs up to 50 million samples per second or 20 nsec. per conversion. This device, or similar, may be used in the preferred embodiment of the present invention. As explained previously, prior art still video camera designs multiplex each signal component into a common/singular A/D path to reduce the number of components and power consumption. However, in accordance with another aspect of the present invention components such as C-MOS and ECL devices coupled with min-

8

iaturized packaging techniques such as surface mount devices (SMD) and ASIC technology make it feasible to incorporate these devices in a parallel design in order to realize a substantial increase in conversion speed with no appreciable increase in power consumption. Therefore, this design approach provides significant conversion throughput increases over previous designs.

The extremely high conversion speed in accordance with another concept of the present invention makes multiple high-speed camera operation possible in an alternate embodiment. For example, total conversion time required for the aforementioned CCD array utilizing the circuit of the present invention (FIG. 5A) requires approximately 380, 640×150 nsec. or 38 milliseconds (msec.). Additional time (approximately 5 msec.) is required for timing and control signal latency. Thus, total conversion time for a complete image frame prior to compression processing and logging to the memory storage diskette 50 is less than fifty msec. This allows for approximately 20 images to be captured in a one second period. By adding additional RAM 11A (FIG. 13) or other forms of commercially available random access memory to the frame buffer 11, image frames could be "pushed" onto a semiconductor memory stack for temporary storage allowing the compression processor and data interface circuitry to perform their respective functions at a slower rate. As shown in FIG. 13, each unprocessed image frame would be recorded or "pulled" from the stack on a "First-In, First-Out" (FIFO) manner until all images in the stack queue were processed and written to the storage diskette via the disk I/O circuitry 13.

As shown in FIG. 6, control panel settings are monitored by the CPU 20, a microprocessor, thus allowing the appropriate timing, control, and signal processing to be effected properly. The microprocessor 20 may be of type 68040 manufactured by MOTOROLA, Intel's 80386 series, or equivalent microprocessors which specifications are commercially available and are incorporated herein by reference. The microprocessor utilization of this invention, which is in the digital control unit 9, transmits commands and status to specific controls, functions, and displays in the control panel as well as receiving both circuit status/control data and operator commands through polling the operator switch settings 14A, 14B, and 17 via the bidirectional function and address decoder 19. This approach allows the user to know immediately how much storage capacity remains in the image storage diskette 50 as well as the camera's overall operational and functional status through the use of status displays 21, 22, and 23 and ongoing software self-tests running in the background as depicted in FIG. 3. An example of this would be a low battery situation. First, the digital control unit 9 would detect a failure in the self-test mode. Next, the self-test light emitting diode 21 (FIG. 6) would be illuminated and an appropriate error display would be illuminated in the status display 22 thus providing the user with an exact indication of the error. Another example illustrating the operation of this embedded microprocessor type of control approach is the format switch 17 (FIG. 6). The position of the format switch 17 is sensed upon power application. Following diskette insertion, the boot block on the diskette is compared with the format switch 17 setting (IBM/clone or Apple) and if the format does not match or if the disk 50 is unformatted, the disk format status light emitting diode 23 would be illuminated and an appropriate error display would be illuminated in the status display 22 thus prompting the user to take appropriate corrective measures.

An alternate embodiment of the present invention involves adding an auxiliary I/O interface circuit or port to

9

the digital control unit 9. As shown if FIG. 7, the auxiliary I/O port 80 connects in a manner similar to the Disk I/O interface 13. This additional I/O channel provides for external control and monitor of all timing and control signals internal to the camera. In addition, it allows for the image data to be routed past or around the compression processor out to any additional internal or external device such as an optical disk storage device, digital analyzer, or other data processors that might be desired.

FIG. 7 shows the digital control unit 9. The microprocessor 20 architecture here is typical to one familiar with the art. The frame buffer 11 (FIG. 5A) receives and stores the outputs of the pixel buffer 10 until a complete frame of image data is received. Then, the CPU 20, under software control, issues a control signal to the optics logic in the shutter and control circuitry 15 (FIG. 6) thus resetting those functions for future image recording. The full frame buffer 11, upon command from the CPU 20, transfers it's data into the compression processor 12 (FIG. 2) which performs thousands of levels of parallel pipeline processing on the image data. The compressed image frame is then written out to the mass memory RAM (Random Access Memory) 24 where it is temporarily stored until transferred to the disk drive assembly 5 via the disk I/O interface circuitry 13.

