EXHIBIT A

1 | Daniel S. Mount, Esq. (State Bar No. 77517)
Justin T. Beck, Esq. (State Bar No. 53138)
2 | Ron C. Finley, Esq. (State Bar No. 200549)
MOUNT & STOELKER, P.C.
3 | 333 West San Carlos
RiverPark Tower, 17th Floor
4 | San Jose CA 95110-2726
Phone: (408) 279-7000
5 | Fax:    (408) 998-1473

*ENDORSED*
2005 JUN 15 PM 8: 00

6 | Attorneys for Plaintiff ~~EASTMAN KODAK COMPANY~~

7 | MIRAGE SYSTEMS, INC.

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF SANTA CLARA

9 | 

10 | MIRAGE SYSTEMS, INC. ~~EASTMAN KODAK COMPANY, a New Jersey corporation,~~

CASE NO. 1-05-CV-039164

11 |            Plaintiff,

12 |      vs.

**AMENDED AND SUPPLEMENTAL COMPLAINT FOR DECLARATORY RELIEF, DAMAGES, RESTITUTION, DISGORGEMENT OF PROFITS AND INJUNCTIVE RELIEF**

13 | JERRY A. SPEASL, an individual, MARC K. ROBERTS, an individual, MATTHEW K.
14 | CHIKOSKY, an individual, ST. CLAIR INTELLECTUAL PROPERTY
15 | CONSULTANTS, INC., a Michigan corporation, and DOES 1 to 50.
16 |            Defendants.

Unlimited Jurisdiction

17 | 
18 | 
19 | 
20 | Plaintiff MIRAGE SYSTEMS, INC. ("MIRAGE") ~~EASTMAN KODAK COMPANY ("Eastman Kodak")~~ by its attorneys, for its

21 | Amended and Supplemental Complaint against Defendants JERRY A. SPEASL, MARC K.

22 | ROBERTS, MATTHEW K. CHIKOSKY, ST. CLAIR INTELLECTUAL PROPERTY

23 | CONSULTANTS, INC., and DOES 1 to 50, alleges as follows:

24 |            <u>NATURE OF THE ACTION</u>

25 |      1.      This is an action in law and equity for the judicial declaration of ownership of and

26 | quiet title to intellectual property — six patents — belonging to ~~Eastman Kodak~~ MIRAGE; for damages and

27 | injunctive relief from the unlawful conversion of ~~Eastman Kodak~~ MIRAGE's patents, fraud, unfair

28 | competition, tortious interference of prospective business opportunity and advantage, and for

1    disgorgement of unjustly gained profits.

2        2.    The six patents at issue are: U.S. Patent Nos. 5,138,459 ("the '459 patent"); 5,576,757

3    ("the '757 Patent"); 6,094,219 ("the '219 Patent"); 6,233,010 ("the '010 Patent"); 6,323,899 ("the

4    '899 Patent"); and 6,496,222 ("the '222 Patent") (collectively, "the Roberts Patents").

5    <u>**THE PARTIES**</u>

6        3.    Plaintiff ~~Eastman Kodak~~ MIRACE is a corporation organized and existing under the laws of the

7    State of ~~New Jersey, having a principal place of business at 343 State Street, Rochester, New York~~

8    ~~14650.~~ California .

9        4.    Upon information and belief, Defendant Jerry A. Speasl ("Speasl") is an individual

10   residing at 4172 Grant Court, Pleasanton, California 94566-7537.

11       5.    Upon information and belief, Defendant Marc K. Roberts ("Roberts") is an individual

12   residing at 497 Cape Alan Drive, Henderson, Nevada 89052.

13       6.    Upon information and belief, Defendant Matthew K. Chikosky ("Chikosky") is an

14   individual residing at 4381 Whippoorwill Drive, Hermitage, Pennsylvania, 16148-3253.

15       7.    Upon information and belief, Defendant St. Clair Intellectual Property Consultants,

16   Inc. ("St. Clair") is a corporation organized and existing under the laws of Michigan, having its

17   principal place of business at 10 Stratford Place, Grosse Pointe, Michigan 48230.

18       8.    Plaintiff is ignorant of the true names and capacities of Defendants sued herein as

19   Does 1 through 50, inclusive, and therefore sues these Defendants by such fictitious names. Plaintiff

20   will amend this Complaint to allege their true names and capacities when ascertained.

21       9.    Upon information and belief, each Defendant is responsible in some manner for the

22   occurrences herein alleged, and Plaintiff's damages as herein alleged were proximately caused by

23   such Defendants.

24   <u>**JURISDICTION AND VENUE**</u>

25       10.    This Court has jurisdiction over this action, the allegations of harms which took place

26   in and the claims of which arose in the State of California and County of Santa Clara.

27       11.    The Court has personal jurisdiction over all Defendants pursuant to Cal. Code. Civ.

28   Proc. § 410.10 because the relevant events, transactions and occurrences giving rise to the claims in

1    this Amended Complaint occurred in the State of California, County of Santa Clara.

2        12.    Speasl, Roberts and Chikosky each submitted to the jurisdiction of this Court when

3    they signed their Employment Agreements with Mirage Systems, Inc. ("Mirage") and agreed that

4    any dispute arising thereof be governed by California law.

5        13.    Venue is proper in this State and County.

6                ~~EASTMAN  KODAK~~'S PURCHASE OF MIRAGE'S RIGHTS
7                            IN THE ROBERTS PATENTS

8        14.    On May 20, 2005, Eastman Kodak entered into an Asset Purchase Agreement with

9    Mirage Systems, Inc. ("Mirage").  Pursuant to this agreement, Eastman Kodak agreed, subject to

10   certain terms and conditions, to purchase from Mirage certain Intellectual Property Rights.  These

11   Intellectual Property Rights consist of (i) the Roberts Patents and all technology related thereto or

12   disclosed therein; (ii) all other technology developed, conceived, invented or discovered by Speasl,

13   Roberts or Chikosky during or in connection with their employment by Mirage; (iii) all invention

14   disclosures, patents, patent applications, utility models, right of priority and other rights of Mirage

15   relating to or arising from the items described in (i) and (ii) or claiming priority from any application

16   from which such items claim priority; (iv) all continuations, continuations-in-part, divisions,

17   reexaminations and reissues of any of the items described in (i) to (iii) above which are pending, or

18   subsequently filed in connection with any of the foregoing; (v) all foreign counterparts and

19   corresponding rights relating to each of the foregoing; and (vi) all rights to assert and bring claims in

20   respect of the foregoing, including the right to sue for past infringements, whether now existing or

21   arising in the future.

22       15.    Pursuant to the Asset Purchase Agreement, Kodak purchased the Intellectual Property

23   from Mirage for valuable consideration on June 10, 2005, close of business West Coast time.

24       16.    Eastman Kodak now stands as the successor-in-interest of Mirage as Plaintiff in this

25   action.

26                    THE BUSINESS OF MIRAGE SYSTEMS

27       17.    Mirage is a company organized and existing under the laws of the State of California,

28   doing business in the City of Sunnyvale, County of Santa Clara, State of California.

18.    Mirage was founded in 1982 to develop cutting-edge electronics in the defense arena. In the '80s, nearly all of Mirage's business involved classified projects for the United States Department of Defense, developing defense electronics and applications.

19.    Throughout the company's existence, part of Mirage's core technology has been designing and developing radar systems and compact, miniaturized electronics, including analog-to-digital ("A/D") converters and processors, which have diverse applications. In the '80s, such applications included, for example, surveillance and electronic countermeasures ("ECM") for use by the United States against the Soviet Union during the Cold War.

20.    Before the Berlin Wall fell in November 1989, Mirage, anticipating the end of the Cold War, began reorganizing its business to expand beyond defense and military applications.

21.    As part of those efforts, Mirage sought new markets and commercial applications for its core technologies and technical capabilities, and created new divisions and hired individuals to find and develop those opportunities.

**SPEASL, ROBERTS AND CHIKOSKY'S EMPLOYMENT WITH MIRAGE**

22.    One of the individuals Mirage hired was Defendant Jerry Speasl. In May 1987, Mirage extended Speasl an offer to join Mirage in a key senior position on its Management Team as Director of Business Development. After negotiations over compensation and benefits, Speasl entered a written Employment Agreement for adequate consideration with Mirage on July 7, 1987, having an effective date of June 29, 1987.

23.    Mirage hired Speasl to, among other things, develop and expand Mirage's existing market base of programs by penetrating further into existing client organizations and program offices; to explore, assess and develop new markets by establishing new client contacts, and by identifying new programs that could benefit from Mirage products, services and capabilities; and to participate with senior management in operational planning and strategic planning related to the Mirage's growth as a company.

