# EXHIBIT C

PUBLIC VERSION

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C.

Before the Honorable Robert L. Barton, Jr.
Administrative Law Judge

|  |  |  |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| CERTAIN DIGITAL CAMERAS AND | ) | Inv. No. 337-TA-593 |
| COMPONENT PARTS THEREOF | ) | |
| | ) | |
| | ) | |

RESPONSE OF EASTMAN KODAK COMPANY TO THE COMPLAINT AND NOTICE
OF INVESTIGATION

Respondent Eastman Kodak Company ("Kodak"), pursuant to 19 C.F.R. §210.13, for its

Response states as follows:

### Rule 210.13 Statement

By providing the following information, Kodak intends to supply only statistical and

other data required by or requested in Rule 210.13. Kodak specifically denies that any of the

supplied data refers or relates to any unlawful act under Section 337 or otherwise, and Kodak

specifically denies that its products infringe any of the claims of U.S. Patent Nos. 5,138,459 (the

"'459 patent"), 6,094,219 (the "'219 patent"), 6,323,899 (the "'899 patent"), 6,496,222 (the

"'222 patent") and 6,233,010 (the "'010 patent") (collectively, the "Roberts Patents").

In accordance with the requirements of Rule 210.13(b), Kodak states that it believes that

cameras having a sales revenue of approximately                    **[REDACTED]**

**[REDACTED]** were imported into the United States and sold in 2006. The accused articles are

believed to be classified under Harmonized Tariff Schedule No. 8525.80.40 et seq. Kodak states

PUBLIC VERSION

[REDACTED]

## Response to Notice of Investigation

To the extent the Notice of Investigation contains any allegations separate and apart from those contained in the Complaint, Kodak denies such allegations.

## Response to Complaint

To the extent the headings used in the Complaint contain any allegations, Kodak denies such allegations. Kodak includes the headings from the Complaint in this Response solely for the purpose of clarity.

## 1. INTRODUCTION

1.1.    Kodak states that Section 337 of the Tariff Act, as amended, 19 U.S.C. §1337 ("Section 337") speaks for itself. Kodak denies Complainant St. Clair Intellectual Property Consultants, Inc. ("St. Clair")'s characterizations of this statute, as well as the allegations of liability under it. Kodak denies that it has violated Section 337.

2

**PUBLIC VERSION**

1.2.    Kodak lacks knowledge or information sufficient to form a belief as to the truth of St. Clair's reasons for bringing this action. Kodak denies St. Clair's allegations of unlawful and unauthorized activities in the first sentence of Paragraph 1.2. Kodak states that the Roberts Patents speak for themselves. Kodak admits that copies of the Roberts patents were attached to the Complaint as Exhibits 1-5.

1.3    Kodak states that the claims of the Roberts Patents speak for themselves. Kodak states that the remainder of Paragraph 1.3 is a legal conclusion to which no response is required.

1.4    Kodak states that the named inventors on the Roberts Patents are Marc K. Roberts, Matthew A. Chikosky, and Jerry A. Speasl (the "Inventors"). Kodak admits that the Roberts Patents, on their face, reflect a filing date of November 20, 1990 and that the Inventors conceived of the subject matter claimed in the Roberts Patents, formed Personal Computer Cameras, Inc. ("PCC"), and filed a patent application while employed by Mirage Systems, Inc. ("Mirage"). Kodak admits that the inventors purported to assign their interest in Roberts Patents to PCC, but denies that the Inventors had any rights in the Roberts Patents; the Inventors assigned to Mirage all inventions conceived and/or developed during their employment with Mirage that related to Mirage's business or arose out of work performed for Mirage. Kodak denies the remaining allegations in the third sentence of Paragraph 1.4.

1.5    Kodak admits that PCC purported to assign the right, title, and interest in and to the Roberts Patents to St. Clair, but denies that PCC had any rights in the Roberts Patents; the Inventors assigned to Mirage all inventions conceived and/or developed during their employment with Mirage that related to Mirage's business or arose out of work performed for Mirage. Kodak denies the remaining allegations in the third sentence of Paragraph 1.5.

PUBLIC VERSION

1.6    Kodak lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 1.6.

1.7    Kodak admits that it sells digital cameras manufactured abroad and imported into the United States.  Kodak denies the remaining allegations contained in the first sentence of Paragraph 1.7.  Kodak denies the allegations contained in the second sentence of Paragraph 1.7. Kodak lacks sufficient knowledge or information to form a belief as to the truth of the remedies sought by St. Clair.  Kodak denies that its products infringe the Roberts Patents.

## 2. COMPLAINANT ST. CLAIR

2.1    Kodak denies that St. Clair is the titleholder to the Roberts Patents.  Kodak lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 2.1.

## 3. RESPONDENT KODAK

3.1    Kodak admits the allegations of the first and second sentences of Paragraph 3.1. Kodak admits that it imports and sells cameras manufactured in Asia, but denies that its products infringe the Roberts Patents.

## 4. BACKGROUND OF THE ROBERTS PATENTS

### a. Nontechnical description of the Roberts Patents

4.1    Kodak admits that the Roberts patents relate to digital camera technology and that they each have a common specification.  Kodak states that the Roberts Patents speak for themselves.

4

PUBLIC VERSION

4.2     Kodak states that the Roberts Patents speak for themselves.  Kodak denies St. Clair's characterizations of the Roberts Patents and denies the remaining allegations of Paragraph 4.2.

4.3     Kodak states that the Roberts Patents speak for themselves.  Kodak denies St. Clair's characterizations of the Roberts Patents and denies the remaining allegations of Paragraph 4.3.

4.4     Kodak states that the Roberts Patents speak for themselves.  Kodak denies St. Clair's characterizations of the Roberts Patents and denies the remaining allegations of Paragraph 4.4.

4.5     Kodak admits that, in *Eastman Kodak Co. v. Speasl et al.*, Kodak has asserted that the Inventors misappropriated from Mirage the concept of a digital camera that can format data into one of a plurality of file formats which can be used in multiple applications.

4.6     Kodak denies the allegations contained in Paragraph 4.6.

4.7     Kodak denies the allegations contained in Paragraph 4.7.

4.8.     Kodak states that the Roberts Patents speak for themselves.  Kodak states that the remainder of Paragraph 4.8 is legal conclusion to which no response is required.

**b. PCC's and St. Clair's History with the Roberts Patents**

4.9     Kodak admits that while the Inventors were employed by Mirage, they formed PCC.  Kodak lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 4.9.

5

PUBLIC VERSION

4.10    Kodak admits that, while the Inventors were employees of Mirage, St. Clair worked with PCC to find and develop business opportunities. Kodak lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 4.10.

4.11    Kodak admits that St. Clair invested in PCC. Kodak lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in Paragraph 4.11.

4.12    Kodak admits that it was approached by PCC in 1992. Kodak lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in Paragraph 4.12.

4.13    Kodak denies the allegations contained in Paragraph 4.13.

4.14    Kodak admits that Exhibit 13 to the Complaint purports to be a letter from Mr. Lewis to Mr. Roberts, dated January 15, 1992, and states that Exhibit 13 speaks for itself. Kodak denies the remaining allegations contained in Paragraph 4.14.

4.15    Kodak admits Exhibit 14 to the Complaint purports to be a written agenda for a PCC meeting at Kodak. Kodak states that Exhibit 14 speaks for itself. Kodak denies the remaining allegations contained in Paragraph 4.15.

