# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ST. CLAIR INTELLECTUAL PROPERTY CONSULTANTS, INC., | : | |
| Plaintiff, | : | C.A. No. 04-1436-JJF-LPS |
| | : | |
| v. | : | **REDACTED** |
| | : | **PUBLIC VERSION** |
| SAMSUNG ELECTRONICS CO., LTD., ET AL., | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| ST. CLAIR INTELLECTUAL PROPERTY CONSULTANTS, INC., | : | |
| Plaintiff, | : | C.A. No. 06-403-JJF-LPS |
| | : | |
| v. | : | |
| SIEMENS AG, ET AL., | : | |
| Defendants. | : | |

### PLAINTIFF'S OPENING *MARKMAN* BRIEF

*Of Counsel:*

Ronald J. Schutz, Esq.
Jake M. Holdreith, Esq.
Becky R. Thorson, Esq.
Annie Huang, Esq.
Seth A. Northrop, Esq.
ROBINS, KAPLAN, MILLER
    & CIRESI L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402
(612) 349-8500

Dated: April 23, 2009

George H. Seitz, III, Esquire (No. 667)
Patricia P. McGonigle, Esquire (No. 3126)
SEITZ, VAN OGTROP & GREEN
222 Delaware Avenue, Suite 1500
P.O. Box 68
Wilmington, DE 19899
(302) 888-0600

**ATTORNEYS FOR PLAINTIFF
ST. CLAIR INTELLECTUAL PROPERTY
CONSULTANTS, INC.**

70449 v1

# TABLE OF CONTENTS

Page

I. Introduction ....................................................................................................... 1

   A. Background Of The Invention .................................................................. 2

   B. Background Of The Case ........................................................................... 4

      1. St. Clair Obtains Three Verdicts Finding the Patents Valid And
      Infringed And St. Clair Licenses The Patents To Fourteen Camera
      Manufacturers ........................................................................................ 4

      2. The Patents Are Confirmed In Reexamination Without
      Amendment .............................................................................................. 6

      3. The Court's Prior Constructions Are Well Reasoned and Correct ............. 9

II. The Law of Claim Construction ...................................................................... 10

   A. Claim Language ........................................................................................ 10

   B. Specification ............................................................................................. 11

   C. Prosecution History .................................................................................. 12

   D. Reexamination Record .............................................................................. 13

   E. Claim Elements Asserted To Be Governed By 35 U.S.C. § 112, ¶ 6 ................... 13

III. The Proper Claim Construction of the Claim Terms At Issue ........................... 15

   A. The Asserted Claims Focus On The Selection of File Formats For Use
   With Different Computer Programs .......................................................... 15

      1. The Court's Previous Construction of Terms Reciting "File
      Formats" Was Correct In Light of the Intrinsic Record ........................... 17

         a. The Ordinary and Customary Meaning of the Claims
         Confirm The Court's Previous Constructions That The
         Asserted Claims Address Incompatibilities Between
         Different Software Applications Loaded On Computers ............. 17

         b. The Asserted Claims, Read In Context Of Each And Every
         Claim Of The Roberts Patents, Confirms This Court Was
         Correct In Identifying The Asserted Claims As Addressing
         Software Program Incompatibilities ........................................... 20

i

      c.    Defendants' "One-to-One Correspondence" Argument Is Inconsistent With How One Skilled In The Art Would Read The Claims In Light Of The Specification ........................... 22

   2.   Defendants' Reliance Upon The Unilateral Unfounded Remarks Of A PTO Examiner Cannot Alter the Claim Scope Already Identified By This Court ......................................................................... 24

      a.    Unilateral Statements By A Patent Examiner Cannot As A Matter of Law Alter this Court's Well-Reasoned Prior Claim Constructions ................................................................... 24

      b.    The PTO Examiner's Comments About Claim Construction Provides No New Reason To Disturb This Court's Well-Reasoned Constructions ............................................................... 26

B.   A Camera is a "Self-Contained, Portable Camera in a Single Housing".............. 27

   1.   The Plain And Ordinary Meaning Of The Word Camera Is A Self-Contained Portable Device Capable Of Taking Still Pictures ................. 27

   2.   The Plain And Ordinary Meaning Of The Word Camera Is Confirmed By The Specification ................................................. 28

   3.   The Prosecution History Put The Public On Notice That The Invention Was Limited To A Self-Contained Portable Camera In A Single Housing......................................................................... 29

   4.   The '459 Patent, Claim 16 Is Limited To A Self-Contained Portable Device Capable of Taking Still Pictures...................................... 30

C.   Digital Movie Formats Are Image File Formats: The Invention Is Not Limited To "Still" Images.............................................................. 31

D.   Memory And Storage Can Be Removable Or Non-Removable........................... 32

E.   The Roberts' Process Claims Are Not Limited To Any Particular Order of Completion.............................................................................. 33

   1.   The Generating And Converting Of Image Signals Need Not Complete Prior To Image Data Being Stored ............................................ 33

   2.   An Image Need Not Be Fully Digitized Prior To An Output Data Code Being Assigned to the Image Data .................................................. 34

F.   Most Of The Asserted Claims Are Not In Means-Plus-Function Form ............... 35

   1.   "Image pick-up unit".................................................................. 35

2.    "Memory means" ........................................................................ 36

3.    "Analog to digital converter means" ......................................... 36

4.    "Logic means" ............................................................................ 37

G.    To The Extent Phrases Are In Means-Plus-Function Form, This Court
Correctly Identified the Corresponding Function and Structure ........................... 37

1.    "Means for capturing image data corresponding to a selected
image" ....................................................................................... 38

2.    "Means for digitizing captured image data" ............................. 38

3.    "Output data [format] control means" ...................................... 39

4.    "[Picture] Image resolution determining means" ...................... 39

# TABLE OF AUTHORITIES

Page

## Cases

*3M Innovative Props. Co. v. Avery Dennison Corp.,*
  350 F.3d 1365 (Fed. Cir. 2003)..................................................................................... 13, 25

*Abbott Labs. v. Syntron Bioresearch, Inc.,*
  334 F.3d 1343 (Fed. Cir. 2003)..................................................................................... 11

*Acco Brands, Inc. v. Micro Security Devices,*
  346 F.3d 1075 (Fed. Cir. 2003)..................................................................................... 13, 26

*AllVoice Computing PLC v. Nuance Communs., Inc.,*
  504 F.3d 1236 (Fed. Cir. 2008)..................................................................................... 11

*Amgen, Inc. v. F. Hoffman-La Roche, Ltd.,*
  494 F. Supp. 2d 54 (D. Mass. 2007) ............................................................................ 5

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.,*
  512 F.3d 1338 (Fed. Cir. 2008)..................................................................................... 33, 35

*Biagro Western Sales, Inc. v. Grow More, Inc.,*
  423 F.3d 1296 (Fed. Cir. 2005)..................................................................................... 13, 30

*Burlington N. R.R. v. Hyundai Merchant Marine Co.,*
  63 F.3d 1227 (3rd Cir. 1995) ........................................................................................ 5

*CCS Fitness, Inc. v. Brunswick Corp.,*
  288 F.3d 1359 (Fed. Cir. 2002)..................................................................................... 11

*Chimie v. PPG Indus., Inc.,*
  402 F.3d 1371 (Fed. Cir. 2005)..................................................................................... 12, 23

*Creo Prods., Inc. v. Presstek, Inc.,*
  305 F.3d 1337 (Fed. Cir. 2002)..................................................................................... 38

*Cybor Corp. v. FAS Techs., Inc.,*
  138 F.3d 1448 (Fed. Cir. 1998)..................................................................................... 10, 24

*DSW, Inc. v. Shoe Pavillion, Inc.,*
  537 F. 3d 1342 (Fed. Cir. 2008).................................................................................... 22, 31

*Elbex Video, Ltd. v. Sensormatic Elecs. Corp.,*
  508 F.3d 1366 (Fed. Cir. 2007)..................................................................................... 14

*Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n,*
    383 F.3d 1352 (Fed. Cir. 2004)...................................................................................... 38

*Gillette Co. v. Energizer Holdings, Inc.,*
    405 F.3d 1367 (Fed. Cir. 2005)...................................................................................... 11

*Golight, Inc. v. Wal-Mart Stores, Inc., v. Innovative Int'l (H.K.) Ltd.,*
    355 F.3d 1327 (Fed. Cir. 2004)................................................................................ 11, 15

*Greenberg v. Ethicon Endo Surgery, Inc.,*
    91 F.3d 1580 (Fed. Cir. 1996)........................................................................... 14, 35, 37

*Helmsderfer v. Bobrick Washroom Equip. Inc.,*
    527 F.3d 1379 (Fed. Cir. 2008)...................................................................................... 28

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,*
    381 F.3d 1111 (Fed. Cir. 2005)...................................................................................... 28

*JVW Enters., Inc. v. Interact Accessories, Inc.,*
    424 F.3d 1324 (Fed. Cir. 2005)...................................................................................... 14

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
    358 F.3d 898 (Fed. Cir. 2004)........................................................................................ 29

*Lighting World, Inc. v. Birchwood Lighting, Inc.,*
    382 F.3d 1354 (Fed. Cir. 2004)................................................................................ 14, 36

*Markman v. Westview Instruments,*
    52 F.3d 967 (Fed. Cir. 1995).......................................................................................... 12

*Markman v. Westview Instruments, Inc.,*
    517 U.S. 370 (1996).......................................................................................................... 5

*Minks v. Polaris Indus. Inc.,*
    546 F.3d 1364 (Fed. Cir. 2008)........................................................................... 14, 15, 38

*Northrop Grumman Corp. v. Intel Corp.,*
    325 F.3d 1346 (Fed. Cir. 2003)........................................................................... 38, 39, 40

*Oatey Co. v. IPS Corp.,*
    514 F.3d 1271 (Fed. Cir. 2008)...................................................................................... 12

*Omega Eng'g, Inc. v. Raytek Corp.,*
    334 F.3d 1314 (Fed. Cir. 2003)...................................................................................... 14

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005)............................................................................... passim

*Salazar v. Procter & Gamble Co.,*
    414 F.3d 1342 (Fed. Cir. 2005)......................................................................... 13, 25

*Smith & Nephew, Inc. v. Ethicon, Inc.,*
    276 F.3d 1304 (Fed. Cir. 2001)............................................................................. 12

