**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ST. CLAIR INTELLECTUAL PROPERTY CONSULTANTS, INC. | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 04-1436-JJF-LPS |
| | : | |
| SAMSUNG ELECTRONICS CO., LTD., ET AL., | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| ST. CLAIR INTELLECTUAL PROPERTY CONSULTANTS, INC. | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 06-403-JJF-LPS |
| | : | |
| SIEMENS AG, ET AL., | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| ST. CLAIR INTELLECTUAL PROPERTY CONSULTANTS, INC. | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 06-404-JJF-LPS |
| | : | |
| LG ELECTRONICS, INC., ET AL., | : | |
| | : | |
| Defendants. | : | |

**REDACTED**
**PUBLIC VERSION**

|  | : |  |
|---|---|---|
|  | : |  |
| ST. CLAIR INTELLECTUAL PROPERTY CONSULTANTS, INC. | : | |
|  | : | |
| Plaintiff, | : | |
|  | : | |
| v. | : | C.A. No. 08-371-JJF-LPS |
|  | : | |
| RESEARCH IN MOTION LTD., ET AL., | : | |
|  | : | |
| Defendants. | : | |

|  | : |  |
|---|---|---|
| ST. CLAIR INTELLECTUAL PROPERTY CONSULTANTS, INC. | : | |
|  | : | |
| Plaintiff, | : | |
|  | : | |
| v. | : | C.A. No. 08-373-JJF-LPS |
|  | : | |
| FUJIFILM HOLDINGS CORPORATION, ET AL., | : | |
|  | : | |
| Defendants. | : | |

## DEFENDANTS' OPENING BRIEF ON CLAIM CONSTRUCTION

**REDACTED**

**PUBLIC VERSION**

## TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................... 1

II.   STATEMENT OF FACTS ........................................................................................ 2

   A.   This Court's Prior Claim Construction Rulings............................................... 2

   B.   The USPTO Reexamination ............................................................................ 3

   C.   The Federal Circuit's *Phillips* Decision......................................................... 4

III.  SUMMARY OF RELEVANT LAW......................................................................... 5

   A.   Claim Construction Standard .......................................................................... 5

   B.   Claims Should be Construed Consistently with the Prosecution History,
      Including Reexamination ................................................................................. 5

   C.   Disputed Claim Terms Must Be Construed ..................................................... 6

IV.   CONSTRUCTION OF DISPUTED CLAIM LIMITATIONS.................................... 7

   A.   "plurality of different data formats" limitations .............................................. 7

     1.   The USPTO's Reexamination Altered the Intrinsic Record By Adopting a
        "Broadest Reasonable Construction" That Is Far Narrower Than St. Clair's
        Construction. ............................................................................................. 8

        a.   The USPTO's Broadest Reasonable Construction Requires One-to-One
           Correspondence with Computer Architecture............................................. 8

        b.   The USPTO's Construction is Important Intrinsic Evidence That Did Not
           Exist in 2002 and 2004. ......................................................................... 10

     2.   When Construed In Light of the Specification and Prosecution History, and
        Under the Framework of Phillips, the "Plurality of Different Data Formats"
        Limitations Require One-to-One Correspondence With Computer
        Architecture............................................................................................. 12

        a.   The Specification Consistently Describes One-to-One Correspondence
           Between Data Formats and Computer Architecture As a Feature of the
           Invention. .............................................................................................. 13

           i.   The Specification Describes Correspondence With Computer
              Architecture As Part of the Alleged Invention as a Whole.................... 14

           ii.  The Specification's Consistent Description of the Data Formats As
              Corresponding to Particular Computer Architectures Limits the Claims............. 15

           iii. The Specification's Consistent Description of the Data Formats As
              Corresponding to Particular Computer Architectures Limits the Claims............. 16

           iv.  The Specification Only Discloses Data Formats in One-to-One
              Correspondence With Different Computer Architecture. ...................... 18

v.    The Specification Does Not Disclose that the "Plurality of Different Data Formats" Can Correspond to Different Application Software Operating on the Same Computer Architecture. .................................. 19

    b.    The Prosecution History Confirms that the Claims Require One-to-One Correspondence With Computer Architecture. ......................................... 20

B.    "selecting" ......................................................................................................... 23

C.    "electronic camera"; "digital camera" ............................................................ 24

    1.    The Intrinsic Record Proves That The Claimed "Camera" Is Not Necessarily Self-Contained, Portable, Or Contained In A Single Housing. ................................. 25

        a.    By Requiring that the Remote Control be Part of the Claim Term "Camera," Claim 15 of the '459 Patent Dictates that the "Camera" Need not be Self-Contained. ................................................................. 25

        b.    Construing "Camera" as Self-Contained or in a Single Housing Would be Contrary to the Patentees' Own Actions in the Prosecution History ........................ 26

    2.    Extrinsic Evidence Confirms That The Claimed "Electronic/Digital Camera" Does Not Have To Be Self-Contained ................................ 27

        a.    *Phillips* Rejected the Court's Primary Reliance on a General-Purpose Dictionary Definition of "Camera" ................................ 27

        b.    This Court's Previous Dictionary Definition of "Camera" Does Not Apply to a "Digital/Electronic Camera" ................................ 28

        c.    The Court's Dictionary and "Self-Contained" Definition of "Camera" are Contrary to the Prior Art ................................ 29

    3.    It is Improper to Rewrite Claim Terms in a Manner that is Contrary to the Intrinsic Record In Order To Preserve Validity ................................ 30

D.    Claim 16 of the '459 Patent Does Not Recite A "Camera" And Should Not Be So Limited ........................................................................................................... 31

E.    "image"; "taking pictures"; "taking . . . digital pictures"; "digitized captured image"; "digitized captured image data"; "digitized image data" ................... 31

    1.    Image ....................................................................................................... 31

    2.    Digital Image Terms ............................................................................... 33

    3.    Taking Pictures ....................................................................................... 34

F.    "digital electronic information signals"; "digital electronic signal"; "digital image signal"; and "digital data information signals" ................................ 35

G.    The asserted claims are limited to a "removable data storage medium" ........................ 38

    1.    Patentees Disclaimed Non-Removable Memory/Storage In The Prosecution History .................................................................................................... 38

    2.    Disclaimed Claim Scope Cannot Be Recaptured Through Claim Differentiation ........................................................................................... 40

H.  Steps of the Asserted Method Claims Must Be Performed in a Particular Order.............. 41

I.  35 U.S.C. § 112, ¶ 6 means-plus-function claim limitations ............................................ 43

1.  "output data control means"....................................................................................... 44

2.  "logic means".............................................................................................................. 45

3.  "means for digitizing captured image data" ('219 patent, claims 1 and 10)
    and "analog to digital converter means for converting said analog picture
    information signal into corresponding digital data information signals" ('219
    patent, claim 16).......................................................................................................... 48

4.  "Memory Means" Elements of the '219 Patent are Limited to Their
    Corresponding Structure ............................................................................................. 49

5.  "image resolution determining means" ('219 patent, claim 12) and "picture
    image resolution determining means" ('219 patent, claim 17)..................................... 49

6.  "an image pick-up unit" ('010 patent, claim 1, '899 patent, claims 1 and 3)
    and "means for capturing image data corresponding to a selected image"
    ('219 patent, claim 10) ................................................................................................ 50

V.  CONCLUSION......................................................................................................................... 50

# TABLE OF AUTHORITIES

CASES

*Acumed LLC v. Stryker Corp.*,
  483 F.3d 800, 815 (Fed. Cir. 2007).......................................................20, 23

*Acco Brands, Inc. v. Micro Sec. Devices, Inc.*,
  346 F.3d 1075 (Fed. Cir. 2003)...................................................................38

*AK Steel Corp. v. Sollac*,
  344 F.3d 1234 (Fed. Cir. 2003)...................................................................30

*Alloc, Inc. v. Int'l Trade Comm'n*,
  342 F.3d 1361 (Fed. Cir. 2003)...................................................................24

*Altiris, Inc. v. Symantec Corp.*,
  318 F.3d 1363 (Fed. Cir. 2003)..............................................................41, 42

*Anderson Corp. v Fiber Composites, LLC*,
  474 F.3d 1361 (Fed. Cir. 2007)...................................................................41

*Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.*,
  98 F.3d 1563 (Fed. Cir. 1996).....................................................................11

*Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*,
  521 F.3d 1328 (Fed. Cir. 2008)..........................................................44, 47, 49

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*,
  262 F.3d 1258 (Fed. Cir. 2001).....................................................................6

*Bowers v. Baystate Techs., Inc.*,
  320 F.3d 1317 (Fed. Cir. 2003) ....................................................................6

*British Telecomms. PLC v. Prodigy Commc'ns Corp.*,
  189 F. Supp. 2d 101 (S.D.N.Y Dec. 13, 2000) .........................................46

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
  388 F.3d 858 (Fed. Cir. 2004)................................................................14, 15

*Cargill, Inc. v. Sears Petroleum & Transp. Corp.*,
  334 F. Supp. 2d 197 (N.D.N.Y. 2004).........................................................11

*Cephalon, Inc. v. Barr Labs., Inc.*,
  389 F. Supp. 2d 602 (D. Del. 2005)...................................................12, 13, 15

*Clearstream Wastewater Sys. Inc. v. Hydro-Action Inc.*,
  206 F.3d 1440 (Fed. Cir. 2000)...................................................................48

*Comark Commc'ns, Inc. v. Harris Corp.*,
    156 F.3d 1187 (Fed. Cir. 1998)........................................................................24

*Combined Sys., Inc. v. Defense Tech. Corp. of Am.*,
    350 F.3d 1207 (Fed. Cir. 2003)..................................................................42, 43

*Computer Docking Station Corp. v. Dell, Inc.*,
    519 F.3d 1366 (Fed. Cir. 2008)........................................................................38

*CVI/Beta Ventures v. Tura LP*,
    112 F.3d 1146 (Fed. Cir. 1997)........................................................................22

*Cybor Corp. v. FAS Techs., Inc.*,
    138 F.3d 1448 (Fed. Cir. 1998) (*en banc*) ......................................................22

*Cytyc Corp. v. Tripath Imaging, Inc.*,
    No. 03-11142, 2005 U.S. Dist. LEXIS 29850 (D. Mass. Nov. 28, 2005) .................. 11-12, 23

*Display Tech., LLC v. Mechtronics Corp.*,
    335 F. Supp. 2d 431 (S.D.N.Y. 2004)...............................................................48

*Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*,
    114 F.3d 1547 (Fed. Cir. 1997)........................................................................22

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
    192 F.3d 973 (Fed. Cir. 1999)..........................................................................38

*Ethicon, Inc. v. Quigg*,
    849 F.2d 1422 (Fed. Cir. 1988)........................................................................12

*Finisar Corp. v. DirecTV Group, Inc.*,
    523 F.3d 1323 (Fed. Cir. 2008)..........................................................44, 47, 49

*Genentech, Inc. v. Wellcome Found. Ltd.*,
    29 F.3d 1555 (Fed. Cir. 1994)...................................................................39, 40

*Gioello Enters. Ltd. v. Mattel, Inc.*,
    C.A. No. 99-375 GMS, 2001 U.S. Dist. LEXIS 26158 (D. Del. Jan. 29, 2001) ....................12

*Gould v. Control Laser Corp.*,
    705 F.2d 1340 (Fed. Cir. 1983) ..........................................................................6

*Hockerson-Halberstadt, Inc. v. Avia Group Int'l*,
    222 F.3d 951 (Fed. Cir. 2000)..........................................................................11

*Honeywell Int'l, Inc. v. Int'l Trade Comm'n*,
    341 F.3d 1332 (Fed. Cir. 2003)........................................................................30

*Honeywell Int'l, Inc. v. ITT Indus., Inc.,*
    452 F.3d 1312 (Fed. Cir. 2006)...................................................................... 15-16

*ICU Med., Inc. v. Alaris Med. Sys., Inc.,*
    558 F.3d 1368 (Fed. Cir. 2009)...............................................................13, 15, 17, 40

*In re Am. Acad. of Sci. Tech. Ctr.,*
    367 F.3d 1359 (Fed. Cir. 2004)...........................................................................4

*In re Berg,*
    320 F.3d 1310 (Fed. Cir. 2003)...........................................................................12

*In re Morris,*
    127 F.3d 1048 (Fed. Cir. 1997)...........................................................................11

*In re Trans Tex. Holdings Corp.,*
    498 F.3d 1290 (Fed. Cir. 2007)...........................................................................8

*In re Yamamoto,*
    740 F.2d 1569 (Fed. Cir. 1984)...........................................................................11

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,*
    381 F.3d 1111 (Fed. Cir. 2004); ........................................................................27

*Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.,*
    450 F.3d 1350 (Fed. Cir. 2006)...................................................................... 15-16

*Irdeto Access, Inc. v. Echostar Satellite Corp.,*
    383 F.3d 1295 (Fed. Cir. 2004)...........................................................................9

*Jonsson v. Stanley Works,*
    903 F.2d 812 (Fed. Cir. 1990)...........................................................................21

*Kinetic Concepts, Inc. v. Blue Sky Med. Group, Inc.,*
    554 F.3d 1010 (Fed. Cir. 2009)...................................................................... 15, 17-18

*Kraft Foods, Inc. v. Int'l Trading Co.,*
    203 F.3d 1362 (Fed. Cir. 2000)...................................................................... 40-41

*Loral Fairchild Corp. v. Sony Corp.,*
    181 F.3d 1313 (Fed. Cir. 1999)...........................................................................41

*Lucent Techs., Inc. v. Extreme Networks, Inc.,*
    367 F. Supp. 2d 649 (D. Del. 2005) .......................................................................3

*Lucent Techs., Inc. v. Gateway, Inc.,*
    525 F.3d 1200 (Fed. Cir. 2008)...........................................................................25

*Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.,*
   152 F.3d 1368 (Fed. Cir. 1998)..............................................................41

*Marion Merrell Dow, Inc. v. Baker Norton Pharms., Inc.,*
   948 F. Supp. 1050 (S.D. Fla. 1996) .......................................................11

*Markman v. Westview Instruments, Inc.,*
   517 U.S. 370 (1996)..........................................................................5, 6

*MBO Labs., Inc. v. Becton, Dickinson & Co.,*
   474 F.3d 1323 (Fed. Cir. 2007).......................................................20-21

*Microsoft Corp. v. Compression Labs, Inc.,*
   2006 WL 1795127 (N.D. Cal. 2006) .....................................................36

*Microsoft Corp. v. Multi-Tech Sys.,*
   357 F.3d 1340 (Fed. Cir. 2004)............................................................39

*NCR Corp. v. Palm, Inc.,*
   217 F. Supp. 2d 491 (D. Del. 2002).......................................................48

*Northrop Grumman Corp. v. Intel Corp.,*
   325 F.3d 1346 (Fed. Cir. 2003).............................................................43

*Nystrom v. Trex Co.,*
   424 F.3d 1136 (Fed. Cir. 2005).................................................13, 15, 18

*Phillips v. AWH Corp.,*
   415 F.3d 1303 (Fed. Cir. 2005) *(en banc)* ......................................*Passim*

*Proctor & Gamble Co. v. Kraft Foods Global, Inc.,*
   549 F.3d 842 (Fed. Cir. 2008)................................................................5

*Raytech Corp. v. White,*
   57 F.3d 187 (3d Cir. 1995)...................................................................31

*Rhine v. Casio, Inc.,*
   183 F.3d 1342 (Fed. Cir. 1999).........................................................25-26

*Rodime PLC v. Seagate Tech., Inc.,*
   174 F.3d 1294 (Fed. Cir. 1999).............................................................46

*Sage Prods. v. Devon Indus.,*
   126 F.3d 1420 (Fed. Cir. 1997).............................................................43

*Salazar v. Procter & Gamble Co.,*
   414 F.3d 1342 (Fed. Cir. 2005).............................................................11

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys.,*
    242 F.3d 1337 (Fed. Cir. 2001).................................................................................24

*Simplification, LLC v. Block Fin. Corp.,*
    593 F. Supp. 2d 700 (D. Del. 2009)..........................................................................6

*Southwall Techs., Inc. v. Cardinal IG Co.,*
    54 F.3d 1570 (Fed. Cir. 1995)..................................................................................5

*St. Clair v. Canon,*
    C.A. No. 03-241 (JJF) (D. Del.).............................................................................2

