## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ST. CLAIR INTELLECTUAL PROPERTY    )
CONSULTANTS, INC.,    )

       )

       Plaintiff,    )   C.A. No. 04-1436-JJF-LPS

       )

       vs.    )   **JURY TRIAL DEMANDED**

       )   **PUBLIC VERSION - REDACTED**

SAMSUNG ELECTRONICS CO., *et al.*,    )

       )

       Defendants.    )

## MEMORANDUM IN SUPPORT OF DEFENDANT HEWLETT-PACKARD
## COMPANY'S MOTION TO EXCLUDE THE TESTIMONY OF MICHAEL J. WAGNER

OF COUNSEL:

Charlene M. Morrow
FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
Tel: (650) 988-8500

Heather N. Mewes
David D. Schumann
Bryan A. Kohm
Jeffrey V. Lasker
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Tel: (415) 875-2300

Dated:   April 12, 2010
**Public Version Dated:**
**April 19, 2010**

Richard L. Horwitz  (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19899-0951
Tel:  (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant*
*Hewlett-Packard Company*

## TABLE OF CONTENTS

**Page**

NATURE AND STAGE OF THE PROCEEDINGS ...................................................................1

I.   SUMMARY OF THE ARGUMENT.....................................................................................1

II.  BACKGROUND...................................................................................................................3

    A.  Mr. Wagner's Qualifications ........................................................................................3

    B.  HP's Accused Products.................................................................................................4

    C.  Summary of Mr. Wagner's Testimony ........................................................................5

        1.  Mr. Wagner Testifies that Use of the Entire Market Value Is Inappropriate, But Nevertheless Improperly Uses the Entire Market Value to Determine the Royalty Base ........................................................................................................6

        2.  Mr. Wagner's Improper Use of the Entire Market Value of the Accused Products Is Exacerbated by His Failure to Apportion the Value of the Patented Feature in the Accused Products......................................................................6

        3.  Mr. Wagner Arrives at a 2.5% Baseline Royalty Rate by Misconstruing Incomparable License Agreements and Relying on Inappropriate Data Points .............8

        4.  Mr. Wagner Improperly Increases the Royalty Rate as to HP's Digital Cameras Based on Consumer Demand Arising After or as HP Exited the Digital Camera Market.......................................................................................................12

III. ARGUMENT......................................................................................................................13

    A.  The Court Must Exclude Unreliable Expert Testimony ...................................................13

    B.  Mr. Wagner's Testimony Should Be Excluded Because He Improperly Applies the Entire Market Value Rule ..........................................................................................16

        1.  Mr. Wagner's Attempts to Justify His Use of the Entire Market Value of the Accused Products as a Royalty Base Are Both Factually and Legally Baseless ..........18

    C.  Mr. Wagner's Testimony Should Be Excluded Because His Baseline Royalty Rate is Entirely Without Factual Support ...............................................................................22

        1.  Mr. Wagner's Reliance on Agreements or Proposals Conveying Broader Rights Than the Patent-In-Suit Is Forbidden..........................................................................22

        2.  Mr. Wagner's Reliance on the ███████████████████ Agreements Is Also Improper Because They Were Entered Into Under the Threat of Litigation.........25

        3.  The ████████████ Agreements Also Are Not Properly Considered Because They Entail Lump Sum Payments .............................................28

        4.  Even Assuming ████████ ███████████ Were Properly Considered, They Factually Fail to Support a Royalty Rate of 2.5% ...................................................................29

D. Mr. Wagner's Expansive Use of the Book of Wisdom Is Improper and His Testimony Should Be Excluded on That Basis................................................................. 31

E. Mr. Wagner's Failure to Use a Separate Hypothetical Negotiation Date for HP's iPAQ Handhelds  and His Use of Unreliable Data Requires Exclusion of His Testimony ...................................................................................................................... 34

IV. CONCLUSION...................................................................................................................... 37

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Advanced Med. Optics, Inc. v. Alcon, Inc.,*
  C.A. No. 03-1095-KAJ, 2005 WL 782809 (D. Del. Apr. 7, 2005) .........................................14

*American Original Corp. v. Jenkins Food Corp.,*
  774 F. 2d 459 (Fed. Cir. 1985)...........................................................................................................3

*Applied Medical Resources Corp. v. United States Surgical Corp.,*
  435 F.3d 1356 (Fed. Cir. 2006)...............................................................................................35, 36

*Callaway Golf Co. v. Dunlop Slazenger Group Americas, Inc.,*
  C.A. No. Civ. A. 01-669-KAJ, 2004 WL 1534786 (D. Del. May 21, 2004)...........................14

*Cornell Univ. v. Hewlett-Packard Co.,*
  609 F. Supp. 2d 279 (N.D.N.Y. 2009) ("Cornell II").........................................15, 17, 18, 25

*Cornell Univ. v. Hewlett-Packard Co.,*
  C.A. No. 01-CV-1974-RRR, 2008 WL 2222189 (N.D.N.Y. May 27, 2008)
  ("Cornell I")..................................................................................................................15, 17, 26

*Cornell Univ. v. Hewlett-Packard Co.,*
  C.A. No. 01-CV-1974-RRR, 2008 U.S. Dist. LEXIS 39343,
  (N.D.N.Y. May 14, 2008) ("Cornell III)..............................................................................26

*Daubert v. Merrell Dow Pharms.,*
  43 F.3d 1311 (9th Cir. 1995) ...............................................................................................13

*Daubert v. Merrell Dow Pharms., Inc.,*
  509 U.S. 579 (1993)................................................................................................... *passim*

*Deere & Co v. Int'l Harvester Co.,*
  710 F.2d 1551 .................................................................................................................26, 27

*Engel Indus. v. Lockformer Co.,*
  96 F.3d 1398 (Fed. Cir. 1996)........................................................................................20-21

*Franconia Assocs. v. United States,*
  61 Fed. Cl. 718 (Fed. Cl. 2004) ............................................................................................32

*Fromson v. Western Litho Plate & Supply Co.,*
  853 F.2d 1568 (Fed. Cir. 1988), *overruled on other grounds by Knorr-Bremse*
  *Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.,* 383 F.3d 1337 (Fed. Cir. 2004) .........31

*Harris Corp. v. Ericsson Inc.*,
   417 F.3d 1241 (Fed. Cir. 2005)........................................................................15, 32, 33

*Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*,
   378 F. Supp. 2d 459 (D. Del. 2005)................................................................32

*Honeywell Int'l, Inc. v. Nikon Corp.*,
   C.A. No. 04-1337-JJF, 2009 WL 577274 (D. Del. Mar. 4, 2009)....................15, 26

*Imonex Services, Inc. v. W.H. Munzprufer Dietmar Trenner GMBH*,
   408 F.3d 1374 (Fed. Cir. 2005)......................................................................16

*Integra Lifesciences I, Ltd. v. Merck KGaA*,
   331 F.3d 860 (Fed. Cir. 2003), *rev'd on other grounds*, 545 U.S. 193 (2005)..................34-35

*IP Innovation L.L.C. v. Red Hat, Inc.*,
   No. 2:07 cv 447, 2010 WL 986620 (E.D. Tex. Mar. 2, 2010)....................14, 17, 31

*Iron Grip Barbell Co. v. USA Sports, Inc.*,
   392 F.3d 1317 (Fed. Cir. 2004)....................................................................25-26

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*,
   383 F.3d 1337 (Fed. Cir. 2004) *(en banc)* ........................................................31-32

*Kori Corp. v. Wilco Marsh Buggies and Draglines, Inc.*,
   761 F.2d 649 (Fed. Cir. 1985)......................................................................16

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999).................................................................................13, 14, 21

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009)............................................................... *passim*

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
   575 F.2d 1152 (6th Cir. 1978) ............................................................25, 32, 35