Referring to FIG. 8, a flowchart shows the steps involved in the image compression process performed by the image compression processor 12 (FIG. 2) in accordance with the preferred embodiment of the present invention. The output of the frame buffer 11 is transferred into the input of the image compression processor 12 under the control of the digital control unit 9. As previously described, the setting of switch 14A (FIG. 6) is read by the CPU 20 (FIG. 7) to determine the image resolution quality desired. Depending on the operator selected setting of switch 14A, the unique digital word generated by the AND gate $60a$–$b$ (FIG. 6A) which is activated by the selected position of switch 14A is routed to image compression processor 12 via CPU 20 (FIG. 7) which selects for example a predetermined digital memory location containing the appropriate corresponding compression ratio parameters under program control. The compression processor uses this command value for example to establish the size of the covariance matrix and a threshold for acceptance for the variances produced by the Discrete Cosine Transformation (DCT) transform coefficients. Next, the digital image signals are converted from the RGB format previously discussed in connection with FIGS. 2, 5, and 6 into luminance and chrominance signals. The luminance and chrominance signals subsequently undergo a DCT. The cosine transformed signals are then quantized and are then processed for Huffman coding. The Huffman coded image signals are then formatted into a form that facilitates format processing into various PC compatible formats (GIFF, PICT2, etc.). For a more complete understanding of the image compression process reference may be made to I.E.E.E. Catalog No. EH0231-1, Library of Congress No. 85-60384 published by the I.E.E.E. Society dated 1985 and incorporated herein by reference.

Of the two traditional classes of image compression techniques, spatial coding and transform coding, transform coding techniques lend themselves well for this application due to computational simplicity. Transform coding techniques that provide good visual fidelity include: Karhunen-Loeve transform (KLT), Fourier, cosine, sine, and Hadamard. The KLT algorithm offers the best visual fidelity but suffers from serious computational complications due to extremely large matrix size. Several alternate algorithms that offer reasonable visual fidelity that are computationally

10

feasible for this invention include the Fast Fourier Transform (FFT), Discrete Cosine Transform (DCT), and Discrete Sine Transform (DST). The DCT was adopted by the JPEG as the preferred algorithm due to computational simplicity and performance.

It should be noted that the Joint Photographic Experts Group (JPEG) (composed of experts from many companies including IBM, AT&T, Digital Equipment Corp, and INTEL) compression/decompression standard was developed in 1985 in response to the lack of interoperability between image and processing equipment due to numerous proprietary standards held by each manufacturer. The JPEG standard provides image compression effectively up to 75 times or greater depending on the visual fidelity desired. The JPEG standard is widely used in industry as an alternative to proprietary algorithms such as Intel's own proprietary standard called DVI which was initially developed by RCA before being sold to INTEL, the integrated Circuit manufacturer. INTEL offers it's own firmware compression processor incorporating their DVI standard delivering compression ratios in excessive of 100:1. However, a new international standard called MPEG is due to be announced in the 1991 time frame from the JPEG and should offer compression ratios of 275:1 and greater. In the preferred embodiment of the present invention, the JPEG standard is the preferred algorithm chosen with the incorporation of the the MPEG standard or other similar standard in the future when available commercially. An alternate embodiment of the present invention would be the incorporation of various proprietary compression algorithm standards such as DVI.

The compression/decompression algorithm firmware implementation of the JPEG algorithm is available commercially from various sources including C-Cube, Electronics for imaging, Storm Technology, Burr-Brown, Spectral Innovations Inc., INTEL, and others. The implementation of this algorithm for the present invention may incorporate the integrated circuit set commercially available from C-Cube. Their four chip ASIC JPEG algorithm implementation is performed in three basic steps: first, the image is divided into 8-by-8 pixel squares and applies a discrete cosine transform (DCT) to each square resulting in 64 frequency values; second, these frequencies are put through a quantization algorithm to eliminate unimportant frequencies; third, the remaining values are run through a Huffman coding scheme to encode the most frequently occurring values using the fewest bits. A compatible software implementation of the JPEG algorithm is available commercially from Aladdin Systems, Radius Inc., Kodak, and others.

Those skilled in the art will be familiar with the process and the commercially available software and firmware chipsets that are currently available on the market. The present invention incorporates both available firmware chipsets in the camera and software for use in the PC for decompression. The decompression algorithm can be written onto the camera's diskette 50 prior to any image data recording. This allows the PC user to take the diskette 50 to a PC and directly incorporate the image data because the image file selected by the user is automatically decompressed transparent to the user. The algorithm can be written onto an unused track 52 or sector combination on the diskette as shown on FIG. 2A. Alternatively, the decompression algorithm can be loaded onto a PC before inserting a diskette 50 containing compressed image data. In the latter embodiment the resolution and mode values 54 and 55 (FIG. 2A) for each representative image would be read from diskette 50 in order to appropriately control the selection and activation of the appropriate corresponding decompression algorithm.

US 6,323,899 B1

11

As shown in FIG. 7, the output of the image compression processor 12 is routed to the RAM memory 24 where the compressed image is formatted for either the PICT II or GIFF format depending on the setting of format switch 17 (FIG. 6). It should be noted that a large number of image formats for PCs exist. PICT and GIFF are the most common for the Apple and IBM PC's and are therefore the preferred formats for the present invention although other formats can be easily incorporated into the design by changing the software format routines. These software image formats are commercially available from many sources most notably Apple computers for PICT and IBM for GIFF. An example of the PICT format is pictorially shown in FIG. 6B as will be familiar to those skilled in the computer arts. Once formatting is complete, the formatted image data is transferred to the disk I/O interface 13 for transfer to the magnetic recording diskette 50.