24.    One of the new divisions Mirage created in early 1989 for business development was the Communications, Command, Control and Intelligence Systems Division ("C3I"), which was created to explore and exploit new business opportunities relating to surveillance, reconnaissance

1   and intelligence technology for military and commercial applications. Mirage opened a Vienna,

2   Virginia, office for C3I's operations to keep it close to governmental contacts and potential

3   customers.

4        25.    On March 27, 1989, Mirage's Board of Directors appointed Speasl an officer of the

5   company, Vice President of Business Development. On June 28, 1989, Speasl became Vice

6   President of the C3I Systems Division, maintaining his position as an officer of Mirage.

7        26.    Foremost in Speasl's job duties, regardless of title, was business development —

8   identifying and pursuing new markets and applications for Mirage's existing technology to grow and

9   for Mirage to develop new technology.

10       27.    Speasl received a performance-based compensation package in which part of his

11  compensation was tied to the amount of new business he developed for Mirage as part of an

12  Incentive Stock Option Plan.

13       28.    Mirage hired more business development people to support Speasl, including

14  Defendant Marc Roberts on March 23, 1989, as Director of Business Development of C3I Systems,

15  and Defendant Matthew Chikosky on August 28, 1989, as Manager of Special Projects Engineering

16  in C3I.

17       29.    Both Roberts and Chikosky reported to Speasl and, like Speasl, both signed

18  Employment Agreements for adequate consideration with Mirage and were primarily responsible for

19  business development. Both Roberts and Chikosky also received Incentive Stock Option Plans tied

20  to the amount of business they each generated for Mirage.

21       **SPEASL, ROBERTS AND CHIKOSKY'S FIDUCIARY DUTIES TO MIRAGE**

22       30.    Speasl, Roberts and Chikosky's Employment Agreements are substantially identical.

23  Each of Speasl, Roberts and Chikosky's Employment Agreements created a special duty of trust and

24  confidence between each employee and Mirage, in that each represented and agreed that

25  employment by Mirage created a fiduciary relationship with and duty to Mirage, in that:

26           . . . my employment by MIRAGE creates a relationship of confidence
             and trust between myself and MIRAGE with respect to any
27           information of a proprietary nature that I may become aware of during
             the period of my employment by MIRAGE and which a) relates to the
28           business of MIRAGE or to the business of any customer or supplier of
             MIRAGE, or b) has been created, discovered or developed by, or has

1  otherwise become known to MIRAGE, and has commercial value in
   the business in which MIRAGE is engaged (hereinafter called
2  "Proprietary Information"). By way of illustration but not limitation,
   Proprietary Information includes trade secrets, processes, formulas,
3  computer programs, data, know-how, inventions, improvements,
   techniques, marketing plans, strategies, forecasts, and customer lists.
4

5      31.    Each Employment Agreement contains a provision requiring the employee to disclose

6  to Mirage any Proprietary Information, including without limitation inventions, trade secrets,

7  marketing plans and customer lists, he made or learned of during his employment. In particular, as

8  part of this fiduciary relationship with and duty to Mirage, each of Speasl, Roberts and Chikosky

9  represented and agreed that:

10         I will promptly disclose in confidence to Mirage or any persons
           designated by it all inventions, improvements, original works of
11         authorship, formulas, processes, computer programs, techniques,
           know-how and data, whether or not patentable or copyrightable, made
12         or conceived of first reduced to practice or learned by me either alone
           or jointly with others during the period of my employment (hereinafter
13         collectively called "Inventions").

14     32.    The nature of Mirage's classified work also created a fiduciary duty, including the

15  duties of candor, loyalty, full disclosure, good faith and fair dealing, individually in Speasl, Roberts

16  and Chikosky to Mirage, just as it did for all of Mirage's employees and officers. Many of Mirage's

17  projects were classified and top-secret, and the identity and details of such projects could not be

18  disclosed to those outside of the project. As a result, not only did Mirage have a reasonable

19  expectation that Speasl, Roberts and Chikosky, as well as all of its other employees and officers,

20  would act on the company's behalf, especially in matters involving business development, but

21  Mirage required its employees to act on its behalf.

22     33.    The scope of each of Speasl, Roberts and Chikosky's job duties also created fiduciary

23  duties because each was charged with developing business, markets and applications for Mirage and

24  Mirage alone. Speasl, moreover, was an officer of Mirage, which created a fiduciary obligation in

25  him to represent the company's interests above his own. This fiduciary relationship of trust and

26  confidence created by the nature of Mirage's business was reinforced by Paragraph 13 of the

27  Nondisclosure Agreement, where Speasl, Roberts and Chikosky each further warranted his

28  understanding that the "obligation to protect MIRAGE Proprietary Information as specified in this

1   agreement is separate and in addition to any requirement for the protection of U.S. Defense

2   Department classified information that may be required during and after my employment with

3   MIRAGE."

4   **SPEASL, ROBERTS AND CHIKOSKY'S ASSIGNMENT OF INVENTION RIGHTS**

5       34.    As part of their Employment Agreements, Speasl, Roberts and Chikosky each signed

6   an Exhibit B, an "Agreement Regarding Nondisclosure of Proprietary Information" ("Nondisclosure

7   Agreement"). For consideration of their employment and continued employment with Mirage,

8   Speasl, Roberts and Chikosky each represented and agreed that he understood:

9           . . . that MIRAGE is engaged in a continuous program of research,
            development, production, and marketing with respect to its present and
10          future products [; and]

11      35.    Each Employment Agreement also contained an Exhibit C, which gives the employee

12  the opportunity to exclude inventions that the employee wishes to exclude from the terms of the

13  Employment Agreement.

14      36.    Upon joining Mirage, Speasl and Chikosky each represented that he had no

15  inventions to exclude from the operation of the Employment Agreement by signing Exhibit C.

16      37.    Roberts listed three inventions on Exhibit C that he wished to exclude from operation

17  of the Employment Agreement.  The inventions listed by Roberts are unrelated to the Roberts

18  Patents or the subject matter thereof.

19      38.    Speasl, Roberts and Chikosky also represented and agreed that "[a]ll Proprietary

20  Information [including inventions, marketing plans and customer lists] shall be the sole property of

21  MIRAGE and its assigns."

22      39.    Each Employment Agreement further vested in Mirage all rights to any Proprietary

23  Information and inventions made or learned of by the employee during his employment.  Speasl,

24  Roberts and Chikosky each specifically assigned any future rights in Proprietary Information

25  (including inventions) to Mirage, representing and agreeing:

26          I hereby assign to MIRAGE any rights I may have or acquire to all
            Proprietary Information.  I will keep in confidence and trust all
27          Proprietary Information at all times, both during my employment and
            after its termination, and I will not use or disclose any Proprietary
28          Information without the written consent of MIRAGE except as may be

necessary in the ordinary course of performing my duties as an
employee of MIRAGE. . . .

I agree that all such Inventions which MIRAGE in its sole discretion
determines to be related to or useful in the business or research or
development of MIRAGE, or which result from work performed by
me for MIRAGE, shall be the sole and exclusive property of MIRAGE
and its assigns and MIRAGE shall have the right to use and/or to apply
for patents . . . for such inventions in any or all countries. . . .

40.    The Employment Agreements notified each of Speasl, Roberts and Chikosky that

Mirage did not claim inventions that qualified fully under the provisions of Section 2870 of the

California Labor Code, which are inventions:

for which no equipment, supplies, facility, or trade secret information
of the Employer was used and which was developed entirely on the
employee's own time, and (a) which does not relate (1) to the business
of the employer or (2) to the employer's actual or demonstrably
anticipated research or development, or (b) which does not result from
any work performed by the employee for the employer.

41.    In addition to making present assignments of their rights in any invention developed

while at Mirage, Speasl, Roberts and Chikosky each agreed that while he was employed by Mirage,

he would "not engage in any employment or activity of any business other than for MIRAGE in

which MIRAGE is now or may hereinafter become engaged without written consent from

MIRAGE."

42.    Upon termination or departure from Mirage, the Employment Agreements also

required the employee to "promptly deliver to Mirage all documents and data of any nature

containing Proprietary Information" and to warrant and represent that he would "not take with [him]

any such documents or data or any reproductions thereof."

43.    Mirage satisfied and performed all of its duties under the Employment Agreements.

**SPEASL, ROBERTS AND CHIKOSKY'S SELF-DEALING**

44.    C3I was located in Virginia, across the country from Mirage's headquarters in

California.  Speasl, Roberts and Chikosky had the authority to control and actually controlled C3I's

day-to-day operations.

45.    In 1989 and 1990, Speasl, Roberts and Chikosky pursued such business opportunities

as incorporating Mirage's miniature electronics technology into unmanned aerial vehicles ("UAVs")

1   and by making presentations to a variety of potential military and commercial customers.