4.16    Kodak admits that Exhibit 15 to the Complaint purports to be a letter from Mr. Roberts to Mr. Lewis, dated February 13, 1992, and states that Exhibit 15 speaks for itself. Kodak denies the remaining allegations contained in Paragraph 4.16.

PUBLIC VERSION

4.17    Kodak admits that Exhibit 16 to the Complaint purports to be a letter from Mr. Lewis to Mr. Roberts, dated March 18, 1992, and states that Exhibit 16 speaks for itself. Kodak denies the remaining allegations contained in Paragraph 4.17.

4.18    Kodak admits that Exhibit 16 to the Complaint purports to be a letter from Mr. Lewis to Mr. Roberts, dated March 18, 1992, and states that Exhibit 16 speaks for itself. Kodak denies the remaining allegations contained in Paragraph 4.18.

4.19    Kodak denies the allegations contained in Paragraph 4.19.

4.20    Kodak admits that Exhibit 18 to the Complaint purports to be a letter from Mr. Speasl to Mr. Lewis, dated August 17, 1992, and states that Exhibit 18 speaks for itself. Kodak denies the remaining allegations contained in Paragraph 4.20.

4.21    Kodak states that Exhibit 19 speaks for itself. Kodak denies the remaining allegations contained in Paragraph 4.21

4.22    Kodak admits that Exhibit 19 to the Complaint purports to be a letter from Mr. Lewis to Mr. Speasl, dated September 11, 1992, and states that Exhibit 19 speaks for itself. Kodak denies the remaining allegations contained in Paragraph 4.22.

4.23    Kodak admits that Exhibit 20 to the Complaint purports to be a letter from Mr. Woods to Mr. Speasl, dated October 7, 1992, and states that the letter speaks for itself. Kodak denies the remaining allegations contained in Paragraph 4.23.

4.24    Kodak lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in the first and second sentences of Paragraph 4.24. Kodak admits that

PUBLIC VERSION

Exhibit 22 to the Complaint purports to be a letter from Mr. Roberts to Mr. Kelly, dated February 17, 1993, and states that Exhibit 22 speaks for itself. Kodak denies the remaining allegations contained in Paragraph 4.24.

4.25    Kodak denies the allegations contained in Paragraph 4.25.

4.26    Kodak denies that PCC owned the Roberts Patents or any "digital camera technology." Kodak denies that PCC and/or Aura openly marketed the patents or any digital camera technology. Kodak lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in Paragraph 4.26.

4.27    Kodak denies that PCC owned the Roberts Patents. Kodak lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in Paragraph 4.27.

4.28    Kodak admits that St. Clair purported to purchase from PCC all right, title, and interest in and to the Roberts Patents, and states that the Patent Purchase Agreement speaks for itself. Kodak denies that this purported assignment gave St. Clair any right, title, or interest in or to the Roberts Patents; the Inventors assigned to Mirage all inventions conceived and/or developed during their employment at Mirage that related to Mirage's business or arose out of work performed for Mirage, and PCC never had any rights to the Roberts Patents. Kodak lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in Paragraph 4.28.

PUBLIC VERSION

4.29    Kodak lacks sufficient knowledge or information to form a belief as to the truth of the alleged due diligence conducted by St. Clair, and states that St. Clair had notice of the Inventors' assignment to Mirage.

4.30    Kodak admits that St. Clair had become familiar with PCC, and that St. Clair had knowledge of PCC's investors, of PCC's secret incorporation, of the purported assignment of the Roberts Patents to PCC, and of the fact that the inventors worked for Mirage and conceived of the invention during the course of their employment.  Kodak denies that PCC had public marketing and press relating to any "patented technology."  Kodak lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 4.30.

4.31    Kodak lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 4.31.

4.32    Kodak lacks sufficient knowledge or information to form a belief as to the truth of the alleged communications between Mr. Speasl and St. Clair.  Kodak denies the remaining allegations contained in Paragraph 4.32.

4.33    Kodak lacks sufficient knowledge or information to form a belief as to the truth of the alleged communications between Mr. Speasl and St. Clair.  Kodak denies the remaining allegations contained in Paragraph 4.33.

4.34    Kodak lacks sufficient knowledge or information to form a belief as to the truth of the alleged communications between Mr. Speasl and St. Clair.  Kodak denies the remaining allegations contained in Paragraph 4.34.

9

**PUBLIC VERSION**

4.35    Kodak lacks sufficient knowledge or information to form a belief as to the truth of the alleged communications between Mr. Speasl and St. Clair.  Kodak denies the remaining allegations contained in Paragraph 4.35.

4.36    Kodak lacks sufficient knowledge or information to form a belief as to the truth of the alleged communications between Mr. Speasl and St. Clair.  Kodak denies the remaining allegations contained in Paragraph 4.36.

4.37    Kodak lacks sufficient knowledge or information to form a belief as to the truth of the alleged communications between Mr. Speasl and St. Clair.  Kodak denies the remaining allegations contained in Paragraph 4.37.

4.38    Kodak lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 4.38.

4.39    Kodak denies that St. Clair received a valid warranty or representation of title from PCC, since St. Clair had notice that PCC had no title to the Roberts Patents.  Kodak lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in Paragraph 4.39

4.40    Kodak lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence regarding St. Clair's Patent Purchase Agreement with PCC.  Kodak admits that St. Clair purported to record its alleged assignment on January 16, 1996, but denies that it was timely and denies that the alleged assignment assigned any actual rights to the Roberts Patents to St. Clair.  Kodak states that 35 U.S.C. § 261 speaks for itself, and Kodak denies St. Clair's characterization of the statute.  Kodak denies the remaining allegations

10

PUBLIC VERSION

contained in the first sentence of Paragraph 4.40.  Kodak lacks knowledge or information

sufficient to form a belief as to the truth of the allegations contained in the last sentence of

Paragraph 4.40.

## 5. THE ROBERTS PATENTS

5.1     Kodak states that the '459 patent speaks for itself.  Kodak states that the '459

patent, on its face, indicates that it issued from U.S. application Serial No. 07/615,848, filed on

November 20, 1990.  Kodak states that the '459 patent, on its face, indicates that it issued August

11, 1992.  Kodak denies that the '459 patent was "duly and legally issued to PCC, as assignee of

the Inventors."

5.2     Kodak denies the allegations contained in the first sentence of Paragraph 5.2.

Kodak admits that Exhibit 8 purports to be papers filed with the PTO, but denies the remaining

allegations contained in Paragraph 5.2.

5.3     Kodak states that the '219 patent speaks for itself. Kodak states that the '219

patent, on its face, indicates that it issued from U.S. application Serial No. 08/651,562, filed May

22, 1996, which is a continuation of U.S. application Serial No. 08/098,787, filed July 29, 1993

(now U.S. Patent No. 5,576,757), which is a continuation of U.S. application Serial No.

07/878,603, filed May 5, 1992 (abandoned), which is a continuation of U.S. application Serial

No. 07/615,848, filed on November 20, 1990 (now the '459 patent).  Kodak states that the '219

patent, on its face, indicates that it issued July 25, 2000.  Kodak denies that the '219 patent was

"duly and legally issued to St. Clair as assignee."