*SRAM Corp. v. AD-II Eng'g, Inc.,*
    465 F.3d 1351 (Fed. Cir. 2006).......................................................................passim

*SRI Int'l v. Matsushita Elec. Corp. Of America,*
    775 F.2d 1107 (Fed. Cir. 1985)............................................................................. 12

*SunRace Roots Enter. Co. Ltd. v. SRAM Corp.,*
    336 F.3d 1298 (Fed. Cir. 2003)................................................................ 11, 20, 33

*Tip Systs., LLC v. Phillips & Brooks/Gladwin, Inc.,*
    529 F.3d 1364 (Fed. Cir. 2008)............................................................................. 12

*Trimed Inc. v. Stryker Corp.,*
    514 F.3d 1256 (Fed. Cir. 2008)................................................................ 35, 36, 37

*U.S. Surgical Corp. v. Ethicon, Inc.,*
    103 F.3d 1554 (Fed. Cir. 1997)............................................................................. 11

*United States v. Olano,*
    407 U.S. 725 (1993)................................................................................................. 5

**Statutes**

35 U.S.C. §112..................................................................................................passim

**Other Authorities**

MICROSOFT PRESS COMPUTER DICTIONARY (1991) ........................................... 33

WEBSTER'S 3D INT'L DICTIONARY 322 (1986) ..................................................... 28

WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1991) ............................... 32

## I.   Introduction

This Court has twice construed the claims at issue in the "Roberts patents,"[1] first in 2003, and again in 2004, both times correctly on a full record after detailed briefing[2] and argument. The Court has conducted three jury trials to verdict based on its prior construction. Since then, fourteen global camera manufacturers have taken licenses of the patents based on the Court's prior construction. The Court rendered its prior construction after it considered the same arguments now advanced by this new group of Defendants.

As this Court has previously ruled, the asserted claims of the Roberts patents relate to a self-contained and portable camera that can output image files in one of at least two image file formats such as JPEG, TIFF and MPEG for immediate use with popular software. This construction aligns with the description of the invention in the specification, filed on November 20, 1990:

> It is a further object of this invention to provide an improved electronic still camera that provides digital image files for immediate and direct incorporation into popular word processing, desktop publishing, and other software programs on PCs.

Ex. 1, '010 patent, Col. 2, ll. 17-21.

For the third time this Court is being asked to construe the very same terms in the claims by infringers who refuse to accept this Court's claim construction. In the intervening time, the United States Patent and Trademark Office ("PTO") has confirmed every one of the claims during re-examination without requiring a single amendment to any claim of the four patents at issue. Here, Defendants' position presents no new arguments. Instead, they merely argue this

---

[1] U.S. Patent No. 6,233,010 ("the '010 patent"); U.S. Patent No. 6,323,899 ("the '899 patent"); U.S. Patent No. 6,094,219 ("the '219 patent"); U.S. Patent No. 5,138,459 ("the '459 patent"), U.S. Patent No. 6,496,222 ("the '222 patent"); and U.S. Patent No. 5,576,757 ("the '757 patent") collectively referred to as "the Roberts patents" are attached as Exhibits 1-6 respectively.

[2] St. Clair's claim construction briefs in the *Sony* and *Canon* actions are attached as Exhibits 49-52 to *Declaration of Patricia P. McGonigle in Support of Plaintiff's Opening Markman Brief*, as are all exhibits cited herein.

1

Court got it wrong. It did not. For each of the reasons it has in the past, this Court should reject Defendants' attempt to improperly narrow or broaden the asserted claims, and maintain its previous construction for the relevant terms.   St. Clair requests that this court maintain its previous constructions of the Roberts patents. To the extent that terms or phrases in this Court's previous constructions are not at-issue here, St. Clair takes the position that the Court should maintain those constructions as reflected in the attached Proposed Order.

### A.   Background Of The Invention

The Roberts patents all relate to digital camera technology and have a common specification. The inventors filed their first patent on this technology in November of 1990. Each patent claims different variations of the multiple inventive aspects and embodiments described in the common specification. The asserted claims cover electronic cameras that can save digital photographs in one of at least two file formats (e.g. JPEG, TIFF, MPEG, etc.) in memory. Some but not all of the asserted claims also specify that the memory be removable storage media, for example, a memory card or floppy disk.

In other unasserted claims,[3] Roberts described methods for addressing incompatibilities with different computer hardware. For example, these claims specified methods for formatting memory devices to be compatible with the memory format commonly used on different computers like IBM or Apple Macintoshes.   Such formatting of memory devices to ensure compatibility of the memory format with hardware is not recited in any of the asserted claims.

Although cameras that incorporate the claimed features are ubiquitous today, the Roberts inventions were pioneering and revolutionized digital camera technology. The Roberts inventors did their work in the years leading up to and including 1990, when digital cameras (in the sense

---

[3] By way of example, Ex. 5, '222 Patent, Claims 1-12; Ex. 4, '459 Patent, Claims 7 and 11; Ex. 3, '219 Patent, Claims 7, 11, 14, and 15; Ex. 6, '757 Patent, Claim 10.

we use the term today) were completely unknown. As explained in the common specification, at the time, it was "expensive and time consuming" to convert electronic images from prior art cameras to make them usable "with PC software applications." Ex 1, '010, col. 1, ll. 62-65.

The prior art sought to resolve the problem of processing image data for use in computers by teaching that processing should be shifted to a separate computer or playback unit set up to accept data from an imaging device and convert the data to a computer-usable form. Many of these systems were intended for playing back pictures on a television. These prior art systems used the computing power of the computer or playback device they were tethered to for handling the images. *See, e.g.*, Ex. 7, '219 patent 8/25/97 Amend., at 8. Thus, the prior art "camera" had to be used with a dedicated, separate device that was specifically set up to handle the output of that specific camera. *See, e.g.*, Ex. 1, '010, Col. 1, l. 62 – Col. 2, l. 10; Ex. 8, '459 patent 6/30/93 Amend., at 14-15. Users of these prior art cameras would often have to purchase both the camera and playback device in order to digitize image data downloaded from the camera.

Roberts, in contrast, taught away from the prior art by teaching that processing should be shifted into the camera itself. Thus, whereas the prior art taught conversion and/or formatting in the computer, Roberts taught processing and formatting in the camera free from any need for a separate playback unit or computer. *See, e.g.*, Ex. 7, at 8-9. After Roberts, digital image data could be formatted in a selected one of different formats by the electronic camera and stored in the camera or on a removable media so that these image files could be inserted directly into any personal computer running any of a number of popular software programs. Roberts thus opened up a new world of digital imaging which was a bold departure from the express teachings of the prior art.

3

B.      **Background Of The Case**

      1.      **St. Clair Obtains Three Verdicts Finding the Patents Valid And Infringed And St. Clair Licenses The Patents To Fourteen Camera Manufacturers**

On August 14, 2001, St. Clair filed suit against Sony in this Court. (*St. Clair v. Sony Corp., et al.* Civil Action No. 01-557-JJF ("*St. Clair v. Sony*"). Sony asserted many of the same claim construction arguments now asserted by Defendants. *E.g.*, Ex. 9, at 2-3. The Court issued its claim construction opinion and order on September 3, 2002. *Id.*; *see also* Ex. 10. By unanimous jury verdict on February 25, 2003, the jury in *St. Clair v. Sony* found all fifteen asserted claims of the Roberts patents infringed by digital cameras sold in the United States by Sony and awarded damages in the amount of $25,000,000. Ex. 11. Immediately thereafter, Sony entered into an agreement with St. Clair that included a license under the Roberts patents. Ex. 12.

Following the Sony verdict and settlement, on February 28, 2003, St. Clair filed suit in this Court against eight additional digital camera manufacturers—Canon, Inc., Casio Computer Co., Ltd., Seiko Epson Corp., Fuji Photo Film Co., Ltd., Kyocera Corp., Minolta Co., Ltd., Nikon Corp., and Olympus Optical Co., Ltd. (*St. Clair v. Canon, Inc.,* Civil Action No. 03-241-JJF ("*St. Clair v. Canon*").) (D.I. 1, *St. Clair v. Canon.*) Before discovery began, Casio, Seiko Epson, Kyocera, Minolta, Nikon, and Olympus entered into licenses with St. Clair. Exs. 13-18.

Canon and Fuji proceeded to a claim construction hearing and trial. Canon and Fuji sought construction of additional terms and challenged the Court's previous claim construction in *St. Clair v. Sony* by asserting many of the same claim construction arguments now asserted by Defendants. *See generally* Ex. 27. On August 31, 2004, the Court rejected the challenge in a well-reasoned, 66-page opinion that was consistent with its first claim construction and St. Clair's proposed construction. *Id. See also* Ex. 28. On October 9, 2004, a unanimous jury in *St. Clair v. Canon* found all 16 asserted claims of the Roberts patents valid and infringed by

digital cameras sold in the United States by Canon and awarded damages to St. Clair in the amount of $34,716,482.49. Ex. 29. Canon has since taken a license to the patents. Ex. 20.

The case against Fuji was tried immediately following the Canon verdict. By majority verdict on October 25, 2004, the jury found all 16 asserted claims of the Roberts patents valid and infringed by digital cameras sold in the United States by Fuji and awarded damages to St. Clair in the amount of $3,003,465.00 for infringing sales from March 1997 through July 2003. Ex. 30. St. Clair has offered Fuji a license, but Fuji has refused. The current action against Fuji (*St. Clair v. Fujifilm, et al.*, Civil Action No. 08-373-JJF-LPS) seeks post-July 2003 damages for Fuji's willful infringement.[4] (D.I. 1, *St. Clair v. Fujifilm.*)

Following the verdict in Fuji, on November 9, 2004, St. Clair filed suit in this Court against Samsung Electronics Co., Ltd., Eastman Kodak Company, Matsushita Electronics Industrial Co., Ltd., Victor Company of Japan, Ltd., Nokia Corp., and Hewlett Packard Co. (*St. Clair v. Samsung, et al.*, Civil Action No. 04-1436-JJF-LPS.)

A few months after St. Clair filed its patent infringement suit against Kodak, Kodak asserted a meritless claim of ownership of the Roberts patents. The ownership issue was litigated in California state court (*Kodak v. Speasl, et al.*, Cal. Sup. Ct. No. 1-05-CV-039164 ("California Action")).