*St. Clair v. Sony,*
    C.A. No. 01-557 (JJF) (D. Del).............................................................................2

*Texas Digital Systems, Inc. v. Telegenix, Inc.,*
    308 F.3d 1193 (Fed. Cir. 2002)...............................................................................12

*United Sweetener USA, Inc. v. Nutrasweet Co.,*
    766 F. Supp. 212 (D. Del. 1991).............................................................................6

*Verizon Servs. Corp. v. Vonage Holdings Corp.,*
    503 F.3d 1295 (Fed. Cir. 2007)...............................................................................14

*Warner-Lambert Co. v. Teva Pharms. USA, Inc.,*
    418 F.3d 1326 (Fed. Cir. 2005)........................................................................ 15-16

*Winbond Elecs. Corp. v. Int'l Trade Comm'n,*
    4 F. App'x 832 (Fed. Cir. 2001) .............................................................................47

*WMS Gaming, Inc. v. Int'l Game Tech.,*
    184 F.3d 1339 (Fed. Cir. 1999)...............................................................................44

### STATUTES

35 U.S.C. § 112, ¶ 6....................................................................................*Passim*

## LIST OF EXHIBITS

Christine Ammer, *American Heritage Dictionary of Idioms* 631 (Houghton
Mifflin Co. 1997) (Exhibit J) ................................................................................34

David C. Kay & John R. Levine, *Graphics File Formats* 148
(Windcrest/McGraw-Hill 1992) (Exhibit D) ........................................................18

*IEEE Standard Dictionary of Electrical and Electronics Terms* 599, 601 (6th ed.
1996) (Exhibit L) ..................................................................................................46

James D. Murray & William vanRyper, *Encyclopedia of Graphics File Formats*
377-83 (O'Reilly & Assocs. 1994) (Exhibit C) ...................................................18

*McGraw-Hill Dictionary of Scientific and Technical Terms* 1164 (5th ed. 1994)
(Exhibit K) ............................................................................................................46

*Merriam-Webster's Guide to Punctuation and Style* (2d ed. 2001) (Exhibit B) ...........................9

Robert G. Stearne et al., *Reexamination Practice with Concurrent District Court
or USITC Patent Litigation* 28-29 (The Sedona Conference 2008) (Exhibit A) ......................4

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

Tessera Megavision Filmless Photography System (Exhibit H) ...........................................28, 29

Table Showing Specification Use of "still," "image," and "picture" (Exhibit I) ..........................33

Pursuant to the Court's Scheduling Order, Defendants and Counterclaim-Plaintiffs in the above-captioned matters (collectively, "Defendants") hereby submit their opening brief on claim construction to address disputed claim language in the four patents-in-suit: U.S. Patent Nos. 5,138,459 ("the '459 patent); 6,094,219 ("the '219 patent"); 6,323,899 ("the '899 patent"); and 6,233,010 ("the '010 patent") (collectively, the "Patents-In-Suit").

## I.  **INTRODUCTION**

Since the Court last construed the claims of the Patents-In-Suit in 2004, both the facts and the law relevant to the meaning of the patents' claims have fundamentally changed.  First, the factual record of intrinsic evidence relevant to claim construction has expanded.  The Patents-In-Suit were reexamined by the U.S. Patent & Trademark Office ("USPTO") and survived only because the USPTO adopted a "broadest reasonable" construction of "file format" that was decidedly narrower than the Court's prior construction of that phrase.  Second, the Federal Circuit clarified the law of claim construction.  In *Phillips v. AWH Corp.*, 415 F.3d. 1303 (Fed. Cir. 2005) (*en banc*), the Federal Circuit re-emphasized the primary importance of intrinsic evidence—which includes the record of reexamination proceedings—in claim construction. When the Court previously construed the Patents-In-Suit, it relied heavily on extrinsic evidence—in particular, general purpose dictionary definitions.

Defendants have proposed constructions that acknowledge these fundamental changes and are consistent with the expanded intrinsic evidence.  St. Clair, however, ignores these changes and asks the Court to adopt in full its prior claim construction rulings.  *See* Parties' Joint Claim Construction Statement (hereinafter "JCCS").[1]  St. Clair's proposal is an invitation to legal error that should be rejected.

_____

[1] The parties submitted *Parties' Joint Claim Construction Statement* on April 9, 2009, in each of the cases.  04-cv-1436, D.I. 248-252; 06-cv-403, D.I. 154-158; 06-cv-404, D.I. 166; 08-cv-371, D.I. 85; and

The Court should also reject St. Clair's proposed constructions because St. Clair is attempting to recapture claim scope it surrendered during the reexamination proceedings. St. Clair essentially asks the Court to reject the narrower claim construction of the USPTO and to adopt a broader construction in an attempt to read the patents on the Defendants' products. But the USPTO only allowed St. Clair's patents to survive reexamination under a narrow claim construction. In other words, St. Clair is now attempting to use the claim construction process to do an end-run around the USPTO and to expand its alleged property rights into areas it previously ceded to the public domain. St. Clair's approach is contrary to law, manifestly unfair, and should be rejected by the Court.

## II.   **STATEMENT OF FACTS**

### A.   **This Court's Prior Claim Construction Rulings**

The Patents-In-Suit have been litigated previously in this Court. *See St. Clair v. Sony,* C.A. No. 01-557 (JJF) (D. Del) ("the Sony Action"); *St. Clair* v. *Canon,* C.A. No. 03-241 (JJF) (D. Del.) ("the Canon Action"). These earlier cases were filed against manufacturers of digital camera products. In contrast, the present actions are directed primarily at manufacturers of products such as mobile phones, communication devices, and personal computers allegedly having some camera functionality, as well as service providers of communications services and a distributor of digital camera products. Judge Farnan issued Memorandum Opinions and *Markman* Orders in both the Sony and Canon Actions construing certain terms of the Patents-In-Suit. (*See* JCCS, Plaintiff's Exs. 1-3.)

---

08-cv-373, D.I. 53. All references to "Defendants' Exhibit __" or "Plaintiff's Exhibit __" refer to the intrinsic evidence filed with the JCCS and identified by the Index filed with the JCCS.

The Memorandum Opinions and *Markman* Orders in the Sony and Canon Actions are not binding on the Defendants.[2] The Court needs to revisit the disputed claim terms and adopt Defendants' proposed claim constructions for several reasons. First, the Court's previous *Markman* Orders issued before the law changed under *Phillips* and the factual record expanded as a result of the reexamination proceedings. Defendants' proposed constructions are consistent with and recognize those changes. Second, the prior rulings did not address at least eight of the terms presently disputed.[3] Finally, Defendants raise various arguments not presented to or addressed by this Court in the prior disputes, including arguments regarding the application of 35 U.S.C. § 112, ¶ 6 and the proper order of steps required by the asserted claims.

## B.    The USPTO Reexamination

Subsequent to the entry of the Court's Opinions and Orders on claim construction, the USPTO issued Reexamination Certificates for each of the Patents-In-Suit.[4] During reexamination, the USPTO defined the scope of the claims of the Patents-In-Suit in a manner

---

[2] This Court has explicitly recognized that the terms of previously-litigated patents should be re-interpreted when new parties are before the Court. *Lucent Techs., Inc. v. Extreme Networks, Inc.*, 367 F. Supp. 2d 649, 653-54 (D. Del. 2005) (Farnan, J.) (finding that a second look is needed when the parties in the prior litigation did not raise the issue now before the Court).

[3] Plaintiff acknowledges in the Joint Claim Construction Chart that the following terms were not previously construed: "digital electronic information signals" ('459 patent, claim 16); "digital electronic signal" ('459 patent, claim 16); "digital image signal" ('010 patent, claim 1; '899 patent, claims 1, 3); "digital data information signal(s)" ('219 patent, claim 16); "digitized captured image" ('219 patent, claim 1); "digitized captured image data" ('219 patent, claim 10); "digitized image data" ('219 patent, claim 10); "image" ('459 patent, claim 16; '219 patent, claims 1, 10, 16; '010 patent, claim 1; '899 patent, claims 1, 3); "taking pictures"; "taking . . . digital pictures" ('010 patent, claim 1; '899 patent, claims 1 and 3); "storage device" ('899 patent, claims 1, 3); "generating," "converting," "selecting," and "storing" ('459 patent, claim 16); "generating," "formatting," and "storing" ('899 patent, claims 1 and 3); and "assigning" and "digitized captured image" ('219 patent, claim 1). (*See* JCCS, Exhibit A.) Defendants agree.

[4] The reexamination certificates issued as follows: '459 patent on May 15, 2007; '219 patent on December 19, 2006; '899 patent on November 28, 2006; and '010 patent on February 27, 2007.

decidedly different from this Court in the Sony and Canon Actions.[5]  By way of example, this

Court construed the phrase "file format" to refer to types of files:

> The terms "file format," "data file format," and "data format," mean "the arrangement
> of digital data in a file, including image, audio, text or other data and includes, at least,
> MPEG, JPEG, GIF, TIFF, PICT, BMP, JFIF, DCF, TXT, DOC, WPD, and WAV.

(JCCS, Plaintiff's Ex. 1 at 7; JCCS, Plaintiff's Ex. 2 at 2.)  However, during reexamination, the

USPTO concluded that the term "file format" has a much different meaning.[6]  Specifically, the

USPTO found that the Patents-In-Suit were valid over certain prior art only after concluding that

"file format" refers to a type of computer architecture:

> [T]here is no disclosure in the Roberts et al. patents to suggest that once the user selects
> that the image is to be output as an IBM PC/Clone, for example, that the user is further
> given the option of selecting between various image file formats such as GIFF, TIFF,
> BMP, JFIF, etc.  *As such, in light of the specification, the claim limitation "a digital
> control unit for formatting said digital image signal in one of a plurality of computer
> formats" is interpreted to mean formatting the image signal as one of an IBM
> PC/Clone, Apple Macintosh, or other PC format.*

(JCCS, Defendants' Ex. 30 at 3 (emphasis added).)  The USPTO issued the Reexamination

Certificates for the Patents-In-Suit based on its different claim interpretation.

C.      **The Federal Circuit's *Phillips* Decision**

In July 2005—more than three years after this Court's claim construction in the Sony

Action and almost a year after its construction in the Canon Action—the Federal Circuit set forth

precise guidelines for interpreting patent claims in its *en banc* decision in *Phillips*.  As discussed

---

[5] Each reexamination is conducted by, and each reexamination certificate is approved by three senior
examiners (with an average of 17 years experience) from a small select group of highly-skilled examiners
(many with advanced technical and/or law degrees) promoted to the USPTO's Central Examination Unit.
*See, e.g.,* Robert G. Stearne et al., *Reexamination Practice with Concurrent District Court or USITC
Patent Litigation* 28-29 (The Sedona Conference 2008) (attached hereto as Exhibit A).

[6] The USPTO is obligated to apply the "broadest reasonable interpretation consistent with the
specification." *In re Am. Acad. of Sci. Tech. Ctr.*, 367 F.3d 1359, 1364 (Fed. Cir. 2004).  As such, it is
clear that the broadest reasonable construction applied by the USPTO is still much more narrow than the
construction reached by the Court.

in more detail below, this decision emphasized the primacy of intrinsic evidence in construing claim terms and clarified the circumstances and manner in which extrinsic evidence, including dictionary definitions, can be used to inform the meaning of disputed terms.

III.   **SUMMARY OF RELEVANT LAW**

A.   **Claim Construction Standard**

Claim construction is a matter of law for the court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 371-73 (1996). Claim terms are to be given their ordinary and customary meaning as understood by a person of ordinary skill in the art in view of the intrinsic evidence— the language used in the claims, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1312-17. All other evidence, according to the *Phillips* court, constitutes "extrinsic evidence." *Id.* at 1317. The "best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history." *Id.* at 1315 (internal quotation and edit omitted). Extrinsic evidence is of significantly less value. *Id.* at 1317.

B.   **Claims Should be Construed Consistently with the Prosecution History, Including Reexamination**

The prosecution history, which includes reexamination proceedings, "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*; *see also Proctor & Gamble Co. v. Kraft Foods Global, Inc.*, 549 F.3d 842, 848 (Fed. Cir. 2008) (district court should "monitor the [reexamination] proceedings . . . to ascertain whether [the court's] construction of any of the claims has been impacted"). Thus, proper claim constructions must be consistent with arguments and amendments made during prosecution, both of which may evidence a disavowal of claim scope. *See Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995).

As Judge Farnan recently noted, "particularly relevant to the construction of the disputed terms is the prosecution history of the patents-in-suit" including reexamination records. *Simplification, LLC v. Block Fin. Corp.*, 593 F. Supp. 2d 700, 703 (D. Del. 2009) (Farnan, J.). Reexamination prosecution can be critical to a court's assessment of the nature and scope of an alleged invention.   For example, in *Bowers v. Baystate Technologies, Inc.*, the Federal Circuit held that a disclaimer in the reexamination history "preclude[d] [it] from adopting a broader construction."   320 F.3d 1317, 1333-34 (Fed. Cir. 2003).   Further, "the Federal Circuit has remarked, '[o]ne purpose of the reexamination procedure is to . . . facilitate trial . . . by providing the district court with the expert view of the PTO (when claim survives the reexamination proceeding).'"   *United Sweetener USA, Inc. v. Nutrasweet Co.*, 766 F. Supp. 212, 217 (D. Del. 1991) (quoting *Gould v. Control Laser Corp.*, 705 F.2d 1340, 1342 (Fed. Cir. 1983), *cert. denied*, 464 U.S. 935 (1983)).   The Federal Circuit's recognition of the importance and the expertise of the USPTO is particularly relevant to the present actions.

C.   **Disputed Claim Terms Must Be Construed**

St. Clair argues that this Court should adopt its prior claim construction rulings without analyzing the intrinsic record—a record that has changed significantly since the claims were last construed.   Although the parties may agree that certain terms require no construction, when the meaning of terms *are disputed*, critical analysis by the court is required to determine the meaning of those claim terms.   *See Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001) (stating that claim construction is necessary to determine whether a patentee has acted as his own lexicographer to give a term an unconventional meaning); *see also Markman*, 517 U.S. at 388 ("judges, not juries, are the better suited to find the acquired meaning of patent terms").

IV.   **CONSTRUCTION OF DISPUTED CLAIM LIMITATIONS**

Defendants respectfully request that the Court adopt Defendants' proposed constructions of the terms and phrases discussed below.

A.   **"plurality of different data formats" limitations**

The USPTO's reexaminations of the Patents-In-Suit changed the intrinsic record for construing the "plurality of different data formats" limitations, and *Phillips* clarified the applicable legal framework for construing those terms. St. Clair asks this Court to ignore these events and apply its 2002 and 2004 construction simply because it was this Court's previous construction. But, after *Phillips*, St. Clair's construction would impermissibly broaden the claim scope beyond what the inventors actually invented and disclosed in the intrinsic record.

Defendants ask the Court to construe the "plurality of different data formats" limitations[7] in light of the current intrinsic record and under the proper legal framework to mean: "two or more different arrangements of digital data in a file, wherein each different arrangement is in one-to-one correspondence with a particular type of computer architecture (*e.g.*, IBM PC/Clone or Apple Macintosh)."

---

[7] The Court previously concluded, and St. Clair has conceded, that claim 16 of the '459 patent, which refers to a "plurality of different data formats for different types of computer apparatus," is representative of the various similar terms in the other asserted claims, and therefore these other terms "should be construed consistently." (JCCS, Plaintiff's Ex. 3 at 5, 10.) The exact terms at issue are: (1) "plurality of different data formats for different types of computer apparatus" ('459 patent, claim 16); (2) "plurality of different data formats for different types of information handling systems" ('219 patent, claim 1); (3) "plurality of different data file formats for different types of computer apparatus" ('219 patent, claim 10); (4) "plurality of different data formats for different types of information handling apparatus" ('219 patent, claim 16); (5) "plurality of computer formats" ('010 patent, claim 1); and (6) "plurality of computer image file formats" ('899 patent, claims 1 and 3).

1.   ***The USPTO's Reexamination Altered the Intrinsic Record By Adopting a "Broadest Reasonable Construction" That Is Far Narrower Than St. Clair's Construction.***

During the 2005 reexamination proceedings, the USPTO explicitly considered this Court's prior construction, but confirmed the asserted claims only by applying "a very different interpretation tha[n] that adopted by the court." (JCCS, Defendants' Ex. 30 at 2.)  In doing so, five USPTO Examiners found that the broadest reasonable construction of the "plurality of different data formats" limitations was significantly narrower than this Court's prior construction.

a.   The USPTO's Broadest Reasonable Construction Requires One-to-One Correspondence with Computer Architecture.