*Pioneer Corp. v. Samsung SDI Co.*,
   No. 06-cv-384, 2008 U.S. Dist. LEXIS 107079 (E.D. Tex. Oct. 2, 2008) ............................27

*Proctor & Gamble Co., v. Paragon Trade Brands, Inc.*,
   989 F. Supp. 547 (D. Del. 1997)....................................................................19

*ResQNet.com, Inc. v. Lansa, Inc.*,
   594 F.3d 860 (Fed. Cir. 2010)................................................................ *passim*

*Riles v. Shell Exploration & Prod. Co.*,
   298 F.3d 1302 (Fed. Cir. 2002)............................................................... *passim*

*Rite-Hite Corp. v. Kelley Co., Inc.*,
  56 F.3d 1538 (Fed. Cir. 1995)............................................................................................16

*Rude v. Westcott*,
  130 U.S. 152 (1889)............................................................................................................26

*Sinclair Refining Co. v. Jenkins Petroleum Process Co.*,
  289 U.S. 689 (1933)............................................................................................31, 32, 33

*St. Clair Intellectual Property Consultants, Inc. v. Fuji Photo Film Co.*,
  674 F. Supp. 2d 555 (D. Del. 2009).............................................................................26, 28

*Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*,
  862 F.2d 1564 (Fed. Cir. 1988)..........................................................................................26

*Telcordia Techs., Inc. v. Lucent Techs., Inc.*,
  C.A. Nos. 04-875-GMS, 04-876-GMS, 2007 WL 7076662 (D. Del. Apr. 27, 2007) .............27

*Trell v. Marlee Electronics Corp.*,
  912 F.3d 1443 (Fed. Cir. 1990)..........................................................................................24

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F. Supp. 2d 147 (D.R.I. 2009)................................................................................26, 27

*Unisplay, S.A. v. American Electronic Sign Co., Inc.*,
  69 F.3d 512 (Fed. Cir. 1995)......................................................................................34-35, 36

## OTHER AUTHORITIES

Fed. R. Evid. 402 .................................................................................................................24

Fed. R. Evid. 403 ...........................................................................................................24, 27

Fed. R. Evid. 408 ...............................................................................................................27

Fed. R. Evid. 702 ..........................................................................................................*passim*

## NATURE AND STAGE OF THE PROCEEDINGS

Fact and expert discovery have closed. This action is set for trial on September 7, 2010 before Judge Farnan, and the pretrial conference is scheduled for July 23, 2010.

Currently pending before the Court is a motion to certify an interlocutory appeal of the Court's claim construction. Magistrate Judge Stark issued a Report and Recommendation conditionally granting the requested certification for interlocutory appeal, and the parties are currently preparing the objections and responses thereto.

## I.    SUMMARY OF THE ARGUMENT

1.    Hewlett-Packard moves to exclude the expert testimony of Michael Wagner, a professional expert, because his damages analysis is irreparably flawed. Indeed, Mr. Wagner essentially seeks to supplant the role of the jury, which is assigned the role of listening to the Court's instructions on the legal issues in the case and then evaluating the evidence in light of those instructions to reach its decision. While Mr. Wagner computes a purportedly "reasonable" royalty, neither the royalty base nor his calculation of the royalty rate comports with applicable law. Because Mr. Wagner's testimony is not the result of specialized knowledge that would assist a jury in understanding the evidence or to determine the proper damages in this matter, and indeed given these flaws would instead mislead a jury, Mr. Wagner's testimony must be excluded.

2.    The entirety of Mr. Wagner's analysis is tainted by improper use of the "entire market value" rule, resulting in a royalty base for this small improvement invention based on the entire price of the HP accused products. Unequivocal Federal Circuit precedent mandates that the entire market value rule be used only when a patentee can prove that the accused feature drives demand for the accused products as whole. Mr. Wagner admits that the accused features do not drive demand for either of HP's accused product lines, yet he relies on the entire market

value to calculate the royalty base.  The result is a wildly inflated royalty base, which in turn causes Mr. Wagner's proffered royalty to be similarly inflated.

3.      The error of Mr. Wagner's misuse of the entire market value of HP's products as a royalty base is compounded by his failure to conduct the requisite apportionment analysis pursuant to *Georgia-Pacific* Factor 13.  Apportionment analysis serves to measure the relative contribution of the allegedly infringing feature to the success of the accused infringer's products, as compared to the other features of the accused product and contributions of the alleged infringer.  Mr. Wagner's failure to conduct this analysis exacerbates the harm resulting from his inflated royalty base, and also denies the jury the ability to evaluate for itself the propriety of Mr. Wagner's royalty rate.

4.      The entirety of Mr. Wagner's analysis is further tainted by his use of inappropriate baseline agreements for setting a reasonable royalty, and by the failure to adjust the rates in those agreements in light of the base they use, versus the base appropriate in a case like this.

5.      Mr. Wagner also commits error through misapplication of the book of wisdom, whereby he uses events – unforeseeable at the time of the hypothetical negotiation in 2000 – that have caused demand for the patented feature to increase in recent years as a basis for an upward adjustment of the royalty rate.  This error is particularly egregious with respect to HP's digital cameras because the events relied on by Mr. Wagner occurred at the tail end or after HP exited the business of designing digital cameras.  Making matters worse, one of the factual bases recited in his report for doing so is a market survey conducted by Jeffrey Stitt in 2009, though Mr. Wagner candidly admitted during his deposition that he did not find Mr. Stitt's results reliable.

6.      Finally, Mr. Wagner's opinion regarding HP iPAQs is based on the wrong

hypothetical negotiation date, by a matter of years; thus his entire analysis lacks the necessary tie

to the relevant period for determining a reasonable royalty.  There are two distinct product lines

at issue in this case.  The first are HP's digital cameras.  The second are HP's iPAQ products,

which are a series of cell phone and PDA products.  Despite these distinct product lines, Mr.

Wagner uses a single hypothetical negotiation date, August 2000, the date that the accused HP

digital cameras were introduced to the market.  The iPAQs, however, were introduced to the

market in 2004.  As set forth in more detail below, this is a simple but stark legal error that

should result in the exclusions of Mr. Wagner's testimony regarding the iPAQs.

7.      The errors raised by HP in this motion are not disagreements with Mr. Wagner's

analysis of the evidence or conclusions, which would go to the weight of his testimony.  Rather,

these flaws are the result of Mr. Wagner applying unreliable methods of analysis that have been

rejected by the Federal Circuit and courts around the country, and his failure to provide the

requisite factual foundation and explanation of his purported analysis results in his opinions

amounting to conjecture, which a jury cannot evaluate because of these failures.  Mr. Wagner's

testimony must therefore be excluded.

## II.   BACKGROUND

### A.   MR. WAGNER'S QUALIFICATIONS

Mr. Wagner has been proffered by St. Clair as a damages "expert" whose testimony will

be helpful to the jury in evaluating the amount of any damages to be awarded to St. Clair.  Mr.

Wagner has an undergraduate degree in engineering, and a Master's in Business Administration.

He also has a law degree.  He does not have, nor does he in this case apply, any special expertise

in economics.  Nor does he have any experience at all in actual licensing.  In fact, in a prior trial

he testified that he shuns such work as not being sufficiently lucrative.  *See* Declaration of

Richard L. Horwitz in Support of Defendant Hewlett-Packard Company's Motions to Exclude

the Testimony of Michael J. Wager and Jeffrey Stitt ("Horwitz Decl.,"), Ex. R (Transcript of

Trial for Case No. 07-125, *Epicrealm Licensing, LP v. Autoflex Leasing, Inc.* (August 19, 2008))

at 231:9-25.  Rather, his professed expertise is being able to read the list of *Georgia-Pacific*

factors, apply his legal acumen to the Federal Circuit's caselaw on damages, and then review the

evidence in the case and determine how in his opinion the *Georgia-Pacific* factors should apply.