FIG. 9 and FIG. 10 illustrate the preferred embodiment of the video format translator device in accordance with another aspect of this invention that converts other still video camera formats for example on two inch video diskette to this invention's selectable PC compatible digital format. The general concept of operation is shown in FIG. 10. In FIG. 9 correspond parts and subassemblies in translator 40 are shown with like numbers corresponding to FIG. 2 and 6 having a 40 hyphenation prefix designation and such parts and subassemblies perform similar functions to those described above with reference to FIGS. 2 and 6. Referring again to FIG. 9, the translator 40 incorporates the same components utilized in the digital circuit card assembly which houses both the digital control unit 9 and optics processing circuits (pixel multiplexer 7, A/D 8, etc. 10–13). The major difference is that the CCD array 1 is replaced with an input disk drive 25, for example a two inch (2") video disk drive assembly, and an NTSC video format decoder 26 which converts the composite video signal to an RGB format for processing as described previously.

FIG. 11. displays an alternate embodiment of the video format translator device 40 of the present invention that shows optional inputs 27 and outputs 28 and 29. The exact same circuitry is utilized that was used for the translator device 40 as shown in FIG. 9 except that inputs 27 for either an NTSC/PAL format or RGB format video signal is provided. This allows video signals from other sources such as a cable TV, CAMCORDER, or other video signal source to be digitized and archived in a PC compatible format. Also, provisions for video output jacks 28 are made to allow either viewing of the image/video source prior to or during image recording. Finally, provisions are made to provide a data output 29 to allow connection to other PC peripherals such as a communications modem, larger/smaller disk drive assembly, optical disk, specialty display or signal processor/analyzer. Either a standard serial, parallel, or Small Computer Standard Interface (SCSI) data port can be readily connected to the auxiliary I/O interface 80.

FIG. 12 depicts an alternate feature of an embodiment of the present invention that shows how an inserted diskette 50 that is either unformatted or formatted for a undesired (e.g., not corresponding to the setting of switch 17-FIG. 6) PC configuration would be automatically properly formatted for use with a camera in accordance with another aspect of this invention. This capability allows the user of this invention to forego the requirement to pre-format the storage medium (diskette) on a PC prior to using it in the camera operated in accordance with the present invention. With reference to FIG. 3 the power-on sequence process would result in an abnormal diskette format error if the format of an inserted diskette 50 did not correspond to the operator selected format switch 17 (FIG. 6). In accordance with the automatic

12

diskette format option, CPU 20 of digital control unit 9 in response to the abnormal diskette format error would initiate the diskette format process illustrated in FIG. 12. Upon completion of the diskette format process illustrated in FIG. 12, the power-on sequence illustrated in FIG. 3 would continue from step B.

Referring now to FIG. 14A, there is shown a schematic block diagram of the format selection logic in accordance with another aspect of the present invention. During the power-on sequence as described in connection with FIGS. 3 and 12, processor 20 of control unit 9 initiates a format selection switch sample and test routine as more fully described in the flow diagram illustrated in FIG. 14B. Switch 17 is illustrated in FIG. 14A in the Apple PC position and logic level v1 is applied as inputs to logic gates 60c and 60d. As illustrated in FIG. 2A, the format signals 57 for the Apple PC format is a logic "zero" and conversely the format signal or tag 57 if the format switch 17 were in the IBM PC or other computer type position would be a logic "one" and "two" respectively. In response to the logic "zero" indicating Apple PC format, processor 20 accesses a unique memory location XY of format memory 20-2 which for example may comprise any random access memory with two megabytes storage capacity. The data format for the operator selectable predetermined number of computer architectures, similar in content and arrangement to those illustrated in FIG. 6B for an Apple PC would be stored in memory 20-2 which would be addressed in response to the other operator selectable position of switch 17 to generate the other unique codes 57 as shown in FIG. 2A. Processor 20 in response to a stored format subroutine more particularly shown in FIG. 14B contains the allocation of data memory addresses in disk input/output format unit 13 in accordance with the picture image file format as illustrated in FIG. 6B. Thus the digital video data information signals generated by compression processor 12 are appropriately formatted and stored in memory storage disk drive 5 to insure compatibility with the format selected by the operator by selectively positioning switch 17.

Those skilled in the art will recognize the many alterations, additions or changes of the preferred embodiment may be made without departing from the scope of the following claims.

What is claimed is:

1. For use in an electronic camera having an image pick-up unit and a storage device, a process for taking and storing digital pictures, the process comprising:

generating a digital image signal corresponding to an image incident on the image pick-up unit;

formatting the digital image signal in one of a plurality of computer image file formats; and

storing the formatted image file in the storage device.

2. A process as in claim 1, wherein the storage device is removable.

3. For use in an electronic camera having an image pick-up unit and a storage device, a process for taking and storing digital pictures, the process comprising:

selecting one of a plurality of computer image file formats in the camera;

generating a digital image signal corresponding to an image incident on the image pick-up unit;

formatting the digital image signal in the selected computer image file format; and

storing the formatted computer image file in the storage device.

4. A process as in claim 3, wherein the storage device is removable.

* * * * *