2       46.    Mirage trusted that Speasl, Roberts and Chikosky, at C3I, were conducting business

3   on Mirage's behalf and not their own.

4       47.    Upon information and belief, Chikosky, in his capacity as a Mirage employee, met

5   with representatives of a potential Mirage customer in the Fall of 1989. At that meeting, the Mirage

6   customer described to Chikosky some UAVs it had built and some features it wished to incorporate

7   into future UAV designs. Those desired features included a digital camera for taking photographs in

8   military and commercial applications.

9       48.    Upon information and belief, that Mirage customer also informed Chikosky, during

10  this meeting to develop Mirage business, that all existing cameras it had investigated were

11  inadequate and that a new digital camera would have to be developed.

12      49.    Upon information and belief, Chikosky discussed this new digital camera idea, which

13  he had learned of in his capacity as a Mirage employee, in a meeting with Speasl and Roberts shortly

14  after his meeting with the potential Mirage customer in the Fall of 1989.

15      50.    Upon information and belief, Chikosky informed Speasl and Roberts of the

16  specifications and digital camera need the Mirage customer had described to him during the Mirage

17  business development meeting.

18      51.    Speasl, Roberts and Chikosky did not inform Mirage of the customer's request to

19  equip a UAV with a camera.

20      52.    Upon information and belief, in the course of making presentations to prospective and

21  existing Mirage customers in 1989, Speasl, Roberts and Chikosky also found that their digital

22  camera idea could be useful for including photographs in marketing and other presentations in the

23  course of their work for Mirage.

24      53.    Upon information and belief, between the Fall of 1989 and November 20, 1990,

25  Speasl, Roberts and Chikosky (collectively, the "Inventors") developed the digital camera idea into a

26  viable invention, using Mirage resources and on Mirage's time.

27      54.    Upon information and belief, in June 1990, in developing the digital camera idea

28  obtained from the Mirage customer, the Inventors drafted a Business Plan for a digital camera and an

1   A/D image converter.

2       55.    Upon information and belief, the Inventors identified potential new market areas for

3   the digital camera and A/D image converter, including traffic control, disaster

4   preparedness/monitoring, law enforcement, security and intelligence, and projected that revenues for

5   their products would climb from the millions to the tens of millions of dollars from 1990 to 1994.

6       56.    Despite having knowledge of Mirage's core technology in miniaturized A/D

7   processing technology for application in surveillance, intelligence and monitoring applications, the

8   Inventors did not inform Mirage of their identification of the digital camera and A/D image

9   converter potential markets and business expansion opportunities.

10      57.    Both Speasl and Roberts participated in Mirage's identification and pursuit of

11  potential acquisitions during Board meetings of Mirage.  Despite having knowledge of Mirage's

12  efforts to reorganize its business to expand beyond defense and military applications by seeking new

13  markets, neither Speasl nor Roberts informed Mirage of their identification of the digital camera and

14  A/D image converter potential markets and business expansion opportunities.

15      58.    The Inventors never informed Mirage of any of their work on or business plans for

16  the digital camera invention.

17      59.    Upon information and belief, on November 19, 1990, one or more of the Inventors

18  caused the incorporation of Personal Computer Cameras, Inc. ("PCC") in the Commonwealth of

19  Virginia which is now a terminated corporation.

20      60.    The Inventors never informed Mirage of the existence of or their involvement in PCC

21  to Mirage.

22      61.    The Inventors were principals of PCC.  All knowledge held and obtained by any or all

23  of the Inventors regarding the acts alleged below are imputed to PCC.

24      62.    On November 20, 1990, one day after PCC's incorporation, the Inventors applied for

25  a patent on the digital camera invention in the United States Patent and Trademark Office ("PTO").

26  The PTO kept the application secret and did not disclose its existence to the public, as was the

27  PTO's policy and practice at that time.

28      63.    The Inventors never disclosed to Mirage that they had applied for a patent.

64.    By 1991, under Speasl, Roberts and Chikosky's leadership, C3I had failed to establish sustainable new business opportunities for Mirage.

65.    In August 1991, Speasl resigned from Mirage.

66.    During his exit interview process, Speasl reaffirmed to Mirage that he had no inventions to exclude from operation of his Employment Agreement.

67.    On December 20, 1991, Chikosky made an assignment of any patent rights arising from the November 20, 1990, patent application to PCC.

68.    On December 27, 1991, Speasl and Roberts made an assignment of any patent rights arising from the November 20, 1990, patent application to PCC.

69.    The Inventors submitted the assignment papers to the PTO on January 8, 1992.

70.    The Inventors never disclosed the assignments or PTO submission to Mirage.

71.    On January 31, 1992, Roberts resigned from Mirage.

72.    During his exit process, Roberts reaffirmed to Mirage that he had no inventions, save the three inventions unrelated to digital camera technology that he had listed on joining the company, to exclude from operation of his Employment Agreement.

73.    On August 11, 1992, the '459 patent, titled "Electronic still video camera with direct personal computer (PC) compatible digital format output" issued on the Inventors' November 20, 1990, patent application.

74.    None of the Inventors obtained Mirage's consent to perform any of the development or commercialization work alleged above for the digital camera invention.

75.    During the time of the Inventors' employment, Mirage was involved in various projects in which a digital camera would have been complementary.  For example, starting no later than 1991, Mirage began pursing and ultimately was involved in a project relating to the study of digital images on computers and modifying those images.

76.    In 1992, Mirage began developing its business opportunities and applying its technical capabilities to the field of traffic surveillance and management.  For example, Mirage conducted research into machine vision, involving optics and radar detection, to control and direct the flow of traffic.

1    77.    Mirage eventually obtained unclassified contracts to work for various agencies to

2  develop its traffic monitoring technology, including the Federal Highway Administration.

3    78.    By 1994 or 1995, while Chikosky was still employed by Mirage, Mirage had

4  developed a traffic monitoring system that used both radar and a compact digital video camera to

5  monitor and report on traffic flow.

6    79.    The digital video camera was only one feature of this overall project.  As digital video

7  cameras were commercially available and suitable for this project, Mirage did not pursue developing

8  a digital video camera.

9    80.    The traffic monitoring system project was not classified, and was an open, active

10  project for Mirage.  Upon information and belief, Chikosky provided support to the traffic

11  monitoring system project.

12    81.    In addition, Chikosky was the key individual instrumental in obtaining and

13  supporting a major classified contract (Project 9199) for Mirage, which initiated on or about January

14  15, 1992, and extended through approximately December 31, 1998.  During the course of this

15  project, Mirage's California facility provided both hardware and software to an agency of the U.S.

16  Government headquartered on the east coast of the U.S.  As part of the project, Mirage analyzed and

17  processed digital imagery in a variety of picture formats (such as JPEG and BMP formats) using

18  image processing software such as Adobe's Photoshop.

19    82.    Chikosky, who was employed by Mirage through 1996, did not disclose the '459

20  patent to Mirage at any time at or before November 2003.

21    83.    In the course of developing its traffic monitoring system, Mirage conducted a survey

22  of digital cameras and concluded that commercially available cameras would be suitable for the

23  project needs, and that Mirage would not have to develop any specialized equipment in that area.

24    84.    The Inventors failed to alert Mirage to the digital camera invention and patents on the

25  same at any time, even when such an invention would have direct application to Mirage's existing

26  projects.

27    85.    Mirage, trusting its fiduciary relationship with the Inventors, was not informed about

28  and did not know of the '459 patent, any of the circumstances leading to the digital camera invention

1  or patent application or the Inventors' breaches of their Employment Agreements and fiduciary

2  duties, and had no reason to doubt the Inventors' representations, at any time before November

3  2003, at the earliest.

4          86.     The application for the '459 patent is the parent of applications for several other U.S.

5  patents, including the '757 patent; the '219 patent; the '010 patent; the '899 patent; and the '222

6  patent (collectively, "the Roberts Patents").

7              **ST. CLAIR'S INVOLVEMENT WITH THE ROBERTS PATENTS**

8          87.     Upon information and belief, in the Fall of 1990, while the Inventors were still

9  employed by Mirage, they employed Paul Fish ("Fish"), a registered patent attorney, to represent

10  them before the PTO and file their patent application.

11          88.     Upon information and belief, in the Fall of 1990, Fish approached Edmund Chung

12  ("Chung") on behalf of the Inventors to explore a business opportunity with a potential licensee or

13  partner for PCC regarding the '459 patent.

14          89.     Upon information and belief, in the Fall of 1990, Chung was a principal of St. Clair.

15  All knowledge held and obtained by Chung regarding the acts alleged below is imputed to St. Clair.

16          90.     Upon information and belief, at least as early as the Fall of 1990, Chung and St. Clair

17  were experienced in dealing with corporations, patents and intellectual property transactions.