PUBLIC VERSION

5.4     Kodak states that the '010 patent speaks for itself. Kodak states that the '010 patent, on its face, indicates that it issued from U.S. application Serial No.09/253,831, filed February 19, 1999, which is a continuation of U.S. application Serial No. 08/712,433, filed September 11, 1996 (pending), which is a continuation of U.S. application Serial No. 08/098,787, filed July 29, 1993 (now U.S. Patent No. 5,576,757), which is a continuation of U.S. application Serial No. 07/878,603, filed May 5, 1992 (abandoned), which is a continuation of U.S. application Serial No. 07/615,848, filed on November 20, 1990 (now the '459 patent). Kodak states that the '010 patent, on its face, indicates that it issued May 15, 2001. Kodak denies that the '010 patent was "duly and legally issued to St. Clair as assignee."

5.5     Kodak states that the '899 patent speaks for itself. Kodak states that the '899 patent, on its face, indicates that it issued from U.S. application Serial No.09/541,285, filed April 3, 2000, which is a continuation of U.S. application Serial No. 08/651,562, filed May 22, 1996 (now the '219 patent), which is a continuation of U.S. application Serial No. 08/098,787, filed July 29, 1993 (now U.S. Patent No. 5,576,757), which is a continuation of U.S. application Serial No. 07/878,603, filed May 5, 1992 (abandoned), which is a continuation of U.S. application Serial No. 07/615,848, filed on November 20, 1990 (now the '459 patent). Kodak states that the '899 patent, on its face, indicates that it issued November 27, 2001. Kodak denies that the '899 patent was "duly and legally issued to St. Clair as assignee."

5.6     Kodak states that the '222 patent speaks for itself. Kodak states that the '222 patent, on its face, indicates that it issued from U.S. application Serial No. 09/724,375, filed November 27, 2000, which is a continuation of U.S. application Serial No.09/253,831, filed February 19, 1999 (now the '010 patent), which is a continuation of U.S. application Serial No. 08/712,493, filed September 11, 1996 (pending), which is a continuation of U.S. application

12

PUBLIC VERSION

Serial No. 08/098,787, filed July 29, 1993 (now U.S. Patent No. 5,576,757), which is a continuation of U.S. application Serial No. 07/878,603, filed May 5, 1992 (abandoned), which is a continuation of U.S. application Serial No. 07/615,848, filed on November 20, 1990 (now the '459 patent). Kodak states that the '222 patent, on its face, indicates that it issued December 15, 2002. Kodak denies that the '222 patent was "duly and legally issued to St. Clair as assignee."

    5.7    Kodak admits that copies of the Roberts Patents are attached to St. Clair's Complaint as Exhibits 1-5. Kodak states that Appendices A-G speak for themselves. Kodak lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 5.7.

    5.8    Kodak denies the allegations of Paragraph 5.8.

    5.9    If the overly broad claim construction advocated by St. Clair is adopted, then the asserted claims would not be valid over the prior art. Kodak states that St. Clair's proposed claim construction is incorrect and should not be adopted. (*See* Exs. 31-35 to St. Clair's Complaint).

    5.10    Kodak denies that the Roberts Patents are enforceable by St. Clair, because St. Clair is not the owner of the Roberts Patents.

    5.11    Kodak states Paragraph 5.11 constitutes an opinion and therefore requires no response.

    5.12    Kodak lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 5.12.

13

PUBLIC VERSION

5.13    Kodak states that Exhibit 23 speaks for itself. Kodak admits that claims of the
'459, '219, '010 and '899 patents, before those patents were re-examined by the United States
Patent and Trademark Office, were given a construction by the United States District Court for
the District of Delaware in *St. Clair Intellectual Property Consultants, Inc. v. Sony*, Civil Action
No. 01-557 (JJF), in an order dated September 3, 2002. Kodak denies that such claim
construction is correct or applicable in this case.

5.14    Kodak states that Exhibit 24 speaks for itself. Kodak admits that claims of the
'459, '219, '010 and '899 patents, before those patents were re-examined by the United States
Patent and Trademark Office, were given a construction by the United States District Court for
the District of Delaware in *St. Clair Intellectual Property Consultants, Inc. v. Canon, Inc.*, Civil
Action No. 03-241 (JJF), in an order dated August 31, 2004. Kodak denies that such claim
construction is correct or applicable in this case.

5.15    Kodak states that Exhibits 25-28, 29, and 30 speak for themselves. Kodak states
that the PTO indicated that the claim construction offered by the United States District Court for
the District of Delaware in *St. Clair Intellectual Property Consultants, Inc. v. Sony Corp.*, Civil
Action No. 01-557 (JJF) and *St. Clair Intellectual Property Consultants, Inc. v. Canon, Inc.*,
Civil Action No. 03-241 (JJF) was incorrect. Kodak lacks knowledge or information sufficient
to form a belief as to the truth of the remaining allegations contained in Paragraph 5.15.

## 6. INFRINGEMENT OF THE ROBERTS PATENTS

6.1    Kodak denies the allegations contained in the first two sentences of Paragraph 6.1.
Kodak admits that claim charts were attached as Exhibits 31-35, but denies the allegations

14

PUBLIC VERSION

contained in those claim charts. Kodak lacks knowledge or information sufficient to form a

belief as to the truth of the allegations contained in the last sentence of Paragraph 6.1.

## 7.    IMPORTATION BY KODAK

7.1    Kodak admits that it sells digital cameras in the United States, but denies that its

cameras infringe the Roberts Patents.

7.2    Kodak admits that it imports and sells digital cameras manufactured on behalf of

Kodak in Asia, but denies that such cameras infringe the Roberts Patents.

7.3    Kodak admits that the C643 camera is made in China, and states that the

packaging of the C643 camera speaks for itself.

7.4    Kodak admits that that P880 camera is made in Korea, and states that the

packaging of the P880 camera speaks for itself.

7.5    Kodak admits that the V705 camera is made in Korea, and states that the

packaging of the V705 camera speaks for itself.

7.6    Kodak admits that the Z710 camera is made in China, and states that the

packaging of the Z710 camera speaks for itself.

7.7    Kodak admits that the EasyShare One (6MP) camera is made in China, and states

that the packaging of the EasyShare One (6MP) camera speaks for itself.

7.8    Kodak states that Exhibit 36 speaks for itself.

PUBLIC VERSION

7.9    Kodak denies the allegations contained in the first two sentences of Paragraph 7.9.
Kodak states that Exhibit 37 speaks for itself.

7.10    Kodak admits that the accused products are classified under a U.S. Harmonized
Tariff Schedule Number under the 2006 Harmonized Tariff Schedule of the United States, and
that its imports occur under subheading 8525.80.40.  Kodak denies that its products infringe the
Roberts Patents and denies that its importations are unlawful.

## 8. DOMESTIC INDUSTRY

8.1    Kodak denies the allegations contained in Paragraph 8.1

### a. St. Clair's Domestic Activity

8.2    Kodak lacks knowledge or information sufficient to form a belief as to the truth of
the allegations contained in Paragraph 8.2.

8.3    Kodak lacks knowledge or information sufficient to form a belief as to the truth of
the allegations contained in Paragraph 8.3.

8.4    Kodak lacks knowledge or information sufficient to form a belief as to the truth
of the allegations contained in Paragraph 8.4.

8.5    Kodak lacks knowledge or information sufficient to form a belief as to the truth of
the allegations contained in Paragraph 8.5.

8.6    Kodak denies that St. Clair purchased the right, title or interest in or to the
Roberts Patents.  Kodak lacks knowledge or information sufficient to form a belief as to the truth
of the remaining allegations contained in Paragraph 8.6.