**REDACTED**

---

[4] Waiver and issue preclusion bar Fujifilm from relitigating claim construction. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390-91 (1996) (discussing importance of uniformity in the treatment of a patent and how issue preclusion fosters uniformity); *Amgen, Inc. v. F. Hoffman-La Roche, Ltd.*, 494 F. Supp. 2d 54, 59-60 (D. Mass. 2007) (collecting cases applying issue preclusion to claim construction). All elements of claim preclusion are met: Fujifilm already litigated this issue in *St. Clair v. Canon* and under the Court's claim construction, the jury found that Fujifilm infringed every asserted claim of the patents-in-suit. *Burlington N. R.R. v. Hyundai Merchant Marine Co.*, 63 F.3d 1227, 1231-32 (3rd Cir. 1995). Further, Fujifilm has altogether waived any challenge to the Court's claim construction by failing to file any motions under the procedure set forth by the Court. (D.I. 1022, *St. Clair v. Canon*); *United States v. Olano*, 407 U.S. 725, 733 (1993). St. Clair reserves its right to move on these issues against Fujifilm.

at 124:10-14. The California Action ended with Kodak's confirmation that St. Clair has been the owner of Roberts patents since 1995. Ex. 33. Kodak has since taken a license. Ex. 21.

Many other companies have also taken a license under the Roberts patents from St. Clair including Pentax Corp., Samsung Techwin Co. Ltd., Motorola, Inc., and LG Electronics Co., Ltd. Exs. 22-25. Within the last few weeks, St. Clair just entered into a license agreement with Samsung Electronics Co., Ltd., a former defendant that sells cameras, camcorders, and camera phones that offer users a choice of image file formats such as JPEG, AVI, and MPEG. Ex. 26.

Each of St. Clair's licensees have invested considerable resources in a license, and all of these licenses are premised on the Court's previous construction of the asserted claims. St. Clair has now obtained fourteen licenses. Exs. 12-18, 20-26. The settled commercial expectations of patentees and their licensees as to the scope of issued patents are critical to the proper functioning of the patent system.

### 2.    The Patents Are Confirmed In Reexamination Without Amendment

Each of the claims of each of the Roberts patents has been confirmed by the PTO during reexamination without a single amendment to any claim. All of the argument, evidence and prior art now urged by the Defendants was before the Patent Examiner. Despite repeating some of Sony's argument about the claims, the Examiner never required amendment to add a limitation, and confirmed the validity of the claims based on the original language that has twice before been construed by this Court.    Each time the Examiner recited arguments previously rejected by this Court, St. Clair traversed the examiner and asserted that it believed this Court's construction was the correct construction. Ultimately, a reexamination certificate was issued for each of the patents following St. Clair's final word on the proper scope of the patents.

The Defendants have seized on dicta of the Examiner during prosecution of the reexamination to urge that this Court turn its own claim construction on its head. During the

6

reexamination of the '010 and '899 patent, the Examiner repeated arguments Sony made to this Court and to the PTO.  Specifically, the Examiner proposed that "a very different [claim] interpretation that that [sic] adopted by the court must be made." Exs. 34A and 35A, at 2.  In response, the Patent owner St. Clair made no amendment and made it very clear that this Court's construction is the correct one and should be the controlling construction:

> It is believed that the Examiner has adopted a particular preferred embodiment to improperly narrow the scope of the phrase "computer format." The Patent Owner provided detailed argument to the District Court in the *Sony* and *Canon* litigations demonstrating the support in the specification for the District Court's claim construction in numerous *Markman* briefs . . . . Litigation results aside, it is clear from the specification that image file format selection without reference to the brand of computer that will read the file is also an embodiment of the invention.

Exs. 34B and 35B, at 3.

Following this exchange and with the Examiner's full knowledge of the scope of the patents defined by the Patent owner and this Court, the Examiner allowed all claims from all patents over the art without amendment.  Exs. 34C-D and 35C-D.

During reexamination of the '459 and '219 patent, in dicta within the Notice of Intent to Issue a Reexamination Certificate, the PTO again repeated Sony's arguments previously rejected by this Court in 2002 and 2004.  The Examiner stated that "image file formats provided for selection (PICT II or GIFF) are in one-to-one correspondence with a particular type of computer system/information handling system (Apple Macintosh or IBM PC), respectively." Exs. 36A and 37A, at 3.  This statement by the Examiner erroneously inserts language found nowhere in the specification or the claims: "one-to-one correspondence" and "a particular type of computer system (Apple Macintosh or IBM PC) respectively." This language only appears from the arguments Sony presented, which were rejected by the Court back in 2002.

7

Specifically, the following table compares the Examiner's dicta to the actual language of the specification.

| Examiner's Statement: | Actual Language of the Specification |
|---|---|
| "Roberts et al. explicitly state that switch 17 on the control logic panel of figure 6 is provided for allowing a user to select between image file formats (PICT II, GIFF, etc.) for formatting a compressed digital image into the selected image format, wherein the image file formats provided for selection (PICTII or GIFF) are in one-to-one correspondence with a particular type of computer system (Apple Macintosh or IBM PC) respectively (see column 10, lines 7-10 and column 11, lines 32-49).<br><br>Ex. 36A, '459 patent Reexam, 8/10/05 Notice of Intent to Issue, at 3 (emphasis added). | "The Huffman coded image signals are then formatted into a form that facilitates format processing into various PC compatible formats (GIFF, PICT2, etc.)." Ex. 4, '459 patent, Col. 10, ll. 7-10.<br><br>"As shown in FIG. 7, the output of the image compression processor 12 is routed to the RAM memory 24 where the compressed image is formatted for either the PICT II or GIFF format depending on the setting of format switch 17 (FIG. 6). It should be noted that a large number of image formats for PCs exist. PICT and GIFF are the most common for the Apple and IBM PC's and are therefore the preferred formats for the present invention although other formats can be easily incorporated into the design by changing the software format routines. These software image formats are commercially available from many sources most notably Apple computers for PICT and IBM for GIFF. An example of the PICT format is pictorially shown in FIG. 6B as will be familiar to those skilled in the computer arts. Once formatting is complete, the formatted image data is transferred to the disk I/O interface 13 for transfer to the magnetic recording diskette 50." Ex. 4, '459 patent, Col. 11, ll. 32-49. |

The specification and claims nowhere refer to a "one-to-one correspondence"[5] with a particular brand of computer. This interpretation improperly inserts language into the specification that is not there and then imports that language as a limitation to the claims.

---

[5] Applicants in fact knew how to claim a one-to-one correspondence when they wanted to. For example, applicants claimed "data format codes where each of said plurality of output data format codes corresponds respectively to one of a like plurality of different data formats." Ex. 4, '459 Patent, Col. 16, ll. 1-4, Claim 16 (emphasis added).

St. Clair again traversed such an interpretation on the record before the Examiner.    In responding to the Examiner's Statement of Intent to Issue a Reexamination Certificate, St. Clair stated:

> The Patent Owner respectfully submits that the District Court's claim interpretation in the *St. Clair Intellectual Property Consultants, Inc. v. Sony Corp.* (C.A.No. 01-557-JJF (D. Del. Sept. 3, 2002)) and *St. Clair Intellectual Property Consultants, Inc. v. Canon, Inc.* (C.A. No. 03-241-JJF (D. Del. Aug. 31, 2004)) litigations is proper and hereby incorporates by reference the detailed arguments and testimony in support of the District Court's claim interpretation that are found in the binders of supporting material that accompanied the Patent Owner's Reply to the request for information pursuant to 30 C.F.R. 1.105 filed on February 19, 2005.

Exs. 36B and 37B, at 1-2.

The last statement of claim interpretation in the reexamination record by anyone is St. Clair's clear and unambiguous statement that this Court's construction correct one.  Thus, the Patent owner St. Clair put the public and the Examiner on notice that language requiring a "one-to-one correspondence" can not be properly read into the specification and certainly can not then be imported into the claims, as specifically construed by this Court.  The PTO thereupon finally conceded the position.  The PTO did not, in response to St. Clair's traversal, require any amendment to add "one-to-one correspondence" or "particular type of computers system (Apple Macintosh or IBM PC) respectively" into any claim, and proceeded to confirm the claims as originally allowed.  Indeed, without amendment of any patent, the PTO confirmed all asserted claims and issued corresponding reexamination certificates.  Exs. 36C and 37C.

### 3.    The Court's Prior Constructions Are Well Reasoned and Correct

Nearly every term Defendants seek to have construed has been construed by this Court—often twice.  This Court's prior constructions are correct and supported by sound reasoning.  In fact, during the *Sony* trial, Sony's expert witness Professor David Dobkin Dean of the Faculty of

9

the Department of Computer Science at Princeton University stated that this Court's Claim Construction Order was substantially correct and entitled to a grade of A minus. Ex. 38, at 881, ll. 8-9. Defendants can provide no reason why this Court should disturb its well-reasoned constructions. Nor can they show that the Court should depart from a construction which has been the basis for fourteen licenses taken by large camera manufacturers, all represented by sophisticated counsel. The prior construction is correct and should continue in effect. Defendants' other constructions lack support in the intrinsic record and are merely an attempt to read limitations that do not exist into the claims.

## II.    The Law of Claim Construction

Claim construction is purely a question of law properly decided by this Court. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc). Since this Court last construed the claims in the Roberts patents, the Federal Circuit has issued its en banc opinion in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005), reaffirming the basic claim construction principles twice applied by this Court. In *Phillips*, the Federal Circuit described principles to be followed in order to guard against importing limitations from the specification into the claim, such as limiting the claims to a preferred embodiment. First, courts should focus on understanding how a person of ordinary skill in the art would understand the terms. *Phillips*, 415 F.3d at 1313, 1323. Second, the Court should seek the construction which stays true to the claim language while naturally aligning with the language of the specification. *Id.* at 1316.

### A.    Claim Language

The claims of a patent define the invention. *Phillips*, 415 F.3d at 1312. The words of a claim should be given their plain and ordinary meaning, which "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1312-13. To determine how a person of skill in the art would have understood the terms, the

10

court looks to intrinsic evidence, including the words of the claims, the specification, and the prosecution history, as well as to relevant extrinsic evidence. *Id.* at 1314.