"Claims are given their broadest reasonable interpretation, consistent with the specification, in reexamination proceedings." *In re Trans Tex. Holdings Corp.*, 498 F.3d 1290, 1298 (Fed. Cir. 2007) (internal quotations omitted).  Five different USPTO examiners (including three different Supervisory Patent Examiners) found that the broadest reasonable construction of the "plurality of different data formats" limitations requires correspondence with a particular type of computer architecture.  (JCCS, Defendants' Ex. 6 at 9; JCCS, Defendants' Ex. 19 at 6; JCCS, Defendants' Ex. 30 at 6; JCCS, Defendants' Ex. 27 at 5.)  In the context of the Patents-in-Suit, computer architecture means the different "types of personal computers manufactured by different companies, e.g. IBM PC, Apple, Sun Micro Systems, Digital Equipment, etc." that at the time of the invention had "widely different, non-compatible input/output data formats, line I/O discipline and instruction command sets." (JCCS, Defendants' Ex. 2 at 8.)

Citing nine different sections of the specification, the Examiners in the '459 and '219 reexaminations concluded that the patents disclose "format[ting] a compressed digital image to a *compatible format for either the **IBM Personal Computer and related architectures or the***

*Apple Macintosh PC architecture*." (JCCS, Defendants' Ex. 6 ¶ 3 (emphasis added); JCCS, Defendants' Ex. 19 ¶ 3 (same).) The Examiners further concluded:

> [The claims of the '459 and '219 patents] disclose and precisely claim selecting an image file format (PICT II, GIFF, etc.) from a plurality of image file formats for formatting a digital image into the selected image file format, wherein each of the image file formats provided for selection (PICT II or GIFF) *are in one-to-one correspondence with a particular type of computer system (Apple Macintosh or IBM PC)*."

(JCCS, Defendants' Ex. 6 ¶ 6 (emphasis added); JCCS, Defendants' Ex. 19 ¶ 6 (same).)

Similarly, noting that claims must be interpreted "in light of the supporting disclosure [because] claims are not to be evaluated in a vacuum," the Examiners in the '899 and '010 reexaminations concluded that "a user is given an option for selecting between PC formats by using switch 17, *wherein a particular image file type is assigned to each of the PC formats*."[8] (JCCS, Defendants' Ex. 30 at 2-3 (emphasis added); JCCS, Defendants' Ex. 27 at 2-3 (same).) The Examiners confirmed that "PC format" referred to computer architecture (as defined by the patents), stating "the claim limitation 'formatting the digital image signal in one of a plurality of computer image file formats' is interpreted to mean formatting the image signal *as one of an IBM PC/Clone, Apple Macintosh, or other PC format*." (JCCS, Defendants' Ex. 30 at 3 (emphasis added); *see also* JCCS, Defendants' Ex. 27 at 3 (applying same construction to "a

---

[8]  In rejecting the Court's prior construction, the Examiners relied on the statement in the specification that the "user must select the desired PC format (IBM PC/Clone or Apple Macintosh, etc.) via switch 17 (FIG. 6)." ('459 patent, col.6 ll.42-44.) The specification defines "PC" to mean "personal computer." ('459 patent, col.1 l.15 ("Personal Computer (PC)"; *see also* '010 patent, col.1 l.23.) As a rule of grammar, the use of parentheses around "IBM PC/Clone or Apple Macintosh" provides definitional examples of the preceding phrase (*i.e.*, personal <u>computer format</u>). *Merriam-Webster's Guide to Punctuation and Style* at 35-36 (2d ed. 2001) (attached hereto as Exhibit B); *see also Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1301 (Fed. Cir. 2004). The USPTO correctly concluded that since the specification describes different computer architectures (*e.g.*, IBM or Apple) as definitional examples of the claimed computer formats, computer apparatus, and related terms, the broadest reasonable interpretation of these terms consistent with the specification requires correspondence with computer architectures.

digital control unit for formatting said digital image signal in one of a plurality of computer formats").)

Notably, the five Examiners rejected St. Clair's position that the claims only require correspondence with different application software operating on the same computer architecture. The Examiners in the '459 and '219 reexaminations explained that the claims only address selecting file formats based on computer architecture or, as they referred to it, "computer species," and do not "provide selecting between various sub-species of the same computer species (e.g. Species 1-A, Species 1-B, or Species 1-C)," *i.e.*, between computers with the same architecture loaded with different application software. (JCCS, Defendants' Ex. 6 ¶ 3; JCCS, Defendants' Ex. 19 ¶ 3.) Similarly, the Examiners in the '010 and '899 reexaminations concluded that "[t]here is no disclosure in the Roberts et al. patents to suggest that once the user selects that the image is to be output" for a particular computer architecture ("IBM PC/Clone, for example"), "that the user is further given the option of selecting between various image file formats" for different application software operating on the chosen computer architecture. (JCCS, Defendants' Ex. 30 at 3; JCCS, Defendants' Ex. 27 at 3.) In other words, five USPTO Examiners expressly considered and rejected this Court's prior construction and instead found that the "plurality of different data formats" must correspond to different computer architectures (as defined by the Patents-In-Suit), not just different application software. St. Clair's proposed construction ignores the expert USPTO Examiners' unbiased, reasonable, and well-supported construction.

      b.      <u>The USPTO's Construction is Important Intrinsic Evidence That Did Not Exist in 2002 and 2004.</u>

The Court construed the disputed "plurality of different data formats" limitations in 2002 and 2004 before the 2005 reexamination. The USPTO's reexamination constructions are

powerful intrinsic evidence of the proper construction of the "plurality of different data formats" limitations. The construction applied by the USPTO reflected its determination of the "broadest reasonable interpretation in light of the supporting disclosure." (*See, e.g.*, JCCS, Defendants' Ex. 27 at 2.) The USPTO applies the broadest reasonable construction to "serve[] the public interest by reducing the possibility that claims, finally allowed, will be given broader scope than is justified."[9] *In re Yamamoto*, 740 F.2d 1569, 1571 (Fed. Cir. 1984). This type of "public notice is an important objective of patent prosecution before the PTO," *In re Morris*, 127 F.3d 1048, 1054 (Fed. Cir. 1997), because "competitors are entitled to rely on those representations [in the prosecution history] when ascertaining the degree of lawful conduct, such as designing around the claimed invention." *Hockerson-Halberstadt, Inc. v. Avia Group Int'l*, 222 F.3d 951, 957 (Fed. Cir. 2000). The Court should, if possible, avoid a construction (like St. Clair's) that is broader than the USPTO's broadest reasonable construction to avoid undermining the public notice function of USPTO proceedings.[10]

Moreover, "[s]tatements about a claim term made by an examiner during prosecution of an application may be evidence of how one of skill in the art understood the term at the time the application was filed." *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1347 (Fed. Cir. 2005); *see also, e.g.*, *Cytyc Corp. v. Tripath Imaging, Inc.*, No. 03-11142, 2005 U.S. Dist. LEXIS

---

[9]   If this Court rejects the USPTO's broadest reasonable construction, the asserted claims may not be entitled to the normal presumption of validity because "[t]he presumption of validity is based on the presumption of administrative correctness of actions of the agency charged with examination of patentability." *Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.*, 98 F.3d 1563, 1569 (Fed. Cir. 1996).

[10]  *See Cargill, Inc. v. Sears Petroleum & Transp. Corp.*, 334 F. Supp. 2d 197, 213 (N.D.N.Y. 2004) ("[C]ourts . . . strive to avoid definitions upon which the PTO could not reasonably have settled."); *Marion Merrell Dow, Inc. v. Baker Norton Pharms., Inc.*, 948 F. Supp. 1050, 1056 (S.D. Fla. 1996) ("To construct a claim as encompassing a different scope than that contemplated by the examiner when she allowed the claim effectively allows an end run . . . around the authority of the Patent Office in its role as executor of Congress' mandate as expressed in the laws governing the issuance of patents.")

29850, at *30 (D. Mass. Nov. 28, 2005).  In fact, "the Patent office [is] where the *most* expert opinions exist," and "[t]he PTO's expertise does not exist elsewhere." *Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1426-27 (Fed. Cir. 1988) (emphasis added); *see also Gioello Enters. Ltd. v. Mattel, Inc.*, C.A. No. 99-375 GMS, 2001 U.S. Dist. LEXIS 26158 at *3 (D. Del. Jan. 29, 2001) (describing the "particular expertise" the USPTO applies in reexamination).  All five Examiners here based their constructions on interpretations of the claims and specification, and "[a]s persons of scientific competence in the fields in which they work," are better able than courts to "mak[e] findings, informed by their scientific knowledge, as to the meaning" of the disputed claims. *In re Berg*, 320 F.3d 1310, 1315 (Fed. Cir. 2003).

> 2. ***When Construed In Light of the Specification and Prosecution History, and Under the Framework of* Phillips*, the "Plurality of Different Data Formats" Limitations Require One-to-One Correspondence With Computer Architecture.***

The *Phillips* decision "clarified the approach that a court should take in construing disputed terms of a patent claim." *Cephalon, Inc. v. Barr Labs., Inc.*, 389 F. Supp. 2d 602, 605 (D. Del. 2005) (Farnan, J.).  Before *Phillips*, cases like *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), "suggested a methodology for claim interpretation in which the specification should be consulted only after a determination is made, whether based on a dictionary, treatise, or other source, as to the ordinary meaning or meanings of the claim term," and, even then, the specification was only used to see if it clearly altered the "ordinary meaning." *Phillips*, 415 F.3d at 1320.  *Phillips* held that this approach "improperly restrict[ed] the role of the specification," which is the best guide to claim meaning. *Id.* at 1320-21.

This Court appears to have applied this pre-*Phillips* approach in reaching its prior constructions, stating that "[a] court should interpret the language in a claim by applying the ordinary and accustomed meaning of the words in the claim. . . .  However, if the patent inventor clearly supplies a different meaning, the claim should be interpreted accordingly." (JCCS,

Plaintiff's Ex. 1 at 2-3 (citation omitted); *see also* JCCS, Plaintiff's Ex. 3 at 4.)   But, "as explained in *Phillips*, [a patentee] is not entitled to a claim construction divorced from the context of the written description and prosecution history." *Nystrom v. Trex Co.*, 424 F.3d 1136, 1144-45 (Fed. Cir. 2005); *see also Cephalon*, 389 F. Supp. 2d at 605 (Farnan, J.).

As stated in representative claim 16 of the '459 patent,[11] the claims require a "plurality of different data formats for different types of computer apparatus."   The claim language alone demonstrates that the "plurality of different data formats" cannot merely be any two (or more) arrangements of digital data in a file, as St. Clair suggests.   Rather, the "data formats" must be "*for different types* of computer apparatus," *i.e.*, each "data format" must correspond to a "different type of computer apparatus." ('459 patent, claim 16 (emphasis added).)   In the context of the specification and prosecution history, this claim language requires one-to-one correspondence with different and incompatible computer architectures, not merely different application software.

    a.    <u>The Specification Consistently Describes One-to-One Correspondence Between Data Formats and Computer Architecture As a Feature of the Invention.</u>

After *Phillips*, "not only is the written description helpful in construing claim terms, but it is also appropriate 'to rely heavily on the written description for guidance as to the meaning of the claims'" because a person of ordinary skill reads the claims in light of the specification. *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1374 (Fed. Cir. 2009) (quoting *Phillips*, 415 F.3d at 1317).   Although *Phillips* recognized the occasional difficulty in drawing the line between interpreting claims in light of the specification and importing limitations into the claims, 415 F.3d at 1323, the Federal Circuit has since held that terms are properly limited to a feature

---

[11] In *Canon*, St. Clair conceded and the Court agreed that the "data format" and like terms in the asserted claims should be construed consistently. (JCCS, Plaintiff's Ex. 3 at 10.)

described in the specification if (1) the feature is described as part of the invention as a whole, or (2) the term is consistently used to include the feature.  Both holdings apply here.

> i.   The Specification Describes Correspondence With Computer Architecture As Part of the Alleged Invention as a Whole.

"When a patent . . . describes the features of the 'present invention' as a whole, this description limits the scope of the invention." *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) (finding feature described as "one aspect [of] the present invention" limiting).  In describing "the format selection logic" of *the present invention*," ('459 patent, col.12 ll.46-49 (emphasis added)), the Patents-In-Suit describe the "data formats" as corresponding to different computer architectures, stating that "[t]he data format" is "for the operator selectable predetermined number of *computer architectures*."   (*Id.* col.12 ll.65-66 (emphasis added).)  They further describe how format selection Switch 17 is shown "in the *Apple PC position*" and that as a result "the format signals 57 for the *Apple PC format* is a logic 'zero.'"   (*Id.* col.12 ll.53-57 (emphases added); *see also id.* col.12 ll.60-61.)  By contrast, the specification states that "if the format switch 17 were in the *IBM PC or other computer type position*," the format signals 57 "would be a logic 'one' and 'two' respectively." (*Id.* col.12 ll.57-60 (emphasis added).)   Since the specification describes the "data formats" of "*the present invention*" as corresponding to particular computer architectures, such as Apple Macintosh or IBM PC, the claims require this feature.

Moreover, "[s]tatements that describe the invention as a whole, rather than statements that describe only preferred embodiments, are more likely to support a limiting definition of a claim term." *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004).  In the Abstract of the '459 and '219 patents, which was filed with the original application, the inventors expressly state that their invention "selectively formats the compressed digital image to a

compatible format for __either__ the IBM Personal Computer and related **architectures** __or__ the **Apple Macintosh PC architecture** as selected by the operator." ('459 patent, Abstract (emphasis added); '219 patent, Abstract.)   Because this statement appears in the Abstract, it defines a feature of the invention as a whole and not merely an embodiment of the invention.   *See C.R. Bard*, 388 F.3d at 864.

> ii.   The Specification's Consistent Description of the Data Formats As Corresponding to Particular Computer Architectures Limits the Claims.

Furthermore, "the consistent use of a claim term by the inventor in the specification may serve to limit the scope of a claim." *Cephalon*, 389 F. Supp. 2d at 606 (Farnan, J.).   The Federal Circuit has explained:

> What *Phillips* now counsels is that in the absence of *something in the written description and/or prosecution history to provide explicit or implicit notice to the public*—i.e., those of ordinary skill in the art—that the inventor intended a disputed term to cover more than the ordinary and customary meaning *revealed by the context of the intrinsic record*, it is improper to read the term to encompass a broader definition simply because it may be found in a dictionary, treatise, or other extrinsic source.

*Nystrom*, 424 F.3d at 1145 (emphases added) (limiting "board" because "written description and prosecution history consistently use the term 'board' to refer to wood decking materials cut from a log").

Because "the specification repeatedly and uniformly describes" the "data formats" as being in one-to-one correspondence with different types of computer architectures, the "plurality of different data formats for different types of computer apparatus" limitation must be construed accordingly.   *ICU Med.*, 558 F.3d at 1374. (limiting "spike" because "[t]he specification never suggests that the spike can be anything other than pointed").[12]   Indeed, the specification *never* describes a correspondence between data formats and application software.

---

[12]   *See also Kinetic Concepts, Inc. v. Blue Sky Med. Group, Inc.*, 554 F.3d 1010, 1019 (Fed. Cir. 2009) (limiting "wound" because "[a]ll of the examples described in the specification involve skin wounds");

iii. The Specification's Consistent Description of the Data Formats As
Corresponding to Particular Computer Architectures Limits the Claims.

The specification also explains that "[t]he user must . . . select the desired *PC format*

*(IBM PC/Clone or Apple Macintosh, etc.)* via switch 17 (FIG. 6) on the control panel." ('459

patent, col.6 ll.42-45 (emphasis added).)  The choice given to the user is thus between different

types of computer architecture, not different types of data formats.  (*Id.* col.6 ll.51-54 (describing

"the format selected by the format switch 17 on the control panel 2 (IBM/Apple/etc.)"); *see also*

*id.* col.9 ll.11-13 (describing "the format switch 17 setting (IBM/clone or Apple)"); JCCS,

Defendants' Ex. 30 at 2 ("[A] user is selecting between the PC format by using switch 17, not the

image file type.").)   Once the user selects a computer architecture using switch 17, the

specification explains that the image is assigned a specific format that corresponds to the chosen

architecture, stating that "[t]he compressed digital frame is then formatted into *either an IBM*

*PC/Clone (such as GIFF) or Apple Macintosh (such as PICT II) image file format* depending on

the setting selected by the operator for a user switch 17 (FIG. 6) position on the control panel 2."