Horwitz Decl., Ex. A, (Deposition of Michael J. Wagner, taken March 5, 2010 ("Wagner Dep."))

at 21:19-22:7.  In somewhat circular fashion, he indicates that his expertise is derived from

testifying in prior patent cases.

### B.    HP's Accused Products

St. Clair has accused over 60 different models of HP products of infringement of the

patents-in-suit.  Horwitz Decl., Ex. B, (Expert Report of Michael J. Wagner, dated January 11,

2010 ("Wagner Report")) at ¶ 56.[1]  These products, samples of which are shown below, are

divided into two separate product categories, digital cameras and iPAQ handhelds.  *See Id.*, Ex.

B, (Wagner Report) at ¶ 56, Fig. 2.



HP started selling the accused digital cameras in approximately August 2000.  *Id.*, Ex. B,

---

[1] To the extent that Mr. Wagner recites any fact, and the accuracy of that fact is immaterial to the
present motion, HP has cited to Mr. Wagner's report or deposition.  HP has taken this approach
merely to avoid unnecessary and immaterial factual disputes.  HP does not waive, and hereby
expressly reserves, its right to later challenge any such facts, including without limitation at trial.

(Wagner Report) at ¶ 50. ██████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

HP first offered the accused iPAQ handhelds for sale in 2004. *Id.*, Ex. B, (Wagner

Report) at Schedule 1.1. ) ████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████



C.    SUMMARY OF MR. WAGNER'S TESTIMONY

Mr. Wagner begins his analysis by noting that there are "two factors central to the

reasonable royalty calculation -- the royalty base (the product sales which would be subject to the

reasonable royalty), and the royalty rate." *Id.*, Ex. B, (Wagner Report) at ¶ 60 (quotation and citation omitted). He further observes that aside from those two determinations, the remainder of the damages analysis is "simple multiplication." *Id.*

1.   **Mr. Wagner Testifies that Use of the Entire Market Value Is Inappropriate, But Nevertheless Improperly Uses the Entire Market Value to Determine the Royalty Base**

As to the determination of the royalty base, Mr. Wagner's report simply assumes that the proper royalty base is the entirety of the revenue derived by HP from selling each of the accused products. *See id.* at Fig. 15, ¶ 312. In his deposition, Mr. Wagner admitted that he "[does not] believe the entire market value rule applies to this case," as the patented features are not a "primary driver" of sales of the accused products. *Id.*, Ex. A, (Wagner Dep.) at 98:12-99:6. When asked why Mr. Wagner nonetheless used the price of the entire accused products as the royalty base, he explained that "[i]t's the most logical base that I could come up with based on the facts of this case." *Id.* at 99:7-10. Mr. Wagner explained that he viewed this approach as appropriate, and refused to use any other approach, because the camera is the only device sold to a user. *Id.* at 99:11-17. Mr. Wagner elaborated that he elected not to use an alternative base, such as the value of an enhanced processor or chipset that enables the patented functionality, merely because it is not sold to end user, and therefore necessarily was "an unrealistic royalty base to use." *Id.* at 177:19-178:21.

2.   **Mr. Wagner's Improper Use of the Entire Market Value of the Accused Products Is Exacerbated by His Failure to Apportion the Value of the Patented Feature in the Accused Products**

Mr. Wagner's error in using the entire market value of HP's devices as the royalty base is aggravated by his failure to properly account for the value of the patented feature in the accused products. In performing his "analysis" of *Georgia-Pacific* Factor No. 13 – which is aimed at evaluating "the proportion of the realizable profit that should be credited to the invention as

distinguished from non-patented elements, the manufacturing process, business risks or significant features or improvements by the infringer" – Mr. Wagner improperly takes a one size fits all approach to all digital camera manufacturers.  Mr. Wagner merely states that HP benefitted from the invention, that HP occasionally made its contributions to digital camera technology available to other manufacturers, and that HP "developed partnerships with a variety of groups that provide the company with avenues to access customers and promote products." *Id.*, Ex. B, (Wagner Report) at ¶¶ 227-231.  That is the full extent of Mr. Wagner's analysis under Factor 13.  ████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████  He then admitted in his deposition that there are differences between them: "clearly, every company has unique factors as to why they have profits that are different than others.  Otherwise, everyone would have the same profit." *Id.,* Ex. A, (Wagner Dep.) 127:13-18, 135:8-138:16.  ██████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

██████████████

████████████████████



Mr. Wagner further admitted that he failed to review any technology specific to HP – for example, by reviewing HP's patent portfolio relating to digital cameras. *Id.* at 127:6-8.



And he further admits that the three companies have different sales, profitability and distribution chains. *Id.* at 135:6-7, 136:19-137-15. Aside from the issue that Mr. Wagner is not a technical expert, but is relying on his own opinions about the features and quality of technology in varying products, Mr. Wagner fails to substantiate his opinion in any manner – for example, by offering any evidence that his opinions are correct.

3.   **Mr. Wagner Arrives at a 2.5% Baseline Royalty Rate by Misconstruing Incomparable License Agreements and Relying on Inappropriate Data Points**

With respect to a royalty rate, Mr. Wagner uses *Georgia-Pacific* Factor No. 1 to first

determine a "Baseline Royalty Rate," and then applies the remaining *Georgia-Pacific* Factors to make any necessary adjustments to that rate. *Id.*, Ex. B, (Wagner Report) at ¶ 73. Mr. Wagner concludes that the appropriate baseline royalty rate in this case is 2.5%. *Id.* at ¶ 135. Although Mr. Wagner discussed a significant number of license agreements when conducting his analysis, he explicitly states that his conclusion that 2.5% is the proper baseline royalty rate is based on only four agreements







Based on these data points, none of which even come close to resembling a license that would be entered into under the hypothetical negotiation, Mr. Wagner determines that a 2.5% baseline royalty rate is appropriate.

### 4. Mr. Wagner Improperly Increases the Royalty Rate as to HP's Digital Cameras Based on Consumer Demand Arising After or as HP Exited the Digital Camera Market

Mr. Wagner makes a single upward adjustment to the baseline royalty, which results from his analysis of *Georgia-Pacific* Factor No. 10. *Id.*, Ex. B, (Wagner Report) at Fig. 10. During his deposition, Mr. Wagner explained that the main consideration—and the basis for his upward adjustment—under Factor 10 is the "benefit to the users of the invention." *Id.*, Ex. A, (Wagner Dep.) at 112:2-5. He testified that he adjusted the rate upward from 2.5% to 3% because the data points he used to determine the baseline royalty rate occurred at a time before the full value of the invention was appreciated. *Id.* at 113:18-114:2.

Mr. Wagner first errs by relying on data about the state of the digital camera market after Hewlett-Packard left the market. For example, he relies on a series articles from Consumer Reports from November 2009 evaluating features in digital cameras, as well as CNET product reviews from July 2008 relating to Apple's iPhone. *Id.*, Ex. B, (Wagner Report) at ¶¶ 194, 198.

Mr. Wagner rightfully points out that demand for the relevant feature of the accused digital cameras, which largely has been assumed to be the ability to capture both still images and

video clips, only began in "2006, but really the closer you are in time to today, the more value that has been recognized." *Id.*, Ex. A, (Wagner Dep.) at 119:4-15. Mr. Wagner explained that the increased demand for video was caused by the Web 2.0 movement, such as the social networking and video sharing websites. *Id.*, Ex. B, (Wagner Report) at ¶ 279. Based on this increased demand beginning in 2006 and increasing since, Mr. Wagner adjusts the royalty rate from 2.5% to 3% for sales of accused devices, including those occurring before 2006. *Id.* at ¶ 238. Despite the fact that the relevant hypothetical negotiation date is August 2000, Mr. Wagner contends that the Book of Wisdom permits consideration of this alleged demand for the patented feature arising six years later—notably just one year before HP exited the digital camera business—and allows the royalty rate applied to the entire price of HP's digital cameras to be increased. *Id.*, Ex. A, (Wagner Dep.) at 66:9-67-7.