18          91.     Upon information and belief, in the Fall of 1990, one or more of the Inventors

19  exchanged communication with Chung, including faxing him a letter for review from Mirage's

20  Virginia C3I office by using a Mirage company facsimile machine and a Mirage company telephone

21  number, (703) 821-4005.

22          92.     Mirage paid for the office rent and operations of the C3I Virginia office, including

23  facsimile and telephone equipment and communications (e.g., telephone) bills for the Virginia

24  office.

25          93.     Upon information and belief, in his communications with Chung, Speasl provided his

26  Mirage company telephone number, (703) 821-4000 for Chung to contact him.

27          94.     Mirage paid for the (703) 821-4000 and (703) 821-4005 telephone numbers for

28  Mirage's Virginia C3I office.

95.   Upon information and belief, Chung and St. Clair knew that the Inventors were employees of Mirage when he spoke with one or more of them in the Fall of 1990.

96.   Upon information and belief, as early as the Fall of 1990, Chung and St. Clair knew that the Inventors had conceived of, developed, and reduced to practice the digital camera invention while employed by Mirage.

97.   Upon information and belief, as early as the Fall of 1990, Chung and St. Clair were actually aware of PCC's defective ownership claim over the '459 patent and the Inventors' lack of rights to the digital camera invention.

98.   Upon information and belief, at least as early as the Fall of 1990, Chung and St. Clair knew that Mirage owned all right and title to the invention developed by the Inventors and the '459 patent application.

99.   Upon information and belief, despite knowing that PCC had no rights in the '459 patent application, St. Clair provided investment capital to PCC on or about May 1992.

100.  Upon information and belief, at around the same time that St. Clair provided funds to PCC and despite knowing that PCC had no rights in the '459 patent application, Chung took a seat on the Board of Directors of PCC.

101.  Upon information and belief, as early as around May 1992, Chung and St. Clair had actual notice of the Inventors' Employment Agreements with Mirage and a duty to investigate PCC's claim of title to the '459 patent application.

102.  Upon information and belief, knowing of PCC's defective title, St. Clair offered to purchase the Roberts Patents from PCC in the Summer of 1995.

103.  Upon information and belief, St. Clair, knowing of PCC's defective title, asked PCC to represent and warrant that PCC owned the Roberts Patents.

104.  Upon information and belief, St. Clair, as an experienced party in the transaction, was on notice that PCC did not own the Roberts Patents because the Inventors had assigned their rights to Mirage through operation of their Employment Agreements, but chose not to perform adequate diligence into PCC's warranty of ownership during St. Clair's due diligence.

105.    Upon information and belief, St. Clair failed to investigate PCC's warranty of ownership because it did not want to confirm that PCC did not own the Roberts Patents, and wanted to be able to falsely represent that it owned the Roberts Patents.

106.    Upon information and belief, the purchase agreement between St. Clair and PCC provides that St. Clair and PCC will equally divide any revenue generated from the Roberts Patents, including damages awards in patent infringement suits.

107.    Upon information and belief, after the purchase, St. Clair had no good faith belief that it owned the Roberts Patents.

108.    Upon information and belief, after the purchase, St. Clair falsely represented to the world that St. Clair owned the Roberts Patents.

### ST. CLAIR'S BAD-FAITH LITIGATION

109.    Upon information and belief, St. Clair does not make, use or sell any products or processes.

110.    Upon information and belief St. Clair's primary business includes licensing and enforcing patents against third parties.

111.    Upon information and belief, starting no later than August 2001, St. Clair arranged and attended business meetings with third parties in California as part of its ordinary conduct of business, during which it claimed to own the Roberts Patents.

112.    Upon information and belief, during those meetings in California, St. Clair accused those and other third parties of infringing the Roberts Patents and attempted to license the Roberts Patents to such third parties or otherwise derive benefit from the Roberts Patents by representing itself to be the owner of the Roberts Patents.

113.    By those acts, St. Clair knowingly falsely represented to one or more third parties that it owned rights in the Roberts Patents and disparaged Mirage's title to the Roberts Patents and the subject matter thereof.

114.    Upon information and belief, St. Clair has filed the following patent infringement lawsuits in the U.S. District Court for the District of Delaware: (1) *St. Clair Intellectual Property Consultants, Inc. v. Sony Corp. et al.*, No. 01-CV-557 (JJF), on August 14, 2001 ("the *Sony*

1   Action"); (2) *St. Clair Intellectual Property Consultants, Inc. v. Canon Inc., et al.*, No. 03-CV-241

2   (JJF), on February 28, 2003 ("the *Canon* Action"); and (3) *St. Clair Intellectual Property*

3   *Consultants, Inc. v. Samsung Electronics, et al.*, No. 04-CV-1436 (JJF) ("the *Samsung* Action"), on

4   November 9, 2004.

5        115.    Upon information and belief, in each of the *Sony, Canon* and *Samsung* actions, St.

6   Clair has knowingly falsely represented itself as the owner of the Roberts Patents to many third

7   parties, including Canon, Inc. and Canon USA, Inc. (collectively, "Canon"); Casio, Inc.; Casio

8   Computer Co., Ltd.; Seiko Epson Corp.; Epson America, Inc.; Fuji Photo Film Co., Ltd., Fuji Photo

9   Film U.S.A., Inc. and FujiFilm America, Inc. (collectively, "Fuji"); Kyocera Corp.; Kyocera Optics,

10   Inc.; Minolta Co., Ltd.; Minolta Corp.; Nikon Corp.; Olympus Optical Co. Ltd.; Olympus America,

11   Inc.; Samsung Electronics Co., Ltd., Samsung Electronics America Inc., and Samsung Telecom

12   America LLP (collectively, "Samsung"); Matsushita Electric Industrial Co., Ltd.; Panasonic AVC

13   Networks Co.; Matsushita Electrical Corp. of America; Victor Company of Japan LTD; JVC

14   Americas Corp.; JVC Company of America; Nokia Corporation; Nokia Mobile Phones; Nokia Inc.;

15   Hewlett-Packard Co.; Sony Corporation, Sony Electronics Inc., Sony Corporation of America and

16   Sony Corporation (collectively, "Sony"); and Eastman Kodak.

17        116.    Upon information and belief, St. Clair has obtained verdicts and judgments for

18   damages from Sony, Canon and Fuji's alleged infringement of the Roberts Patents exceeding a total

19   of $62 million.

20        117.    Upon information and belief, St. Clair has entered into licenses with other defendants

21   in the *Sony, Canon* and *Samsung* actions and other non-party companies over the Roberts Patents for

22   comparable value.

23        118.    Upon information and belief, St. Clair is not entitled to any of damages awards or

24   licensing fees it has received in connection with the Roberts Patents.

25        119.    Upon information and belief, based on the Summer 1995 purchase agreement

26   between St. Clair and PCC, St. Clair has divided its gains from the Roberts Patents equally with

27   PCC.

28

120.    Upon information and belief, PCC is not entitled to any of the profits or royalties it has received from St. Clair.

### MIRAGE'S DELAYED DISCOVERY OF THE ROBERTS PATENTS

121.    Mirage had no knowledge of the Roberts Patents, the circumstances or involvement by the Inventors with the digital camera invention or patent application, the Inventors' knowing misrepresentations and material omissions, PCC or St. Clair until November 2003, and could not have discovered those facts at an earlier time.

122.    Mirage could not have known of the '459 patent application, because the PTO keeps patent applications confidential.

123.    Mirage relied on the Inventors and their fiduciary duties of candor, loyalty, full disclosure, good faith and fair dealing to Mirage.

124.    The Inventors actively, intentionally and fraudulently concealed the fact of their invention from Mirage.

125.    The Inventors failed to disclose to Mirage one or more materials facts, including, without limitation, any one or a combination of the UAV/camera business opportunities presented by Mirage, the digital camera invention, their business plans for a digital camera and A/D image converter, their formation and incorporation of PCC and the '459 patent application.  The Inventors failed to disclose these facts even though they were employed by Mirage at the time and subject to fiduciary obligations imposed by the nature of Mirage's business, the scope of their business development duties and their Employment Agreements.  These omissions were done knowingly, in bad faith and with the intent to defraud and deprive Mirage of Mirage's rightful title to and ownership of the Roberts Patents.

126.    Without actual notice of any of the circumstances surrounding the invention or the invention itself, and relying on the fiduciary duties of its employees and officer, Mirage had no reason to inquire about any inventions or patents involving the inventors.

127.    Mirage first learned of the Roberts Patents in November 2003, when Canon served Mirage with a subpoena for documents relating to the *Canon* Action between St. Clair and Canon.

1    128.    Prior to November 2003, Mirage had no knowledge of the Roberts Patents or St.