PUBLIC VERSION

8.7    Kodak lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 8.7.

8.8    Kodak lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 8.8.

8.9    Kodak admits the allegations contained in Paragraph 8.9.

8.10    Kodak states that Exhibit 39 speaks for itself. Kodak lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 8.10.

8.11    Kodak lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 8.11.

8.12    Kodak lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 8.12.

8.13    Kodak lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 8.13.

8.14    Kodak admits the allegations contained in Paragraph 8.14.

8.15    Kodak lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 8.15.

8.16    Kodak states that Exhibit 40 speaks for itself. Kodak lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 8.16.

PUBLIC VERSION

8.17    Kodak lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 8.17.

8.18    Kodak states that Exhibit 41 speaks for itself. Kodak lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 8.18.

8.19    Kodak admits that St. Clair contacted Kodak about a potential license to the Roberts Patents in 2004. Kodak lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 8.19.

8.20    Kodak denies that its digital cameras sold in the United States infringe the Roberts Patents. Kodak lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 8.20.

8.21    Kodak admits the allegations contained in Paragraph 8.21.

8.22    Kodak lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 8.22.

8.23    Kodak lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 8.23.

8.24    Kodak admits the allegations contained in Paragraph 8.24.

8.25    Kodak lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 8.25.

18

PUBLIC VERSION

8.26    Kodak lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 8.26.

8.27    Kodak admits the allegations contained in Paragraph 8.27.

8.28    Kodak lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 8.28.

8.29    Kodak lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 8.29.

**b. St. Clair's Licensees' Domestic Activities**

8.30    Kodak states that U.S.C.§ 1337 speaks for itself.  Kodak lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 8.30.

8.31    Kodak lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 8.31.

8.32    Upon information and belief, Kodak states that the documents contained in Confidential Appendix N speak for themselves.

**9.    RELATED LITIGATION**

9.1    Kodak admits the allegations contained in Paragraph 9.1.

9.2    Kodak admits the allegations contained in Paragraph 9.2.

9.3    Kodak admits the allegations contained in Paragraph 9.3.

19

PUBLIC VERSION

9.4    Kodak admits the allegations contained in the first sentence of Paragraph 9.4. Kodak states that its initial Answer to St. Clair's Complaint, which was filed before Kodak purchased the Roberts Patents from Mirage, speaks for itself. Kodak admits that the Delaware infringement litigation has been stayed, and states that it has not addressed validity or ownership in that case because proceedings have been stayed. Kodak denies that it has not made any allegation that St. Clair is not the true owner of all right, title, and interest in and to the '459, '219, '010, and '899 patents. Kodak denies the remaining allegations contained in Paragraph 9.4.

9.5    Kodak admits that, on April 12, 2005, Mirage filed suit against St. Clair and the Inventors in the Superior Court of California, County of Santa Clara, claiming that Mirage owns the Roberts Patents and seeking, among other things, a declaration of title to the Roberts Patents. allegations contained in the first sentence of Paragraph 9.5. Kodak admits that it acquired Mirage's rights to the Roberts Patents through an agreement signed May 20, 2005, but denies St. Clair's characterization of that agreement. Kodak admits that Kodak was substituted as Plaintiff in the California ownership action on May 24, 2006. Kodak admits that St. Clair has filed a cross-complaint, thereby invoking the jurisdiction of the California state court. Kodak denies the remaining allegations contained in Paragraph 9.5.

9.6    Kodak admits that St. Clair filed suit against Mirage and against Mr. Moussally and Mr. Ford on May 6, 2005 in the District of Delaware. Kodak admits the allegations contained in the second, third, and fourth sentences of Paragraph 9.6. Kodak denies that Kodak or Mirage committed any tort, and denies that St. Clair is entitled to any tort damages. Kodak denies that St. Clair's "ownership" rights were undermined, and states that St. Clair has no such ownership rights. Kodak denies that St. Clair's ability to license the Roberts Patents was

PUBLIC VERSION

interfered with, and denies that St. Clair has any legitimate ability or right to license the Roberts Patents.

    9.7    Kodak admits the allegations contained in Paragraph 9.7.

    9.8    Kodak admits the allegations contained in Paragraph 9.8.

    9.9    Kodak lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 9.9.

## 10.    REQUEST FOR RELIEF

    10. Kodak denies that St. Clair is entitled to the requested relief.

### First Affirmative Defense

Kodak is the rightful owner of the Roberts Patents such that St. Clair has no standing to assert the Roberts Patents. Jerry Speasl, Marc Roberts, and Matthew Chikosky, the named inventors of the Roberts Patents (the "inventors"), conceived of the invention(s) described in the Roberts Patents while they were employees of Mirage Systems, Inc. ("Mirage") and in connection with their work at Mirage. Kodak is Mirage's successor-in-interest, and, in California State Court, is seeking a declaration that it is the legal owner of the Roberts Patents.

Prior to their employment with Mirage, the inventors had each signed employment agreements in which they: (1) assigned to Mirage all inventions conceived during their employment that related to Mirage's business/research and development, or arose out of work performed for Mirage (meaning any covered inventions would immediately vest in Mirage upon conception of the invention); and (2) agreed to promptly disclose to Mirage all inventions

21

PUBLIC VERSION

conceived during their employment so that Mirage could determine whether such inventions related to its business.

In 1989, while working on a project involving unmanned aerial vehicles, the inventors conceived of and developed an idea for a digital camera that could save images in multiple formats, thereby allowing the images to be easily transferred to computers for analysis. In addition to the use of the invention with a UAV, the inventors explored a concept for the U.S. Army in which the invention would be used to take and send images remotely, general applications for security organizations, and applications for intelligence operations. The inventors have also admitted that the invention would assist them in their work for Mirage by allowing them to efficiently incorporate digital images into presentations to Mirage customers.

Instead of promptly disclosing the invention to Mirage, as required by their employment agreements, the inventors concealed the invention and sought to retain the benefits for themselves. The inventors secretly formed their own company, Personal Computer Cameras, Inc. ("PCC"), filed a patent application, and then purported to assign the rights to the expected patents to PCC. St. Clair helped the inventors develop and market the Roberts Patents while they were still employees of Mirage, and, in 1995, purported to purchase the Roberts Patents from PCC. Given the circumstances of the invention's conception and reduction to practice, however, the alleged assignments to PCC and St. Clair were a nullity. The invention related to Mirage's business, it was covered by the inventors' employment agreements, and any rights to it vested immediately in Mirage upon conception. The inventors never possessed any ownership interest in the invention and therefore had nothing to convey to PCC or to St. Clair.

22

PUBLIC VERSION

Mirage learned of the invention described in the Roberts Patents in 2003 when Canon served it with a subpoena in connection with a patent infringement action brought by St. Clair. Prior to this subpoena, Mirage was unaware that the Individual Defendants had developed the digital camera idea as employees of Mirage, used Mirage resources to do so, secretly formed a separate company to profit from the invention, and concealed business opportunities relating to the invention. After learning of the existence of the Roberts Patents, Mirage investigated the facts regarding the invention, uncovered the circumstances surrounding its conception and development, and initiated the California ownership litigation. In June 2005, Kodak purchased Mirage's rights to the Roberts Patents, and Kodak now owns the very patents it is accused of infringing in this Investigation.

<u>Second Affirmative Defense</u>

Respondent's investigation of the Roberts patents is ongoing. Respondent reserves the right to amend and/or supplement this Response to add new prior art or additional arguments in light of its continuing investigation and if and when discovery progresses.