There is a strong presumption in favor of the plain and ordinary meaning of the claim terms. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (noting that courts indulge "heavy presumption" in favor of ordinary meaning). The Federal Circuit has admonished that claim construction is not simply an exercise in converting the words of a patent into other words. *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Words such as "memory," "image," or "picture," for example, should not be construed just for the sake of adding a limitation from the specification—especially when the specification does not alter the meaning of those terms. *See Abbott Labs. v. Syntron Bioresearch, Inc.*, 334 F.3d 1343, 1354 (Fed. Cir. 2003) Notwithstanding this fact—and the fact that this Court has construed these claims twice—Defendants have identified over 29 different elements set forth in the asserted claims as requiring construction. *See generally*, Ex. 19.

A difference in claim scope is presumed when different words or phrases are used in separate claims. *AllVoice Computing PLC v. Nuance Communs., Inc.*, 504 F.3d 1236, 1247 (Fed. Cir. 2008). This presumption is "especially strong" when the only meaningful difference between the claims is the limitation in dispute. *SunRace Roots Enter. Co. Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003). For example, when dependent claims add a limitation for storage that is "removable," there is an "especially strong" presumption that "storage" in the independent claims can be removable or non-removable.

**B.   Specification**

Claims must be construed in light of the specification, but limitations from the specification are not to be read into the claims. *Golight, Inc. v. Wal-Mart Stores, Inc., v. Innovative Int'l (H.K.) Ltd.*, 355 F.3d 1327, 1331 (Fed. Cir. 2004); *Gillette Co. v. Energizer*

11

*Holdings, Inc.*, 405 F.3d 1367, 1370 (Fed. Cir. 2005) ("Specifications teach. Claims claim.") (*quoting SRI Int'l v. Matsushita Elec. Corp. of America*, 775 F.2d 1107, 1121 n.14 (Fed. Cir. 1985)). It is improper to limit the scope of an otherwise broad claim merely because the specification recites, for example, a particular example of a storage device or specific image formats. It is also inappropriate to import a limitation that does not even exist within the specification, for example, to read in a "one-to-one correspondence" between file formats and types of computer despite the specification never discussing such a correspondence.

Where claims can reasonably be interpreted "to include a specific embodiment, it is incorrect to construe the claims to exclude that embodiment, absent probative evidence on the contrary." *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1277 (Fed. Cir. 2008); *Smith & Nephew, Inc. v. Ethicon, Inc.*, 276 F.3d 1304, 1309-10 (Fed. Cir. 2001) (internal citation omitted). A construction that would exclude a preferred embodiment, for example, a camera that allows the selection of computer program file formats such as GIFF, PICT, MPEG would "rarely if ever be correct and would require highly persuasive evidentiary support." *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1377 (Fed. Cir. 2005) (quotations omitted).

### C.    Prosecution History

Like the specification, the prosecution history may not "enlarge, diminish, or vary" the claims themselves. *Markman v. Westview Instruments*, 52 F.3d 967, 980 (Fed. Cir. 1995). "[T]he prosecution history of a related application may inform construction of a claim term, when the two applications are directed to the same subject matter and a clear disavowal or disclaimer is made during prosecution of the related application." *Tip Systs., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1370 (Fed. Cir. 2008).    The facts before the Court are particularly illustrative of this tenet of claim construction. For example, it is improper to limit the claimed invention based solely upon what an Examiner said during the course of

reexamination when an applicant made no disclaimer of that claim scope. In contrast, where the applicant distinguished the invention from prior art in order to achieve an allowance—for example, making it clear the invention is a self-contained portable camera as distinguished from prior art multi-component systems—the claims should be so limited. *Biagro Western Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296, 1304 (Fed. Cir. 2005).

### D.    Reexamination Record

Conclusions by an Examiner during reexamination about the scope of a patent are entitled no deference by an Article III Court. *SRAM Corp. v. AD-II Eng'g, Inc.*, 465 F.3d 1351, 1359 (Fed. Cir. 2006). As is the case here, the Federal Circuit has found reversible error in adopting an Examiner's unilateral statements in a notice of allowance which purportedly narrow the claim scope. *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342 (Fed. Cir. 2005). Such statements can only limit the claims if they are accompanied by statements or actions (such as an amendment) by the patent owner that unambiguously convey a position to limit that claim scope. *3M Innovative Props. Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1371 (Fed. Cir. 2003); *Acco Brands, Inc. v. Micro Security Devices*, 346 F.3d 1075, 1079 (Fed. Cir. 2003). In contrast, where a patent owner does not amend, and explicitly traverses the Examiner's view of the scope of the claims, the Examiner's statements do not limit or alter the claim scope.

### E.    Claim Elements Asserted To Be Governed By 35 U.S.C. § 112, ¶ 6

Claim elements that recite a means for performing a function but do not recite the structure of the means may be governed by 35 U.S.C. § 112, ¶ 6. Means plus function elements are subject to the above rules of construction, but also carry specific set of claim construction rules. The Federal Circuit has held that once a court determines that the claim invokes 35 U.S.C. § 112, ¶ 6, the appropriate framework for construing a claim limitation in means-plus-function format involves two steps: 1) identify the function recited in the claim; and 2) identify the

corresponding structure in the specification that is necessary to perform the recited function. *Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*, 508 F.3d 1366, 1370 (Fed. Cir. 2007).

Where there is a dispute as to whether a claim is governed by § 112, ¶ 6, determining whether a claim limitation falls under § 112, ¶ 6 is itself a three-step process: (1) the word "means" in the claim creates a presumption that § 112, ¶ 6 applies while its absence from the claim creates a presumption that this statutory section does not apply; 2) the presumption is rebutted if despite reciting the words "means," the claim element recites no function corresponding to the means; or 3) the presumption is also rebutted if the claim element itself recites sufficiently definite structure. The mere fact "that a particular mechanism . . . is defined in functional terms is not sufficient to convert a claim element . . . into a 'means for performing a specified function' within the meaning of § 112, ¶ 6." *Greenberg v. Ethicon Endo Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996); *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1360 (Fed. Cir. 2004).

Once the Court determines to apply § 112, ¶ 6 to any particular element, a two-step process is followed. The first step is to identify in the means-plus-function element the function explicitly recited in the claim. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1322 (Fed. Cir. 2003). It is error to select a function for a means plus function claim element other than the function explicitly recited in the claim. *JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1330 (Fed. Cir. 2005).

The next step is to identify the corresponding structure set forth in the patent's written description that performs the particular function set forth in the claim. *Minks v. Polaris Indus. Inc.*, 546 F.3d 1364, 1377 (Fed. Cir. 2008). In order to be "corresponding structure," the specification or prosecution history must provide a clear link between the structure and the

14

function recited in the claim.  *Id.*  In identifying "corresponding structure" it is error to identify more structure than that which is "necessary" to perform the recited function.  *Golight*, 355 F.3d at 1334-35 ("these structures are superfluous to our claim construction analysis because they are not required for performing the claimed function.").

III.   **The Proper Claim Construction of the Claim Terms At Issue**

    A.   **The Asserted Claims Focus On The Selection of File Formats For Use With Different Computer Programs**

       The inventors identified two distinct shortcomings in the prior art.  First, the inability of digital cameras to allow users a choice of multiple image files for immediate use in various computer applications.  Second, hardware incompatibilities such as different storage or memory formats between IBM and Apple computers.  The inventors sought and obtained different claims which separately address each short-coming.  As this Court has repeatedly recognized, the asserted claims address the first shortcoming, i.e., the failure of prior art cameras' failure to allow users the ability to select in the camera between at least two of many common image file formats such as JPEG, GIF, TIFF, PICT, MPEG, BMP, and JFIF which are designed for use by any number of computer programs.

       The Court reached this conclusion twice.  In *Sony*, the Court considered

> whether, as Sony contends, the asserted claims are limited to cameras that can select among different "computer formats" associated with different manufacturer's computers, or whether, as St. Clair contends, the asserted claims cover cameras that allow the user to select among different "image file formats."

Ex. 9, at 3.  After considering "the claim language, patent specification, and hearing the attorneys' arguments," the Court concluded that "the patents-in-suit teach the selection of different image file formats."  *Id.*  Specifically, the Court found that:

> Switch 17 allows the user to select a particular image file format, such as PICT, GIFF, or JPEG, compatible with operating systems, such as Apple

15

and IBM, and their required memory formats. After the image file is formatted, per the user's selection, the image file is then written onto the memory device. In sum, the Court concludes that the term "format" relates to the image signal, and not the computer hardware.

*Id.* at 4 (citations omitted).

In Canon and Fuji, this Court concluded after again reviewing the entire record that the patent's objective is to provide compatibility between different types of software. Ex. 27, at 7. The Court expressly held that: "Computer apparatus are of 'different types' within the meaning of the claim if they are loaded with different application software, even if they are otherwise the same." *Id.* at 10. Specifically, the Court found that "the patent is not limited to the computer architecture problem." Ex. 27, at 8. For each of the reasons this Court relied upon in its previous two constructions, this Court should maintain its past constructions. Specifically:

- "file format" means "the arrangement of digital data in a file, including image, audio, text or other data and includes, at least, MPEG, JPEG, GIF, TIFF, PICT, BMP, JFIF, DCF, TXT, DOC, WPD and WAV."

- "image file format" means ""an arrangement of digital image data in a file and includes, at least, the file formats JPEG, GIF, TIFF, PICT, MPEG, BMP, JFIF and DCF."

- "formatting said digital signal in one of a plurality of computer formats" means "arranging digital image data into one of a plurality of image file formats, including, at least, JPEG, GIF, TIFF, PICT, MPEG, BMP, JFIF and DCF."

- "plurality of different data formats for different types of computer apparatus" means "a plurality of different data formats for different types of computer apparatus where: (1) a 'data format' is the arrangement of digital data in a file including image, audio, text or other data and includes, at least, MPEG, JPEG, GIF, TIFF, PICT, BMP, JFIF, DCF, TXT, DOC, WPD and WAV, and (2) a 'computer apparatus' is a computer and any operating system or application software loaded on the computer. Computer apparatus are 'different types' within the meaning of the claims if they are loaded with different application software, even if they are otherwise the same."[6]

---

[6] To the extent that the remaining claims of the patents-in-suit use the phrases proposed above and/or variations of those phrases, the phrase and its variations should be construed consistently with the Court's previous constructions.