('459 patent, col.4 l.68-col.5 l.4.)

The specification also explains that each choice of computer architecture offered by

switch 17 is pre-assigned a single "data format." ('459 patent, col.12 l.65-68 ("*The data format*

for the operator selectable predetermined number of computer architectures . . . would be stored

in memory 20-2." (emphasis added)); *see also, e.g.,* JCCS, Defendants' Ex. 6 at 3 ("[T]he data

within the image file is arranged according to *the file format provided in the design for that*

---

*Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.,* 450 F.3d 1350, 1354-55 (Fed. Cir. 2006) (limiting
"host interface" because that was the only type of host interface mentioned in the specification);
*Honeywell Int'l, Inc. v. ITT Indus., Inc.,* 452 F.3d 1312, 1319 (Fed. Cir. 2006) (limiting "fuel injection
system component" because "[n]o other fuel injection system component . . . is disclosed or suggested");
*Warner-Lambert Co. v. Teva Pharms. USA, Inc.,* 418 F.3d 1326, 1340 (Fed. Cir. 2005) (limiting
"discoloration" because "the only type of discoloration referred to in the '450 patent is oxidative
discoloration").

*particular computer system*" chosen by switch 17. (emphasis added)).)  For example, PICT II and GIFF are "the preferred formats" for assignment to the Apple and IBM PC architectures, respectively, because "PICT and GIFF are the most common for the Apple and IBM PC's [sic]." ('459 patent, col.11 ll.34-39.)  The patent describes and illustrates the format being tied to the disk structure associated with a specific architecture.  (*See, e.g.,* '459 patent fig.2A.)  Other formats can be used but only "by changing the software format routines," (*id.* col.11 ll.34-44), *i.e.,* reprogramming the camera to change the format assigned to each choice of computer architecture offered by switch 17. (JCCS, Defendants' Ex. 30 at 2-3.)

The figures of the Patents-In-Suit also repeatedly and consistently describe each of the "plurality of different data formats" as corresponding to a different, incompatible computer architecture, such as the IBM PC architecture or Apple Macintosh architecture. *See ICU Med.,* 558 F.3d at 1374.  Figure 2A shows the "data format flag" under the heading "Format" and includes three choices: "Apple =00," "IBM =01," and "Other =10." ('459 patent, col.3 ll.8-11; *see also id.* fig.14A (listing options for format switch 17: "Apple V1"; "IBM V2"; and "Other PC V3").)  Figure 6, which shows the control panel logic, also has a heading "Format" and includes two choices: "IBM" or "Apple."  Finally, according to Figure 14B, which is a flow diagram illustrating the steps of the format selection logic operations, (*id.* col.3 ll.59-60), after "Read[ing] Switch 17 Position," the camera "Determine[s] PC Format," and is then supposed to *either*: "Access *IBM Format* Memory Location"; "Access *Apple Format* Memory Location"; *or* "Access *Other PC Format* Memory Location." (*Id.* fig.14B (emphases added).)

Defendants' proposed construction recognizes the specification's consistent description of the "plurality of different data formats for different types of computer apparatus" in direct correspondence with different, incompatible computer architectures.  On the contrary, St. Clair's

broader proposed construction must be rejected because it would impermissibly "expand the scope of the claims far beyond anything described in the specification." *See Kinetic Concepts*, 554 F.3d at 1019.

> iv.  The Specification Only Discloses Data Formats in One-to-One Correspondence With Different Computer Architecture.

The intrinsic record does not support St. Clair's contention that a skilled artisan would have construed the "plurality of different data formats" limitations as covering "data formats" that correspond to multiple computer architectures or different application software running on the same architecture. *See Nystrom*, 424 F.3d at 1145.

As described above, the specification does not disclose more than one "data format" associated with each choice of computer architecture offered by switch 17. (*See, e.g.*, JCCS, Defendants' Ex. 30 at 3.)  Similarly, the specification does not disclose a single "data format" associated with more than one of the choices of computer architecture offered by switch 17.[13] Although the specification mentions JPEG and MPEG, which are *now* associated with particular data formats corresponding to various computer architectures, the specification only discloses JPEG and MPEG as compression algorithm standards, not data formats.[14] (*See* '459 patent, col.4 l.57-col.5 l.4 (describing how JPEG and MPEG are used "to compress the size of the image" and

---

[13] The specification twice describes the "data formats" as GIFF and PICT II, rather than IBM or Apple. (*See* '459 patent, col.10 ll.7-10; *id.* col.11 ll.34-36.)  But the patent is clear that, in the context of the invention, GIFF and PICT II each correspond to a particular computer architecture, IBM PC and Apple Macintosh, respectively. (*Id.* col.4 l.68-col.5 l.2; *id.* at col.11 ll.37-39.)

[14] In fact, technical publications from the early 1990s show that JPEG and MPEG did not have established formats at the time the '459 application was filed (November 20, 1990). (*See, e.g.*, James D. Murray & William vanRyper, *Encyclopedia of Graphics File Formats* 377-83 (O'Reilly & Assocs. 1994) (attached hereto as Exhibit C) ("[T]he JPEG specification . . . does not itself define a common file interchange format to store and transport JPEG data between computer platforms and operating systems."); *id.* at 456-64 ("It is likely that when needed, a multimedia standards committee . . . will one day define an MPEG file format"); David C. Kay & John R. Levine, *Graphics File Formats* 148 (Windcrest/McGraw-Hill 1992) (citing Eric Hamilton, JPEG *File Interchange Format* (Version 1.01., Aug. 20, 1991) (attached hereto as Exhibit D).)

"[t]he compressed digital frame is *then* formatted").)  The USPTO Examiners concluded that "image file format is not to be confused with the various image compression schemes (also referred to as formats on occasion) provided by Roberts et al." (JCCS, Defendants' Ex. 6 at ¶ 4.) Consequently, the limited disclosure of JPEG and MPEG as compression standards in the Patents-in-Suit would not (and in fact could not) suggest to one of ordinary skill at the time of the invention that the claims cover multiple "data formats" that each correspond to multiple, compatible computer architectures.[15]

> v.   The Specification Does Not Disclose that the "Plurality of Different Data
>       Formats" Can Correspond to Different Application Software Operating on the
>       Same Computer Architecture.

The specification does not suggest that the "plurality of different data formats" can correspond to different application software operating on the same computer architecture.  While the specification mentions saving the image "in a format compatible for immediate use with word processing, desk top publishing, data base, and multimedia applications," ('459 patent, col.1 ll.19-25; *see also id.* col.1 ll.57-60; *id.* col.2 ll.15-19), it does not teach or suggest that this is achieved by saving the image in multiple formats that correspond to different application software operating on the same computer architecture.  The specification only describes using *one format* with multiple software programs, not *multiple formats* with *multiple programs*.

Instead, the invention promotes "immediate use" with software programs through correspondence of the data formats with *different and incompatible* computer architectures.  At the time of the invention, different computer architectures had "widely different, non-compatible

---

[15] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████  *Phillips* makes clear that this is improper.  *See, e.g.,*
*Phillips*, 415 F.3d at 1313 (noting that claim terms are construed "as of the effective filing date of the patent application").

input/output data formats, line I/O discipline and instruction command sets," (JCCS, Defendants' Ex. 2 at 8-9), and "████████████████████████████████████████." (St. Clair *Sony* Claim Constr. Br. at 12 (attached hereto as Exhibit F).)  Recognizing this, the Abstract explains that the alleged invention "formats the compressed digital image to a *compatible format for either the IBM Personal Computer and related architectures or the Apple Macintosh PC architecture* as selected by the operator *so that* the digital image can be directly read into most *word processing, desktop publishing, and data base software packages*." ('459 patent, Abstract.)  Thus, the Patents-In-Suit only disclose formatting the captured image in a format that corresponds to the desired (and incompatible) computer architecture, which would in turn promote "immediate use" with the various application software programs unique to that architecture.  The patents do not disclose correspondence of various data formats with different application software operating on the same computer architecture.

Despite these unambiguous statements, St. Clair asks this Court to expand the claim scope to cover a camera that saves and stores images in a format that can be displayed on any number of compatible computer architectures.  St. Clair did not invent this camera and is not entitled to "patent coverage that is broader than what the inventor actually invented and disclosed in his specification." *See Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 815 (Fed. Cir. 2007).

> b.     The Prosecution History Confirms that the Claims Require One-to-One Correspondence With Computer Architecture.

The prosecution history does not support St. Clair's assertion that the "plurality of different data formats" need not correspond to different computer architectures.  On the contrary, the reexamination prosecution history strongly supports Defendants' construction.  Similarly, the original prosecution history confirms that "one-to-one correspondence" between a "data format" and a particular computer architecture is an essential feature of the invention.  "It is therefore

appropriate to construe the claims so as to ensure that they, too, require that feature." *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1330 (Fed. Cir. 2007).

During prosecution of the parent '459 patent, the inventors described how their "claimed improvement to an electronic still camera"—not merely an embodiment—"solve[d] a long felt need by providing a low cost and efficient solution for achieving flexible and selectable *data format compatibility between the output of an electronic still camera and the input to any one of a plurality of personal computer-type apparatus.*" (JCCS, Defendants' Ex. 2 at 7-8 (emphasis added)); *see also Jonsson v. Stanley Works*, 903 F.2d 812, 818 (Fed. Cir. 1990) (holding that arguments during prosecution of parent application limit similar terms in related patents). The inventors defined "plurality of personal computer-type apparatus" in the next sentence to mean different computers "*manufactured by different companies, e.g. IBM PC, Apple, Sun Micro Systems, Digital Equipment, etc.*," *i.e.*, different and incompatible computer architectures, not different software operating on the same architecture. (JCCS, Defendants' Ex. 2 at 8.)

The inventors then described the problem their alleged invention solved: "different types of personal computers, e.g. IBM PC, Apple Macintosh, DEC, Sun Microsystems, etc. each have widely different, non-compatible input/output data formats, line I/O discipline and instruction command sets and therefore the input/output *data formats for one type apparatus is not usable with or inputable into another manufacturer's apparatus.*" (*Id.* at 8-9 (emphasis added).) As a result, "data formatted for one such PC-type machine must be converted to be compatible with another machine." (*Id.* at 9.) The inventors claimed to have solved this problem by "permit[ting] the electronic still camera to *designate or select one of a plurality of digital data formats as the camera is being utilized to ensure direct data format compatibility for input into a selected model personal computer apparatus*," defined as computer architecture, as described

21

above. (*Id.* at 9-10 (emphasis added).)  This gave the user the "flexib[ility]" to input images from their camera into "a plurality of personal computer apparatus," rather than having to purchase expensive "special purpose data format conversion circuits" that were "designed for compatibility with only one model or type of computer apparatus." (*Id.* at 7, 9.)

"In construing claims, the problem the inventor was attempting to solve, as discerned from the specification and the prosecution history, is a relevant consideration." *CVI/Beta Ventures v. Tura LP*, 112 F.3d 1146, 1160 (Fed. Cir. 1997).  Moreover, the prosecution history's teachings regarding "the way the claimed invention solves th[e] problems" in the prior art "provide valuable context for the meaning of the claim language." *See Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1554 (Fed. Cir. 1997), *overruled in part on other grounds, Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (*en banc*). Here, the inventors claimed to have solved the problem of incompatibility between the data formats for different manufacturers' computer architectures by giving the user a choice between several "data formats," each of which corresponded to a specific architecture.[16]  In this manner, the user had the flexibility to choose a "data format" compatible with the desired computer architecture (*e.g.*, IBM PC or Apple Macintosh).

St. Clair impermissibly seeks to broaden the claim scope to cover data formats that correspond to multiple types of computer architecture or to different application software operating on the same computer architecture.  In other words, St. Clair wants to expand the scope

---

[16]  *See also, e.g.*, JCCS, Defendants' Ex. 2 at 13 (distinguishing prior art as not using "a plurality of output data formats to achieve compatibility with one of a plurality of personal computer devices which each have different data format specifications"); JCCS, Defendants' Ex. 3 at 1 (describing "the feature of the invention—digital format coded for different PC and no converter is used."); JCCS, Defendants' Ex. 14 at 5 (finding prior art disclosed using "image data format compatible to IBM or Apples Macintosh"); JCCS, Defendants' Ex. 23 at 1 (proposing examiner's amendment to add limitation "such as 'a user selects computer formats' in order to overcome the prior art").

of its alleged invention to cover devices that can take, save, and store images in multiple formats, each of which can be used with multiple computer architectures. This is simply not the alleged invention disclosed and claimed in the Patents-in-Suit. *See Acumed*, 483 F.3d at 815 ("Patent scope should be coextensive with what the inventor invented as evidenced by what is disclosed in the patent specification."). Although today's technology does offer such devices, "it would be improper to construe the patent in the context of today's technology." *Cytyc*, 2005 U.S. Dist. LEXIS 29850, at *20 (citing *Phillips*, 415 F.3d at 1313).

B.      **"selecting"**

Defendants propose that the term "selecting" in claim 16 of the '459 patent and claim 3 of the '899 patent should be construed to mean: "selecting based on compatibility with a particular type of computer architecture."

Computer compatibility is more than an object of the Patents-In-Suit's invention, it <u>is</u> the invention. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ The specification and prosecution history (*i.e.*, the intrinsic evidence) fully confirms ██████████████ that compatibility is the invention.[17]   Because computer compatibility is the very essence of the alleged invention,

---

[17] *See* '459 patent, Abstract (The disclosure provides "a compatible format for either the IBM Personal Computer and related architectures or the Apple Macintosh PCT architecture."); *id.* col.1 ll.8-16 ("This invention generally relates to [a camera that formats a picture] into an operator selectable compressed digital format... formatted into Personal Computer (PC) compatible format retaining the images' color information."); JCCS, Defendants' Ex. 2 at 7-8 (asserting that the claimed invention "achiev[es] flexible and selectable data format compatibility [with] the input to any one of a plurality of personal computer-type apparatus."); *id.* at 9-10 (asserting that "before Applicants' improvement, there has not been commercially available a simple apparatus or process which permits the electronic still camera to

"selecting" should be construed to include this admittedly "key" and "primary" feature of the invention.[18] Specifically, Defendants ask the Court to construe "selecting" in claim 16 of the '459 patent and claim 3 of the '899 patent to mean "selecting based on compatibility with a particular type of computer architecture."

### C.    "electronic camera"; "digital camera"

"Electronic camera" and "digital camera" should be construed to mean "electronic equipment that may be self-contained or not, and has the capability to take still pictures." This Court previously construed "electronic camera" to mean a "self-contained, portable electronic camera, . . . the components of which are contained in a single housing." (JCCS, Plaintiff's Ex. 3 at 23.) However, this Court made that construction: (a) without considering that some of the claimed "cameras" include a remote control, (b) without being fully apprised of the applicability of the prosecution history of the '219 patent, (c) using a dictionary-based approach to claim construction the Federal Circuit has since rejected, and (d) based at least in part on St. Clair's

---

designate or select one of a plurality of digital data formats as the camera is being utilized to ensure direct data format compatibility for input into a selected model personal computer apparatus") (underlining added); *id.* at 11 (distinguishing the prior art based on the claimed invention's provision of "an output data format [that is] selectable or changeable to provide compatibility with different computer device input specifications"); *id.* at 13 (distinguishing prior art based on the claimed invention's ability "to selectively achieve input data format compatibility with a particular one of a plurality of personal computer types of apparatus"); *id.* at 13-14 (distinguishing prior art based on the claimed invention's inclusion of logic means ... to control...the recording of the digital video signals in the camera in one of a plurality of output data formats to achieve compatibility with one or a plurality of personal computer devices which each have different data format specifications").