## III.   ARGUMENT

### A.   THE COURT MUST EXCLUDE UNRELIABLE EXPERT TESTIMONY

Rule 702 of the Federal Rules of Evidence requires that district court judges act as "gatekeepers" to ensure that proposed expert testimony "rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). An expert whose opinion lacks sufficient logical or factual foundation must not be allowed to testify, lest the trier of fact be misled by his resume and credentials. *Id.* at 595, 597; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). The party seeking to admit expert testimony bears the burden of proving that its expert's proffered testimony is sufficiently reliable to be admissible. *Daubert v. Merrell Dow Pharms.*, 43 F.3d 1311, 1316 (9th Cir. 1995), *cert. denied*, 516 U.S. 869 (1995).

Subpart (1) of Rule 702 requires that an expert's analysis be based "sufficient facts and data." Subparts (2) and (3) require that an expert apply a reliable methodology in forming his or

her opinion in the specific case. The Advisory Committee Notes to Rule 702 make clear that

when an expert relies on his or her experience, rather than scientific or technical knowledge, the

expert must explain how that experience leads to the conclusion reached, why that experience is

a sufficient basis for the opinion, and how that experience is reliably applied to the facts. Fed. R.

Evid. 702, Adv. Comm. Notes (2000 Amendments.); *see also Kumho*, 526 U.S. at 151 ("[It] will

at times be useful to ask even of a witness whose expertise is based purely on experience . . .

whether his preparation is of a kind that others in the field would recognize as acceptable.").

When an expert conducts a hypothetical negotiation analysis, the Federal Circuit requires

that the expert's analysis be based on "sound economic and factual predicates" to prevent it from

"lapsing into pure speculation." *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311

(Fed. Cir. 2002) (internal quotation omitted). "A reliable reasonable royalty calculation depends

on trustworthy evidence of both the royalty base and the royalty rate." *IP Innovation L.L.C. v.*

*Red Hat, Inc.*, No. 2:07 cv 447, 2010 WL 986620, at *1 (E.D. Tex. Mar. 2, 2010). Analysis

without "sound economic and factual predicates" is unsupported speculation and should be

excluded. *See id.; see also Advanced Med. Optics, Inc. v. Alcon, Inc.*, C.A. No. 03-1095-KAJ,

2005 WL 782802, at *2, *11 (D. Del. Apr. 7, 2005) (excluding opinions by two experts on the

market for and commercial success of the accused feature: an ophthalmologist with no

specialized knowledge of sales or marketing speculating about the market and other doctors'

preferences; and an expert who identified no basis for his testimony of commercial success other

than his discussions with plaintiff's counsel); *Callaway Golf Co. v. Dunlop Slazenger Group*

*Americas, Inc.*, C.A. No. 01-669-KAJ, 2004 WL 1534786, at *2, *4 (D. Del. May 21, 2004)

(excluding unjust enrichment testimony of expert who failed to explain how he arrived at a dollar

amount, because "testimony of an expert that constitutes mere personal belief as to the weight of

the evidence invades the province of the fact-finder").

Recent developments in the law have changed the framework under which reasonable

royalty analysis must be conducted since Mr. Wagner last testified in a St. Clair matter in 2004.

The Federal Circuit has clarified that the entire market value rule cannot be used to calculate the

royalty base without evidence that the accused feature drives customer demand for the product as

a whole, especially when the accused feature is a small element of a complex product. *Lucent

Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1336 (Fed. Cir. 2009). It has also been established

that irrespective of whether the damages expert purports to apply the rule or not, a gatekeeper

court must evaluate the expert's methodology and exclude his testimony under Rule 702 if he

improperly derives his proposed royalty base from the entire market value of the accused

products. *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 287 (N.D.N.Y. 2009)

(Rader, J.) ("Cornell II") The Federal Circuit also has clarified that licenses used to calculate a

reasonable royalty rate must be closely analogous to the hypothetical license for the patent-in-

suit: expert analysis must be excluded if it is based on licenses broader in scope than the

hypothetical license. *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 871-72 (Fed. Cir. 2010).

The same holds true for expert testimony deriving a royalty rate from licenses entered into under

threat of litigation. *Cornell Univ. v. Hewlett-Packard Co.*, No. 01-CV-1974-RRR, 2008 WL

2222189, at *2-3 (N.D.N.Y. May 27, 2008) (Rader, J.) ("Cornell I"); *Honeywell Int'l, Inc. v.

Nikon Corp.*, No. 04-CV-1337, 2009 WL 577274 (D. Del. Mar. 4, 2009). Finally, the Federal

Circuit has narrowed the use of post-hypothetical negotiation information in formulating the

hypothetical agreement the parties would have reached at the time infringement began. *See

Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1257 (Fed. Cir. 2005).

**B.     MR. WAGNER'S TESTIMONY SHOULD BE EXCLUDED BECAUSE HE IMPROPERLY APPLIES THE ENTIRE MARKET VALUE RULE**

Mr. Wagner's use of the price of the entire accused products as the royalty base violates the longstanding rule against using the entire market value of accused products when the patented feature does not drive demand.

In limited circumstances, the "entire market value rule" allows a patentee to recover damages based on the entire value of a product incorporating patented and unpatented features. *Kori Corp. v. Wilco Marsh Buggies and Draglines, Inc.*, 761 F.2d 649, 656 (Fed. Cir. 1985). The rationale is that the patented feature is sometimes so crucial that it drives demand for the product as a whole. *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1549 (Fed. Cir. 1995) (the entire market value rule may be applied only "if the patented apparatus 'was of such paramount importance that it substantially created the value of the component parts'"). The patentee bears the burden of establishing that the royalty base is properly arrived at using the entire market value of the accused products. *Lucent Techs.*, 580 F.3d at 1337-38 (holding that the patentee failed to satisfy its burden of proving the applicability of the entire market value rule). To carry that burden, "the patentee must prove that 'the patent-related feature is the basis for customer demand.'" *Id.* at 1336 (quoting *Rite-Hite*, 56 F.3d at 1549 (*en banc*)); *Imonex Services, Inc. v. W.H. Munzprufer Dietmar Trenner GMBH*, 408 F.3d 1374, 1380 (Fed. Cir. 2005) (Without any evident record that the patented features were the basis for customer demand for the laundry machines as a whole, the trial court properly foreclosed further evidence on this unsupported theory."). The entire market value rule is inappropriate when the value of the patented component is outweighed by other features. *See, e.g., Lucent Techs.*, 580 F.3d at 1337 (excluding testimony that used the entire market value rule to calculate royalties because the infringing feature was a "very small component of a much larger software program. The vast

majority of the features, when used, do not infringe."); *IP Innovation*, 2010 WL 986620, at *2 (excluding testimony where the patented feature was one of over a thousand components of the accused operating systems); *Cornell II*, 609 F. Supp. 2d at 287 (excluding testimony of expert who "breezed by the unit closest to the claimed technology" and chose instead a much larger product unit as the royalty base).

As Judge Rader of the Federal Circuit, sitting by designation, explained in *Cornell*, expert testimony using the entire market value of the product containing accused features, if it is unsupported by credible and sufficient economic proof of customer demand for the patented feature, will only "mislead the jury to award damages far in excess of their compensatory purpose." *Cornell II*, 609 F. Supp. 2d at 284. This misleading testimony must be excluded under Rule 702. *See Daubert*, 509 U.S. at 589; *Cornell I*, 2008 WL 2222189 (excluding expert testimony because it improperly used the entire market value of the accused products as a royalty base); *IP Innovation*, 2010 WL 986620 (same).