2  Clair's litigations over those patents.

3    129.    On April 30, 2004, after several months of negotiations, Mirage and Canon entered

4  into "Consulting Agreement and Covenant Not to Sue" ("Covenant") wherein Canon requested

5  Mirage's assistance with its litigation against St. Clair in exchange for a lump-sum payment of

6  $75,000 and incidental costs and expenses related to time spent by Mirage employees in providing

7  assistance.

8    130.    After Mirage entered the Covenant with Canon, it discovered that the Inventors had

9  breached their fiduciary duties of candor, loyalty, full disclosure, good faith and fair dealing to

10  Mirage by intentionally concealing the existence of the invention and patent, failing to disclose the

11  invention upon leaving Mirage's employ and intentionally withholding business opportunities from

12  Mirage, among other acts alleged above.

13    131.    Mirage first learned of the fraud the inventors perpetrated on it after April 30, 2004,

14  as Mirage was conducting its investigation into the Roberts Patents.

15    132.    Upon information and belief, the Inventors knowingly provided false affirmations

16  upon their exit interviews and omitted information about the Roberts Patents with the intent to

17  defraud Mirage and prevent any inquiry into the invention by actively concealing and

18  misrepresenting such material information.

19    133.    Prior to entering the Covenant with Canon, Mirage could not have known of

20  Inventors' fraudulent concealment because it had no reason to question the Inventors' prior

21  representations to them.

22    134.    Considering the Inventors' fiduciary relationship with Mirage, Mirage justifiably

23  relied on the Inventors' prior statements and trusted that they had disclosed pertinent business

24  opportunities and developments to Mirage in the course of their employment.

25              **COUNT I: BREACH OF CONTRACT**
              **(AGAINST SPEASL, ROBERTS AND CHIKOSKY)**
26                    MIRAGE

27    135.    ~~Eastman Kodak~~ incorporates by reference herein the allegations of Paragraphs 1
                    RC
28  through 134 above.

136.   Each Inventor had an Employment Agreement with Mirage.

137.   Mirage satisfied and performed all of its duties under the Employment Agreements.

138.   Each Inventor breached his Employment Agreement in several ways, including, without limitation, by:

(a)   intentionally concealing the business opportunity of a UAV with a digital camera from Mirage;

(b)   intentionally concealing the digital camera invention to Mirage;

(c)   filing a patent application on an invention owned by Mirage without notifying Mirage;

(d)   intentionally concealing the issuance of the '459 patent from Mirage;

(e)   intentionally concealing information that would benefit Mirage on existing and contemplated projects;

(f)   failing to keep in confidence and trust Mirage's Proprietary Information from third parties, such as the PTO, PCC, Fish, Chung and St. Clair, among others;

(g)   using and disclosing Proprietary Information to the PTO, PCC, Fish, Chung and St. Clair, among others, without Mirage's written consent;

(h)   incorporating and engaging in the activities of PCC while employed by Mirage, without Mirage's written consent; and

(i)   fraudulently assigning rights to the Roberts Patents to PCC, and in turn, to St. Clair.

139.   Each breach by each Inventor was willful, intentional, deliberate and in bad faith.

140.   Because of the Inventors' fraudulent concealment of material information regarding the digital camera invention and the Roberts Patents, and Mirage's justified and reasonable reliance on the statements of the fiduciary-Inventors, Mirage did not know and could not have known about the Roberts Patents and its rights in them until November 2003, at the earliest.

141.   As a result, Mirage's cause of action against Defendants could not accrue until November 2003, at the earliest.

142.   ~~Eastman Kodak~~ MIRAGE 84 now timely raises this cause of action against Defendants.

143.   ~~Eastman Kodak~~ MIRAGE 85 suffered and continues to suffer actual damages as a direct and proximate result of Defendants' actions in an amount in excess of the jurisdictional minimum of this Court.

**COUNT II: DECLARATORY JUDGMENT OF OWNERSHIP AND QUIET TITLE (AGAINST ALL DEFENDANTS)**

1    144.  ~~Eastman Kodak~~ [MIRAGE] incorporates by reference herein the allegations of Paragraphs 1

2    through 143 above.

3    145.  An actual and justiciable controversy over the ownership and title of the Roberts

4    Patents, the subject matter thereof and any patents or applications stemming from them has arisen

5    and currently exists between ~~Eastman Kodak~~ [MIRAGE] and the Defendants.

6    146.  ~~Eastman Kodak~~ [MIRAGE] and the Defendants will suffer hardship if judicial consideration is

7    withheld.

8    147.  The Inventors assigned their rights in the Roberts Patents, the subject matter thereof

9    and any patents or applications stemming from them on the dates they signed their Employment

10   Agreements.

11   148.  St. Clair alleges that it owns the Roberts Patents.

12   149.  Based on the assignments in the Employment Agreements, Mirage, at all times up to

13   June 10, 2005, has been the rightful owner and titleholder of the Roberts Patents.

14   150.  ~~Eastman Kodak~~ [St. Clair] became the rightful owner and titleholder of the Roberts Patents

15   when it purchased those assets from Mirage on June 10, 2005.

16   151.  Because of the Inventors' fraudulent concealment of material information regarding

17   the digital camera invention and the Roberts Patents, and Mirage's justified and reasonable reliance

18   on the statements of the fiduciary-Inventors, Mirage did not know and could not have known about

19   the Roberts Patents and its rights in them until November 2003, at the earliest.

20   152.  As a result, Mirage's cause of action against Defendants could not accrue until

21   November 2003, at the earliest.

22   153.  ~~Eastman Kodak~~ [MIRAGE] now timely raises this cause of action against Defendants.

23   154.  ~~Eastman Kodak~~ [MIRAGE] requests a judicial determination of its rights and a declaration that it

24   is the true and proper owner of all legal and equitable right, title and interest in the Roberts Patents

25   and the subject matter thereof.

26   155.  ~~Eastman Kodak~~ [MIRAGE] requests a judicial determination that the Inventors, PCC and St.

27   Clair were not, at any time, owners or titleholders of the Roberts Patents or subject matter thereof.

28
**COUNT III: FRAUD**
**(AGAINST SPEASL, ROBERTS AND CHIKOSKY)**

1

2    156.    ~~Eastman Kodak~~ MIRAGE incorporates by reference herein the allegations of Paragraphs 1

3    through 155 above.

4    157.    The Inventors knowingly concealed and misrepresented material facts from Mirage

5    regarding the existence and ownership of the digital camera invention and the Roberts Patents.

6    158.    The Inventors concealed and misrepresented facts with the intent to defraud Mirage

7    and induce Mirage's reliance on their omissions and misrepresentations to Mirage's detriment.

8    159.    Based on the Inventors' fiduciary duty to Mirage, Mirage reasonably and justifiably

9    relied on the Inventors' knowing, fraudulent omissions and misrepresentations, not knowing that

10   they were false.

11   160.    Mirage actually relied on the Inventors' fraudulent omissions and misrepresentations

12   in entering the Covenant with Canon.

13   161.    · But for the inventors' fraudulent concealment and material misrepresentations,

14   Mirage would not have accepted Canon's offer of $75,000 to enter the Covenant, and would not

15   have entered such a Covenant with Canon.

16   162.    The inventors' fraudulent concealment and material misrepresentations have caused

17   harm to Mirage, including, without limitation, unwanted litigation, damage to Mirage's credibility

18   and reputation, and business opportunity costs.

19   163.    As a result of Mirage's Covenant with Canon, Mirage has been dragged into a special

20   proceeding in the District of Delaware involving St. Clair and Canon and is also involved in two

21   litigations with St. Clair.

22   164.    Mirage has incurred extensive legal fees and spent valuable time and resources in

23   defending against and prosecuting these actions, which has created additional harm to its current

24   business in time, expense and opportunity costs, which has now become Eastman Kodak's burden.

25   165.    ~~Eastman Kodak~~ MIRAGE 'S now timely raises this cause of action against Defendants.

26   166.    ~~Eastman Kodak~~ MIRAGE 'S suffered and continues to suffer actual damages as a direct and

27   proximate result of Defendants' actions in an amount in excess of the jurisdictional minimum of this

28   Court.

## COUNT IV: BREACH OF FIDUCIARY DUTY
### (AGAINST SPEASL, ROBERTS & CHIKOSKY)

167. ~~Eastman Kodak~~ MIRAGE incorporates by reference herein the allegations of Paragraphs 1 through 166 above.