In Exhibits 31-35 to the Complaint, St. Clair provides preliminary infringement claim charts that appear to construe material claim terms – particularly "file format" and its variants – broadly in a manner which may be an attempt to follow claim constructions from earlier District Court litigations against other parties, but which ignores the superceding constructions provided by the U.S. Patent and Trademark Office Examiner in the reexamination file histories for each of the '459, '219, '010, and '899 patents. St. Clair's claim construction (the "St. Clair Construction") is incorrect based not only on what the Roberts Patents describe as the invention,

23

PUBLIC VERSION

but also because giving the claims such a broad construction would render the patents invalid under 35 U.S.C. §§ 102 and 103.

During the reexaminations of each of the '459, '219, '010, and '899 patents, the Examiner explicitly noted that "a very different interpretation than that adopted by the court must be made" with respect to the definition for the common claim limitation "formatting the digital image signal in one of a plurality of computer image file formats." (*See In re Reexamination of U.S. Patent No. 6,323,899,* Control No. 90/006/438, 6/20/05, Office Action, Paper No. [not provided by PTO], p. 2, ¶1) Whereas Judge Farnan had construed this term without reference to the hardware associated with the saved image data, the Examiner defined it to mean "formatting the image signal as one of an IBM PC/Clone, Apple Mactintosh, or other PC format." It was only under this alternate construction that the Examiner during the reexamination process confirmed the patentability the claims over the prior art of record. The Examiner did not determine whether the claims would be valid under the construction that he found to be in error.

Despite the clear and explicit construction provided by the Examiner for the limitation "formatting the digital image signal in one of a plurality of computer image file formats" (and similar terms in the other asserted claims), St. Clair has asserted that the accused cameras infringe this limitation not based on any hardware associated with image data saved, but because they allegedly "format a digital image signal in either a JPEG or QuickTime image file format." (*See* Ex. 31 at p. 2). However, this construction, which ignores the computer hardware associated with the stored image data, and also ignores the fact that there is no selection of a data format for any given still image recorded, must be in error because a review of the prior art demonstrates that several other individuals and entities, when confronted with problems relating to digital imaging technology, conceived, reduced to practice, sold, offered for sale, and

24

PUBLIC VERSION

described in printed publications the alleged broad "invention" that would be covered under the St. Clair Construction. Following are examples of prior art that would anticipate and/or make obvious the asserted claims if they were to be given St. Clair's proposed construction.

A.    WO 90/0917 to Kuhberger ("Kuhberger")

The Kuhberger PCT application claims February 20, 1989 as a priority date and was published August 28, 1990. Kuhberger discloses an electronic camera having an optical lens and shutter, a digital image pick-up unit and a storage device, and a microcomputer for controlling the camera containing processing and control programs. Kuhberger describes a process for generating an analog image signal corresponding to an image incident on the pick-up unit (e.g., a CCD), digitizing the signal from the CCD or other pick-up unit, storing digital image data in buffer memory, putting the digital data in a data format that can be read directly by a standard computer (e.g., GEM, Paintbrush, PCX, TIF, etc.), and saving the resultant data on a removable, computer-readable disk.

St. Clair submitted Declarations and other exhibits in the reexamination file histories for the '899 and '010 patents in an attempt to demonstrate an earlier conception date for those patents than August 28, 1990. However, the allegedly contemporaneous documents submitted in those file histories do not evidence any conception that would be supported by the St. Clair Construction. As such, at least under the St. Clair Construction, Kuhberger is prior art to the Roberts patents at least under 37 U.S.C. §102(a).

B.    The Kodak Hawkeye II Camera

25

PUBLIC VERSION

The Hawkeye II was an electronic camera developed by Kodak having an optical lens and shutter, a digital image pick-up unit in the form of a CCD, and analog-to-digital converter, buffer memory for short-term storage of digital image data, long-term storage, and a microcomputer for controlling the camera containing processing and control programs. Kodak developed two versions of the Hawkeye II camera in the late 1980's and continuing into 1990. The first Hawkeye II was an integrated digital electronic camera with a removable memory card that could and did store image data as TIFF images. The second Hawkeye II was a digital electronic camera in two parts with an imaging unit tethered to a shoulder pack, in which digital images could be and were stored as TIFF images or as NITF images in a hard drive of the shoulder pack. Both the conception and reduction to practice of both versions of the Hawkeye II took place before November 20, 1990, and offers for sale of the Hawkeye II were made as well. Thus, both Hawkeye IIs qualify as prior art under at least 37 U.S.C. § 102(a), (b) and (g).

C.    The Kodak E-CAM Camera

The ECAM camera (also called D-5000) was an integrated electronic camera developed by Kodak having an optical lens and shutter, a digital image pick-up unit in the form of a CCD, an analog-to-digital converter, buffer memory for short-term storage of digital image data, long-term storage, and a microcomputer for controlling the camera containing processing and control programs. The ECAM could store digital images in a compressed or uncompressed format, depending on a setting of a switch on the camera. If stored in compressed format, the image data will be stored in a file with a different arrangement of data than if uncompressed – the file will contain such additional information as a quantization information table for decoding the compressed image data. Both the conception and reduction to practice of the ECAM took place

PUBLIC VERSION

prior to November 1990. Thus, the ECAM qualifies as prior art under at least 37 U.S.C. § 102
(g).

**D.    U.S. Patent No. 4,546,390 to Konishi ("Konishi")**

U.S. Patent No. 4,546,390 ("the Konishi patent") issued on October 8, 1985 and therefore

qualifies as prior art to the Roberts patents at least under 35 U.S.C. § 102(b). The Konishi

patent discloses a self-contained portable electronic combination still/movie camera that utilizes

a simple audio-grade recording device to store both still and movie pictures. The Konishi patent

discloses a mode change-over switch and control unit for selecting either a still picture format or

a movie format. The Konishi patent also includes a mode decision circuit in the control unit,

which is responsive to the mode change-over switch, that converts the output data to the user

selected format.

**E.    U.S. Patent Nos. 5,034,804 and 5,018,017 to Sasaki ("Sasaki '804" and
"Sasaki '017")**

U.S. Patent Nos. 5,034,804 and 5,018,017 (the "Sasaki '804 patent" and "Sasaki '017

patent") were filed on December 23, 1988 and December 8, 1989, respectively, and issued on

July 23, 1991 and May 21, 1991, respectively. These patents qualify as prior art to the Roberts

patents at least under 35 U.S.C. § 102(e). The application that led to the Sasaki '017 patent is a

continuation-in-part ("CIP") of the application that led to the Sasaki '804 patent. Thus, much of

the disclosure of the Sasaki '017 is the same as the disclosure in the Sasaki '804 patent.

The Sasaki '804 patent and Sasaki '017 patent disclose a self-contained portable

electronic still camera, the components of which -- including a CCD array, analog-to-digital

converter and a data compression unit -- are contained in a single housing, which stored digital

data, which could be image data, voice data or other types of data, in files stored on a removable

27

PUBLIC VERSION

memory card. The Sasaki '804 and '017 patents teach that the user of the disclosed camera could select one of a plurality of recording modes (A)-(D) for recording the digital image data in files on a removable memory card. In mode (A), full-resolution data is stored in a file on the memory card. In mode (B), subsampled data is stored in a file on the memory card. In modes (C) and (D), compressed, subsampled data is stored in a file on the removable memory card with one of two different levels of compression. The data could be compressed using a variety of compression algorithms, including DPCM (differential pulse code modulation), which quantified the difference between an image's actual value at each pixel and its predicted value based on one or more previous pixels. These differences are then stored in smaller amounts of memory than would be required to store the original image. In this type of compression, the algorithm is applied to the image data, changing the arrangement of image data in the compressed file as compared to the arrangement of data in the uncompressed file.