16

- "information handling apparatus" and "information handling systems" mean "a collection of hardware and software for the purposes of handling information that includes both computers and peripheral devices."

- "Computer apparatus and information handling systems and apparatus are 'different types' within the meaning of the claims if they are loaded with different application software, even if they are otherwise the same."

### 1. The Court's Previous Construction of Terms Reciting "File Formats" Was Correct In Light of the Intrinsic Record

The Court's previous constructions of the "file format" terms are correct. The relevant claim terms have a plain and ordinary meaning confirmed by the specification. This plain and ordinary meaning was never forfeited by statements within the intrinsic record. The entirety of the intrinsic record confirms this Court's previous orders contain the only correct construction.

### a. The Ordinary and Customary Meaning of the Claims Confirm The Court's Previous Constructions That The Asserted Claims Address Incompatibilities Between Different Software Applications Loaded On Computers

This Court's inquiry begins with the claims as the claims are what define the invention. *Phillips*, 415 F.3d at 1312.   Reading the asserted claims in the context of the entirety of the patents-in-suit substantiate the Court's previous constructions. *Id.* at 1312-13.

The term "file formats" (and similar terms in the asserted claims) have a well understood meaning that does not appear to be in dispute.   The accused parties appear to agree with this Court's prior decisions finding that JPEG, GIF, TIFF, PICT, MPEG, BMP, and JFIF are all examples of file formats within the ordinary meaning of those terms and within the meaning of the claims.   Accordingly, the plain meaning of "file formats" does not appear to be in dispute, only whether the claims should be given their ordinary meaning without extra limitation.

None of the claims recites that the "file formats" have a "one-to-one correspondence" with anything.   None of the claims recites that the files formats correspond "respectively" to brands of computers.   The very absence of this language demonstrates that the claims are not so

17

limited.   The inventors knew how to recite a "correspondence" when they meant it, for example in the case of the '459 patent, Claim 16, which recites that "each of said plurality of <u>output data format codes corresponds</u> respectively <u>to one of a like</u> plurality of <u>different data formats</u>." Ex. 4, '459 Patent, Col. 16, ll. 2-4 (emphasis added).

Had the inventors wanted to make claims limited to "one-to-one correspondence" with respective brands of computers, they would have said so in the language of the claims. Had the PTO wanted the claims limited, it would have required an amendment. The Examiner during reexamination clearly set forth limiting language that the office could have required by amendment but did not. Instead, the inventors more broadly claimed cameras that allow the selection from among common file formats, without any limitation that file formats have a one-to-one correspondence with a particular brand of computer.

Some of the asserted claims recite that the image file formats are "for different types" of computers. Those claims do not recite that "each" format is for "a specific brand of computer respectively" or that the formats are "in one-to-one correspondence with IBM computers and Apple computers respectively," as the defendants would have them limited. Instead, the phrase "for different types" has the ordinary meaning that the file formats are usable in a variety of computers including like branded computers running different software. As shown in more detail below, this ordinary meaning aligns naturally with the specification.

The specification provides "dispositive" insight into the meaning of the disputed phrase "for different types." *Phillips*, 415 F.3d at 1315.   The specification explains that image file formats are "for" software not hardware—exactly as this Court has previously held. Ex. 27, at 9-11.   For example, the Summary of the Invention explains that the camera "provides digital image files for immediate and direct incorporation into . . . software programs on PCs." Ex. 1,

'010, Col. 2 ll. 18-21 (emphasis added). The Background of the Invention likewise explains that the digital image "is in a format compatible <u>for</u> immediate use with word processing, desktop publishing, data base, and multi-media applications." *Id.* at Col. 1, ll. 29-32. The descriptions of the camera in the Background and Summary sections do not ever mention IBM, Apple, or different hardware.

The specification repeatedly teaches the primary problem addressed by the invention was the difficulty making captured image data in prior art systems immediately accessible to computer programs. *See, e.g.,* Ex. 1, '010, Col. 1, ll. 26-33; Col. 2, ll. 17-23. Often, this was a result of necessary external hardware used to control the camera and process its data. To make this data accessible to various computer programs, a user would have to do an additional conversion step on a personal computer with a circuit board that was hardware compatible with the camera. *Id.* at Col. 1, l. 62 – Col. 2, l. 10. Because prior art systems used only proprietary or single image file formats and dedicated hardware, it was "expensive and time consuming to convert the analog image equivalent to a <u>digital format for direct utilization with PC **software** applications.</u>" *Id.* at Col. 1, ll. 62-65 (emphasis added). The invention described a digital camera that allowed users to select between multiple commonly understood data file formats such as GIF and PICT. These file formats were designed to work for any number of software products. As a result of the invention, users no longer needed special hardware outside of the camera to use image files on a computer. Specifically:

> The digital diskette is removeable [sic] from the electronic camera for direct insertion into a PC which contains the previously loaded corresponding decompression algorithm whereby <u>the digital image is in a format compatible for immediate use with word processing, desk top publishing, data base, and multi-media **applications**.</u>

Ex. 1, '010, Col. 1, ll. 27-33 (emphasis added). Users could immediately use image files generated by the invention, regardless of whether they had a computer running an application like Microsoft Word or PowerPoint or Adobe Photoshop.

> **b.** **The Asserted Claims, Read In Context Of Each And Every Claim Of The Roberts Patents, Confirms This Court Was Correct In Identifying The Asserted Claims As Addressing Software Program Incompatibilities**

Reading the unasserted claims of the Roberts patents confirms that the asserted claims focus on computers having different programs and not different hardware. Both asserted <u>and unasserted</u> claims are instructive in claim construction. *Phillips*, 415 F.3d at 1314-15. The patents-in-suit contain numerous unasserted claims that contain the hardware limitations Defendants seek to attach to the asserted claims. These separate claims create a presumption that the limitation they describe—i.e., hardware memory formatting—are not present in the asserted claims. *Id.*

The inventors separately claimed elements of the invention related to hardware compatibility. For example, the inventors obtained numerous claims related to ensuring that the diskette in the camera is compatible with a "memory format" commonly used with particular brand of hardware such as IBM and Apple. Ex. 5, '222 Patent, Claims 1-12. The inventors also obtained numerous <u>dependent</u> claims which focused on the selection of particular memory, data storage, or hardware formats. Ex. 4, '459 Patent, Claims 7 and 11; Ex. 3, '219 Patent, Claims 7, 11, 14, and 15; Ex. 6, '757 Patent, Claim 10. These dependent claims make the presumption "especially strong" as the only meaningful difference between the independent asserted claims and dependent claims is the additional limitation of allowing the selection between memory or data storage formats. *SunRace*, 336 F.3d at 1303.

The specification also discloses how image file formats are selected independently of a hardware format:

> As shown in FIG. 7, the output of the image compression processor 12 is routed to the RAM memory 24 where the compressed image is formatted for either the PICT II or GIFF format depending on the setting of format switch 17 (FIG. 6). It should be noted that a large number of image formats for PCs exist. PICT and GIFF are the most common for the Apple and IBM PCs and are therefore the preferred formats for the present invention although other formats can be easily incorporated into the design by changing the software format routines.

Ex. 1, '010, Col. 11, ll. 1-10 (emphasis added).

The specification never discusses a "one-to-one correspondence" between file formats and memory formats, and it confirms that different image file formats can be associated with a single memory format. For example, Figure 2A shows how multiple files, each with a potentially different data file format, can be written to a single data diskette.



Ex. 1, '010, Fig. 2A.  This is consistent with the Court's conclusion that many different file formats could be written to a single memory format. Moreover, it is entirely inconsistent with

Defendants' claim that there must be a "one-to-one correspondence" between individual image file formats and computers such as IBM and Apple.

The specification also indicates that it uses labels such as "IBM" and "Apple" interchangeably with image file formats in teaching how a switch is used to select such formats:

> The compressed digital frame is then formatted into either an IBM PC/Clone (such as GIFF) or Apple Macintosh (such as PICT II) image file format depending on the setting selected by the operator for a user switch 17.

Ex. 1, '010, Col. 4, ll. 61-65 (emphasis added).

In contrast to the above examples, the specification also describes the hardware memory format claims. For example, the inventors addressed issues specific to memory or hardware architectures within "an alternative embodiment of the invention showing an optional diskette format utility." *Id.* at Col. 3, ll. 46-47 (emphasis added). *See also id.* at Col. 8, ll. 58-65; Col. 12, ll. 7-13. This optional embodiment disclosed a method for the user of a digital camera to configure the memory format of the storage device, i.e., a memory card, on the camera so it would be compatible with a particular type of computer such as IBM or Apple.

The mere existence of memory or hardware format embodiments, however, cannot limit the scope of all of the claims. *DSW, Inc. v. Shoe Pavillion, Inc.*, 537 F. 3d 1342, 1348 (Fed. Cir. 2008) (claims should not be confined to a particular embodiment, even where the embodiment is the preferred embodiment). Yet, this is precisely what Defendants ask this Court to do.

### c. Defendants' "One-to-One Correspondence" Argument Is Inconsistent With How One Skilled In The Art Would Read The Claims In Light Of The Specification

Defendants' proposed construction cannot be reconciled with how someone skilled in the art would read the claims in light of the specification. *Phillips*, 415 F.3d at 1316.   **REDACTED**

22

**REDACTED**

In essence, image file formats such as JPEG, GIF, TIFF, PICT, MPEG, BMP, and JFIF are multi-platform because they are designed for a plurality of computer hardware. An application running on Apple hardware could just as easily be written to open an MPEG file as one running on IBM hardware. Therefore, no "one-to-one correspondence" exists between those formats and, say, an IBM or Apple computer respectively as is argued by Defendants. To conclude otherwise would, in effect, read out the preferred embodiment since the PICT-II and GIF image file format are not in a "one-to-one correspondence" with any particular computer hardware. *Chimie*, 402 F.3d at 1377 (A construction that would not read on the preferred embodiment would "rarely if ever be correct and would require highly persuasive evidentiary support.").

Nor would someone skilled in the art read a "one-to-one correspondence" between memory or disk formats and particular pieces of hardware. An IBM computer, for example, could have any number of operating systems or memory formats. Those same operating systems or memory formats could be on any other number of types of computer hardware. It is nonsensical to invent a "one-to-one correspondence" where none exists. Because the Examiner's and Defendants' proposed construction is inconsistent with the ordinary and customary meaning someone skilled in the art would ascribe to the patents-in-suit, each should be rejected. *Phillips*, 415 F.3d at 1321.