[18] *See Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1187 (Fed. Cir. 1998) ("[W]hen the preferred embodiment is described in the specification as the invention itself, the claims are not necessarily entitled to a scope broader than that embodiment.") (citations omitted); *see also SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys.*, 242 F.3d 1337, 1344 (Fed. Cir. 2001) (construing claims to include an unrecited "coaxial" limitation because the patentee admitted it was a necessary element of "all embodiments of the invention"); *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1371 (Fed. Cir. 2003) (construing claims to include an unrecited feature because the "specification indicates that the invention is indeed exclusively directed toward" the inclusion of such feature and the patentee had asserted during prosecution that the feature was "important" to the operation of the device).

improper request to avoid prior art by adding the "self-contained" and "single housing" limitations to the claims.

1.    ***The Intrinsic Record Proves That The Claimed "Camera" Is Not Necessarily Self-Contained, Portable, Or Contained In A Single Housing.***

a.    By Requiring that the Remote Control be Part of the Claim Term "Camera," Claim 15 of the '459 Patent Dictates that the "Camera" Need not be Self-Contained.

The text and Figure 6C of the '459 patent's specification teaches a remote control:



An alternate embodiment of the present invention that provides remote operation of the camera is shown in FIG. 6C. When remote "Shoot" control 30 is activated by any means for example manually, or by radiant, or electronic energy, a control signal is generated and routed through the external jack 31, located on the external camera body. The external control 30 is electri-

('459 patent, col.4 ll.24-30, fig.6C (color added).)   As shown in Figure 6C above, the "remote 'shoot' control 30" (*i.e.*, the remote control) is separate from the "camera body." (*Id.*)   The specification teaches that when a user activates the external remote control to shoot a picture, a control signal is routed through the camera's jack 31, which is on the exterior of the camera body. *Id.*   The "remote 'shoot' control" is, by definition, *remote* from the "camera body." *Id.*

Claim 15 of the '459 patent states that this separate remote control is part of the "camera," calling it "remote activation means." Claim 15 requires a "camera . . . *comprising* remote activation means for selectively activating said camera." ('459 patent, col.15 ll.17-19 (emphasis added).)   The Federal Circuit "has consistently interpreted 'including' and 'comprising' to have the same meaning." *Lucent Techs., Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1214 (Fed. Cir. 2008).   Accordingly, claim 15 requires that the *remote* control—which is not in the camera body—be part of the claimed "camera." The term "camera" must, therefore, be construed to mean equipment that need not be self-contained in a single housing. *Rhine v. Casio,*

*Inc.*, 183 F.3d 1342, 1345 (Fed. Cir. 1999) (terms are not to be construed to "conflict with the explicit language of the claim").

> b. Construing "Camera" as Self-Contained or in a Single Housing Would be Contrary to the Patentees' Own Actions in the Prosecution History

The patentees' amendments and arguments during prosecution prove that "camera" is not limited to a "self-contained, portable electronic camera, . . . the components of which are contained in a single housing." (JCCS, Defendants' Ex. 3 at 23.) During prosecution of the '219 patent, the examiner rejected "camera" claims over a prior art camera with multiple parts, *i.e.*, a PC and tethered "image capture device." (JCCS, Defendants' Ex. 10 at 8-9.) In an attempt to distinguish the multi-part prior art camera, the patentees amended various claims to require components of the claimed "camera" to be "in the camera," which the patentees defined as "in a housing thereof." (*Id.* at 6 (claim 99), 8-9.) The patentees *never* sought to distinguish this prior art by arguing that the word "camera" alone required that all camera components were "self-contained" or "contained in a single housing." (*Id.* at 9.) If the claim term "camera" itself meant that all components must be "in the camera" or "in the housing thereof," as the Court previously held, then adding the limitation "in the camera" to certain components of the "camera" would have been irrelevant and redundant. (*Id.* at 6 (claim 99).) In other words, if the claimed "camera" was already "self-contained" and "contained in a single housing," there would have been no need for the patentees to amend the claims to add "in the camera" to certain components. Rather, by their amendment and arguments, the patentees admitted that the term "camera" by itself did not require equipment that is self-contained.

For example, in claim 99 the patentees added "in the camera" to two components:

99.     (Amended)  An electronic camera for capturing an image comprising:
digital data format means <u>in the camera</u> . . .; and
means <u>in the camera</u> for formatting a digital representation . . . .

(*Id.* at 6, 9 (underlining in original to show text added by amendment).)   The patentees'
amendment shows that camera components were only required to be "in the camera" when such
language was added to the claim.   The unmodified word "camera" does not require that all
camera components be "in the camera" or a housing thereof.   "[W]hen an applicant uses different
terms in a claim it is permissible to infer that he intended his choice of different terms to reflect a
differentiation in the meaning of those terms."   *Innova/Pure Water, Inc. v. Safari Water
Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004); *see also Phillips*, 415 F.3d at 1314
(The term "'steel baffles' [] strongly implies that the term 'baffles' does not inherently mean
objects made of steel.").   Instead of arguing that the definition of "camera" already required all
its components to be self-contained in the camera, the patentees revealed and conceded that
"camera" is not "self-contained" or "contained in a single housing," by adding "in the camera" to
the various electrical equipment claim terms.

Construing "camera" to be self-contained and in a single housing would be contrary to
the patentees' own claim language and actions in the prosecution history.   The Court should,
therefore, construe "camera" to be "electronic equipment that may be self-contained or not, and
has the capability to take still pictures."

2.   ***Extrinsic Evidence Confirms That The Claimed "Electronic/Digital Camera"
Does Not Have To Be Self-Contained***

The extrinsic evidence also confirms that the ordinary meaning of "electronic [or digital]
camera" does not require the camera to be "self-contained," "portable," or "in a single housing."

a.   <u>*Phillips* Rejected the Court's Primary Reliance on a General-Purpose
Dictionary Definition of "Camera"</u>

Following then-existing precedent, the Court previously construed the term "camera" by
placing primary weight on a general "dictionary definition" of "camera," and then only looking
to the specification and prosecution history for a clear departure from this definition.   (JCCS,

27

Plaintiff's Ex. 3 at 18-19.) The Federal Circuit has since rejected the Court's original approach because it "places too much reliance on extrinsic sources such as dictionaries, treatises, and encyclopedias and too little on intrinsic sources, in particular the specification and prosecution history." *Phillips*, 415 F.3d at 1322. Furthermore, the extrinsic, dictionary definition of "camera" cannot contradict and overcome the construction dictated by the intrinsic record, which is discussed above. *Id*. The Court, therefore, should set aside its previous dictionary definition and rely upon the intrinsic record.

> **b.** **This Court's Previous Dictionary Definition of "Camera" Does Not Apply to a "Digital/Electronic Camera"**

The Court's previous dictionary definition of camera—"a lightproof box fitted with a lens through the aperture of which the image of an object is recorded on a light-sensitive material"— applies to conventional film cameras, not to the fundamentally different "digital/electronic camera" claimed in the Patents-In-Suit. (JCCS, Plaintiff's Ex. 3 at 18.) Film cameras include lightproof boxes to selectively cause and prevent film exposure. (*Id*.) Electronic or digital cameras handle image data electronically in a manner that does not require light shielding or lightproof boxes. ('459 patent, fig.2; Tessera Megavision Filmless Photography System (attached hereto as Exhibit H).) Thus, the dictionary's reference to a "lightproof box" is a vestige from the era of film cameras that is inapplicable to the claimed "electronic [or digital] camera." *See Phillips*, 415 F.3d at 1321 ("The main problem with elevating the dictionary to such prominence is that it focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent."). The Court's previous dictionary definition of "camera" therefore does not apply to the claimed "digital camera" or "electronic camera."

c.    The Court's Dictionary and "Self-Contained" Definition of "Camera" are
      Contrary to the Prior Art

The prior art digital cameras also provide an ordinary understanding of the term "digital/electronic camera" that is contrary to the Court's (and St. Clair's proposed) dictionary definition and includes equipment that is not self-contained or contained in a single housing. The prior art cameras used wires to connect discrete components. (Tessera Megavision Filmless Photography System (attached hereto as Exhibit H).) Because digital cameras transferred data by wire rather than light, these digital cameras had no need to be self-contained in a lightproof box. (JCCS, Plaintiff's Ex. 3   at 18; '459 patent, fig.2; Tessera Megavision Filmless Photography System (attached hereto as Exhibit H).)  Furthermore, in its opinion, the Court recognized the existence of prior art "digital cameras that were not self-contained, such as the Tessera 2K and Dycam Model 1." (JCCS, Plaintiff's Ex. 3 at 19.)  These multipart, prior art digital cameras prove that the ordinary understanding of the term digital/electronic camera encompassed multi-part cameras that were not self-contained in a lightproof box.

In its prior construction, the Court stated that prior art "digital cameras with physically separate components" did not prove that "the patentees in this case intended to depart from the general usage [*i.e.*, dictionary definition] of the term 'camera.'"  (*Id.*)  Respectfully, the Federal Circuit has expressly rejected the Court's previous approach to claim construction. *See Phillips*, 415 F.3d at 1322 ("[A] general-usage dictionary cannot overcome art-specific evidence of the meaning of a claim term.").  Post-*Phillips*, the construction of "camera" depends less on what a dictionary says, and more on how one skilled in the digital camera art would have understood the term "digital/electronic camera." *Id.*  Art-specific evidence of multi-part digital cameras (such as

the Court-recognized Dycam and Tessera cameras) confirms that the term "digital/electronic cameras" should not be limited to equipment that is self-contained or in a single housing.[19]

3. **_It is Improper to Rewrite Claim Terms in a Manner that is Contrary to the Intrinsic Record In Order To Preserve Validity_**

██████████████ the Court added "portable," "self-contained," and "in a single housing" to the definition of "camera," in part to avoid invalidity.  The Court stated:

> In the Court's view, these statements take on particular significance when one considers that "cameras" involving a multiple of separate parts and a separate computer were well-known in the prior art.

(JCCS, Plaintiff's Ex. 3 at 22; █████████████████████████

████████████████████████████████████████

███████████████████████.)  However, this maxim of claim interpretation does not apply where, as here, the proposed construction contradicts the intrinsic and extrinsic record.  *AK Steel Corp. v. Sollac*, 344 F.3d 1234, 1243 (Fed. Cir. 2003) ("[T]he interpretation advocated by [plaintiff], while possibly avoiding validity pitfalls, cannot be a correct interpretation, for it is counter to the ordinary meaning of the claims as well as to the prosecution history."); *Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1341 (Fed. Cir. 2003) ("We may not rewrite claims to preserve validity [by importing limitations into the claims].").  In light of the compelling intrinsic and extrinsic evidence, this Court should not construe the term "camera" to preserve validity.

---

[19]  Moreover, even if this Court were to rely on a dictionary to construe these claim terms, there is no reason to limit "camera" to a "self-contained, portable" device with all components "contained in a single housing" because the dictionary definition does not include any such language.  (JCCS, Plaintiff's Ex. 3 at 18, 23.)

The intrinsic and extrinsic record, therefore, proves that "electronic camera" and "digital camera" should be construed to mean "electronic equipment that may be self-contained or not, and has the capability to take still pictures."

### D.   Claim 16 of the '459 Patent Does Not Recite A "Camera" And Should Not Be So Limited.

In a footnote to its prior claim construction, the Court added a "camera" limitation to claim 16 of the '459 patent.  Judge Farnan believed that the litigants in a prior case had agreed that the phrase "in an electronic camera" is implicit in claim 16 of the '459 patent.  (JCCS, Plaintiff's Ex. 3 at 23 n.5.)  Any such agreement would not apply to this suit.  *Raytech Corp. v. White*, 57 F.3d 187, 190 (3d Cir. 1995).

Adding such a limitation is not proper because neither the term "camera" nor words of similar meaning ever appear in claim 16.  Further, claim differentiation counsels against the Court's construction, as dependent claim 17 recites "camera" for the first time.  Further, the specification does not provide support for adding a camera limitation since it teaches a non-camera, video translator embodiment that would otherwise be covered by claim 16.  (*See* '459 patent, col.12 ll.4-23).

### E.   "image"; "taking pictures"; "taking . . . digital pictures"; "digitized captured image"; "digitized captured image data"; "digitized image data"

#### 1.   *Image*

The construction of the term "image" has not previously been considered by this Court. The dispute relating to this term is simple—whether the term "image," in its singular form, is limited to a still picture, or whether an "image" can somehow refer to a movie, an interpretation that St. Clair's construction seeks to allow but which is contrary to the consistent usage of that term in the patent specification.

The term "image"—which is always used in its singular form in the asserted claims of the Patents-In-Suit—can only refer to a still picture. This is most conclusively shown in portions of the specification where the inventors describe taking multiple "images" in rapid succession. In column 8, for example, the specification describes how the alleged invention enables a "high speed camera" to capture "approximately 20 images . . . in a one second period." (*See* '459 patent, col.8 ll.24-48.) Similarly, the specification states that an "additional object of this invention [is] to provide an electronic still camera device that can rapidly capture a series of images automatically as well as singularly." (*Id.* col.2 ll.32-34.) This language indisputably confirms that the word "image," used in the singular form, can only refer to a still picture, since the specification is clearly not describing, *e.g.,* capturing a series of 20 *movies* in one second.

This construction of the term "image" is further supported by the fact that the specification and the claims of the Roberts patents are expressly limited to still picture cameras (*i.e.*, not movie cameras). From the opening sentence of the patent specification, the Abstract makes this clear: "An electronic still camera . . . through which an image is focused . . . ." ('459 patent, at Abstract (emphasis added).) In the preliminary "Field of the Invention," the specification states, "This invention generally relates to . . . an improved electronic still camera which converts a still picture of an object or scene . . . ." (*Id.* col.1 ll.8-11.) In the "Description of the Prior Art," the patent describes the prior art method for converting "an image captured on an electronic still camera to a PC compatible format" as being "expensive and time consuming," which is the problem being solved by the invention. (*Id.* col.1 l.50-col.2 l. 5.)

Indeed, throughout the specification—*i.e.*, the Abstract, the Background of the Invention, the Summary of Invention, and the Description of the Preferred Embodiments—*without exception* the inventors expressly identified their alleged invention as applying to still picture

cameras for the purpose of taking and storing still pictures (*i.e.*, "images").[20]  In the Summary of the Invention, for example, in every paragraph where the "invention" of a camera is described, the camera is described as an "electronic still camera" that, *e.g.,* "can record and store still images," "take a still picture," and "rapidly capture a series of images."  (*Id.* col.2 ll.9-68.) Exhibit I takes the words of the specification and the asserted claims and demonstrates how the terms "still," "image," and "picture" were used throughout the specification in reference to a still camera that takes still pictures.  (*See* Table attached hereto as Exhibit I.)

A still camera for taking still pictures (*i.e.*, "images") is all that the inventors disclosed and claimed.  Even when the specification describes the capability of the invention to take pictures in rapid succession, this function is never characterized as taking a movie.  Instead, this aspect of the invention is only described as that of a "high-speed camera," *i.e.,* "an electronic still camera device that can rapidly capture a series of images."  (*See* '459 patent, col.2 ll.32-34; col.8 ll.24-48).  There is no disclosure of taking and storing movies.  Accordingly, the alleged invention of the Roberts patents is clearly limited to a camera that takes and stores still pictures. *See supra*, n.12 and accompanying text and cases.  The claims and the specification of the patents clearly, consistently, and unambiguously use the word "image" to refer to a picture that exists at a singular moment in time, and it cannot be interpreted any other way.

2.   ***Digital Image Terms***

For the same reasons, the Court should construe the "digital" phrases using the term "image"—"digitized captured image," "digitized captured image data," and "digitized image

---

[20]  In the patent specification, the word "still" appears at least 28 times.  (*See* '459 patent.)  In contrast, the words "movie" and "motion picture" do not appear even once in the patent specification, and there is no disclosure of combining multiple images to make a movie.  (*See, e.g., id.* at Abstract, col.1 l.8-col.2 l.5, col.2 ll.8-54, col.2 ll.63-68, col.3 ll.3-7, col.3 l.64-col.4 l.10, col.4 ll.42-57, col.4 l.68-col.5 l.15, col.5 ll.29-46, col.6 ll.16-27, col.6 ll.59-64, col.7 ll.1-62, col.8 ll.24-48, col.9 ll.31-47, col.10 ll.9-10, col.11 ll.26-31, col.11 ll.32-49, col.13 ll.3-8.)

data"—to mean "a digital representation of a single still picture."[21]   (*See, e.g.,* '459 patent, col.7 l.1-col.8 l.48.)