Here, Mr. Wagner gives this clear, unequivocal precedent lip service by acknowledging that application of the entire market value rule in this case is improper given that the patented feature does not drive demand for the accused products. Horwitz Decl., Ex. A, (Wagner Dep.) at 99:1-6. Incredibly, however, Mr. Wagner proceeds to then use the entire market value of the accused products to arrive at his royalty base. *Id.* at 99:7-10. This attempted sleight of hand should not be permitted. Mr. Wagner's actual use of the entire price of the accused products to calculate the royalty base plainly belies his assertion that he is not applying the entire market value rule. It is unnecessary to dispute whether Mr. Wagner has applied the entire market value rule, however, as it is the expert's method of calculation, not the nomenclature, that invokes the requirement to prove customer demand under the entire market value rule. *See Cornell II*, 609 F.

Supp. 2d at 287 ("Because Cornell elected to angle for a royalty base encompassing much more than the market most aligned with the claimed invention, it had to satisfy the requirements for application of the entire market value to the CPU bricks in order to prevail.").

It is undisputed in the present action that the allegedly infringing feature does not drive demand, and therefore Mr. Wagner's use of the entire market value of HP's accused products as a royalty base is in error and must be excluded.

      1.    **Mr. Wagner's Attempts to Justify His Use of the Entire Market Value of the Accused Products as a Royalty Base Are Both Factually and Legally Baseless**

Mr. Wagner attempts to justify his use of the entire market value of HP's accused products in two ways. He first asserts that it is only proper to consider the "sales price to a user of the invention," and thus entire market value of the accused products was the appropriate measurement. Horwitz Decl., Ex. A, (Wagner Dep.) at 99:7-17. Circuit Judge Rader, however, flatly rejected this position in *Cornell II*, where the patentee first tried to use the sales of servers, and then the sales of CPU bricks, as the royalty base. *See Cornell II*, 609 F. Supp. 2d at 284-85 (rejecting patentee's argument that the royalty base was properly derived from the sales of servers because that was the device sold to end users). Judge Rader explained that the proper measure of the royalty base was determined by looking at the hypothetical sales price of the processors used in the servers and CPU bricks. *Id.* at 287-89.

*Lucent* demonstrates the burden that the patentee must meet in order to use the entire market value rule. The infringing feature was a "date-picker" tool in Microsoft's software. *Lucent Techs.*, 580 F.3d at 1317. At trial, the patentee sought a royalty of 8% of sales of the accused products. *Id.* at 1323. Although the jury did not adopt the patentee's damages theory in its entirety, the size of the award suggested that the jury might have calculated it based on the entire market value of the accused products. *Id.* at 1336. The Federal Circuit reversed the jury

verdict, holding that use of the entire market value rule was legal error because there was insufficient evidence to demonstrate that the infringing feature drove demand for the accused product. *Id.* at 1336-38. Thus, the patentee failed as a matter of law to meet its burden of establishing that such an approach to calculating a royalty base was proper. *Id.* The takeaway is that any damages award based on the entire market value of the accused products is reversible error, unless the patentee has carried its burden of establishing that the patented feature is the basis of the demand for the accused products. *See id.*

Mr. Wagner also seeks to justify his inflated royalty base by relying on a statement made by the Federal Circuit in *Lucent* that use of the entire market value is not *necessarily barred* in all instances where the feature does not drive demand, so long as the rate is adjusted accordingly. *Lucent Techs.*, 580 F.3d at 1338-39. There is no evidence, however, that Mr. Wagner made such an adjustment, which would necessarily account for the fact that the other features and factors contribute to success of the products. Indeed, rather than decreasing the royalty rate as suggested by *Lucent*, Mr. Wagner instead elected to increase it. Such analysis is conducted under Factor 13 to account for the inflated royalty base, but Mr. Wagner wholly fails to conduct any apportionment analysis pursuant to that factor.

Factor 13 takes into "account the relative contribution of the patented feature to the success of the product." *Proctor & Gamble Co., v. Paragon Trade Brands, Inc.*, 989 F. Supp. 547, 612-13 (D. Del. 1997) (*citing* 7 Chisum, *Patents*, § 20.02[[3][b][viii], at 20-211 to 213). As this Court explained, "[i]f the patented feature forms only a small part of the product, either physically or economically, it is generally the case that a licensee would have been less disposed to agree to a high royalty." *Id.* Apportionment analysis must focus on the relative value of the patented feature in the alleged *infringer's* products. *Lucent Techs.*, 580 F.3d at 1332 (comparing

the value of the infringing feature to the accused Microsoft Outlook as a whole); *see* Horwitz

Decl., Ex. A, (Wagner Dep.) at 124:2-6, 125:12-19.

In his report, Mr. Wagner's apportionment analysis as to HP's digital cameras consists of

five short paragraphs, none of which even identify any features of HP's cameras, much less

compare the value of the patented feature to other features. *Id.* at Ex. B, (Wagner Report) at ¶¶

227-231. Instead, Mr. Wagner simply states that "HP's efforts to find product demand and cater

to that demand through its own research and development...should not be overlooked when

analyzing the profits HP reaped from digital cameras and smartphones that incorporated the

[patented] technology." *Id.* at ¶ 228. That is the entirety of Mr. Wagner's feature apportionment

analysis. Oddly, despite acknowledging that such analysis was necessary, Mr. Wagner wholly

failed do it.



There are two problems with this approach. First, there is no authority for the proposition

that just because a licensee resolving a commercial dispute picked a certain royalty base, it is the

legally appropriate royalty base for purposes of a reasonable royalty analysis. In fact, the

Federal Circuit has recognized that commercial entities may bargain for terms that are

commercially expedient but may not track the patent laws. *Cf Engel Indus. v. Lockformer Co.*,

96 F.3d 1398, 1408 (Fed. Cir. 1996) (not *per se* misuse for party to agree to royalty based on

unpatented components "if that provides a convenient means for measuring the value of the

license").

Second, Mr. Wagner *fails to provide any factual foundation* whatsoever to support this

approach. Cameras have varying quality of lenses, image processing capabilities, battery life,

ease of use, and style, among other features. See Horwitz Decl., Ex. B, (Wagner Report) at ¶¶

194-197; Exs. K, (STCLR268635-42), L, (STCLR268644-45). █████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

██████████ Based on his erroneous conjecture that all digital cameras are the same, Mr. Wagner

concluded that the royalty rate need not be adjusted downward in light of Factor 13. *Id.*, Ex. B,

(Wagner Report) at ¶ 232. *See Daubert*, 509 U.S. at 595, 597 (testimony lacking factual

foundation must be excluded); *Kumho Tire*, 526 U.S. at 149.

Mr. Wagner's analysis regarding HP's iPAQ handhelds is similarly flawed. He flatly

states that HP's handhelds include a number of features that "have contributed to the economic

success of the accused products separate and apart from the patented technology." Horwitz

Decl., Ex. B, (Wagner Report) at ¶ 297. But he fails to conduct any analysis to determine the

relative value of the patented feature compared to those other features. *Id.* at ¶¶ 295-98.

Although Mr. Wagner decreases the royalty rate as to smartphones under Factor 13, his failure to

offer any analysis robs the jury of its ability to evaluate whether he properly considered those

features and adjusted the rate accordingly.

Mr. Wagner's complete and utter failure to provide any factual foundation for his conclusions with respect to apportionment, much less conduct the requisite analysis, will prevent the jury from being able to evaluate Mr. Wagner's basis and reasoning for the royalty rate that he proposes, and therefore his testimony must be excluded. *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 597 (trial courts must ensure that unreliable expert testimony does not reach the jury to mislead it); *Riles*, 298 F.3d at 1311 (speculative expert testimony without sound economic and factual predicates must be excluded).