168. Each Inventor had a fiduciary duty of candor, loyalty, full disclosure, good faith and fair dealing to Mirage.

169. The Inventors, jointly and severally, breached their fiduciary duties to Mirage in several ways, including, without limitation, by:

(a) misappropriating Mirage's UAV and digital camera business opportunity for themselves;

(b) intentionally concealing the business opportunity of a UAV with a digital camera from Mirage;

(c) intentionally concealing the digital camera invention to Mirage;

(d) filing a patent application on an invention owned by Mirage without notifying Mirage;

(e) intentionally concealing the issuance of the '459 patent from Mirage;

(f) intentionally concealing information that would benefit Mirage on existing and contemplated projects;

(g) failing to keep in confidence and trust Mirage's Proprietary Information;

(h) using and disclosing Proprietary Information to the PTO, PCC, Fish, Chung and St. Clair, among others, without Mirage's written consent;

(i) incorporating and engaging in the activities of PCC while employed by Mirage, without Mirage's written consent; and

(j) fraudulently assigning rights to the Roberts Patents to PCC, and in turn, to St. Clair.

170. Because of the Inventors' fraudulent concealment of material information regarding the digital camera invention and the Roberts Patents, and Mirage's justified and reasonable reliance on the statements of the fiduciary-Inventors, Mirage did not know and could not have known about the Roberts Patents and its rights in them until November 2003, at the earliest.

171. As a result, Mirage's cause of action against Defendants could not accrue until November 2003, at the earliest.

172. ~~Eastman Kodak~~ MIRAGE now timely raises this cause of action against Defendants.

173. ~~Eastman Kodak~~ MIRAGE suffered and continues to suffer actual damages as a direct and proximate result of Defendants' actions in an amount in excess of the jurisdictional minimum of this Court.

1

2

**COUNT V: CONVERSION**
**(AGAINST SPEASL, ROBERTS AND CHIKOSKY)**

3

MIRAGE ₮

4

174.    ~~Eastman Kodak~~ incorporates by reference herein the allegations of Paragraphs 1 through 173 above.

5

6

175.    Mirage, at all times prior to June 10, 2005, owned and held title to the Roberts Patents and the subject matter thereof.

7

8

176.    Eastman Kodak became the rightful owner of all right, title and interest in the Roberts Patents and subject matter thereof on June 10, 2005.

9

10

177.    The Defendants, individually and in conspiracy with one another, intentionally took possession of the Roberts Patents and the subject matter thereof in the Fall of 1989, intentionally depriving Mirage of its Proprietary Information involving the digital camera invention.

11

12

13

178.    The Defendants, individually and in conspiracy with one another, intentionally took possession of the Roberts Patents and the subject matter thereof on November 20, 1990, when they filed their patent application, intentionally depriving Mirage of its right to control its Proprietary Information and trade secrets involving the digital camera invention.

14

15

16

179.    The Defendants, individually and in conspiracy with one another, intentionally transferred the Roberts Patents and the subject matter thereof on or about January 8, 1992, to PCC, intentionally depriving Mirage of its right and title to the Roberts Patents and the subject matter thereof.

17

18

19

20

180.    Because of the Inventors' fraudulent concealment of material information regarding the digital camera invention and the Roberts Patents, and Mirage's justified and reasonable reliance on the statements of the fiduciary-Inventors, Mirage did not know and could not have known about the Roberts Patents and its rights in them until November 2003, at the earliest.

21

22

23

24

181.    As a result, Mirage's cause of action against Defendants could not accrue until November 2003, at the earliest.

25

26

MIRAGE ₮ᵇ

182.    ~~Eastman Kodak~~ now timely raises this cause of action against Defendants.

27

28

---

Amended and Supplemental Complaint for Declaratory Relief, Damages, Restitution, Disgorgement of Profits and     23
Injunctive Relief – Case No. 1-05-CV-031964

MIRAGE ⟨s⟩

1  183.  ~~Eastman Kodak~~ suffered and continues to suffer actual damages as a direct and

2  proximate result of Defendants' actions in an amount in excess of the jurisdictional minimum of this

3  Court.

4                              **COUNT VI: CONVERSION**
                              **(AGAINST DEFENDANT ST. CLAIR)**
5

MIRAGE ⟨s⟩

6  184.  ~~Eastman Kodak~~ incorporates by reference herein the allegations of Paragraphs 1

7  through 183 above.

8  185.  Mirage, at all times prior to June 10, 2005, owned and held title to the Roberts Patents

9  and the subject matter thereof.

10  186.  Eastman Kodak became the rightful owner of all right, title and interest in the Roberts

11  Patents and subject matter thereof on June 10, 2005.

12  187.  St. Clair, individually and in conspiracy with the other Defendants, intentionally took

13  possession of the Roberts Patents and the subject matter thereof in the Summer of 1995, intentionally

14  depriving Mirage of its right and title to the Roberts Patents and the subject matter thereof.

15  188.  St. Clair, individually and in conspiracy with the other Defendants, intentionally

16  asserted itself as the owner the Roberts Patents in the *Sony, Canon* and *Samsung* Actions,

17  intentionally depriving Mirage of its right and title to the Roberts Patents and the subject matter

18  thereof.

19  189.  St. Clair, individually and in conspiracy with the other Defendants, intentionally

20  asserted itself as the owner the Roberts Patents in negotiations with third parties from 2001 to the

21  present, intentionally depriving Mirage of its right and title to the Roberts Patents and the subject

22  matter thereof.

23  190.  Because of the Inventors' fraudulent concealment of material information regarding

24  the digital camera invention and the Roberts Patents, and Mirage's justified and reasonable reliance

25  on the statements of the fiduciary-Inventors, Mirage did not know and could not have known about

26  the Roberts Patents and its rights in them until November 2003, at the earliest.

27  191.  As a result, Mirage's cause of action against Defendants could not accrue until

28  November 2003, at the earliest.

1    192.    ~~Eastman Kodak~~ MIRAGE ~~now~~ now timely raises this cause of action against Defendants.

2    193.    ~~Eastman Kodak~~ MIRAGE BS suffered and continues to suffer actual damages as a direct and

3    proximate result of Defendants' actions in an amount in excess of the jurisdictional minimum of this

4    Court.

5
                           **COUNT VII: MISAPPROPRIATION OF TRADE SECRETS**
6                          **(AGAINST SPEASL, ROBERTS AND CHIKOSKY)**

7    194.    ~~Eastman Kodak~~ MIRAGE BS incorporates by reference herein the allegations of Paragraphs 1

8    through 193 above.

9    195.    Mirage, at all times prior to June 10, 2005, owned and held title to the Roberts Patents

10   and the subject matter thereof.

11   196.    Eastman Kodak became to rightful owner of all right, title and interest in the Roberts

12   Patents and subject matter thereof on June 10, 2005.

13   197.    The Inventors' Employment Agreements expressly recognized the confidential,

14   proprietary and trade secret nature of any inventions discovered or developed in the course each

15   Inventor's employment with Mirage.

16   198.    In 1989 and 1990, most, if not all, of Mirage's work was classified or top secret in

17   nature, could not be disclosed, and had to be kept as trade secret.

18   199.    Mirage took reasonable and extensive steps to protect its trade secrets and other

19   Proprietary Information by requiring the Inventors to sign Employment Agreements with multiple

20   clauses involving confidentiality of information and protection of Proprietary Information.

21   200.    The Inventors' duties to keep information confidential extended beyond their

22   employment with Mirage.

23   201.    Defendants misappropriated Mirage trade secrets by willfully, intentionally and in

24   bad faith depriving Mirage of its trade secret rights, including, but not limited to, taking the business

25   opportunity presented by Mirage's potential customer for themselves in the Fall of 1989 and by

26   filing a patent application on the digital camera invention, which was a protected trade secret, on

27   November 20, 1999.

28

202.    Upon information and belief, at the time the Defendants misappropriated Mirage's trade secrets, they knew or should have known that they acquired those trade secrets under circumstances giving rise to a duty to maintain their secrecy or limit their use.  Upon information and belief, at the same time, the Inventors knew they owed Mirage a duty to keep those trade secrets confidential and limit their use.

203.    By filing a patent application on the digital camera invention, the Inventors destroyed Mirage's ability to decide the best course of action to exploit its trade secrets and other Proprietary Information.

204.    Because of the Inventors' fraudulent concealment of material information regarding the digital camera invention and the Roberts Patents, and Mirage's justified and reasonable reliance on the statements of the fiduciary-Inventors, Mirage did not know and could not have known about the Roberts Patents and its rights in them until November 2003, at the earliest.

205.    As a result, Mirage's cause of action against Defendants could not accrue until November 2003, at the earliest.

206.    ~~Eastman Kodak~~ MIRAGE ᵇˢ now timely raises this cause of action against Defendants.

207.    ~~Eastman Kodak~~ MIRAGE ᵇˢ suffered and continues to suffer actual damages as a direct and proximate result of Defendants' actions in an amount in excess of the jurisdictional minimum of this Court.

## COUNT VIII: INTENTIONAL INTERFERENCE
## WITH PROSPECTIVE ECONOMIC ADVANTAGE
## (AGAINST SPEASL, ROBERTS AND CHIKOSKY)

208.    ~~Eastman Kodak~~ MIRAGE ᵇˢ incorporates by reference herein the allegations of Paragraphs 1 through 207 above.