F.    U.S. Patent No. 5,164,831 to Kuchta ("Kuchta patent")

U.S. Patent No. 5,164,831 ("the Kuchta patent"), which was filed on March 15, 1990 and issued November 17, 1992, qualifies as prior art to the Roberts patents at least under 35 U.S.C. § 102(e). The Kuchta patent, which is assigned to Kodak, describes an electronic still camera that provides multi-format storage of full and reduced resolution images that are stored in digital files on a removable memory card. The Kuchta patent teaches that the camera produces a file that contains image data in two image file formats (thumbnail format and full resolution format). With the full resolution file format, the image is compressed by a series of steps, including DCT (discrete cosine transform), block-to-serial conversion, thresholding, normalization, quantization, and minimum redundancy encoding, as described in the patent. In the thumbnail image file

28

PUBLIC VERSION

format, two different possible averaging algorithms may be used -- one that uses the averaged or

DC values from the DCT algorithm or one that simply averages values over blocks of pixels.

F.    Thermovision, Tessera 2K, Dycam and EDC 1000 Cameras

    1.    Agema Thermovision 470 camera

    The Agema Thermovision 470 camera is a self-contained, portable, thermal-imaging

digital camera. It was developed in the mid 1980s and offered for sale in 1989. The Agema

Thermovision 470 integrated all of the essential features of a digital camera into a portable self-

contained system. The image sensor was sensitive in the thermal infrared spectrum. Digital

images were captured and temporarily stored in camera memory before being formatted and

stored on a floppy disk drive in the camera by the camera's microprocessor. The digital image

data could be arranged and stored in two different formats (MAG format and non-MAG format).

The floppy disk could be removed from the camera, inserted into the floppy disk drive in a

personal computer, and directly read and stored by any IBM PC. The Agema Thermovision 470

qualifies as prior art under at least under 35 U.S.C. §§ 102(a), (b), and (g).

    2.    MegaVision Tessera 2K camera

    The MegaVision Tessera 2K camera was a digital camera primarily for use by the

professional commercial photographer. The camera contained a camera head, which contained a

lens, shutter, color wheel, and light sensor. The camera also contained a processor and a

controller, to which images were sent from the camera head via a cable. The processor digitized

the images and stored them in a buffer. The controller provided long-term image storage

facilities such as magnetic and optical disks, floppy disks, and tape drives. A user could select

one of several image file formats such as Elph, Targa 16, Targa 32, CT2T/T2CT, Hell, Crosfield,

29

PUBLIC VERSION

and TIFF.  The MegaVision Tessera 2K camera qualifies as prior art at least under 35 U.S.C. §§

102(a), (b), and (g).

### 3.    Dycam Model 1 Digital Still Camera

The Dycam Model 1 was a self-contained, portable, digital still camera that was first

demonstrated in June 1990.  The camera included a battery, a shutter button, a lens, a flash, a

viewfinder, a CCD, an analog to digital converter, a microprocessor, and internal memory.  The

Dycam Model 1 stored digital image data in an internal solid state (semiconductor) memory.

Each photo was stored in memory in an uncompressed RAW image file format.  The digital

image data was transferred from the internal memory to an IBM PC or Macintosh computer via a

cable.  The Dycam Model 1 transferred digital image data to a computer as raw data, and the user

could selectively convert the RAW format into either the TIFF or PICT format using the

computer.  The Dycam Model 1 qualifies as prior art under at least 35 U.S.C. §§ 102(a), (b), and

(g).

### 4.    Electrim EDC-1000 Digital Camera

The Electrim EDC-1000 was a digital camera that was first publicly demonstrated and

sold in the spring of 1989.  The EDC-1000 contained a camera head, a lens, a connecting cable

for use with a computer, and an interface card.  The EDC-1000 used a personal computer (e.g.,

IBM PC or compatible) as the microprocessor.  Commands for the device were issued by using

the connected computer.  The camera used a CCD to capture an image and it output an 8-bit

digital signal corresponding to the captured brightness levels.  The camera utilized the floppy

drive of the PC as the storage device.  The EDC-1000 could save digital image data in multiple

PUBLIC VERSION

formats, including TIFF, PCX, and BUF (Electrim's proprietary RAW format). The EDC-1000

qualifies as prior art under at least 35 U.S.C. §§ 102(a), (b), and (g).

**G.    Section 103 Considerations**

While discovery is just commencing as to critical issues related to the analysis under the

St. Clair Construction, Kodak contends the following with respect to § 103 considerations:

**1.    Scope and Content of the Prior Art**

Several key pieces of prior art to the Roberts patents under the St. Clair Construction

have been outlined above. From a review of this and other prior art, it is clear that although

many elements of the asserted claims of the Roberts patents are directed towards various features

of electronic still cameras, the named inventors on those patents did not invent electronic still

cameras. Indeed, Kodak built the world's first digital camera in 1975. Nor did the named

inventors invent the use of CCD's in electronic cameras, or analog-to-digital converters, or

buffering and long-term storage of digital image data, or generating files in electronic still

cameras that are computer-readable, or formatting computer disks and/or memory cards. All of

these features were common and well known in the prior art. By 1980, there were already

products on the market that could perform any or all of these functions. The limiting factors

related to the costs and technological constraints associated with random access and long term

memory were less limiting as the 1980's progressed, and by the late 1980's it had become more

feasible to include more components within a single housing.

**2.    The Difference Between the Claimed Invention and the Prior Art**

31

**PUBLIC VERSION**

Under the St. Clair Construction for the claims, there is no difference between the claimed invention and the prior art – there are simply no claim limitations that cannot be found in the prior art. Nor has St. Clair identified how, under the St. Clair Construction, any particular combination of well-known features could be considered unforeseeable or unique.

### 3.    Objective Evidence of Non-Obviousness

While discovery has not commenced on this issue, it is clear that there is little evidence of non-obviousness under the St. Clair Construction of the asserted claims.

### 4.    Explicit/Implicit Motivations to Combine

Several of the pieces of prior art described herein were developed by Kodak or Kodak's competitors. There is an explicit motivation to combine different aspects of different products from the same manufacturer. There is also an explicit motivation to combine different but complementary products from different manufacturers, which products also constitute art that persons of ordinary skill would find of special importance when designing an electronic still camera.

There is also a motivation to combine references based on the nature of the problem to be solved under the St. Clair Construction. If the St. Clair Construction of the asserted claims of the Roberts patents is given effect, then the nature of the problem to be solved would appear to be how to take digital image data in an electronic camera and store it on long-term memory such that it can be later accessed. In other words, if the claim limitation "formatting the data signal in one of a plurality of computer formats" merely means arranging the digital image data into one of a plurality of image formats, including JPEG, GIF, TIFF, PICT, BMP, JFIF, etc., then the

32

PUBLIC VERSION

nature of the problem that is being solved would be generally the problem of how to store data in long-term memory for later access. Persons of ordinary skill in the art confronted with a problem of this nature would thus look to see how digital data is stored in electronic cameras already built or described in patents or other publications, as well as how digital data is stored in other devices including scanners and computers. The elements described in the Roberts patents for manipulating and storing the digital image data – including analog-to-digital converters, buffers, long-term memory, and microprocessors – are just as ubiquitous in these other fields as they are in the field of electronic still cameras.