23

### 2. Defendants' Reliance Upon The Unilateral Unfounded Remarks Of A PTO Examiner Cannot Alter the Claim Scope Already Identified By This Court

The patents-in-suit were confirmed in reexamination proceedings following this Court's two rounds of correct constructions. St. Clair made it absolutely clear to the Examiner and the public throughout these proceedings that St. Clair affirmed and relied on the correct claim construction adopted twice by this Court. Although the patent Examiner unilaterally recited some of the unsuccessful claim construction arguments made by Defendants, after St. Clair's final comments, the Examiner allowed the claims with full awareness of this Court's constructions. The Examiner did not require and St. Clair did not make any amendments, even when St. Clair responded to the allowance with its assertion in the prosecution history of the correct construction. Accordingly, nothing in the re-examination provides a basis for the Court to change its constructions.

Moreover, the Examiner's recitation of arguments this court has already rejected is no basis for the Court to reverse itself. Indeed, well-established precedent holds that the unilateral statements of the Examiner should not be read into claims when no amendment was made or required. The arguments were unpersuasive when first presented to this Court, and they remain unpersuasive now.

### a. Unilateral Statements By A Patent Examiner Cannot As A Matter of Law Alter this Court's Well-Reasoned Prior Claim Constructions

Claim construction is purely a question of law properly decided by this Court. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc). With the benefit of extensive briefing and an exhaustive review of the record, this Court has reviewed the position taken by the Defendants and the PTO Examiner and rejected the arguments twice. There is no

basis in fact or law why this Court should provide any weight to the PTO Examiner's statements. *SRAM*, 465 F.3d at 1359.

The Federal Circuit has repeatedly stated that unilateral statements by an Examiner cannot alter the scope of the patent. *See, e.g., Salazar*, 414 F.3d 1342. In *Salazar* the patentee claimed "a toothbrush with, *inter alia*, elastic stimulator rods and elastic polishing rods that extend above the bristles of the brush." *Salazar*, 414 F.3d at 1343. In allowing the claims, the Examiner stated in the Notice of Allowance that:

> Claim 7 now incorporates previously held allowable subject matter .... Although the patent to Clemens appears to have the recited structure, Clemens' "rods" 22 are made of nylon, which is not considered "elastic." Obviously the "rods" of Clemens are flexible, but are not considered to be "elastic" as recited by the claim.

*Id.* The patentee did not respond to the Examiner's statements. The defendant argued that this statement limited the claims to "elastic" and removed materials such as "nylon" from the scope of the invention. *Id.* at 1344. The Federal Circuit disagreed, stating that "the Examiner's unilateral remarks did not alter the scope of the claim" and that "[a]n Examiner's statements cannot amend a claim" even when the patentee does not respond to the Examiner's attempt to limit the claim scope. *Id.* at 1347 (emphasis added). Here, St. Clair was not just silent—it actually explicitly traversed the Examiner, filing a response stating:

> The Patent Owner respectfully submits that the District Court's claim interpretation in the *St. Clair Intellectual Property Consultants, Inc. v. Sony Corp.* (C.A. No. 01-557-JJF (D. Del. Sept. 3, 2002)) and *St. Clair Intellectual Property Consultants, Inc. v. Canon, Inc.* (C.A. No. 03-241-JJF (D. Del. Aug. 31, 2004)) litigations is proper and hereby incorporates by reference the detailed arguments and testimony in support of the District Court's claim interpretation that are found in the binders of supporting material that accompanied the Patent Owner's Reply to the request for information pursuant to 37 C.F.R 1.105 filed on February 18, 2005.

Exs. 36B and 37B, at 1-2. The reexamination history cannot be used to limit the scope of any claim unless the patent owner took a position to limit the claim scope before the PTO. *3M*, 350

25

F.3d at 1371; *Acco Brands,* 346 at 1079. Here, the patent owner not only did not take a position to limit the scope of the claims, it unambiguously reaffirmed its position that the proper scope of the invention was outlined by this Court's two prior orders.

> **b.   The PTO Examiner's Comments About Claim Construction Provides No New Reason To Disturb This Court's Well-Reasoned Constructions**

An Examiner's mere recitation of Sony's incorrect claim construction arguments provides no support for Defendants' flawed proposed construction. *SRAM,* 465 F.3d at 1359 ("the PTO erred . . . . [and] thus provide[s] no support for SRAM's argument. Furthermore, this court is not bound by the PTO's claim interpretation because we review claim construction de novo.").

The intrinsic record cited by the Examiner supports, not detracts, from this Court's previous construction. To support his erroneous position that there must be a one-to-one correspondence between a particular file format and a particular computer such as IBM or Apple, the Examiner cited only two passages within the specification. Exs. 36A and 37A, at 3. ("wherein the image file formats provided for selection (PICTII or GIFF) are in one-to-one correspondence with a particular type of computer system (Apple Macintosh or IBM PC) respectively (see column 10, lines 7-10 and column 11, lines 32-49)") (emphasis added). Neither of these passages refer to a "one-to-one correspondence" between image file formats and particular types of computer hardware, let alone support the conclusion that such a limitation should be read into all of the claims. In fact, "one-to-one correspondence" appears nowhere in the intrinsic record. Instead, both citations support this Court's previous constructions.

The record cited by the Examiner also highlights that the specification teaches that the invention is not limited to the recited image file formats. Instead, "a large number of image formats for PCs exist" which "can be easily incorporated into the design by changing the

software format routines." Ex. 4, '459 patent, Col. 11, ll. 36-42. Thus, the Examiner's citation teaches that any number of image files formats, including multiple formats specifically "for PCs" can be "easily incorporated into the design." *Id.* at ll. 37-43.

The intrinsic record cited by the Examiner also makes clear that memory formatting is distinct from file formatting. For example, the cited portion of the specification states that only after any one of an interchangeable "large number of image formats" are selected by an operating and formatting of that image data is initiated by the camera are the files <u>then</u> transferred to a memory device, *Id.* at ll. 45-49, where hardware-related memory formatting issues—such as in what structure the image files are physically written to the disk—are addressed.

### B.    A Camera is a "Self-Contained, Portable Camera in a Single Housing"

A camera is a camera, not a camera plus a number of other external parts. This Court was correct in construing "electronic camera" as a "self-contained, portable electronic camera, with the capability to take still pictures, the components of which are contained in a single housing." Ex. 27, at 17-23. The plain and ordinary meaning of the word "camera" supports this construction. Despite this, Defendants' attempt to broaden the scope of the asserted claims so as to encompass prior art distinguished and overcame during prosecution. This is improper. This Court should therefore maintain its previous construction of camera and any like phrases.

#### 1.    The Plain And Ordinary Meaning Of The Word Camera Is A Self-Contained Portable Device Capable Of Taking Still Pictures

As with all claim constructions, the construction of the term "camera" should begin with the plain language of the claim. *Phillips*, 415 F.3d at 1312. As this Court previously recognized, the plain and ordinary definition of "camera" is "a lightproof box fitted with a lens through the

27

aperture of which the image of an object is recorded on a light-sensitive material." Ex. 27 at 18

(citing Ex. 42, WEBSTER'S 3D INT'L DICTIONARY 322 (1986)).

The surrounding words provide additional context which confirms the proper scope of the claims. *Phillips*, 415 F.3d at 1313, 1323 (claims should be read in their context). In most cases, the relevant claim language explicitly states that either the claimed invention is a "camera," the relevant process or components are "<u>in</u>" the camera, or the claim is to a "camera comprising." This language makes clear that the plain meaning of the claim language does not extend the invention beyond the camera housing.

### 2. The Plain And Ordinary Meaning Of The Word Camera Is Confirmed By The Specification

The correct meaning of claim terms is usually that which is most in-line with the written description. *Phillips*, 415 F.3d at 1316. Here, the written description supports this Court's previous construction. In order for this Court to alter the plain and ordinary meaning of the word "camera," the specification must "clearly express th[e] intent" of the patentee to do so. *Helmsderfer v. Bobrick Washroom Equip. Inc.*, 527 F.3d 1379 (Fed. Cir. 2008). Here no such intent exists. Instead, the specification supports the plain and ordinary meaning. The specification describes the object of the invention as to "provide an electronic still camera that is efficient in design and permits extended periods of portable operation. . . ." Ex. 1, '010, Col 2, lines 59-61. Further, the specification describes that compression hardware and software are incorporated "in the camera." Ex. 1, '010, Col 10, ll. 48-55. Finally, the abstract for the first patent issued—the '459 patent—describes that a removable memory device can be inserted "into the housing of the camera." Ex. 4, '459 Abstract.[7] Each of these statements confirm that the

---

[7] While it is proper to understand the ordinary meaning of a word by looking to how it is used in the Abstract, it is improper to limit the claims to what is described in the Abstract. *See, e.g., Innova/Pure Water, Inc. v. Safari Water*

inventors embraced the plain and ordinary meaning of the word camera.  In fact, a "camera" that was just a bunch of parts, including a computer, spread out on a table would not have solved any of the problems identified in the specification.

### 3. The Prosecution History Put The Public On Notice That The Invention Was Limited To A Self-Contained Portable Camera In A Single Housing

Applicants distinguished their invention over prior art systems that were not self-contained.  Defendants' attempt to unjustifiably expand the claim scope is merely designed to invalidate the patent by expanding the claims to capture art the patents originally issued over. This is improper and should not guide this Court's construction.  *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 911 (Fed. Cir. 2004) (claims should be construed "so as to sustain their validity").

A major shortcoming of the prior art was that prior art systems required a collection of parts.  For example, a camera would need to be connected to a dedicated playback device such as a "frame-grabber" which itself had to be connected to a PC.  That PC would then do the necessary processing.  Ex. 1, '010, Col. 1, l. 62 – Col. 2, l. 10.  In the prosecution history, applicants repeatedly distinguished the invention over these prior art systems.  For example, applicants distinguished prior art systems that used a playback device or PC to perform functions of the camera by noting "[t]he claimed device instead stores a plurality of computer-ready digitized images on removable mass memory elements in the device housing."  Ex. 7, '219 8/25/97 Amend., at 8 (emphasis added); *see generally* Ex. 39, '219 patent, 1/7/00, Appeal Br. *See also* Ex. 8, '459 Patent, 6/30/93 Amend., at 15 ("Applicants submit that their claimed improvements provide new and novel features for formatting digital data in the camera[.]"); Ex.