### 3.    *Taking Pictures*

Similarly, the term "taking pictures" recited in the preambles of the claims of the '010 and '899 patents further clarifies that the device and methods claimed in those patents are limited to taking still pictures.  The plain meaning of "taking pictures" is to obtain still pictures; if a person is asked to "take a picture," that person would understand that they are being asked to obtain a still photograph, which ordinary meaning is confirmed by the *American Heritage Dictionary of Idioms.*[22]  The specification further supports this definition by repeatedly stating that "the invention" is directed to capturing and formatting still pictures.  (*See* discussion above.) Accordingly, as with the other claims of the Patents-in-Suit, the claims of the '899 and '010 patents require that the camera is capable of formatting a still picture in more than one format, since the whole process (including the formatting and selecting steps) claimed in the '899 patent is directed to taking still pictures and since the operations of the camera claimed in the '010 patent (including formatting) are directed to still pictures.

---

[21] The phrase "digitized captured image" appears in claim 1 of the '219 patent; the phrase "digitized captured image data" appears in claim 10 of the '219 patent; and the phrase "digitized image data" also appears in claims 1 and 10 of the '219 patent.

[22] *See, e.g.,* Christine Ammer, *American Heritage Dictionary of Idioms* 631 (Houghton Mifflin Co. 1997) (defining the idiom "take a picture" as "Photograph, as in I'd love to take a picture of your garden.  This idiom was first used in the 1600s for making a drawing or other portrayal.  It was transferred to photography in the mid-1800s.") (attached hereto as Exhibit J).

F.     **"digital electronic information signals"; "digital electronic signal"; "digital image signal"; and "digital data information signals"**

St. Clair has not offered a proposed construction for the phrase "digital electronic information signals" or any of its variants.[23]   Instead, St. Clair contends that these phrases "do not require construction."   Defendants disagree.   These are important claim limitations that should be construed by the Court in order to assist the jury in understanding the claimed invention.   Defendants submit that these phrases should be construed to mean "a digital signal representing a single still picture," which is consistent with, and fully supported by, the plain language of the claims and the specification of the Patents-In-Suit.

The discussion in the section above related to "image" applies equally to the four phrases relating to digital signals.   Should the Court agree with Defendants that an "image" is a still picture, then it is clear that the phrase "digital image signal" must likewise mean "a digital signal representing a single still picture."   Similarly, the other three phrases in this grouping must be given the same construction because the claims and the specification clearly demonstrate that the digital signals represent single "images," *i.e.*, single still pictures.

A review of the intrinsic evidence relating to the "digital signal" phrases reveals that the specification never uses these phrases in the form that they appear in the claims.   Nevertheless, the specification, including the figures, describes signals that are generated by capturing images (still pictures) and converting the analog information from those images into digital information (digital signals).   There is no mistaking the intent of the inventors to describe a system and process for converting still pictures into digital signals for storage and manipulation.

---

[23] The phrases "digital electronic information signals" and "digital electronic signal" appear in claim 16 of the '459 patent; the phrase "digital image signal" appears in claim 1 of the '010 patent and claims 1 and 3 of the '899 patent; and the phrase "digital data information signals" appears in claim 16 of the '219 patent.

Accordingly, the specification compels a construction of these disputed phrases that is limited to still pictures. *See, e.g., Microsoft Corp. v. Compression Labs, Inc.,* 2006 WL 1795127, *5-7 (N.D. Cal. 2006).

The claims of the Patents-in-Suit also demonstrate that the inventors intended to limit the construction of the disputed terms to mean a digital signal representing a single still picture. Although not asserted in the present action, claim 1 of the '459 patent provides substantial evidence to support Defendants' proposed construction. Claim 1 recites the function of generating an "analog picture information signal corresponding to said subject image." This "subject image" is necessarily a single image. It is also clear from the claim language that an analog to digital converter takes the analog picture information signal (relating to the single image) and converts it to "digital data information signals." As such, in order for the claim to be definite, the "digital data information signals"[24] must result from the conversion of **an** analog signal that relates to the information from a **single** image, *i.e.,* a single still picture.

Similarly, for the phrases "digital electronic information signal" and "digital electronic signal" found in claim 16 of the '459 patent, there is an association of **a** digital signal with a **single** analog image signal. This claim has an anomaly of flip-flopping the singular and plural forms of analog and digital signals.[25] To the extent that the claim is not indefinite, it can only be interpreted to require a one-to-one association of an image pattern to a digital electronic signal.

---

[24] It is unclear why the inventors used the plural phrase "digital data information signals" in claim 1 of the '459 patent instead of the singular phrase "digital data information signal." Among other things, that usage seems inconsistent with dependent claims 5 and 6 where the inventors recite "each said digital data information signals." Regardless of the reasons the inventors adopted this formulation, defendants have stayed true to the language of the claim by associating the converted digital form of the original analog picture information signal to the plural "digital data information signals."

[25] Claim 16 of the '459 patent recites "the analog image signals" without an antecedent basis for anything other than a single analog image signal. The claim further recites "a distinct digital electronic signal" that "corresponds to the analog image signals," but there is still no antecedent basis for the plural form of analog image signals.

In claim 16, there is a recitation of "generating an analog image signal corresponding to the imagewise pattern of radiant light incident on a plurality of light sensing pixel elements." The claim then recites a conversion of each such analog signal to a digital electronic signal. In order for this claim to be understandable, it must be construed to mean that **each** analog image signal corresponds to a **single** image and is then converted into **a** digital electronic signal that is associated with that same **single** image. Likewise, the term "digital data information signal" in claim 16 of the '219 patent corresponds directly with an "analog picture information signal corresponding to said subject image."

The prosecution history provides additional support for Defendants' position. For example, in claim 1 as originally filed, the intent of the inventors to recite the one for one association of the analog signal to the digital signal is clear. Claim 1 as originally filed recited:

> shutter mechanism is operated to incident illumination from **a subject image** radiating through said lens and shutter mechanism **to generate an analog picture information signal corresponding to said subject image**.

(JCCS, Defendants' Ex. 5 at 13-14.) Claim 1 as filed then continues by reciting a "means for converting said analog signals[26] into **corresponding** digital data information signals." (*Id.* at 14.) This makes clear that the inventors intended to associate an image signal for each image to a corresponding digital information signal.

For the foregoing reasons, Defendants respectfully request that the Court construe each of the phrases "digital electronic information signals," "digital electronic signal," and "digital data information signals" to mean: "a digital signal representing a single still picture."

---

[26] Note that the same problem exists here as in the final patent with respect to a lack of antecedent basis for "said analog signals" because there is a preceding reference only to the singular (*i.e.*, "an analog information signal").

G.     **The asserted claims are limited to a "removable data storage medium"**

Based on the patentees' clear disavowal of claim scope during the prosecution history, the claim terms "digital memory" ('459 patent, claim 16); "memory element" ('219 patent, claim 1); "storage device" ('899 patent, claims 1-4); and "removable storage device" ('010 patent, claim 1) are limited to a: *"__removable__ __data storage medium__."*

Defendants' proposed construction is mandated by the intrinsic evidence; in an effort to distinguish their alleged invention from the prior art, the patentees repeatedly argued that their claimed invention only includes a removable memory/storage medium, and thereby disclaimed non-removable memory/storage media from their alleged invention.   By contrast, St. Clair's proposed construction ignores this intrinsic evidence and is inconsistent with the prosecution history.   St. Clair's proposed construction is an improper attempt to recapture claim scope that St. Clair abandoned during patent prosecution.

1.     *Patentees Disclaimed Non-Removable Memory/Storage In The Prosecution History*

"[A] patentee may limit the meaning of a claim term by making a clear and unmistakable disavowal of scope during prosecution." *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008) (internal quotation omitted).   A disavowal arises from statements "clearly characterizing the invention in a way to try to overcome rejections based on prior art." *Id.* at 1374-75.[27]   When a patentee disavows claim scope, the result is a blanket disclaimer applicable to all claims. *See Acco Brands, Inc. v. Micro Sec. Devices, Inc.*, 346 F.3d 1075, 1079

---

[27] A disavowal of claim scope applies in related applications as well. *See Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999) ("When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation.").

(Fed. Cir. 2003).   After disclaimer, a patentee cannot recapture claim scope when suing for

infringement. *Genentech, Inc. v. Wellcome Found. Ltd.*, 29 F.3d 1555, 1564 (Fed. Cir. 1994).

The patentees' repeated arguments during prosecution of the Patents-In-Suit that their

invention was limited to removable media clearly and unmistakably disavow non-removable

memory/storage media.   To overcome a rejection based on prior art, the patentees argued:

> [The prior art] does not have the capability of storing a plurality of computer-ready,
> digitized frames of image data on a *removably mounted* memory element located in the
> image capturing device itself - i.e. in a housing thereof. As a result, the prior art]
> requires that its camera always be cabled to a PC for downloading of image data.
>
> Applicants' claimed device and method, by distinction, does not require a cable to
> download image data to a PC. *The claimed device instead stores a plurality of
> computer-ready digitized images on removable mass memory elements in the device
> housing. These mass memory elements can be removed from the device and directly
> inserted into a PC* for printing, display or further processing.
>
> Applicants' approach allows a user to *take a group of memory elements, such as
> floppy disks*, to a photo processing center for printing, rather than requiring taking the
> whole camera in for downloading as required by devices such as disclosed by [the prior
> art]. Applicants' approach also allows a user to *download images from mass memory
> elements to a PC without the need to hook up a cumbersome tethering cable* to the
> back of the PC as required by devices as disclosed by [the prior art] for downloading of
> image data.

(*See* JCCS, Defendants' Ex. 17 at 8-9 (emphasis added).)[28]

During the subsequent prosecution of the related '757 patent the patentees again limited

their alleged invention to removable memory:

> Applicants submit that . . . the claim as a whole does point out and distinctly claim
> applicants' invention where the -- *removably mounted memory means* -- is properly
> construed to cover the structure and function as fully described in the specification and
> drawings, and any equivalents thereof, as required by the statute and relevant case law
> precedents. Further, applicants submit that *"removable mounted memory means"...
> accurately describes [the] memory means of applicants' improved electronic video
> camera* in which the video or picture data is selectively formatted and recorded in the
> camera to *facilitate removal of such memory means for insertion into the*

---

[28]   The patentees' disclaimer applies equally to the asserted claims of the '459 patent, the parent of the
'219 patent. *See Microsoft Corp. v. Multi-Tech Sys.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) (applying
prosecution disclaimer to restrict scope of both later-issued sibling and sibling that had issued earlier).

*predetermined type of information handling apparatus* for which the output data format determining code data was selected. However, applicants have amended claim 46 by adding -- means for removably mounting -- to more particularly point out and claim that element of their improved video camera.

(*See* JCCS, Defendants' Ex. 8 at 10-11 (emphasis added).)

The patentees confirmed their blanket disclaimer of non-removable storage media during

the reexamination proceedings of the '010 and '899 patents:

[D]uring prosecution of related U.S. Patent No. 6,094,219, the applicants distinguished various prior art systems by describing the claimed invention as follows: *"The claimed device instead stores a plurality of computer-ready digitized images on removable mass memory* elements in the device housing." Amend. C, Paper No. 13 at 8. During prosecution of related U.S. Patent No. 5,576,757, the applicants described their improvement as *"eliminat[ing] the need for a physical connection or tether from the camera to the device or unit."* Amend. D, Paper No. 17 at 12. These statements are consistent with the specification . . . "[t]he digital diskette is *removable* inserted into the housing of the camera prior top [sic] use in recording digital image data." Abstract of related US. Patent No. 5,138,459.

(*See* JCCS, Defendants' Ex. 28 at 6-7 (emphasis omitted and added); JCCS, Defendants' Ex. 31

at 6-7.)  As a result of these explicit statements during prosecution, the patentees disclaimed

memory/storage media that is not removable.[29]  Any construction of these terms that broadens St.

Clair's claim scope to include non-removable memory is improper as a matter of law.  *See*

*Genentech*, 29 F.3d at 1564 ("An applicant should not be able deliberately to narrow the scope of

examination to avoid during prosecution scrutiny by the PTO . . . and then obtain in court . . . a

scope of protection which encompasses that subject matter.").

2.    *Disclaimed Claim Scope Cannot Be Recaptured Through Claim Differentiation*

The doctrine of claim differentiation does not allow St. Clair to recapture abandoned

claim scope (*compare* claim 1 of the '899 patent *with* claim 2) since "claim differentiation only

---

[29]  In addition, all of the embodiments disclosed in the Patents-In-Suit have a removable memory/storage medium, and the specification makes clear this is a necessary feature to achieve the object of the invention.  (*See e.g.*, '459 patent, col.1 ll.8-25); *see also ICU Med.*, 558 F.3d at 1374 (It is appropriate "to rely heavily on the written description for guidance as to the meaning of the claims.").

creates a *presumption* that each claim in a patent has a different scope; it is 'not a hard and fast rule of construction.'" *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1368 (Fed. Cir. 2000) (citations omitted; emphasis added). Here, given the unambiguous disavowal of non-removable memory/storage media from the scope of the claims, this presumption is overcome.[30] *Anderson Corp. v Fiber Composites, LLC*, 474 F.3d 1361, 1370 (Fed. Cir. 2007) (claim differentiation argument rejected in view of prosecution statements limiting the scope of the claims).

### H.    Steps of the Asserted Method Claims Must Be Performed in a Particular Order

The Federal Circuit has made clear that where the language of the claim, the specification, or the prosecution so require, the steps of a method claim must be performed in the order recited. *Loral Fairchild Corp. v. Sony Corp.*, 181 F.3d 1313, 1322 (Fed. Cir. 1999). The court first must look at "the claim language to determine if, as a matter of logic or grammar, [the steps] must be performed in the order written." *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003). Where the method steps implicitly require an order, the court will limit the construction of the claim to that order. *Loral Fairchild*, 181 F.3d at 1322; *see also Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.*, 152 F.3d 1368, 1376 (Fed. Cir. 1998).

The plain language of claim 16 of the '459 patent explicitly requires that the "generating," "converting," and "selecting" steps occur **before** the "storing" step.   Claim 16 recites, in pertinent part:

> **generating** an analog image signal[,] . . . **converting** the analog image signals into digital electronic information signals[,] . . . **selecting** . . . one of said different

---

[30] In addition, the patentees disclaimed non-removable memory/storage media during prosecution of the '219 patent with respect to all of the rejected claims without regard to claim differentiation—claim 62 did not explicitly recite "removable," but dependent claim 64 recited: "wherein the digital memory is removably coupled to the image capturing and processing device." As a result, St. Clair should not receive the benefit of the doctrine now.

41

> digital output data output format codes to be associated with each said digital electronic information signals, and **storing** said digital electronic information signals . . . in accordance with said selected output data format code.

('459 patent, col.15 l.25-col.16 l.11 (emphasis added).)  Storing requires the storing of **digital** electronic information signals which are only first created by the combination of the generating and converting steps.  Thus, the plain language requires the generating and converting steps to occur before the storing.

Further, the storing is "in accordance with *said selected* output data format code," ('459 patent, col.16 ll.10–11 (emphasis added)), which plainly relies on the prior selecting step and confirms that the storing step must happen after the selecting step.  *See, e.g., Combined Sys., Inc. v. Defense Tech. Corp. of Am.*, 350 F.3d 1207, 1211-12 (Fed. Cir. 2003) ("[P]lainly as a matter of grammar, the recitation of '*inserting said formed folds* . . . into said projectile compartment' forecloses—at least in the absence of compelling evidence to the contrary in the written description or prosecution history—a construction permitting the 'folds' to be formed after or during insertion of the projectile into the projectile compartment . . . . [F]or the 'formed folds' to be inserted into [the] projectile compartment, they must already have been formed.").  Because the claim language is clear, resort to the specification is unnecessary.  *See Altiris*, 318 F.3d at 1370 (the court must look to the specification only when the claim language itself does not clearly require an order for the recited steps).

Similarly, the language of Claims 1 and 3 of the '899 patent require the "generating" and "formatting" steps to occur *before* the "storing" step.  The generating step generates a digital image signal, and this digital image signal is then formatted in the formatting step.  ('899 patent, col.12 ll.46–49.)  The claim then recites "storing the formatted image file," which, for the same reasons as discussed above, plainly forecloses a construction permitting the storing to be

performed prior to either the generating or the formatting steps. *See Combined Sys.*, 350 F.3d at 1211–12.