### C.   MR. WAGNER'S TESTIMONY SHOULD BE EXCLUDED BECAUSE HIS BASELINE ROYALTY RATE IS ENTIRELY WITHOUT FACTUAL SUPPORT

Mr. Wagner's royalty rate analysis begins by setting a baseline royalty rate. Horwitz Decl., Ex. B, (Wagner Report) at ¶ 73. He determines this baseline royalty rate through his analysis under *Georgia-Pacific* Factor 1 – specifically, "royalties that the patentees have receive from licensing the Roberts Patents." *Id.* ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

These data points, however, neither support a royalty rate of 2.5% nor are properly considered under reasonable royalty analysis.

### 1.   Mr. Wagner's Reliance on Agreements or Proposals Conveying Broader Rights Than the Patent-In-Suit Is Forbidden

The Federal Circuit has explicitly rejected attempts by patentees to consider licensee agreements that include a conveyance of more than a license to the patented technology. *ResQNet.com*, 594 F.3d at 871-72 (vacating a damages award because the patentee's expert relied on license agreements that included more than a license to the patent-in-suit).

████████████████████████████████████████████████████



Because these data points are not "commensurate with what [HP has allegedly] appropriated," they are not properly used to establish a baseline royalty rate. *ResQNet.com*, 594 F.3d at 871-72. Indeed, to permit Mr. Wagner to rely on these data points would allow him to "inflate the reasonable royalty analysis with conveniently selected licenses" and offers without an economic link to hypothetical license at issue here. *See id.* at 871.

In *ResQNet.com*, the Federal Circuit explained that its decisions in *Lucent* and *Trell v. Marlee Electronics Corp.*, 912 F.3d 1443 (Fed. Cir. 1990), mandate that licenses used for the purpose of establishing a royalty rate must correspond closely with the hypothetical license. *ResQNet.com*, 594 F.3d at 871. Notably, the court noted that the agreement used in *Trell* to establish the royalty rate "conveyed rights more broad in scope that those covered by Trell's patent," thus requiring reversal of the damages award. *Id.* at 871-72 (quoting *Trell*, 912 F.3d at 1446). Here, based on the face of the four data points, the license to the patents-in-suit is but a fraction of the value being conveyed to the licensees. Mr. Wagner points to no evidence suggesting otherwise, and thus any use of those data points runs a significant risk that a jury will misconstrue their scope and be misled into believing that they are comparable, particularly given Mr. Wagner's unsubstantiated testimony to that effect. Given that these data points lack any reasonable resemblance to the hypothetical license, their relevance is minimal at best; in light of their significant prejudicial effect, the use of the data points must be excluded. *See id.* at 871-72 (finding non-comparable licenses to be significantly more prejudicial than probative); Fed. R. Evid. 403 (requiring exclusion of evidence whose probative value is substantially outweighed by the danger of unfair prejudice, confusion, or misleading the jury); Fed. R. Evid. 402 (irrelevant evidence is inadmissible).

Mr. Wagner's explanation that he accounted for the broad nature of these data points by

decreasing the royalty rate under his analysis of Factor 3 fails.  As the Federal Circuit has

previously noted, such downward adjustment by Mr. Wagner amounts to "an admission that his

calculations are speculative without any relation to actual market rates at all."  *See ResQNet.com*,

594 F.3d at 871.

Moreover, the record does not support the contention that Mr. Wagner did such a

reduction in rate.  There is no discussion of such a reduction in his damages report, let alone any

quantification of it.  *See* Horwitz Decl., Ex. B, (Wagner Report) at ¶¶ 141-142.  An expert must

give more than lip service to such an important principle to avoid having his report excluded.[2]

*See Cornell II*, 609 F. Supp. 2d at 287 (evaluating what a damages expert does in his analysis,

not simply what he says he does).

Mr. Wagner's use of these four data points is explicitly barred by Federal Circuit

precedent, because without sufficient similarity to the hypothetical negotiation his opinion based

on them is mere speculation, and therefore Mr. Wagner's testimony must be excluded.  *Riles*, 298

F.3d at 1313; *ResQNet.com*, 594 F.3d at 871.

        **2.**     **Mr. Wagner's Reliance on the ████████████**
               **Agreements Is Also Improper Because They Were Entered Into**
               **Under the Threat of Litigation**

To be relevant to the rate the parties would have agreed to in a hypothetical negotiation,

license agreements must not be distorted by the threat of litigation.  It is well-known that license

fees negotiated in the face of a threat of high litigation costs "may be strongly influenced by a

desire to avoid full litigation."  *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152,

1164 n.11 (6th Cir. 1978) (citation omitted); *see also Iron Grip Barbell Co. v. USA Sports, Inc.*,

---

[2]  Mr. Wagner somehow started with a starting point of 2.5% and ended up with a final rate of
3%, with no indication that he reduced the 2.5% rate to account for the value attributable to the
patents-in-suit versus the other licensed technology, or by how much.  *See* Horwitz Decl., Ex. B,
(Wagner Report) at ¶¶ 135, 237-238.

392 F.3d 1317, 1324 (Fed. Cir. 2004) ("it is often cheaper to take licenses than to defend

infringement suits.") (quotation omitted).  Indeed, the Supreme Court long ago opined on the

irrelevance and inadmissibility of settlements to prove a reasonable royalty:

> "It is clear that a payment of any sum in settlement of a claim for an alleged
> infringement cannot be taken as a standard to measure the value of the
> improvements patented, in determining the damages sustained by the owners of
> the patent in other cases of infringement. Many considerations other than the
> value of the improvements patented may induce the payment in such cases. The
> avoidance of the risk and expense of litigation will always be a potential motive
> for a settlement."

*Rude v. Westcott*, 130 U.S. 152, 164 (1889).  This is equally true of license agreements which are

entered into under the *threat* of impending litigation.[3]  *Studiengesellschaft Kohle, m.b.H. v. Dart*

*Indus., Inc.*, 862 F.2d 1564, 1572 (Fed. Cir. 1988); *see also Honeywell Int'l*, 2009 WL 577274

(excluding license agreements after evaluating their terms and concluding they were entered into

under threat of litigation).  This distortion renders such agreements "not considered probative of

a reasonable royalty because in the usual course they do not provide an accurate reflection of

what a willing licensor would do in an arm's length transaction." *Uniloc USA, Inc. v. Microsoft*

*Corp.*, 632 F. Supp. 2d 147 (D.R.I. 2009); *see also Deere & Co v. Int'l Harvester Co.*, 710 F.2d

1551, 1557 ("Moreover, as the White license was negotiated against a backdrop of continuing

litigation and IH infringement of the Schreiner patent, the district court could properly discount

the probative value of the White license with regard to a reasonable royalty."); *Cornell Univ. v.*

*Hewlett-Packard Co.*, C.A. No. 01-CV-1974-RRR, 2008 U.S. Dist. LEXIS 39343, at *12

(N.D.N.Y. May 14, 2008) ("Cornell III) ("Where, as here, a license agreement arises under the

---

[3] While in some circumstances *ResQNet* warrants consideration of licenses entered into despite
threat of litigation, those circumstances do not obtain here.  This Court has previously excluded
similar St. Clair licenses from evidence on the basis that the evidence that must be considered in
order to evaluate them would be more prejudicial than probative; the Court also previously
excluded evidence of the prior lawsuits. *See St. Clair Intellectual Property Consultants, Inc. v.*
*Fuji Photo Film Co.*, 674 F. Supp. 2d 555 (D. Del. 2009).

threat of litigation, it has little relevance to the hypothetical reasonable royalty situation.")