209.    An economic relationship existed between Mirage and the Mirage customer that met with Chikosky to discuss a UAV with a camera that had probable future economic benefit to both Mirage and its customer.

210.    The Inventors, as fiduciaries, employees and business development personnel of Mirage, knew of the probable relationship between Mirage and its customer.

211.    The Inventors intentionally disrupted the relationship between Mirage and its customer by, among other acts, usurping the opportunity offered by Mirage's customer for themselves, failing to inform Mirage of such opportunity, filing a patent application without informing Mirage, purporting to assign the '459 patent to PCC, approaching Chung and St. Clair for business opportunities and purporting to sell, through PCC, the Roberts Patents to St. Clair.

212.    Mirage did not achieve a relationship with its customer because of the Inventors' deliberate actions.

213.    The Defendants' conduct was a substantial factor in causing harm to Mirage.

214.    Because of the Inventors' fraudulent concealment of material information regarding the customer communications, digital camera invention, and the Roberts Patents, and Mirage's justified and reasonable reliance on the statements of the fiduciary-Inventors, Mirage did not know and could not have known about the Roberts Patents and its rights in them until November 2003, at the earliest.

215.    As a result, Mirage's cause of action against Defendants could not accrue until November 2003, at the earliest.

216.    ~~Eastman Kodak~~ MIRAGE now timely raises this cause of action against Defendants.

217.    ~~Eastman Kodak~~ MIRAGE suffered and continues to suffer actual damages as a direct and proximate result of Defendants' actions in an amount in excess of the jurisdictional minimum of this Court.

### COUNT IX: NEGLIGENT INTERFERENCE
### WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (AGAINST SPEASL, ROBERTS AND CHIKOSKY)

218.    ~~Eastman Kodak~~ MIRAGE incorporates by reference herein the allegations of Paragraphs 1 through 217.

219.    An economic relationship existed between Mirage and the Mirage customer that met with Chikosky to discuss a UAV with a camera that had probable future economic benefit to both Mirage and its customer.

220.    The Inventors, as fiduciaries, employees and business development personnel Mirage

1   knew of the probable relationship between Mirage and its customer.

2      221.   The Inventors negligently disrupted the relationship between Mirage and its customer

3 by, among other acts, usurping the opportunity offered by Mirage's customer for themselves, failing

4 to inform Mirage of such opportunity, filing a patent application without informing Mirage,

5 purporting to assign the '459 patent to PCC, approaching Chung and St. Clair for business

6 opportunities and purporting to sell, through PCC, the Roberts Patents to St. Clair.

7      222.   Mirage did not achieve a relationship with its customer because of the Inventors'

8 negligent actions.

9      223.   The Defendants' conduct was a substantial factor in causing harm to Mirage.

10      224.   Because of the Inventors' fraudulent concealment of material information regarding

11 the customer communications, digital camera invention and the Roberts Patents, and Mirage's

12 justified and reasonable reliance on the statements of the fiduciary-Inventors, Mirage did not know

13 and could not have known about the Roberts Patents and its rights in them until November 2003, at

14 the earliest.

15      225.   As a result, Mirage's cause of action against Defendants could not accrue until

16 November 2003, at the earliest.

17      226.   ~~Eastman Kodak~~ MIRAGE now timely raises this cause of action against Defendants.

18      227.   ~~Eastman Kodak~~ MIRAGE suffered and continues to suffer actual damages as a direct and

19 proximate result of Defendants' actions in an amount in excess of the jurisdictional minimum of this

20 Court.

21                    **COUNT X: INTENTIONAL MISREPRESENTATION**

22                 **(AGAINST SPEASL, ROBERTS AND CHIKOSKY)**

23      228.   ~~Eastman Kodak~~ MIRAGE incorporates by reference herein the allegations of Paragraphs 1

24 through 227 above.

25      229.   Each Inventor entered into an Employment Agreement with Mirage when he became

26 a Mirage employee.

27      230.   Each Employment Agreement contained express representations made by the

28 employee to Mirage, relating to inventions.

231.    Roberts disclosed three inventions in his Employment Agreement which are not related to the subject matter of the Roberts Patents. Speasl and Chikosky disclosed in their Employment Agreements that they had no inventions. Thus, each Defendant affirmatively represented to Mirage that he had or knew of no inventions relating to the subject matter of the Roberts Patents.

232.    Each Employment Agreement afforded the employee an opportunity to disclose any rights that he wished to exclude from the terms of the Agreement which vest all rights in inventions and proprietary information in Mirage. By failing to promptly disclose the subject matter of the Roberts Patents to Mirage, each Defendant, acting individually and in conspiracy with one another, represented to Mirage that the subject matter of the Roberts Patents did not exist.

233.    Each Defendant had actual knowledge of the falsity of this ongoing misrepresentation to Mirage. Their actual knowledge of the inventions is proved by the filing of the applications for the Roberts Patents. Each such false representation by each Defendant was willful, intentional, deliberate, and in bad faith. Even if any Defendant lacked actual knowledge of the falsity of his ongoing misrepresentation, he acted recklessly with respect to the truth relating to his ongoing misrepresentation.

234.    Each Inventor intended to defraud Mirage and to induce Mirage's reliance on their individual and joint misrepresentations by actively concealing the existence of the subject matter of the Roberts Patents from Mirage.

235.    Mirage reasonably and justifiably relied on the Defendants' individual and joint misrepresentations because each Inventor was under an ongoing obligation to disclose such information to Mirage under the terms of his Employment Agreement. Mirage has the right to expect the undivided loyalty of its employees and to expect that others will obey the law.

236.    The Defendants' conduct was a substantial factor in causing harm to Mirage.

237.    Because of the Inventors' fraudulent concealment of material information regarding the customer communications, digital camera invention and the Roberts Patents, and Mirage's justified and reasonable reliance on the statements of the fiduciary-Inventors, Mirage did not know and could not have known about the Roberts Patents and its rights in them until November 2003, at

1    the earliest.

2        238.    As a result, Mirage's cause of action against Defendants could not accrue until

3    November 2003, at the earliest.

4        239.    ~~Eastman Kodak~~ MIRAGE BS now timely raises this cause of action against Defendants.

5        240.    ~~Eastman Kodak~~ MIRAGE BS suffered and continues to suffer actual damages as a direct and

6    proximate result of Defendants' actions in an amount in excess of the jurisdictional minimum of this

7    Court.

8    ///

9    ///

10   ///

11          **COUNT XI: NEGLIGENT MISREPRESENTATION**
            **(AGAINST SPEASL, ROBERTS AND CHIKOSKY)**
12

13       241.    ~~Eastman Kodak~~ MIRAGE BS incorporates by reference herein the allegations of Paragraphs 1

14   through 240 above.

15       242.    Each Inventor entered into Employment Agreement with Mirage when he became a

16   Mirage employee.

17       243.    Each Defendant's Employment Agreement contained express representations made

18   by the employee to Mirage, relating to inventions.

19       244.    Roberts disclosed three inventions in his Employment Agreement which are not

20   related to the subject matter of the Roberts Patents.  Speasl and Chikosky disclosed in their

21   Employment Agreements that they had no inventions.  Thus, each Defendant affirmatively

22   represented to Mirage that he had or knew of no inventions relating to the subject matter of the

23   Roberts Patents.

24       245.    Each Employment Agreement invited the employee to disclose any rights that he

25   wished to exclude from the terms of the Agreement which vest all rights in inventions and

26   proprietary information in Mirage.  By failing to promptly disclose the subject matter of the Roberts

27   Patents to Mirage, each Defendant, acting individually and in conspiracy with one another,

28   represented to Mirage that the subject matter of the Roberts Patents did not exist.

246.    None of the Inventors had any reasonable grounds for believing his ongoing representations to Mirage were tree because they devoted a substantial amount of time to developing and reducing to practice the subject matter of the Roberts Patents and went to the substantial expense of filing the applications for the Roberts Patents. The Defendants could not have devoted such time and expense to such a project and not known of the project's existence.

247.    Each Inventor made negligent misrepresentations to Mirage and induced Mirage's reliance on their individual and joint misrepresentations as to the existence of the Roberts Patents and the subject matter thereof. Each such act by each Defendant was in negligent breach of their obligations, deliberate, and in bad faith.

248.    Mirage reasonably and justifiably relied on the Defendants' individual and joint misrepresentations because each Inventor was under an ongoing obligation to disclose such information to Mirage under the terms of his Employment Agreement. Mirage has the right to expect the undivided loyalty of its employees and to expect that others will obey the law.