If the St. Clair Construction is given effect, then the "invention" of the Roberts patent would thus be characterized as requiring the data to be saved in a computer format that accepts digital data. However, it is beyond reasonable dispute that electronic cameras, as well as computers, scanners and other devices, formatted and stored digital image data in digital files long before November 1990. Thus, under the St. Clair Construction, the nature of the problem to be solved had already been solved long before the Roberts patents were applied for.

H. Section 112 Considerations

If the patents were given St. Clair's proposed construction, the patents would also be invalid under 35 U.S.C. § 112 ¶1. The patents' specifications disclose an invention that allows a user to store images in formats for at least two different hardware systems (e.g., IBM PC, Macintosh, etc.). The specifications do not disclose an invention that allows a user to choose between any two or more formats regardless of hardware platform. If the patents are construed broadly to encompass any two such formats (as St. Clair proposes), the patents' disclosure would

33

PUBLIC VERSION

not support the claims, and the claims would be invalid for failing to meet the written description requirement of § 112 ¶1.

### Third Affirmative Defense

The asserted claims of the Roberts Patents are not infringed by the accused Kodak cameras directly and/or by inducement:

PUBLIC VERSION

U.S. Patent No. 5,138,459                 Roberts, et al.  August 11, 1992

Electronic still video camera with direct personal computer (PC) compatible digital format output

| | |
|---|---|
| 16. A process for storing an electronically sensed video image comprising the steps of: | |
| [a]     generating an analog image signal corresponding to the imagewise pattern of radiant light incident on a plurality of light sensing pixel elements, | |
| [b]     converting the analog image signals into digital electronic information signals wherein a distinct digital electronic signal corresponds to the analog image signals corresponding to the intensity of radiant light falling on the light sensing pixel elements, | |
| [c]     temporarily storing the digital electronic information signals, | |
| [d]     recording in selectable addressable memory means at least one of a plurality of different digital output data format codes where each of said plurality of output data format codes corresponds respectively to one of a like plurality of different data formats for different types of computer apparatus, | **[REDACTED]** |
| [e]     selecting from said selectable addressable memory means one of said different digital output data format codes to be associated with each said digital electronic information signals, and | **[REDACTED]** |
| [f]     storing said digital electronic information signals in a digital memory in accordance with said selected output data format code. | **[REDACTED]** |

PUBLIC VERSION

U.S. Patent No. 6,094,219                    Roberts, et al.  July 25, 2000

Electronic still video camera with direct personal computer (PC) compatible digital format output

| | |
|---|---|
| 1. In an electronic camera including means for digitizing captured image data and a memory element for storing digitized image data, the improvement comprising: | |
| [a]    output data control means for selecting for each digitized captured image to be stored in the memory element one of a plurality of different output data format codes stored in the camera and assigning the selected format code to the digitized captured image, each output data format code corresponding to at least one of a plurality of different data formats for different types of information handling systems, and | **[REDACTED]** |
| [b]    logic means responsive to said output data control means for determining an output data format for each digitized captured image in accordance with the assigned output data format code. | **[REDACTED]** |
| 2. The improved arrangement of claim 1 further comprising picture image resolution determining means for selectively determining which of a plurality of compression algorithm parameters are to be applied to said digitized captured image. | Because Kodak's accused cameras do not infringe independent claim 1, they do not infringe dependent claim 2 |
| 3. The improved arrangement of claim 2 wherein said memory element comprises a removably mounted digital disk. | Because Kodak's accused cameras do not infringe dependent claim 2, they do not infringe dependent claim 3 |
| 8. The improved arrangement of | Because Kodak's accused cameras do not |

PUBLIC VERSION

| | |
|---|---|
| claim 1 further comprising audio recording means for simultaneously storing digital audio signals associated with each subject image and memory file correlation means for associating in said memory element the respective storage locations of said audio signals with its associated image signals. | infringe independent claim 1, they do not infringe dependent claim 8.<br><br>**[REDACTED]** |
| 10. An electronic camera comprising: | |
| [a]     means for capturing image data corresponding to a selected image; | |
| [b]     means for digitizing captured image data; | |
| [c]     removably mounted memory means for storing digitized image data; | |
| [d]     output data format control means for storing in said camera at least one of a plurality of different output data format codes where each of said plurality of output data format codes corresponds respectively to at least one of a plurality of different data file formats for different types of computer apparatus; and | **[REDACTED]** |
| [e]     logic means responsive to said format control means for selectively controlling the formatting of said digitized captured image data in accordance with a selected one of said plurality of different output data format codes. | **[REDACTED]** |
| 12. The device of claim 10 further comprising image resolution determining means for selectively determining which of a plurality of compression algorithm parameters are to be applied to said digitized image data. | Because Kodak's accused cameras do not infringe independent claim 10, they do not infringe dependent claim 12 |
| 16. An improved electronic camera comprising: | |
| [a]     an optical lens; | |
| [b]     shutter means operably associated with said lens; | |
| [c]     an array of discrete light sensing pixel elements, each pixel being responsive to incident illumination from a subject image radiating through said lens | |

37

PUBLIC VERSION

| | |
|---|---|
| and shutter means to generate an analog picture information signal corresponding to said subject image; | |
| [d]    analog to digital converter means for converting said analog picture information signal into corresponding digital data information signals; | |
| [e]    memory means for storing said digital data information signals; | **[REDACTED]** |
| [f]    output data control means for selecting for each digital data information signal one of a plurality of different output data format codes prerecorded in said camera and assigning the selected output data format code to the digital data information signal, each output data format code corresponding respectively to at least one of a plurality of different data formats for different types of information handling apparatus; and | **[REDACTED]** |
| [g]    logic means responsive to said output data control means for determining the output data format file structure of said digital data information signals in accordance with said assigned output data format code. | **[REDACTED]** |
| 17. The improved electronic camera of claim 16, further comprising picture image resolution determining means for selectively determining which of a plurality of compression algorithm parameters are to be applied to said digital data information signals. | Because Kodak's accused cameras do not infringe independent claim 16, they do not infringe dependent claim 17 |
| 18. The improved electronic camera of claim 16, wherein said memory means comprises digital data means having a plurality of addressable sections for storing said digital data information signals. | Because Kodak's accused cameras do not infringe independent claim 16, they do not infringe dependent claim 18 |

**PUBLIC VERSION**

U.S. Patent  6,233,010          Roberts, et al.  May 15, 2001

Electronic still video camera with direct personal computer (PC) compatible digital format output

| | |
|---|---|
| 1. A digital camera for taking pictures and storing them in a removable storage device in the camera, said digital camera apparatus comprising: | |
| [a]      an image pick-up unit for generating and outputting a digital image signal photoelectrically converted from an image incident thereon, and | **[REDACTED]** |
| [b]      a digital control unit for formatting said digital image signal in one of a plurality of computer formats. | **[REDACTED]** |