---

*Filtration Sys., Inc.*, 381 F.3d 1111, 1121 (Fed. Cir. 2005).  St. Clair refers to the Abstract here only to show that the inventors used the word "camera" consistently with its ordinary meaning.

40, '219 patent, 10/29/98 Amend., at 15 ("Indeed, to incorporate data formatting functionality within the camera, as claimed by Applicants, runs contrary to the express teachings and purpose of Kawahara et al., which states as its goal the minimization of circuit complexity and the reduction of power consumption – all of which is taught to result from the processing of data in the player.") (emphasis in original); Ex. 43, '757 Patent, 1/23/95 Amend., at 9 ("Therefore, applicants submit there is no teaching by Yamawaki '132, or even a suggestion that an ' . . . output data format determining program subroutine . . . ' stored in the camera would yield applicants' improved electronic camera structure and function which permits the ready removal of a memory disc from the camera[.]") (emphasis added).   These statements are a clear and unmistakable disavowal of claim scope which limit the invention to a self-contained portable camera. *Biagro*, 423 F.3d at 1304 (distinguishing invention over the prior art limits the scope of the issued claims).

4.     **The '459 Patent, Claim 16 Is Limited To A Self-Contained Portable Device Capable of Taking Still Pictures**

Defendants' attempt to broaden claim 16 to non-camera embodiments should be rejected. As an initial matter, as this Court has already recognized, previous Defendants—including Fuji—have conceded that "the phrase 'in an electronic camera' is implicit in the claimed 'process for storing an electronically sensed video image.'" Ex. 27, at 23 fn. 5. This is the correct limitation of the claim in light of the language of the claim and the prosecution history. The language of claim 16 supports this Court's previous conclusion that the claim is also limited to self-contained portable device. For example, the claim recites structure consistent with the described camera invention, notably "light sensing pixel elements" which are in tandem with "digital memory." Ex. 4, '459 Patent, Col. 15, l. 23 – Col. 16, l. 11.  St. Clair therefore requests that this Court maintain its prior construction that electronic and digital cameras are a "self-

contained, portable electronic or digital camera, with the capability to take still pictures, the components of which are contained in a single housing."

### C.   Digital Movie Formats Are Image File Formats: The Invention Is Not Limited To "Still" Images

Digital movie formats such as AVI, MPEG, and Quicktime are image file formats.   As this Court previously recognized, "neither the specification nor the language of the claims imposes a still picture limitation on the patented invention and the specification expressly contemplates the camera's capability to take both still and motion pictures." Ex. 27, at 17.   St. Clair therefore asks this Court to maintain its previous constructions on this issue and reject Defendants' numerous attempts to limit the claimed invention to "still" pictures alone.

The specification explicitly discloses that the camera circuitry of a preferred embodiment can be configured such that "approximately 20 images to be captured in a one second period"— which is a digital movie. Ex. 1, '010, Col. 8, ll. 18-19.   It would be improper to read out movie formats from the claims when the specification clearly envisions these formats.   This is especially true when it is the preferred embodiment that discloses the functionality. *DSW, Inc. v. Show Pavillion, Inc.*, 537 F. 3d 1342, 1348 (Fed. Cir. 2008).

The specification also explicitly teaches the use of both the Moving Picture Experts Group (MPEG) and Digital Video Interface (DVI) movie compression schemes within the preferred embodiments:

> In the preferred embodiment of the present invention, the JPEG standard is the preferred algorithm chosen with the incorporation of the MPEG standard or other similar standard in the future when available commercially. An alternate embodiment of the present invention would be the incorporation of various proprietary compression algorithm standards such as DVI.

Ex. 1, '010, Col. 10, ll. 23-29; *see also* ll. 6-23.   In fact, the MPEG compression algorithm disclosed in the specification is most effectively used to format digital movies.   REDACTED

31

**REDACTED**

In discussing these movie format technologies, applicants left no doubt they were referring to movie files. For example, applicants discussed the compression advantages of MPEG in stating that "a new international standard called MPEG is due to be announced in the 1991 time frame from the JPEG and should offer compression ratios of 275:1 and greater." Ex. 1, '010, Col. 10, ll. 20-23. MPEG only achieves this compression ratio when it is processing movie, not still files. This is because MPEG files only store the differences between frames within a video file. These differences would not exist if the MPEG algorithm were used on a single still image. *See, e.g.,* Ex. 45, at 2. This compressed movie data is then placed within an image file format such as MPEG. Similarly, DVI compressed data would typically be placed into movie formats. St. Clair therefore requests that this Court reject Defendants' attempt to read "still" into numerous claim terms that do not require such a limitation.

**D.   Memory And Storage Can Be Removable Or Non-Removable**

Memory and storage are memory and storage—it is not proper to create a limitation of "removable" when none exists. As this Court previously recognized, the various storage and memory terms have an ordinary meaning of "memory, e.g. floppy disks, optical disks, magnetic disks, magnetic media, memory storage disk drive, semiconductor memory, and solid state memory." Ex. 27, at 39-44.

Memory has a plain and ordinary meaning that is well established. For example, Webster's Ninth New Collegiate Dictionary in 1991 defined "memory" as "4 a: a device in which information esp. for a computer can be inserted and stored and from which it may be extracted when wanted." Ex. 46, WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 741 (1991). The Microsoft Press Computer Dictionary defined memory as "Circuitry that allows information

to be stored and retrieved." Ex. 47, MICROSOFT PRESS COMPUTER DICTIONARY 225 (1991). Type or removability are simply not part of this meaning.

The claims themselves further confirm that all of the asserted claims should not be limited to removable memory and storage. Many of the asserted claims exclusively add the limitation of a "removably mounted," "digital disk," "memory means" or "image memory." These dependent claims establish an "especially strong" presumption that no such limitation exists in the independent claims. *SunRace*, 336 F.3d at 1303. Nothing in the intrinsic record overcomes this presumption. Instead, Defendants merely seek to improperly import a limitation from one of the embodiments from the specification. *SRAM*, 465 F.3d at 1357-59.

### E. The Roberts' Process Claims Are Not Limited To Any Particular Order of Completion

A method claim is not limited to performance of the steps in the order recited unless the claim explicitly or implicitly requires a specific order. *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1345 (Fed. Cir. 2008). The claims here do not require that particular steps complete prior to the initialization of other steps.

#### 1. The Generating And Converting Of Image Signals Need Not Complete Prior To Image Data Being Stored

Portions of an image file can be stored prior to the completion of the generating and converting steps of Claim 16 of the '459 patent and claims 1 and 3 of the '899 patent. Some or all of the steps recited in each claim could happen simultaneously in whole or in part. Each of these claims merely require that (1) an image signal be "generated" from data obtained from an image pickup unit such as a CCD or CMOS sensor; (2) that the signal be formatted into an image file format such as JPEG, MPEG, or TIFF; and (3) that the image file be stored on a storage device. There is no explicit or implicit requirement in the claims that prevents the image data from being converted into a file format as image data is being generated; or prevents portions of

33

an image file being written to a storage device as an image signal is being formatted into an image file.

The specification supports this conclusion. In Figure 13 applicants demonstrated how multiple image frames could be queued for processing by the image compressor. In describing this Figure, the specification makes clear that it envisions particular functions will perform at different rates but nonetheless simultaneously:

> This allows for approximately 20 images to be captured in a one second period. By adding additional RAM 11A (Fig. 13) or other forms of commercially available random access memory to the frame buffer 11, image frames could be "pushed" onto a semiconductor memory stack for temporary storage allowing the compression processor and data interface circuitry to perform their respective functions at a slower rate. As shown in FIG. 13, each unprocessed image frame would be recorded or "pulled" from the stack on a "First-In, Firs-Out [sic] (FIFO) manner until all images in the stack queue were processed and written to the storage diskette via the disk I/O circuitry 13.

Ex. 1, '010, Col. 8, ll. 17-29. In essence, image file data can be written to disk even while image signal data is queued awaiting processing and conversion to a portion of the image file. The specification therefore envisions that—particularly when writing a movie file type—that each of the steps of the claim could happen simultaneously in whole or in part.

This Court should construe Claim 16 of the '459 patent and claims 1 and 3 of the '899 patent so as the "generating," "converting," "formatting" and "selecting" steps need not complete before the "storing" step. Specifically, that some or all of these steps could happen simultaneously in whole or in part.

## 2. An Image Need Not Be Fully Digitized Prior To An Output Data Code Being Assigned to the Image Data

An output data code need not be assigned to an image only after the image data has been fully digitized within Claim 1 of the '219 patent. The claim merely states that "the selected format code" be assigned "to the digitized captured image." The claim never requires when this

process must occur making it inappropriate to require a particular order of operation. *Baldwin Graphic*, 512 F.3d at 1345.  Further, the specification identifies that numerous processes can occur simultaneously. Ex 1, '010, Col. 8, ll. 17-29.  Even where an embodiment articulates a particular order, there is no reason why that recitation should be read as a limitation into the claims. *SRAM*, 465 F.3d at 1357-59.  Because no limitation within the claims foreclose the possibility that an output data code could be assigned to digital image data prior to the image being completely digitized, St. Clair requests that this Court construe the terms of Claim 1 of the '219 whereby the "assigning" and "digitizing" steps need not happen in any particular order.

### F.   Most Of The Asserted Claims Are Not In Means-Plus-Function Form

The phrases "image pick-up unit," "memory means," "analog to digital converter means" and "logic means" are not in means-plus-function form because they lack "means" or because they recite sufficient structure. *Trimed Inc. v. Stryker Corp.*, 514 F.3d 1256, 1259-60 (Fed. Cir. 2008); *Greenberg*, 91 F.3d at 1583. This Court has already determined that § 112 ¶ 6 does not apply to these phrases. The terms are no less understandable now than when this Court issued its previous orders or when the application was made.  Therefore, this Court should reject Defendants' attempt to improperly construe these claims in means-plus-function form.