Claim 1 of the '219 patent also requires that the "assigning" of the output data control means occurs *after* the "digitized captured image" is created. The claim recites "assigning the selected format code *to the digitized captured image*." ('219 patent, col.12 ll.51–52 (emphasis added).) Again, since the "assigning" step operates on the existing "digitized captured image," it would not be possible to assign the format code to something that did not already exist. The clear language of the claims forecloses a construction permitting the "assigning" to be performed prior to capturing the digitized captured image. *See Combined Sys.*, 350 F.3d at 1211–12.

I.     **35 U.S.C. § 112, ¶ 6 means-plus-function claim limitations**

Use of the term "means" in claim elements of the '219 patent gives rise to a presumption that the inventor used the term "means" to invoke the statutory mandates for means-plus-function clauses of 35 U.S.C. § 112, ¶ 6. *See Sage Prods. v. Devon Indus.*, 126 F.3d 1420, 1427 (Fed. Cir. 1997). Even more, during the prosecution of the '757 patent,[31] parent to the '219 patent, the patentees repeatedly referenced various terms containing the word "means" as "means plus function claim language" to be interpreted under § 112, ¶ 6.[32]

To construe a means-plus-function element, the court first identifies the claimed function. *Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1350 (Fed. Cir. 2003). The court must then determine the corresponding structure disclosed in the specification for performing that function. *Id.* at 1350.

---

[31] U.S. Patent No. 5,576,757 to Roberts et al.

[32] *See* the prosecution history of the '757 Patent: JCCS, Defendants' Ex. 7 at 8; JCCS, Defendants' Ex. 9 at 9; JCCS, Defendants' Ex. 8 at 10-11.

1.    *"output data control means"*

The Court previously found that the "output data control means" terms should be interpreted under § 112, ¶ 6 since the limitation explicitly recites a "means for" performing a stated function and does not recite sufficient structure to overcome the presumption that § 112, ¶ 6 applies.    Defendants agree with this conclusion.    However, the Court's previous interpretation of the corresponding structure is not consistent with the rules recently discussed by the Federal Circuit when the corresponding structure is a computer or microprocessor.

Specifically, the Court previously found that the corresponding structure to the "output data control means" was a general purpose microcomputer.    However, the Federal Circuit has recently held that "in a means-plus-function claim 'in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm.'" *Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008) (quoting *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999)); *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) (same).    Thus, the correct structure for the "output data control means" is not just the general purpose microcomputer identified in the Court's prior interpretation, but also the relevant portions of the disclosed algorithm of the '219 patent.

In claims 1 and 16 of the '219 Patent, the function associated with the claimed "output data control means" is: "selecting for each digitized captured image to be stored in the memory element one of a plurality of different output data format codes stored in the camera and assigning the selected format code to the digitized captured image"—requiring both "selecting" and "assigning." The structure described in the specification corresponding to the "selecting"

function includes switch 17, logic gates 60c and 60d, format memory 20-2, and CPU 20[33] programmed to perform the portions of the algorithm of Figure 14B including at least "read switch 17 position" and "determine PC format." (Figure 14B is the only disclosed algorithm associated with the recited function.) The structure described in the specification corresponding to the "assigning" function includes CPU 20 programmed to perform the portions of the algorithm of Figure 14B including at least "access IBM format memory location," "access Apple format memory location," "access Other PC format memory location," "read compression, mode, and format switch codes from CPU 20," and "write switch codes and other file info to header."[34]

The function associated with the "output data control means" in claim 10 is "storing in said camera at least one of a plurality of different output data format codes" as various terms contained therein are appropriately construed. The structure corresponding to the recited function includes the CPU 20 programmed to perform the algorithm of Figure 14B, including at least "write switch codes and other file info to header." (*See* '219 patent, col.12 ll.9-39).

2.      *"logic means"*

The Court previously found that the "logic means" claim limitations were not in a format for interpretation under § 112, ¶ 6 reasoning that the term "logic" recited sufficient structure to

---

[33] Because Figure 14B describes the only disclosed algorithm associated with the recited function, the structure corresponding to the recited function must include, *inter alia*, the CPU 20 configured to perform the portions of the algorithm illustrated in the flow chart of Figure 14B and described at '219 patent col.12 ll.11-39 that correspond to the function of this element.

[34] The "output data control format means" and "output data control means" limitations in claims 10 and 16 of the '219 patent should be construed in a similar manner. (*See* JCCS, Exhibit A.) The function recited in claim 10 is "storing in said camera at least one of a plurality of different output data format codes" as various terms contained therein are appropriately construed. The structure corresponding to the recited function includes the CPU 20 programmed to perform the portions of the algorithm illustrated in the flow chart of Figure 14B that correspond to the function of this element, including at least "write switch codes and other file info to header," as the flow chart is understood from the discussion of the routine at '219 patent col.12 ll.9-39.

overcome the presumption. However, Defendants respectfully disagree that these limitations recite sufficient structure to overcome the presumption that § 112, ¶ 6 applies. *See Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1302 (Fed. Cir. 1999).

In particular, "logic means," by itself, is not sufficient structure to overcome the presumption. *See, e.g., British Telecomms. PLC v. Prodigy Commc'ns Corp.*, 189 F. Supp. 2d 101, 135-06 (S.D.N.Y Dec. 13, 2000) (construing "logic means" as a § 112, ¶ 6 limitation having as corresponding structure a logic unit). Nor is "logic" synonymous with "logic circuit" as Judge Farnan ruled. To the contrary, "logic" is distinct from and much broader than "logic circuit." Whereas the latter phrase is limited to circuitry having a definite configuration, the recited term "logic" relates to mathematical computation in computers generally, including logic operations and functions untethered to any structure. (JCCS, Plaintiff's Ex. 3 at 50-51; *see also McGraw-Hill Dictionary of Scientific and Technical Terms* 1164 (5th ed. 1994) (compare definitions for "logic" and "logic circuit") (attached hereto as Exhibit K); *IEEE Standard Dictionary of Electrical and Electronics Terms* 599, 601 (6th ed. 1996) (same) (attached hereto as Exhibit L).) Accordingly, § 112, ¶ 6 applies to the "logic means" term.

Moreover, during prosecution of the '757 patent (parent to the '219 patent), the patentees argued that "data processor means"—a term with more structure than "logic means"[35]—was in means-plus-function format. (*See* JCCS, Defendants' Ex. 7.) Because the patentees represented that the term "data processor" was not enough structure to remove the "data processor means" claim element from interpretation under the § 112, ¶ 6, one of skill in the art would understand that the less structural term "logic" would also not be sufficient structure to remove "logic means" from interpretation under § 112, ¶ 6.

---

[35] A data processor configured to perform a function is a subset of a logic circuit.

While not a precedential case, it is instructive that a panel of the Federal Circuit found that the placement of the more structural term "logic circuit" in front of the term "means" did not provide sufficient structure to overcome the presumption that the term "logic circuit means"[1] is interpreted under § 112, ¶ 6. *See Winbond Elecs. Corp. v. Int'l Trade Comm'n*, 4 F. App'x 832 (Fed. Cir. 2001) ("this 'logic circuit means' itself is in -means-plus-function format and, therefore, does not provide sufficient structure to overcome the presumption that 'access means' is a means-plus-function element").

The recited function is to "determin[e] an output data format for each digitized captured image in accordance with the assigned output data format code."[36] The corresponding structure includes a microprocessor (CPU 20), so it must also include the disclosed algorithm corresponding to the recited function. *Aristocrat*, 521 F.3d at 1333; *Finisar*, 523 F.3d at 1340. Figure 14B is the only disclosed algorithm associated with the recited function, so the corresponding structure is the CPU 20 programmed to perform the corresponding portions of the algorithm of Figure 14B, including at least "pack image data bytes into IBM format with opcode as shown in Fig. 6B," "pack image data bytes into Apple format with opcode as shown in Fig. 6B," and "pack image data bytes into Other PC format with opcode as shown in Fig. 6B."[37]

---

[36] The function recited in claim 10 is "selectively controlling the formatting of said digitized captured image data in accordance with a selected one of said plurality of different output data format codes" and the function recited in claim 16 is "determining the output data format file structure of said digital data information signals in accordance with said assigned output data format code." Since these functions all have the same corresponding structure in the specification, these claim terms are being addressed together.

[37] The "logic means" limitations in claims 10 and 16 of the '219 patent should be construed in a similar manner. (*See* JCCS, Exhibit A.)

3.      *"means for digitizing captured image data"* (*'219 patent, claims 1 and 10) and *"analog to digital converter means for converting said analog picture information signal into corresponding digital data information signals"* (*'219 patent, claim 16)

These terms recite "means" and a function so they should be construed under § 112, ¶ 6. As illustrated in Figure 5A, the structure that corresponds to the recited functions of "digitizing captured image data" and "converting said analog picture information signal into corresponding digital data information signals" are the "A/D converters 8," ('219 patent, col.4 ll.39-40), where each A/D converter digitizes a separate color component (R,G,B) of the image. (*See* '219 patent, fig.5A (reproduced below with color added, showing three A/D converters as item 8).)



In *NCR Corp.*, the Court rejected the patentee's attempt to rely on *Clearstream*[38] (which allowed disclosed prior art structures to be considered corresponding structure for a claimed function), holding that only structures expressly described as usable in the invention could be corresponding structure. *NCR Corp. v. Palm, Inc.*, 217 F. Supp. 2d 491, 517 (D. Del. 2002); *see also Display Tech., LLC v. Mechtronics Corp.*, 335 F. Supp. 2d 431, 439-40 (S.D.N.Y. 2004) (described prior art upon which the patent seeks to improve were not considered corresponding structure). Here, the '219 patent does not suggest that the prior art common/singular A/D converter can perform the digitizing function, but only mentions the single A/D converter to distinguish it from the '219 Patent's "novel aspect of the invention" of multiple A/D converters.

---

[38] *Clearstream Wastewater Sys. Inc. v. Hydro-Action Inc.*, 206 F.3d 1440, 1445 (Fed. Cir. 2000).

(*Compare* '219 patent, fig.5A, col.4 ll.39-40, col.7 ll.8-9, col.7 ll.33, and col.7 ll.50, *with id.* col.7 ll.62-65)

### 4.   *"Memory Means" Elements of the '219 Patent are Limited to Their Corresponding Structure*

These claim terms use the word "means" which raises the presumption that § 112, ¶ 6 applies.   Further, as discussed in more detail above in the "memory" section, the patentee represented to the USPTO in the parent to the '219 patent that § 112, ¶ 6 applies.   The specification of the '219 patent identifies two specific structures to perform the claimed function: a magnetic disk (*see, e.g.*, '219 patent, Abstract) or an optical disk (*see* '219 patent, col.9 ll.5-9).[39]   Therefore, the terms "removably mounted memory means for storing digitized image data" and "memory means for storing said digital data information signals" must be construed as "a removable magnetic memory diskette (*i.e.*, a floppy disk)" or its equivalents.

### 5.   *"image resolution determining means" ('219 patent, claim 12) and "picture image resolution determining means" ('219 patent, claim 17)*

These means-plus-function terms were not previously construed.   The function as recited in the claim is "selectively determining which of a plurality of compression algorithm parameters are to be applied to the digitized captured image data."   The structure corresponding to the recited function includes CPU 20 and the relevant algorithm, switches 14A and 14B, logic gates 60a and 60b, and function & address decoder 19.   The corresponding algorithm causes the CPU to read the setting of the switches 14A and 14B to determine the parameters to be applied to the image. *Aristocrat*, 521 F.3d at 1333; *Finisar*, 523 F.3d at 1340.

---

[39] St. Clair's proposed construction includes miscellaneous structures mentioned in the specification, such as "semiconductor memory" and "solid state memory." But "semiconductor memory is mentioned only in the context of a temporary buffer storage, and "solid state" is mentioned only in the context of the CCD imaging device. These terms are therefore irrelevant to the recited functions.

6. *"an image pick-up unit" ('010 patent, claim 1, '899 patent, claims 1 and 3) and "means for capturing image data corresponding to a selected image" ('219 patent, claim 10)*

The recited functions, proposed structures and intrinsic support for these terms appear in

the Joint Claim Construction Chart at 30-31 and 42-43.

## V.  **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court adopt their

proposed constructions.

Original Filing Date:  4/23/09
Redacted Filing Date:  4/30/09

PROCTOR HEYMAN LLP

 */s/ Dominick T. Gattuso*
Kurt M. Heyman (#3054)
Dominick T. Gattuso (#3630)
1116 West Street
Wilmington, DE  19801
(302) 472-7300
*kheyman@proctorheyman.com*
dgattuso@proctorheyman.com

*Of Counsel:*
PILLSBURY WINTHROP SHAW
    PITTMAN LLP
William P. Atkins
Benjamin L. Kiersz
Christopher K. Dorsey
1650 Tysons Boulevard, 14th Floor
McLean, VA  22102
(703) 770-7900
*william.atkins@pillsburylaw.com*
*benjamin.kiersz@pillsburylaw.com*
*christopher.dorsey@pillsburylaw.com*
    - and-
Samuel E. Stubbs
Two Houston Center
909 Fannin Street
Suite 2000
Houston, TX  77010
(713) 276-7600
*sam.stubbs@pillsburylaw.com*

*Attorneys for Defendants*
*AT&T Mobility LLC*
*AT&T Mobility Corporation*
*New Cingular Wireless Services, Inc.*

------------------------------------------------------------------------

YOUNG CONAWAY STARGATT &
   TAYLOR, LLP

  */s/ Megan C. Haney*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Megan C. Haney (No. 5016)
1000 West Street
Brandywine Building, 17th Floor
Wilmington, DE 19801
(302) 571-6600
mhaney@ycst.com

OF COUNSEL:

MORRISON & FOERSTER LLP
David C. Doyle
M. Andrew Woodmansee
Philip A. Morin
Greg Reilly
12531 High Bluff Drive, Suite 100
San Diego, CA 92130
(858) 720-5100
greilly@mofo.com

*Attorneys for Defendant Palm, Inc.*

------------------------------------------------------------------------------------

YOUNG CONAWAY STARGATT &
   TAYLOR, LLP

*/s/ Megan C. Haney*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Megan C. Haney (No. 5016)
1000 West Street
Brandywine Building, 17th Floor
Wilmington, DE 19801
(302) 571-6600
mhaney@ycst.com

OF COUNSEL:

MORRISON & FOERSTER LLP
David C. Doyle
M. Andrew Woodmansee
Philip A. Morin
Greg Reilly
12531 High Bluff Drive, Suite 100
San Diego, CA 92130
(858) 720-5100
greilly@mofo.com

*Attorneys for Defendants Kyocera Wireless Corp. and Kyocera Communications, Inc. (formerly known as Kyocera Sanyo Telecom, Inc.)*
--------------------------------------------------------------------------------------------------------

POTTER ANDERSON & CORROON LLP

By:  /s/ David E. Moore
     Richard L. Horwitz  (#2246)
     David E. Moore (#3983)
     D. Fon Muttamara-Walker (#4646)
     Hercules Plaza, 6th Floor
     1313 N. Market Street
     Wilmington, Delaware 19899-0951
     Tel:  (302) 984-6000
     rhorwitz@potteranderson.com
     dmoore@potteranderson.com
     fmuttamara-walker@potteranderson.com

*Attorneys for Defendant*
*Hewlett-Packard Company*

OF COUNSEL:

Sharon R. Barner
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, IL 60610-4764
Tel:  (312) 832-4500

Naikang Tsao
FOLEY & LARDNER LLP
150 East Gilman Street
Verex Plaza
Madison, WI 53703
Tel:  (608) 257-5035

-----------------------------------------------------------------------------------------------------

Morris, Nichols, Arsht & Tunnell LLP

*/s/ Mary B. Graham*
Mary B. Graham (#2256)
James W. Parrett, (#4292)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
mgraham@mnat.com
jparrett@mnat.com

OF COUNSEL:

Kathryn L. Clune
Clyde E. Findley
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC  20004-2595
kclune@crowell.com
cfindley@crowell.com

*Attorneys for Sprint Nextel Corporation*

-----------------------------------------------------------------------------------------------------------------

ASHBY & GEDDES

*/s/ John G. Day*

*Of Counsel:*

Richard de Bodo
Christopher Broderick
HOGAN & HARTSON LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA  90067-6047
(310) 785-4600