(Rader, J.). With only minimal relevance to the reasonable royalty inquiry, the probative value

of such agreements is far outweighed by the unfair prejudice and juror confusion they would

likely create, thus they must be excluded. *Uniloc*, 632 F. Supp. 2d at 159 (excluding settlement

agreements and prohibiting damages expert from testifying about them under Rules 403 and

408); *Pioneer Corp. v. Samsung SDI Co.*, No. 06-cv-384, 2008 U.S. Dist. LEXIS 107079, at *18

(E.D. Tex. Oct. 2, 2008) ("Accordingly, this Court finds that even if negotiations, offers, and

agreements reached under the threat of litigation had some probative value, such value would be

too slight and clearly outweighed by the danger of unfair prejudice and confusion. Such evidence

is thus excluded under Rule 403.").

Licenses entered into to settle infringement disputes may also properly be excluded under

Rule 408. *See, e.g., Deere & Co.*, 710 F.2d at 1556-57 (affirming district court's decision that

license offer made after dispute had begun was inadmissible under Rule 408). Rule 408 provides

that a license agreement may be excluded from evidence "where it (1) was reached under a threat

of litigation, (2) arose in a situation where litigation was threatened or probable, or (3) was

negotiated against a backdrop of continuing litigation infringement." *Telcordia Techs., Inc. v.*

*Lucent Techs., Inc.*, C.A. Nos. 04-875-GMS, 04-876-GMS, 2007 WL 7076662, at *7 (D. Del.

Apr. 27, 2007) (quoting *Pharmastem Therapeutics, Inc. v. Viacell Inc.*, C.A. No. 02-148-GMS,

2003 WL 22387038, at *2 (D. Del. Oct. 7, 2003)). Because these agreements are not probative

of a reasonable royalty rate, and for the policy reasons undergirding Rule 408, expert testimony

based on such settlements should also be excluded. *See id.* (relying on Rule 408 and its

underlying policy to exclude patent licenses entered into in settlement of litigation, and

prohibiting parties or their experts from relying on such licenses to calculate reasonable royalty rate).

Indeed, this Court has previously barred attempts by Mr. Wagner to rely on license agreements entered into under the threat of or as a result of litigation. *See St. Clair*, 674 F. Supp. 2d at 555. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

3.       ████████████████████████ **Agreements Also Are Not Properly Considered Because They Entail Lump Sum Payments**

████████████████████████████████████████████████████

████████████████████████████████ The Federal Circuit has explained that "[s]ignificant differences exist between a running royalty license and a lump-sum license." *Lucent Techs.*, 580 F.3d at 1326. The second *Georgia-Pacific* factor must therefore take into account whether the licensor and licensee would hypothetically have agreed to a lump-sum or running royalty license. *Id.* Because the risks and benefits of each type of license are so different, only licenses using the same form of compensation—lump-sum or running royalty— should be used as comparable license agreements from which to derive a reasonable royalty. *Id.* (quoting Russell L. Parr, *Royalty Rates for Licensing Intellectual Property* 64 (2007)). Although it is theoretically possible that a lump-sum license could assist a jury in determining a reasonable running royalty rate, the party urging such a comparison must present "factual testimony explaining how a license agreement structured as a running royalty agreement is probative of a lump-sum payment to which the parties would have agreed." *Id.* at 1327. This necessarily calls for data about actual usage of the invention to convert the lump-sum into an approximate running

rate. Without this information, expert testimony about a lump sum amounts to speculation. *Id.*

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

With no factual findings explaining how these lump sums are probative of a running rate, Mr.

Wagner's testimony on this point essentially calls for the jury to speculate. It should be excluded

for the same reasons as expert testimony was excluded in *Lucent*: there, Lucent relied on license

agreements which are "radically different" from the hypothetical license to the patent-at-issue;

Lucent utterly failed to explain how lump-sum licenses are probative of running royalties; and

finally, the court concluded that this call to speculation about usage misleads the jury more than

assists it. *See id.* at 1326-28.

**4.      Even Assuming** ████████████████████

████████████████████████████ **Were Properly**
**Considered, They Factually Fail to Support a Royalty Rate of 2.5%**

The four data points used by Mr. Wagner fail to provide sufficient factual support for his

baseline royalty rate. ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████





Because these data points do not support a baseline royalty rate of 2.5%, Mr. Wagner's

testimony must be excluded. *See IP Innovation*, 2010 WL 986620, at *3 ("Another reason for

excluding Mr. Gemini's expert testimony is that he arbitrarily picked a royalty rate that is much

higher than the existing royalty rates for licenses to the patents-in-suit.").

### D.   MR. WAGNER'S EXPANSIVE USE OF THE BOOK OF WISDOM IS IMPROPER AND HIS TESTIMONY SHOULD BE EXCLUDED ON THAT BASIS

The book of wisdom allows for consideration of information arising after the date of the

hypothetical negotiation. But its application has limits, and Mr. Wagner has exceeded those

limits by relying on the demand for the patented feature arising at the tail end or after HP exited

the digital camera market to increase the royalty rate applied to the entire price of all HP digital

cameras.

The hypothetical negotiation aims to determine what the parties would have agreed to at

the time infringement began. "A reasonable royalty determination for purposes of making a

damages evaluation must relate to the time infringement occurred, and not be an after-the-fact

assessment." *Riles*, 298 F.3d at 1313. In some circumstances, however, the patent's value may

not be apparent at the time of the hypothetical negotiation. With the passage of time since the

hypothetical negotiation date, "[e]xperience is then available to correct uncertain prophecy."

*Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698 (1933). The Federal

Circuit has adopted this "book of wisdom" approach to post-negotiation evidence as probative of a reasonable royalty in certain circumstances. *See Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1575 (Fed. Cir. 1988), *overruled on other grounds by Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337 (Fed. Cir. 2004) (*en banc*). Significantly, however, "[t]o correct uncertain prophecies in such circumstances is not to charge the offender with elements of value non-existent at the time of his offense. It is to bring out and expose to light the elements of value that were there from the beginning." *Sinclair Refining*, 289 U.S. at 698.

The book of wisdom prevents the hypothetical negotiation method from determining a reasonable royalty at a point in time before the patent has proven its worth. *See Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 378 F. Supp. 2d 459, 466 (D. Del. 2005). It does not diminish the requirement that a hypothetical negotiation attempt to arrive at a rate the parties would have negotiated "*at the time the infringement began.*" *Riles*, 298 F.3d at 1312-13 (remanding for a re-determination of damages because expert's models assessed value at time of trial, and plaintiff "did not provide any evidence or testimony to show that [its expert's] models reflected what the parties might have agreed to, at any time, particularly at the time the infringement began") (emphasis added). "The key element in setting a reasonable royalty...is the necessity for return to the date when the infringement began." *Panduit*, 575 F.2d at 1158. Post-negotiation information is properly used only to test the reliability of assumptions about the hypothetical negotiators' states of mind. *See Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 767 n. 87 (Fed. Cl. 2004) (interpreting *Sinclair Refining* and *Georgia-Pacific* to mean "subsequent events may be used to test the reasonableness of assumptions used in projecting damages").

It is also necessary to page through the book of wisdom when the hypothetically negotiated license would have hinged on subsequent factual developments.  For example, in *Harris Corp. v. Ericsson Inc.*, there was evidence that the parties would have agreed initially to a 1.75% royalty rate for the first five years, and thereafter renewed the license at 0.5% rate.  417 F.3d at 1257.  Damages were only available for the time period after the 0.5% rate went into effect.  *Id.*  The district court set a blended royalty rate in between 1.75% and 0.5%, which the Federal Circuit reversed, holding that the "rate to apply is the one that would have been in effect during the period for which damages are available."  *Id.* at 1257-58.