249.    The Defendants' conduct was a substantial factor in causing harm to Mirage.

250.    Because of the Inventors' fraudulent concealment of material information regarding the customer communications, digital camera invention and the Roberts Patents, and Mirage's justified and reasonable reliance on the statements of the fiduciary-Inventors, Mirage did not know and could not have known about the Roberts Patents and its rights in them until November 2003, at the earliest.

251.    As a result, Mirage's cause of action against Defendants could not accrue until November 2003, at the earliest.

252.    ~~Eastman Kodak~~ MIRAGE now timely raises this cause of action against Defendants.

253.    ~~Eastman Kodak~~ MIRAGE suffered and continues to suffer actual damages as a direct and proximate result of Defendants' actions in an amount in excess of the jurisdictional minimum of this Court.

## COUNT XII: FRAUDULENT CONCEALMENT
## (AGAINST SPEASL, ROBERTS AND ~~CHIKOSKY~~)

254.    ~~Eastman Kodak~~ MIRAGE incorporates by reference herein the allegations of Paragraphs 1

1    through 253 above.

2        255.    Each Inventor was an employee of Mirage during the first portion of his active,

3    ongoing concealment of material information from Mirage and owed a duty of disclosure to Mirage.

4        256.    Each Defendant, acting individually and in conspiracy with one another, intentionally

5    failed to disclose the subject matter of the Roberts Patents to Mirage, and the Inventors actively

6    concealed such information from Mirage.  Each such act by each Defendant was willful, intentional,

7    deliberate, and in bad faith.

8        257.    Each Defendant, both individually and in conspiracy with one another, intended to

9    deceive Mirage by concealing the subject mattes of the Roberts Patents.

10        258.    Mirage reasonably and justifiably relied on the Defendants' individual and joint

11    deceptions because each Inventor was under an ongoing obligation to disclose such information to

12    Mirage under the terms of his Employment Agreement.  Mirage has the right to expect the undivided

13    loyalty of its employees and to expect that others will obey the law.

14        259.    Based on the Defendants' knowing, intentional omission of material facts, Mirage

15    determined that its C3I Division had not developed sustainable business opportunities, and closed

16    the C3I Division.

17        260.    The Defendants' conduct was a substantial factor in causing harm to Mirage.

18        261.    Because of the Inventors' fraudulent concealment of material information regarding

19    the customer communications, digital camera invention and the Roberts Patents, and Mirage's

20    justified and reasonable reliance on the statements of the fiduciary-Inventors, Mirage did not know

21    and could not have known about the Roberts Patents and its rights in them until November 2003, at

22    the earliest.

23        262.    As a result, Mirage's cause of action against Defendants could not accrue until

24    November 2003, at the earliest.

25        263.    ~~Eastman Kodak~~ MIRAGE now timely raises this cause of action against Defendants.

26        264.    ~~Eastman Kodak~~ MIRAGE suffered and continues to suffer actual damages as a direct and

27    proximate result of Defendants' actions in an amount in excess of the jurisdictional minimum of this

28    Court.

1

**COUNT XIII: UNFAIR COMPETITION**
**(AGAINST ALL DEFENDANTS)**

2

3     265.    ~~Eastman Kodak~~ MIRAGE incorporates by reference herein the allegations of Paragraphs 1

4     through 264 above.

5     266.    Each Defendant, acting individually and in conspiracy with one another, has engaged

6     in unfair competition under Cal. Bus. & Prof. Code § 17200, *et seq.* Each Defendant has engaged in

7     unlawful, unfair, and fraudulent business practices.

8     267.    Each Defendant, acting individually and in conspiracy with one another, has acted

9     unlawfully by such acts as violating the Uniform Trade Secrets Act, committing the tort of

10    conversion, tortiously breaching duties to Mirage, intentionally and negligently interfering with

11    Mirage's prospective economic advantage, intentionally and negligently misrepresenting facts to

12    Mirage, concealing important and material information from Mirage, and wrongfully procuring

13    unjust enrichment at Mirage's expense. Each such act by each Defendant was willful, intentional,

14    deliberate, and in bad faith.

15    268.    Members of the public are likely to be deceived by Defendants' representations.

16    269.    The Defendants' conduct was a substantial factor in causing harm to Mirage.

17    270.    Because of the Inventors' fraudulent concealment of material information regarding

18    the customer communications, digital camera invention and the Roberts Patents, and Mirage's

19    justified and reasonable reliance on the statements of the fiduciary-Inventors, Mirage did not know

20    and could not have known about the Roberts Patents and its rights in them until November 2003, at

21    the earliest.

22    271.    As a result, Mirage's cause of action against Defendants could not accrue until

23    November 2003, at the earliest.

24    272.    ~~Eastman Kodak~~ MIRAGE now timely raises this cause of action against Defendants.

25    273.    ~~Eastman Kodak~~ MIRAGE suffered and continues to suffer actual damages as a direct and

26    proximate result of Defendants' actions in an amount in excess of the jurisdictional minimum of this

27    Court.

28

**COUNT XIV: UNJUST ENRICHMENT**
**(AGAINST ALL DEFENDANTS)**

Amended and Supplemental Complaint for Declaratory Relief, Damages, Restitution, Disgorgement of Profits and    33
Injunctive Relief – Case No. 1-05-CV-031964

MIRAGE ~*

1  274.   ~~Eastman Kodak~~ incorporates by reference herein the allegations of Paragraphs 1
2  through 273 above.

3  275.   Each Defendant, acting individually and in conspiracy with one another, received
4  benefits from its wrongful conduct and the wrongful conduct of the other Defendants. By way of
5  illustration, but not limitation, each Defendant received benefits from the filing of patent
6  applications, the issuance of patents, the formation and incorporation of PCC, the purported
7  assignment of rights to PCC, the purported assignment of rights to St. Clair, and the enforcement of
8  the Roberts Patents in the St. Clair Infringement Actions. Each Defendant has also received other
9  benefits unknown to Mirage at this time. Each such act by each Defendant was willful, intentional,
10  deliberate, and in bad faith.

11  276.   Each Defendant, acting individually and in conspiracy with one another, wrongfully
12  and unjustly received and retained these benefits at the expense of Mirage.

13  277.   The Defendants' conduct was a substantial factor in causing harm to Mirage.

14  278.   Because of the Inventors' fraudulent concealment of material information regarding
15  the customer communications, digital camera invention and the Roberts Patents, and Mirage's
16  justified and reasonable reliance on the statements of the fiduciary-Inventors, Mirage did not know
17  and could not have known about the Roberts Patents and its rights in them until November 2003, at
18  the earliest.

19  279.   As a result, Mirage's cause of action against Defendants could not accrue until
20  November 2003, at the earliest.

21  280.   ~~Eastman Kodak~~ MIRAGE now timely raises this cause of action against Defendants.
22  281.   ~~Eastman Kodak~~ MIRAGE suffered and continues to suffer actual damages as a direct and
23  proximate result of Defendants' actions in an amount in excess of the jurisdictional minimum of this
24  Court.

25  **PRAYER FOR RELIEF**

26  WHEREFORE, ~~Eastman Kodak~~ MIRAGE prays for judgment against each Defendant and for the relief
27  set forth below:

28  A.   For damages according to proof at the time of trial;

Amended and Supplemental Complaint for Declaratory Relief, Damages, Restitution, Disgorgement of Profits and    34
Injunctive Relief – Case No. 1-05-CV-031964

1      B.    For a declaration that Mirage, at all times prior and up to June 10, 2005, has been the legal and equitable owner of all right, title, and interest in the Roberts Patents and the subject matter thereof;

4      C.    For a declaration that Eastman Kodak has been the legal and equitable owner of all right, title, and interest in the Roberts Patents and the subject matter thereof since June 10, 2005;

6      D.    For a declaration that no Defendant was, at any time, an owner or titleholder of the Roberts Patents or subject matter thereof;

8      E.    For an injunction such that each Defendant shall cease representing to others and shall not represent to others any ownership or title in the Roberts Patents or subject matter thereof;

10      F.    For restitution according to proof at the time of trial;

11      G.    For disgorgement of profits according to proof at the time of trial;

12      H.    For exemplary and punitive damages;

13      I.    For reasonable attorneys' fees according to proof;

14      J.    For costs of suit herein incurred; and

15      K.    For such other and further relief as the Court may deem just and proper.

Dated: June 15, 2005

By: _____

Daniel S. Mount, Esq. (State Bar No. 77517)
Justin T. Beck, Esq. (State Bar No. 53138)
Ron C. Finley, Esq. (State Bar No. 200549)
Mount & Stoelker, P.C.
333 West San Carlos
RiverPark Tower, 17th Floor
San Jose CA 95110-2726
Phone: (408) 279-7000
Fax:    (408) 998-1473

Attorneys for Plaintiff
~~EASTMAN KODAK COMPANY~~ By
MIRAGE SYSTEMS, INC.