PUBLIC VERSION

U.S. Patent  6,323,899       Roberts, et al.  November 27, 2001

Process for use in electronic camera

| | |
|---|---|
| 1. For use in an electronic camera having an image pick-up unit and a storage device, a process for taking and storing digital pictures, the process comprising: | |
| [a]     generating a digital image signal corresponding to an image incident on the image pick-up unit; | |
| [b]     formatting the digital image signal in one of a plurality of computer image file formats; and | **[REDACTED]** |
| [c]     storing the formatted image file in the storage device. | |
| 2. A process as in claim 1, wherein the storage device is removable. | Because Kodak's accused cameras do not infringe independent claim 1, they do not infringe dependent claim 2 |
| 3. For use in an electronic camera having an image pick-up unit and a storage device, a process for taking and storing digital pictures, the process comprising: | |
| [a]     selecting one of a plurality of computer image file formats in the camera; | **[REDACTED]** |
| [b]     generating a digital image signal corresponding to an image incident on the image pick-up unit; | |
| [c]     formatting the digital image signal in the selected computer image file format; and | **[REDACTED]** |
| [d]     storing the formatted computer image file in the storage device. | |
| 4. A process as in claim 3, wherein the storage device is removable. | Because Kodak's accused cameras do not infringe independent claim 3, they do not infringe dependent claim 4 |

40

PUBLIC VERSION

U.S. Patent No. 6,496,222     Roberts, et al.  December 17, 2002

Digital camera with memory format initialization

| | |
|---|---|
| 5. For use in a digital camera utilizing an IBM compatible memory format, a method for changing the format of a digital storage medium formatted in an Apple compatible memory format to the IBM compatible memory format, comprising: | **[REDACTED]** |
| [a]     checking in the camera a boot area of the storage medium to determine if the storage medium Is formatted in the IBM compatible memory format; | **[REDACTED]** |
| [b]     providing a format error indication to an operator of the camera if the checking determines that the storage medium is not formatted in the IBM compatible memory format; and | **[REDACTED]** |
| [c]     formatting the storage medium in the camera in the IBM compatible memory format in response to an operator control of the camera. | **[REDACTED]** |
| 6. A method as in claim 5, wherein the storage medium is removably coupled to the camera. | Because Kodak's accused cameras do not infringe independent claim 5, they do not infringe dependent claim 6 |
| 9. In a digital camera utilizing an IBM compatible memory format, the improvement comprising: | **[REDACTED]** |
| [a]     a controller operative to change the format of a digital storage medium from an Apple compatible memory format to the IBM compatible memory format. | **[REDACTED]** |

41

PUBLIC VERSION

|  | [REDACTED] |
|---|---|
| 10. A digital camera, comprising: | |
| [a]     an assembly operative to receive a digital storage medium, the storage medium having a boot area including information identifying an Apple compatible memory format of the storage medium; and | [REDACTED] |
| [b]     a control unit operative to (a) check the boot area, and (b) format the storage medium in an IBM compatible memory format for use with the camera. | [REDACTED] |
| 11. For use in a digital camera, a method for changing the format of a digital storage medium from an Apple compatible memory format to an IBM compatible memory format, the method comprising: | [REDACTED] |
| [a]     determining in the camera if the storage medium is formatted in the IBM compatible memory format; and | [REDACTED] |
| [b]     formatting the storage medium in the camera in the IBM compatible memory format. | [REDACTED] |
| 12. A process for use in a digital camera utilizing an IBM compatible memory format, comprising: | [REDACTED] |
| [a]     coupling a removable digital storage medium with the camera, the storage medium formatted in one of a plurality of memory formats; | [REDACTED] |
| [b]     determining in the camera if the storage medium is formatted in the IBM compatible memory format; and | [REDACTED] |
| [c]     formatting the storage medium In the camera in the IBM compatible memory format. | [REDACTED] |

PUBLIC VERSION

## Fourth Affirmative Defense

St. Clair's Complaint fails to state a claim upon which relief may be granted because St. Clair's allegations of a domestic industry are insufficient to state a claim under Section 337. St. Clair has failed to plead facts which, if true, establish for the Roberts Patents: (1) that there existed significant investment in plant and equipment in the United States at the time of the filing of the Complaint; (2) that there was significant employment of labor or capital in the United States at the time of the Complaint's filing; or (3) that there was substantial investment in the exploitation of the Roberts Patents, either through engineering, research and development, or licensing, as of the time of the filing of the Complaint. St. Clair itself does not practice the Roberts Patents, and does not otherwise design, manufacture or sell digital cameras or any other products.

## Fifth Affirmative Defense

St. Clair's Complaint is barred by the doctrine of laches. Kodak has sold electronic digital cameras starting in the 1980's and continuing throughout the 1990's and to the present. To the extent St. Clair has any cause of action against any of the accused cameras (and Kodak denies that such a cause of action exists), such cause of action would have been viable against cameras sold by Kodak from 1995 and thereafter. St. Clair did not charge Kodak with infringement until November 9, 2004, when it filed suit in the District of Delaware, nearly nine years after it purported to acquire the rights to the patents at issue. St. Clair's actions constitute an unreasonable delay, and this delay has prejudiced Kodak.

43

PUBLIC VERSION

### Sixth Affirmative Defense

The Roberts Patents are unenforceable by St. Clair.

WHEREFORE, Kodak respectfully requests that the International Trade Commission:

A.    Dismiss with prejudice St. Clair's Complaint;

B.    Declare that Kodak does not infringe the Roberts Patents;

C.    Declare that Kodak is the owner of the Roberts Patents;

D.    Award Kodak its attorneys' fees, experts' fees, and costs incurred in this proceeding; and

E.    Award any other and further relief to which Kodak may be entitled.

Respectfully submitted,

EASTMAN KODAK COMPANY
By its counsel,

William F. Lee
Don Steinberg
Michael J. Summersgill
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000

44

**PUBLIC VERSION**

Michael D. Esch
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue N.W.
Washington, D.C. 20006
Tel: (202) 663-6420
Fax: (202) 663-6363

S. Calvin Walden
WILMER CUTLER PICKERING HALE AND DORR LLP
399 Park Avenue
New York, NY 10022
Tel: (212) 230-8800
Fax: (212) 230-8888

Eric J. Ward
WARD NORRIS HELLER & REIDY LLP
300 State Street
Rochester, NY 14614
Tel: (585) 454-0700
Fax: (585) 423-5910

45

PUBLIC VERSION

## VERIFICATION OF RESPONSE

I, Laura G. Quatela, Managing Director, Intellectual Property Transactions, Vice President, Eastman Kodak Company, for and on behalf of Respondent Eastman Kodak Company, declare under penalty of perjury, in accordance with 19 C.F.R. §§ 210.4(c) and 210.13, that the following statements are true:

1.     I am duly authorized to execute this verification.

2.     I have read the foregoing Response to St. Clair's Complaint, and am familiar with the allegations and factual statements contained therein.

3.     To the best of my knowledge, information, and belief, formed after reasonable inquiry, the allegations and factual contentions in the Response to St. Clair's Complaint have evidentiary support or are likely to have evidentiary support after reasonable opportunity for further investigation or discovery.

4.     To the best of my knowledge, information, and belief, formed after reasonable inquiry, the denials of factual contentions in the Response to St. Clair's Complaint are warranted by the evidence or are reasonably based on lack of information or belief.

5.     To the best of my knowledge, information, and belief, formed after reasonable inquiry, the claims, defenses, and other legal contentions in the Response to St. Clair's Complaint are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law.

6.     The foregoing Response to the Complaint is not being filed for any improper purpose.

Executed this 12th day of March, 2007.

Laura G. Quatela

46