### 1.   "Image pick-up unit"

There is a presumption that Claim 1 of the '010 patent and Claims 1 and 3 of the '899 are not in means-plus-function form because they do not include the phrase "means" in relation to an image pick-up unit. *Greenberg*, 91 F.3d at 1583.  As this Court previously recognized, "[t]he claims describe a definite structure, an 'image pick-up unit,' and do not recite a function that is detached from this structure or beyond the capabilities of this structure." Ex. 27, at 30. The shared specification supports this Court's previous construction that an "image pick-up unit" is "an image sensor, such as, Charge Coupled Device (CCD), C-MOS sensor, Infrared sensor (IR),

Ultra-Violet sensor (UV) alone or in combination with an analog to digital converter(s)." *See, e.g., id.* at 30-31; Ex. 1, '010, Col. 1, ll. 34-38, Col. 2, ll. 41-46; Col. 3, l. 63 – Col. 4, ll. 1,4-7, 16; Col. 6, l. 57 – Col. 7, l. 1; Col. 7, l. 65 – Col. 8, l. 7. Because this Court was correct in its original construction, St. Clair believes it should maintain its construction of this phrase.

### 2.   "Memory means"

This Court was correct that "memory means," is not in means-plus-function form and instead should be construed according to its ordinary and customary meaning. Ex. 27 at 44. Specifically, "any digital memory, e.g. floppy disks, optical disks, magnetic disks, magnetic media, memory storage disk drive, semiconductor memory, and solid state memory." *Id.* at 45.

As this Court has already identified, this construction is supported by the language of the claims in dispute. For example, in Claim 10 of the '219 patent the "memory means" is "removably mounted" and must store digital data. Indeed, in each of the disputed claims, the "memory means" must be capable of storing data. Ex. 3, '219 Claim 16 ("memory means <u>for storing said digital data information signals</u>") (emphasis added). "In this context, 'memory means,' or 'memory,' would be understood by one skilled in the art as a definite structure." Ex. 27, at 35. This definite structure overcomes any presumption that the phrase is in means-plus-function form. *Trimed*, 514 F.3d at 1259-60.

### 3.   "Analog to digital converter means"

This Court correctly determined that "analog to digital converter means" should not be construed as a means-plus-function term. An analog to digital converter is a structure well known in the art—so well known in fact, that Defendants construe the corresponding structure as "three analog-to-digital converters." Ex. 19, at 43. An "analog to digital converter means" is nothing more or less than "analog to digital converter[s]." *Lighting World*, 382 F.3d at 1360 ("the fact that a particular mechanism . . . is defined in functional terms is not sufficient to

36

convert a claim element . . . into a 'means for performing a specific function' within the meaning of § 112, ¶ 6") quoting *Greenberg*, 91 F.3d at 1583 (Fed. Cir. 1996).   This conclusion is supported by the specification's numerous references to analog-to-digital converters.   *See, e.g.*, Ex. 1, '010, Col. 7, ll. 7-8, 18-19, 58-62.

### 4.   "Logic means"

This Court correctly determined that "'logic means,' . . . is not in means-plus-function form and should be accorded its ordinary meaning of 'circuitry and/or a set of instructions.'"   Ex. 27, at 51.   To one of ordinary skill in the art, the term "logic" is a circuitry or a set of instructions.   Indeed, by the time the original patent application was filed, "logic circuit" was defined as "a circuit comprising one or more gates or flip flops that performs a particular logic function."   Ex. 48, VAN NOSTRAND REINHOLD DICTIONARY OF INFORMATION TECHNOLOGY 307 (3d ed. 1989).   This definition is consistent with the description in the specification.   *See, e.g.*, Ex. 1, '010, Col. 5, ll. 16-18 ("typical logic AND gate circuits 60a and 60b"); Col. 7, ll. 16-18 ("The general digital logic and timing and control signals for this circuitry"); Col. 9, ll. 13-17 ("issues a control signal to the optics logic in the shutter and control circuitry").   The logic circuitry is structure within the camera and therefore any presumption created by the inclusion of the word "means" is overcome.   *Trimed*, 514 F.3d at 1259-60.

### G.   To The Extent Phrases Are In Means-Plus-Function Form, This Court Correctly Identified the Corresponding Function and Structure

The parties agree that the Court correctly concluded that "means for capturing image data corresponding to a selected image," "means for digitizing captured image data," "output data format control means," and "image resolution determining means" are in means-plus-function form. This Court also correctly identified the corresponding function and structure for each.   To be "corresponding structure," the specification or prosecution history must provide a clear link

between the structure and the function recited in the claim. *Minks*, 546 F.3d at 1377. Yet, the Court must always guard against importing more corresponding structure than that which is "necessary" to perform the recited function. *Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1352 (Fed. Cir. 2003). In addition, if multiple structures are clearly linked to the recited function, the corresponding structure is not limited to any one, or combination of structures. Rather, each of the multiple structures is corresponding structure for purposes of 35 U.S.C. §112, ¶ 6. *Creo Prods., Inc. v. Presstek, Inc.*, 305 F.3d 1337, 1345 (Fed. Cir. 2002).

1.   "Means for capturing image data corresponding to a selected image"

The parties agree that the Court correctly identified the corresponding function as "capturing image data corresponding to a selected image." Ex. 27, at 26. The Court was also correct that the corresponding structure is "electro-optical sensors including Charge Coupled Device (CCD), C-MOS sensor, Infrared Sensor (IR), and Ultra-Violet sensor (UV), and equivalents thereof." *Id.* at 27. These are the only structures necessary to perform the recited function. *See, e.g.*, Ex. 1, '010, Col. 2, ll. 43-46; Col 3, ll. 63-66; Col. 7, l. 65 – Col. 8, l. 5. Importing structure would be error. *Northrop*, 325 F.3d at 1352. Accordingly, St. Clair requests that this Court maintain its original construction of this phrase.

2.   "Means for digitizing captured image data"

This Court correctly recited the function of the phrase "means for digitizing captured data" as "digitizing captured data." Ex. 27, at 32. The claim clearly recites this function—such a recitation should control the determination of the corresponding function. *Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1361 (Fed. Cir. 2004).

This Court also correctly identified the corresponding structure as "analog to digital converter(s), and equivalents thereof." The Court's previous construction is supported by the specification, which identifies analog to digital converters are all that is necessary to digitize

analog image data. *See, e.g.*, Ex. 1, '010, Col. 7, ll. 52-53 ("serial S/H and A/D path typical of

prior art"); Col. 7, ll. 62-65 ("common/singular A/D path"). The corresponding structure must

be limited to what is required in order to perform the function. *Northrop*, 325 F.3d at 1352. St.

Clair therefore requests that this Court maintain its previous construction.

### 3.   "Output data [format] control means"

As this Court has already recognized, the use of the phrase "output data format control

means" within the claims is done so consistently. Ex. 27, at 49. The Court previously identified

the function for each claim as "the function described in each claim" and the corresponding

structures as "microprocessors programmed to perform the functions recited in each claim." The

Court's construction is supported by the specification. The specification identifies that a

microprocessor is responsible for performing each of the recited functions:

> As shown in FIG. 6, control panel settings are monitored by the CPU 20, a
> microprocessor, thus allowing the appropriate timing, control, and signal
> processing to be effected properly. The microprocessor 20 may be of the
> type 68040 manufactured by MOTOROLA, Intel's 80386 series, or
> equivalent microprocessors which specifications are commercially available
> and are incorporated herein by reference. The microprocessor utilization of
> this invention, which is in the digital control unit 9, transmits commands and
> status to specific controls, functions, and displays in the control panel as
> well as receiving both circuit status/control data and operator commands
> through polling the operator switch settings 14A, 14B, and 17 via the
> bidirectional function and address decoder 19.

Ex. 1, '010, Col. 8, ll. 30-44. St. Clair requests that this Court maintain its previous construction.

### 4.   "[Picture] Image resolution determining means"

The Court was correct in identifying the corresponding function as "selectively

determining which of a plurality of compression algorithm parameters are to be applied to said

digitized captured image" and the corresponding structure of "at least one switch, circuitry

and/or a set of instructions programmed or configured to perform the recited function . . . and

equivalents thereof." Ex. 27, at 54. The Court's construction is consistent with how one skilled in the art would understand the claims in light of the specification.

One of skill in the art understands the function recited in the claim is the algorithm which determines which compression algorithm to be applied to a captured image. The specification makes clear that "typical logic AND gate circuits 60a and 60b utilizable in conjunction with switches 14A and 14B or switch 17 to generate appropriate signals to designate respective switch positions and generate appropriate control signals from." Ex. 1, '010, Col. 5, ll. 17-21.

While the specification identifies specific switches, the specific compression parameters are not necessary to perform the recited function. One of skill in the art would understand that the algorithm does not require switches 14A, 14B, and 17. Neither the specific mechanism that would drive the selection, e.g., as user switch, nor the specific parameters available for selection are recited in this element. Thus, the circuitry underlying any switch, e.g., switches 14A, 14B, and 17, and the circuitry underlying the specific compression parameters, stand outside the corresponding structure. *Northrop*, 325 F.3d 1346, 1352 (Fed. Cir. 2003) ("A court may not import into the claim features that are unnecessary to perform the claimed function.").

Dated: April 23, 2009.

SEITZ, VAN OGTROP & GREEN

*/s/ Patricia P. McGonigle*

*Of Counsel:*
Ronald J. Schutz, Esq.
Jake M. Holdreith, Esq.
Becky R. Thorson, Esq.
Annie Huang, Esq.
Seth A. Northrop, Esq.
ROBINS, KAPLAN, MILLER
    & CIRESI L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402

George H. Seitz, III, Esq. (No. 667)
gseitz@svglaw.com
Patricia P. McGonigle, Esq. (No. 3126)
pmcgonigle@svglaw.com
222 Delaware Avenue, Suite 1500
P.O. Box 68
Wilmington, DE 19899
(302) 888-0600

*Attorneys for Plaintiff*
*St. Clair Intellectual Property Consultants, Inc.*

40

## CERTIFICATE OF SERVICE

I, Patricia P. McGonigle, Esquire, hereby certify that on this 30th day of April 2009, I electronically filed the foregoing document with the Clerk of Court using CM/ECF which will send notification of such filing to counsel of record.


/s/ Patricia P. McGonigle

_____

Patricia P. McGonigle (ID No. 3126)
pmcgonigle@svglaw.com