John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
Caroline D. Hong (I.D. #5189)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888

*Attorneys for Panasonic Corporation (formerly known as Matsushita Electric Industrial Co., Ltd.), Panasonic Corporation of North America (formerly known as. Matsushita Corporation of America), Victor Company of Japan, Ltd., and JVC Company of America*

ASHBY & GEDDES

*/s/ John G. Day*

*Of Counsel:*

Richard de Bodo
Rachel M. Capoccia
HOGAN & HARTSON LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA  90067-6047
(310) 785-4600

John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
Caroline D. Hong (I.D. #5189)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
chong@ashby-geddes.com

*Attorneys for Sanyo Electric Co., Ltd. and Sanyo North America Corporation*

--------------------------------------------------------------------------------

ASHBY & GEDDES

/s/ John G. Day
_____

*Of Counsel:*

Richard de Bodo
Robert J. Benson
Huan-Yi Lin
HOGAN & HARTSON LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA  90067-6047
(310) 785-4600

John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
Caroline D. Hong (I.D. #5189)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
chong@ashby-geddes.com

*Attorneys for Aiptek International Inc. and Aiptek Inc.*


ASHBY & GEDDES

/s/ John G. Day
_____

*Of Counsel:*

Richard de Bodo
Robert J. Benson
Huan-Yi Lin
HOGAN & HARTSON LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA  90067-6047
(310) 785-4600

John G. Day (#2403)
Tiffany Geyer Lydon (#3950)
Caroline D. Hong (I.D. #5189)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
chong@ashby-geddes.com

*Attorneys for HTC Corporation (formerly known as High Tech Computer Corp. ), HTC (BVI) Corp. and HTC America, Inc. (formerly known as HTC USA Inc.)*

------------------------------------------------------------------------------

DUANE MORRIS LLP
        *s/ Matt Neiderman*
Matt Neiderman (#4018)
1100 North Market Street
Suite 1200
Wilmington, DE  19801
(302) 657-4900
mneiderman@duanemorris.com

   - and -

OF COUNSEL:

D. Joseph English
Ryan Hardee
DUANE MORRIS LLP
505 9th Street, NW, Suite 1000
Washington, DC  20004

*Attorneys for Audiovox Communications Corp. and Audiovox Electronics Corp.*

-------------------------------------------------------------------------------------------------------------

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_s/ James L. Higgins_
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801

P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6681
msharp@ycst.com

Steven M. Bauer
Kimberly A. Mottley
PROSKAUER ROSE LLP
One International Place
Boston, MA 02110-2600
(617) 526-9600

_Attorneys for Defendant T-Mobile USA, Inc._

---------------------------------------------------------------------------------------------------------------

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Julia Heaney (#3052)*

Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jheaney@mnat.com

*Attorneys for Defendant General Imaging, Inc.*

OF COUNSEL:

Joseph R. Re
Jon W. Gurka
J. David Evered
KNOBBE, MARTENS, OLSON &
BEAR, LLP
2040 Main Street
Fourteenth Floor
Irvine, CA 92614
(949) 760-0404

-------------------------------------------------------------------------------------------------------------

ASHBY & GEDDES

*/s/ John G. Day*

_____

John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
Caroline D. Hong (I.D. #5189)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
tlydon@ashby-geddes.com

*Attorneys for Verizon Communications Inc.,*
*Vodafone Group PLC and Cellco Partnership*
*d/b/a Verizon Wireless*

*Of Counsel:*

Henry B. Gutman
Victor Cole
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-2000

-------------------------------------------------------------------------------------------------------------

60

**WOMBLE CARLYLE SANDRIDGE & RICE, PLLC**

*/s/  Gerard M. O'Rourke*
Gerard M. O'Rourke (#3265)
Stephen J. MacKenzie (#4791)
222 Delaware Avenue
Suite 1501
Wilmington, Delaware 19801
Telephone:  (302) 252-4320
Facsimile:  (302) 252-4330
*Attorneys for Defendants*
BenQ Corporation
BenQ America Corporation


**WOMBLE CARLYLE SANDRIDGE & RICE, PLLC**

*/s/* Stephen J. MacKenzie
Gerard M. O'Rourke (#3265)
Stephen J. MacKenzie (#4791)
222 Delaware Avenue
Suite 1501
Wilmington, Delaware 19801
Telephone:  (302) 252-4320
Facsimile:  (302) 252-4330
*Attorneys for Defendant*
Siemens AG and Siemens Corporation


**WOMBLE CARLYLE SANDRIDGE & RICE, PLLC**

*/s/  Gerard M. O'Rourke*
Gerard M. O'Rourke (#3265)
Stephen J. MacKenzie (#4791)
222 Delaware Avenue
Suite 1501
Wilmington, Delaware 19801
Telephone:  (302) 252-4320
Facsimile:  (302) 252-4330
*Attorneys for Defendant*
Concord Camera Corp.

---------------------------------------------------------------------------------------------------------

61

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Julia Heaney (#3052)*

Julia Heaney (#3052)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jheaney@mnat.com

*Attorneys for UTStarcom Inc.*

OF COUNSEL:

JoAnna M. Esty
Tamany J. Vinson Bentz
VENABLE LLP
575 7th Street, NW
Washington, DC  20004-1601
(202) 344-4000

-------------------------------------------------------------------------------------------------------------

/s/ Kevin F. Brady.
Collins J. Seitz, Jr. (#2237)
Kevin F. Brady (#2248)
Connolly Bove Lodge & Hutz LLP
1007 North Orange Street, P.O. Box 2207
Wilmington, DE 19899
(302) 658-9141
cseitz@cblh.com
kbrady@cblh.com

*Attorneys for Defendants Research in
Motion, Ltd. and Research in Motion Corp.*

*Of Counsel*

Dominic Massa
Christopher R. Noyes
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, MA 02109  USA
Tel: (617) 526-6000

------------------------------------------------------------------------------------------------------------------

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Julia Heaney (#3502)*

Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jheaney@mnat.com

*Attorneys for Defendants Nokia Corporation and
Nokia, Inc.*

OF COUNSEL:

Robert F. Perry
Alexas D. Skucas
Allison H. Altersohn
Susan A. Kim
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY  10036-4003
(212) 556-2100

--------------------------------------------------------------------------------------------------------

ASHBY & GEDDES

/s/ John G. Day

John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
Caroline D. Hong (I.D. #5189)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
tlydon@ashby-geddes.com

*Attorneys for the Fujifilm Defendants*

*Of Counsel:*

Steven J. Routh
Sten A. Jensen
ORRICK HERRINGTON & SUTCLIFFE
LLP
1252 15th St., NW
Washington, DC   20005
(202) 339-8436

-----------------------------------------------------------------------------------------------------------------

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 30, 2009, the foregoing was caused to be electronically filed with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered participants.

In addition, the undersigned hereby certifies that true and correct copies of the foregoing were caused to be served via electronic mail on April 30, 2009 upon the following parties:

ST. CLAIR INTELLECTUAL
PROPERTY CONSULTANTS INC.

C.A. No. 04-1436
C.A. No. 06-403
C.A. No. 06-404
C.A. No. 08-371
C.A. No. 08-373

AIPTEK INTERNATIONAL, AIPTEK
INC., HIGH TECH COMPUTER
CORP., HTC (BVI) CORP. AND HTC
USA INC.

C.A. No. 06-404

AUDIOVOX COMMUNICATIONS
CORPORATION, AUDIOVOX
ELECTRONICS CORPORATION

C.A. No. 06-403

BENQ AMERICA CORPORATION,
BENQ CORPORATION

C.A. No. 06-403

SEITZ, VAN OGTROP & GREEN, P.A.
**Patricia Pyles McGonigle**–pmcgonigle@svglaw.com
**George H. Seitz, III**–gseitz@svglaw.com
**James S. Green**–jgreen@svglaw.com

ROBINS, KAPLAN, MILLER & CIRESI LLP
**Ronald J. Schutz**–rjschutz@rkmc.com
**Jake M. Holdreith**–jmholdreith@rkmc.com

ASHBY & GEDDES
**John G. Day**–jday@ashby-geddes.com
**Steven J. Balick**–sbalick@ashby-geddes.com

HOGAN & HARTSON LLP
**Richard de Bodo**–rdebodo@hhlaw.com
**Huan-Yi Lin**–hlin@hhlaw.com

DUANE MORRIS LLP
**Matt Neiderman**–mneiderman@duanemorris.com
**Aimee Czachorowski**–
amczachorowski@duanemorris.com

WOMBLE CARLYLE SANDRIDGE & RICE
**Gerard O'Rourke**–gorourke@wcsr.com
**Stephen James Mackenzie**–smackenzie@wcsr.com

1

| | |
|---|---|
| AT&T MOBILITY LLC (F/K/A CINGULAR WIRELESS L.L.C.), AT&T MOBILITY CORPORATION (F/K/A CINGULAR WIRELESS CORPORATION), NEW CINGULAR WIRELESS SERVICES INC.<br><br>C.A. No. 06-403 | **PROCTOR HEYMAN LLP**<br>**Dominick T. Gattuso**–dgattuso@proctorheyman.com<br>**Kurt M. Heyman**–kheyman@proctorheyman.com<br><br>**PILLSBURY WINTHROP SHAW PITTMAN LLP**<br>**William P. Atkins**–william.atkins@pillsburylaw.com<br>**Benjamin Kiersz**–benjamin.kiersz@pillsburylaw.com |
| CONCORD CAMERA CORPORATION<br><br>C.A. No. 06-404 | **WOMBLE CARLYLE SANDRIDGE & RICE**<br>**Gerard O'Rourke**–gorourke@wcsr.com<br>**Stephen James Mackenzie**–smackenzie@wcsr.com<br><br>**CONCORD CAMERA CORPORATION**<br>**Scott L. Lampert**–scott_lampert@concord-camera.com |
| FUJIFILM HOLDINGS CORP., FUJIFILM CORP., FUJI PHOTO FILM CO. LTD., FUJI PHOTO FILM USA INC., FUJIFILM USA INC., FUJIFILM AMERICA INC.<br><br>C.A. No. 08-373 | **ASHBY & GEDDES**<br>**John G. Day**–jday@ashby-geddes.com<br>**Steven J. Balick**–sbalick@ashby-geddes.com<br><br>**ORRICK, HERRINGTON & SUTCLIFFE LLP**<br>**Steven Routh**-srouth@orrick.com<br>**Sten Jensen**-sjensen@orrick.com |
| GENERAL IMAGING CO.<br><br>C.A. No. 08-371 | **MORRIS, NICHOLS, ARSHT & TUNNELL LLP**<br>**Jack B. Blumenfeld**–jblumenfeld@mnat.com<br><br>**KNOBBE MARTENS OLSON & BEAR LLP**<br>**J. David Evered**–devered@kmob.com<br>**Jon Gurka**–jgurka@kmob.com |
| HEWLETT-PACKARD CO.<br><br>C.A. No. 04-1436 | **POTTER ANDERSON & CORROON, LLP**<br>**Richard L. Horwitz**–rhorwitz@potteranderson.com<br>**David E. Moore**–dmoore@potteranderson.com<br><br>**FOLEY & LARDNER LLP**<br>**Sharon R. Barner**–sbarner@foley.com<br>**Naikang Tsao**–ntsao@foley.com |

JVC COMPANY OF AMERICA,
MATSUSHITA ELECTRIC
INDUSTRIAL CO., LTD.
MATSUSHITA CORPORATION OF
AMERICA (NOW KNOWN AS
PANASONIC CORPORATION OF
AMERICA), AND VICTOR
COMPANY OF JAPAN LTD.

C.A. No. 04-1436

**ASHBY & GEDDES**
**John G. Day**–jday@ashby-geddes.com
**Steven J. Balick**–sbalick@ashby-geddes.com

**HOGAN & HARTSON LLP**
**Richard de Bodo**–rdebodo@hhlaw.com
**David H. Ben-Meir**–dhben-meir@hhlaw.com

KYOCERA WIRELESS CORP., PALM
INC.

C.A. No. 06-404

**YOUNG CONAWAY STARGATT & TAYLOR LLP**
**Karen E. Keller**–kkeller@ycst.com

**MORRISON & FOERSTER LLP**
**Gregory W. Reilly**–greilly@mofo.com
**David C. Doyle**–ddoyle@mofo.com

NOKIA CORPORATION,
NOKIA INC.

C.A. No. 04-1436

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
**Jack B. Blumenfeld**–jblumenfeld@mnat.com
**Julia Heaney**-jheaney@mnat.com

**KING & SPALDING**
**Alexas Skucas**–askucas@kslaw.com
**Allison Altersohn**–aaltersohn@kslaw.com

PETTERS GROUP WORLDWIDE,
POLAROID CONSUMER
ELECTRONICS LLC, POLAROID
HOLDING CO., POLAROID
CORPORATION

C.A. No. 06-404

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
**Jack B. Blumenfeld**–jblumenfeld@mnat.com

**KIRKLAND & ELLIS LLP**
**Russell E. Levine, P.C.**–rlevine@kirkland.com
**Melody Drummond-Hansen**–
mdrummond@kirkland.com

RESEARCH IN MOTION LTD.,
RESEARCH IN MOTION CORP.

C.A. No. 08-371

**CONNOLLY, BOVE, LODGE & HUTZ LLP**
**Collins J. Seitz, Jr.**–cseitz@cblh.com
**Kevin F. Brady**–kbrady@cblh.com

**WILMER HALE**
**Michael Summersgill**–
michael.summersgill@wilmerhale.com
**Dominic E. Massa**–dominic.massa@wilmerhale.com

| | |
|---|---|
| SANYO ELECTRIC CO., LTD., SANYO NORTH AMERICA CORPORATION<br><br>C.A. No. 06-404 | **ASHBY & GEDDES**<br>**John G. Day**–jday@ashby-geddes.com<br>**Steven J. Balick**–sbalick@ashby-geddes.com<br><br>**HOGAN & HARTSON LLP**<br>**Richard de Bodo**–rdebodo@hhlaw.com<br>**David H. Ben-Meir**–dhben-meir@hhlaw.com |
| SIEMENS AG, SIEMENS CORPORATION<br><br>C.A. No. 06-403 | **WOMBLE CARLYLE SANDRIDGE & RICE**<br>**Gerard O'Rourke**–gorourke@wcsr.com<br>**Stephen James Mackenzie**–smackenzie@wcsr.com |
| SPRINT-NEXTEL CORPORATION<br><br>C.A. No. 06-403 | **MORRIS, NICHOLS, ARSHT & TUNNELL LLP**<br>**Mary Graham**–mgraham@mnat.com;<br>mbgeservice@mnat.com<br>**James W. Parrett, Jr.**–jparrett@mnat.com<br><br>**CROWELL & MORING LLP**<br>**Kathryn L. Clune**–kclune@crowell.com<br>**Clyde E. Findley**–cfindley@crowell.com |
| T-MOBILE USA INC.<br><br>C.A. No. 06-404 | **YOUNG CONAWAY STARGATT & TAYLOR LLP**<br>**Melanie K. Sharp**–msharp@ycst.com<br>**James L. Higgins**–jhiggins@ycst.com<br><br>**PROSKAUER ROSE LLP**<br>**Steven M. Bauer**–sbauer@proskauer.com<br>**Kimberly A. Mottley**–kmottley@proskauer.com |
| UTSTARCOM INC.<br><br>C.A. No. 06-403 | **MORRIS, NICHOLS, ARSHT & TUNNELL LLP**<br>**Julie Heaney**–jheaney@mnat.com<br><br>**VENABLE LLP**<br>**JoAnna M. Esty**–jmesty@venable.com<br>**Tamany J. Vinson Bentz**–tjbentz@venable.com |
| VERIZON COMMUNICATIONS INC., VODAFONE GROUP PLC, CELLCO PARTNERSHIP<br><br>C.A. No. 06-403 | **ASHBY & GEDDES**<br>**Steven J. Balick**–sbalick@ashby-geddes.com<br>**John G. Day**–jday@ashby-geddes.com<br><br>**SIMPSON THACHER & BARTLETT LLP**<br>**Henry B. Gutman**–hgutman@stblaw.com<br>**Victor Cole**–vcole@stblaw.com |

*/s/ Julia Heaney (#3052)*

Julia Heaney (#3052)