Mr. Wagner's primary basis for increasing the royalty rate with respect to HP's digital cameras is the increase demand for video beginning in 2006 and increasing through today. Horwitz Decl., Ex. A, (Wagner Dep.) at 119:4-15.  This demand arose at the tail end of HP's involvement in the digital camera market.  Indeed, most of the evidence that Mr. Wagner cites in support of this increased demand is from 2007 to the present day.  As Mr. Wagner candidly admits, the driver of this increased demand is the Web 2.0 revolution, and specifically recent introduction and rapid growth of websites such as Facebook and YouTube.  *Id.*, Ex. B, (Wagner Report) at ¶ 184.  Certainly the explosion of such social networking and video sharing websites was not foreseeable at the time of the hypothetical negotiation, as evidenced by the fact that it took so many years for those sites to be created and adopted by the public. *See Sinclair Refining*, 289 U.S. at 698 (offender should not be charged with value not envisioned at the time of the negotiation); *Riles*, 298 F.3d at 1312-13 (damages should not be calculated based on value at time of trial, but rather based on value at time of negotiation).

Given that HP exited the digital camera design business in 2007, the Web 2.0 revolution's impact on the demand for video functionality in digital cameras cannot properly be

used as a basis to increase the royalty as to HP's digital cameras. To the extent that HP "benefitted" from the increased demand during 2006 and 2007, that benefit applied to only a small fraction of HP's total sales of digital cameras. As such, under Mr. Wagner's use of the book of wisdom, HP is forced to pay a significantly higher royalty rate on all of its sales, yet only a small fraction of its sales benefited from the increased demand. This result would completely undermine the intent of the hypothetical negotiation, which is to ascertain what the parties would have agreed to at the time infringement began. See *Riles*, 298 F.3d at 1313.

The Federal Circuit has explicitly barred the approach taken by Mr. Wagner of increasing the royalty rate based on events occurring after the hypothetical negotiation. For example, in *Integra Lifesciences I, Ltd. v. Merck KGaA*, Integra's expert based his royalty analysis, in part, on Merck's "1995 expectations of obtaining FDA approval." 331 F.3d 860, 870 (Fed. Cir. 2003), *rev'd on other grounds*, 545 U.S. 193 (2005). Merck's expectations in 1994, the year of the hypothetical negotiation, were uncertain because Merck had not yet conducted the research necessary to evaluate the likelihood of obtaining FDA approval. *Id.* The Federal Circuit rejected Integra's reliance on Merck's 1995 expectations, noting that the "value of a hypothetical license negotiated in 1994 could be drastically different from one undertaken in 1995." *Id.*

Mr. Wagner's misuse of the book of wisdom is much more egregious than in *Integra*. Rather than relying on a game-changing event that occurred only one year after the hypothetical negotiation, Mr. Wagner basis his opinion on the proliferation of social networks, which substantially increased the demand for video, beginning *six years* after the hypothetical negotiation.

E.    MR. WAGNER'S FAILURE TO USE A SEPARATE HYPOTHETICAL NEGOTIATION DATE FOR HP'S IPAQ HANDHELDS AND HIS USE OF UNRELIABLE DATA REQUIRES EXCLUSION OF HIS TESTIMONY

Mr. Wagner's testimony regarding HP's iPAQ handhelds must be excluded because he

fails to conduct his reasonable royalty analysis under the proper hypothetical negotiation date. "A reasonable royalty determination for purposes of making a damages evaluation must relate to the time infringement occurred." *Unisplay, S.A. v. American Electronic Sign Co., Inc.*, 69 F.3d 512, 518 (Fed. Cir. 1995) (citation omitted). Indeed, a "[t]he key element in setting a reasonable royalty...is the necessity for return to the date when the infringement began." *Panduit*, 575 F.2d at 1158; *see also Integra*, 331 F.3d at 870 (holding that the "correct determination of this date is essential for properly assessing damages"). "Because the determination of reasonable royalty damages is tied to the infringement being compensated for, reasonable royalties for a different infringement beginning at a different time may well be different from each other." *Applied Medical Res. Corp. v. United States Surgical Corp.*, 435 F.3d 1356, 1363 (Fed. Cir. 2006). As such, where the alleged infringement of two different products began at separate times, the reasonable royalty analysis for each must be conducted using different hypothetical negotiation dates. *Id.* at 1361-63 (rejecting argument that the sale of two different products should be treated as continuing infringement).

Mr. Wagner uses August 2000, the first date of alleged infringement for HP's digital cameras, as the hypothetical negotiation date for both HP digital cameras and iPAQ handhelds. Horwitz Decl., Ex. B, (Wagner Report) at ¶ 67. The date of first alleged infringement for HP's iPAQ handhelds, however, is 2004. *Id.* at ¶ 206. Mr. Wagner's analysis regarding the iPAQ handhelds thus fails to relate to the time infringement occurred and must be excluded. *See Applied Medical*, 435 F.3d at 1361-63.

In *Applied Medical*, the Federal Circuit made it clear that different products that have different dates of first infringement must be analyzed under separate hypothetical negotiation dates. *Id.* at 1362. U.S. Surgical argued that the infringement of the two products should be

considered continuing infringement and thus did not require separate analysis under different hypothetical negotiation dates. *Id.* at 1360. The Federal Circuit rejected this argument and held that to do so would fail to properly tie the damages analysis to the relevant period. *Id.* at 1362-63.

Mr. Wagner's opinions regarding HP's accused iPAQs are also flawed because he relies on two admittedly unreliable surveys to increase the royalty rate. During his deposition, Mr. Wagner testified he was aware of only two pieces of evidence that isolated demand for video. Horwitz Decl., Ex. A, (Wagner Dep.) at 84:13-23. One was the market survey performed by Jeffrey Stitt, conducted in 2009, aimed at measuring how much consumers were presently willing to pay for video functionality in cell phones. *Id.* at 84:24-85:4. During his deposition, Mr. Wagner admitted that he did not find Mr. Stitt's survey reliable because the "numbers seemed fairly high to [him] in [his] judgment." *See id.* at 85:20-86:7; *see also* HP's Motion to Exclude the Testimony of Jeffrey Stitt. The other data point was a 2008 Strategy Analytics report, also designed to test "consumers' willingness to pay for certain capabilities on mobile phones." *Id.*, Ex. B, (Wagner Report) at ¶ 287; Ex. A, (Wagner Dep.) at 84:13-23. But again Mr. Wagner took issue with the reliability of that report. *Id.*, Ex. A, (Wagner Dep.) at 85:5-10. Nevertheless, despite expressing concern, Mr. Wagner testified that these two reports were the primary basis for his upward adjustment of the royalty rate as to iPAQs. *Id.* at 94:20-24.

Because Mr. Wagner failed to use a separate hypothetical negotiation date for the accused iPAQ handhelds and uses admittedly unreliable data, his testimony as to those devices lacks the necessary tie to the relevant period for determining a reasonable royalty, and therefore must be excluded. *See Applied Medical,* 435 F.3d at 1361-63; *Unisplay,* 69 F.3d at 518.

## IV.   **CONCLUSION**

For the foregoing reasons, HP respectfully submits that testimony of Michael Wagner

must be excluded.


OF COUNSEL:

Charlene M. Morrow
FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
Tel: (650) 988-8500

Heather N. Mewes
David D. Schumann
Bryan A. Kohm
Jeffrey V. Lasker
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Tel: (415) 875-2300

Dated:  April 12, 2010

**Public Version Dated:
April 19, 2010**

POTTER ANDERSON & CORROON LLP


By:  _/s/ David E. Moore_
      Richard L. Horwitz  (#2246)
      David E. Moore (#3983)
      Hercules Plaza, 6th Floor
      1313 N. Market Street
      Wilmington, DE 19899-0951
      Tel:  (302) 984-6000
      rhorwitz@potteranderson.com
      dmoore@potteranderson.com

*Attorneys for Defendant
Hewlett-Packard Company*