# EXHIBIT 1

```
                                                                    1

1                 IN THE UNITED STATES DISTRICT COURT
                  IN AND FOR THE DISTRICT OF DELAWARE
2
                              - - -
3    ST. CLAIR INTELLECTUAL                    CIVIL ACTION NO.
     PROPERTY CONSULTANTS, INC.,          :
4                                         :
                Plaintiff,                :
5           v.                            :
                                          :
6    SAMSUNG ELECTRONICS CO., LTD., et al,:
                                          :   04-1436-LPS
7               Defendants.               :
     ------------------------------------
8    ST. CLAIR INTELLECTUAL                    CIVIL ACTION NO.
     PROPERTY CONSULTANTS, INC.,          :
9                                         :
                Plaintiff,                :
10          v.                            :
                                          :
11   SIEMENS AG, et al,                   :
                                          :   06-403-LPS
12              Defendants.               :
     ------------------------------------
13   ST. CLAIR INTELLECTUAL                    CIVIL ACTION NO.
     PROPERTY CONSULTANTS, INC.,          :
14                                        :
                Plaintiff,                :
15          v.                            :
                                          :
16   LG ELECTRONICS, INC., et al,         :
                                          :   06-404-LPS
17              Defendants.               :
     ------------------------------------
18                            - - -
19
                         Wilmington, Delaware
20                       Tuesday, April 19, 2011
                         TELEPHONE CONFERENCE
21
                              - - -
22
     BEFORE:    HONORABLE LEONARD P. STARK, U.S.D.C.J.
23
                              - - -
24
25   (Captions continued on Page 2)
```

2

```
 1   ST. CLAIR INTELLECTUAL            CIVIL ACTION NO.
     PROPERTY CONSULTANTS, INC.,       :
 2                                     :
            Plaintiff,                 :
 3       v.                            :
                                       :
 4   RESEARCH IN MOTION, et al,        :
                                       :    08-371-LPS
 5          Defendants.                :
     ------------------------------------
 6   ST. CLAIR INTELLECTUAL            CIVIL ACTION NO.
     PROPERTY CONSULTANTS, INC.,       :
 7                                     :
            Plaintiff,                 :
 8       v.                            :
                                       :
 9   FUJIFILM HOLDINGS CORPORATION, et al,:
                                       :    08-373-LPS
10          Defendants.                :
     ------------------------------------
11
     APPEARANCES:
12
13              RICHARDS, LAYTON & FINGER, P.A.
                BY:  LAURA D. HATCHER, ESQ.
14
                     -and-
15
                SEITZ, VAN OGTROP & GREEN, P.A.
16              BY:  PATRICIA P. McGONIGLE, ESQ.
17                   -and-
18              RADER, FISHMAN & GRAUER, PLLC
                BY:  R. TERRANCE RADER, ESQ.,
19                   CHARLES W. BRADLEY, ESQ., and
                     GLENN E. FORBIS, ESQ.
20                   (Bloomfield Hills, Michigan)
21                   Counsel on behalf of Plaintiff
                     St. Clair Intellectual Property
22
23
24
25                   Brian P. Gaffigan
                     Registered Merit Reporter
```

3

```
 1   APPEARANCES:  (Continued)
 2
 3              POTTER ANDERSON & CORROON, LLP
                BY:  RICHARD L. HORWITZ, ESQ.
 4
                     -and-
 5
                FENWICK & WEST
 6              BY:  VIRGINIA K. DeMARCHI, ESQ.
                     (Mountain View, California)
 7
                     Counsel for Hewlett-Packard
 8
 9              MORRIS NICHOLS ARSHT & TUNNELL, LLP
                BY:  JULIA HEANEY, ESQ.
10
                     -and-
11
                KING & SPALDING, LLP
12              BY:  ALLISON H. ALTERSOHN, ESQ.
                     (New York, New York)
13
                     Counsel for Nokia Inc. and
14                   Nokia Corporation
15
                YOUNG CONAWAY STARGATT & TAYLOR, LLP
16              BY:  KAREN E. KELLER, ESQ.
17                   -and-
18              MORRISON FOERSTER
                BY:  M. ANDREW WOODMANSEE, ESQ., and
19                   GREGORY W. REILLY, ESQ.
                     (San Diego, California)
20
                     Counsel on behalf of Kyocera Wireless
21                   Corp., Kyocera Communications, Inc.,
                     and Palm Inc
22
23              CONNOLLY BOVE LODGE & HUTZ, P.A.
                BY:  KEVIN F. BRADY, ESQ.
24
                     and
25
```

4

```
 1   APPEARANCES:  (Continued)
 2
 3              WILMER HALE CUTLER PICKERING & DORR, LLP
                BY:  DOMINIC E. MASSA, ESQ., and
 4                   KEVIN S. PRUSSIA, ESQ.
                     (Boston, Massachusetts)
 5
                     Counsel on behalf of Research in Motion
 6
 7              ASHBY & GEDDES, P.A.
                BY:  JOHN G. DAY, ESQ.
 8
                     -and-
 9              STEPTOE & JOHNSON, LLP
                BY:  HUAN-YI LIN, ESQ.
10                   (Los Angeles, California)
11                   -and-
12              STEPTOE & JOHNSON, LLP
                BY:  THOMAS G. PASTERNAK, ESQ.
13                   (Chicago, Illinois)
14                   Counsel on behalf of HTC Corporation
                     (formerly known as High Tech Computer
15                   Corp.), HTC (BVI) Corp. and HTC
                     America, Inc. (formerly known as HTC
16                   USA Inc.) NTC Corporation
17
18              ASHBY & GEDDES, P.A.
                BY:  JOHN G. DAY, ESQ.
19                   -and-
20              ORRICK, HERRINGTON & SUTCLIFFE
                BY:  STEVEN J. ROUTH, ESQ., and
21                   STEN A. JENSEN, ESQ.
                     (Washington, District of Columbia)
22
                     Counsel for Fujifilm
23
24
25
```

5

```
 1                          - oOo -
 2              P R O C E E D I N G S
 3              (REPORTER'S NOTE:  The following telephone
02:17:69  4   conference was held in chambers, beginning at 2:19 p.m.)
02:17:19  5        THE COURT:  Good afternoon everybody.  This is
02:18:15  6   Judge Stark.  Who is there, please?
02:18:54  7        MS. McGONIGLE:  Good afternoon, your Honor.
02:16:57  8   Patty McGonigle of Seitz, Van Ogtrop & Green, Delaware
02:13:02  9   counsel for St. Clair in the Samsung case.
02:19:04 10        THE COURT:  Okay.
02:19:07 11        MS. HATCHER:  Good afternoon, your Honor.  Laura
02:19:08 12   Hatcher from Richards, Layton & Finger.  I'm Delaware
02:19:11 13   counsel for plaintiff in the remaining cases.  We also have
02:19:14 14   co-counsel on the line.
02:19:16 15        THE COURT:  Okay.
02:19:16 16        MR. RADER:  Yes, your Honor.  Good afternoon.
02:19:17 17   This is Terry Rader, Glenn Forbis, and Charlie Bradley for
02:19:24 18   St. Clair in these cases before you this afternoon.
02:19:27 19        THE COURT:  Okay.
02:19:30 20        MS. HEANEY:  For Nokia, this is Julie Heaney and
02:19:35 21   Allison Altersohn of King & Spalding is on.
02:19:40 22        MS. KELLER:  Good afternoon, your Honor.  Karen
02:19:42 23   Keller from Young Conaway.  Drew Woodmansee and Greg Reilly
02:19:44 24   from Morrison & Foerster on behalf of the defendants, Palm
02:19:46 25   and Kyocera.
```

6

1     (Unidentified speaker): Good afternoon, your
2  Honor.
3        THE COURT: Good afternoon.
4        MR. HORWITZ: Your Honor, this is Rich Horwitz
5  at Potter Anderson for HP. With me is Virginia DeMarchi
6  from Fenwick & West.
7        MR. BRADY: Good afternoon, your Honor. Kevin
8  Brady for Connolly Bove. With me on the line is Dominic
9  Massa and Kevin Prussia from Wilmer Cutler for Research in
10 Motion.
11       THE COURT: Okay.
12       MR. DAY: Good afternoon, your Honor. John Day
13 from Ashby & Geddes as Delaware counsel for two groups of
14 defendants, Fujifilm and HTC. With me for Fujifilm are
15 Steve Routh and Sten Jensen from Orrick, Herrington &
16 Sutcliffe in the DC office. And for HTC, Huan-Yi Lin and
17 Thomas Pasternak from Steptoe & Johnson; Huan-Yi from Los
18 Angeles, Tom from Chicago.
19       MR. PASTERNAK: Good afternoon, your Honor.
20       THE COURT: Good afternoon. Is there anybody
21 else?
22       I am here with a court reporter. For the
23 record, this is the various St. Clair cases, including St.
24 Clair versus Samsung et al, Civil Action No. 04-1436-LPS,
25 and the related actions, all of which are addressed in the

7

1  letter to the Court of April 14th, 2011, that came in under
2  the signature of Mr. Cottrell on behalf of all of the
3  parties.
4        This is another status conference at which I
5  am looking for a better understanding of the parties'
6  suggestions as to how the Court should proceed in light of
7  all of the recent developments, including most particularly
8  the ruling from the Federal Circuit in the Fuji case as well
9  as the pending motion to recuse as well as the defendants
10 request that the recusal motion be withdrawn.
11       So I'll hear first from the plaintiff and then
12 turn to the defendants.
13       Go ahead, please, whoever is speaking for St.
14 Clair.
15       MR. RADER: Yes, your Honor. Again, this is
16 Terry Rader speaking for St. Clair.
17       I wanted to first go directly to the letter that
18 we presented with the defendants jointly and cover the St.
19 Clair portion. To do that, I think the best place to start
20 is your Honor's order dated March 28, 2010, which is at
21 docket number 761 in the Samsung case and appears at other
22 docket numbers in the other three cases that we're going to
23 be discussing here today.
24       Specifically, in that order, the Court was
25 addressing the issue of whether there should be a stay of

8

1  the cases, and whether there should be certification for
2  interlocutory appeal. During the presentations made to the
3  Court in connection with that motion, on page 6, the Court
4  takes note of the fact that St. Clair had contended in that
5  motion process that even if the Federal Circuit in the
6  Fujifilm I appeal construes the claim terms differently than
7  this Court has, that ruling will not be dispositive in the
8  instant actions since St. Clair may still be able to prove
9  infringement under a different construction. That is what
10 St. Clair contended to the Court, and the Court noted that
11 on page 6 of its order.
12       On page 7 of the order, your Honor, you
13 specifically stated that: "Moreover, even if the Federal
14 Circuit construes the claims differently than this Court has
15 done, it is not clear that such a ruling would be case
16 dispositive. Whether some or all defendants' accused
17 devices infringe under alternative constructions appears to
18 be a disputed issue."
19       You specifically footnoted and commented on the
20 specific arguments that had been made by the defendants prior
21 to your order that St. Clair had allegedly conceded that it
22 cannot prove infringement under the PTO's construction; and,
23 of course, the Court pointed out -- you pointed out that St.
24 Clair vehemently denies it has done so, and you gave record
25 citations for that.

9

1        So we, of course, now are faced with an
2  alternative construction. At the time you issued that
3  order, the background of this case had been, there had been
4  a verdict of infringement in the Sony case using this
5  construction. There had been a verdict of infringement in
6  the Canon case using this claim construction. There had
7  been a verdict of infringement in the Fujifilm I case using
8  this claim construction.
9        In fact, I want to add a few other points
10 regarding the background. As the Court will remember, after
11 the St. Clair -- after the Canon and Fujifilm I verdicts
12 were entered, there was a case that was brought regarding
13 ownership of the patents in suit which went on for several
14 years. Furthermore, there was a PTO reexamination process
15 that started in 2005.
16       To address some of the positions that have
17 been taken by the defendants here, at one point in time in
18 which the appeal was taken, actually, St. Clair and the
19 Court believed that the claim construction that had been
20 gone to trial on three separate occasions, and only one of
21 those cases was appealed, the other two were not, and the
22 fact that it had withstood other challenges to title and
23 withstood the Patent Office reexamination proceeding, with
24 the claims of the patents coming through unscathed, and
25 the Court's recognition, your recognition that the claim

10

1   construction that you had entered in November of 2009
2   was clearly different than what the PTO had done in the
3   reexamination.
4           At that point in time, there was no reason to
5   even present or take discovery on an alternative theory of
6   infringement based upon a different claim construction
7   because it would have been a waste of the parties and
8   potentially a waste of the parties and the Court's resources.
9           I also want to point out this point that I think
10  is relevant here, your Honor. At the time that Fujifilm
11  finally did file its notice of appeal -- and that wasn't
12  until December 15, 2009 -- St. Clair had no reason to
13  believe that the only basis for the appeal was going to be
14  on the claim construction order. In fact, the appeal, as
15  the Court knows, was from the verdict of infringement that
16  had been entered against Fujifilm, and so clearly by the
17  time all the things I had just described had taken place,
18  in December of 2009, St. Clair could reasonably believe, as
19  it did, that Fujifilm would go to some other issue from the
20  verdict and deal with that rather than the issue of the
21  claim construction.
22          So that's the background information that I
23  think is relevant to what we're dealing with here.
24          Clearly, it was understood that if it turned out
25  that the Court of Appeals for the Federal Circuit changed

11

1   the claim construction, that St. Clair would be given the
2   opportunity to pursue an alternative theory of infringement,
3   if that was possible.
4           So now I want to turn to the claim construction
5   that the CAFC did render. I think the best place to
6   identify is on page 7 of the -- first, I want to point out,
7   as the Court already knows, this was a two-to-one decision.
8   So we won't be able to argue about whether you were right or
9   wrong, but at this point in time, it should be noted that
10  this was not an unequivocal, clear decision by the Court of
11  Appeals.
12          Secondly, the finding of the Court of Appeals
13  probably is best stated on page 7, when it is describing
14  what its claim construction means, it states: When a user
15  selects a format, he makes the decision based on the desired
16  architecture, not a particular data format.
17          We have the belief and we believe that this
18  construction -- now that the Federal Circuit has ruled on
19  this, we believe that this claim construction is infringed
20  by camera phones and by smart phones. Just to give the
21  Court some feel for what that position on infringement is,
22  we would point out that when you put -- and we'll use just
23  the JPEG image file. When you put that in a text message to
24  another phone, a computer architecture, you use an MMS file
25  to do that, so that is a different -- that is one file

12

1   format, whereas if you put the JPEG image into an e-mail to
2   a PC, which is a different computer architecture, you use a
3   specific file format to allow that image to be transmitted.
4   And then,
5           Thirdly, if you take the JPEG file and you use it
6   with a PC, it could be stored on a removable card or memory;
7   and if the device is not removable, it can be downloaded to
8   the computer architecture by way of a USB cable or a Bluetooth
9   connection.
10          So that in a very broad description, your Honor,
11  is the basis upon which we said in our letter that we actually
12  think that the ruling by the Court of Appeals presents us with
13  a good case of infringement, certainly, with respect to camera
14  phones and/or smart phones.
15          So that brings us to the recommendation that we
16  have to the Court about scheduling. I think I have covered
17  the other items, but the scheduling issue is something that
18  we think that needs to be addressed in the following way:
19          As the defendants suggest, it could be the
20  decision of the Court that we go directly to a motion for
21  summary judgment. But we feel that that would not be the
22  proper way to go. Because at this point in time, the
23  defendants would be making a motion for summary judgment
24  on a theory of infringement that hasn't been completely
25  articulated other than what I just said. We obviously would

13

1   respond to the summary judgment motion with expert testimony
2   and evidence showing why the claim construction ruling of
3   the CAFC provides us a continuing basis of infringement with
4   respect to the smart phones and camera phones.
5           Our proposal would be to, instead, add
6   discovery. I would preface this by saying that -- which is
7   not included in the letter, your Honor. I would preface
8   this by saying that St. Clair is willing to present what
9   amounts to a preliminary expert report to the defendants
10  which would be based upon available information, and that we
11  then take a very limited amount of discovery to determine
12  which of these cellphones -- I'm sorry -- camera phones and
13  smart phones would be potentially at risk in connection with
14  that preliminary infringement contention, and then we have
15  discovery on function and structure with respect to that
16  theory and then, at the same time, update the damages issue
17  where appropriate, then go through with the process of
18  expert reports where the defendants then have an opportunity
19  to actually attack our theory of infringements formally
20  through their own expert testimony, and then we go through
21  the motion for summary judgment.
22          We're not suggesting that we have a drawn out
23  protracted process here. We want to keep it as compact as
24  possible. We are representing to the Court and to the
25  defendants that we don't intend to make any claims that

14

1 are not clearly supported within this contention theory that
2 we know exists. So we're willing to -- we think that this
3 process is going to make it easier for the parties and for
4 the Court in getting down to the point where an issue of
5 whether the CAFC decision is fully dispositive of everything
6 can be addressed appropriately.
7 So I think that more or less summarizes where we
8 are here, your Honor.
9 THE COURT: Do you believe that the issue of
10 what the impact of the Federal Circuit's decision is on the
11 cases here in this court, that in order for me to reach that
12 issue, I need to let you have further discovery, or ...?
13 I understand that is your preference, but if I allow the
14 defendants to move for summary judgment on the grounds that
15 there is really nothing left here to do, there is no factual
16 disputes, just apply the Federal Circuit order to the record
17 here, that you will still have the ability to make the
18 argument that you have sketched out for me today?
19 MR. RADER: Well, certainly, your Honor, we
20 could make the argument that we sketched out today. I
21 mentioned that as well. That if we made that argument in
22 response to motion for summary judgment, we may, under
23 Rule 56(f), depending on what the defendants say, we may be
24 required to take some limited discovery on some issue that
25 they raise as part of this, because I don't know that they

15

1 have a full understanding of our position. It's simple
2 enough to understand, I believe, but I don't know that.
3 Also, the technical details of what I just
4 described would seem to be more appropriate to have some, at
5 least, expert input on. We certainly would object to or
6 respond to any motion for summary judgment with a detailed
7 report on why we should have infringement, not that we
8 shouldn't have infringement.
9 So we would try to look for a way to make it
10 possible for us to help not only the defendants in this
11 effort but also the Court, because if we go through the
12 process of a motion for summary judgment without any
13 discovery at all, then it would seem that it's more likely
14 than not that we're going to be able to raise factual issues
15 on infringement that would preclude summary judgment. Then
16 the defendants, they have to proceed forward with our expert
17 and the evidence as if it was the evidence that is going to
18 be presented at trial, whereas what we're proposing gives
19 them an opportunity to challenge the technical aspects of
20 what we intend to present on infringement and gives them a
21 better opportunity to present that to the Court and for the
22 Court to make a more informed decision at the end of the
23 process on whether summary judgment should be granted or not.
24 THE COURT: Mr. Rader, I don't believe you
25 commented on recusal. Where do you think we are on that

16

1 issue?
2 MR. RADER: My understanding, based on the
3 withdrawal today, is that there is no longer any issue of
4 recusal present.
5 THE COURT: Do you believe there is any issue as
6 to whether they can withdraw that motion?
7 MR. RADER: I don't think so, your Honor. I
8 mean I'm not an expert in that area, but it seems to me that
9 they have withdrawn it and it's done.
10 THE COURT: Let me hear from defendant or
11 defendants. Clue me in as to whether you all intend to
12 speak or if it's just one of you.
13 MS. ALTERSOHN: Good afternoon, your Honor.
14 It's Allison Altersohn from King & Spalding. I represent
15 Nokia. I have been asked to speak on behalf of most of --
16 on behalf of all of the defendants here. My co-counsel are
17 on the phone and I expect that if they want to, they will
18 speak up.
19 THE COURT: Hopefully, they won't need to, but
20 you go ahead first.
21 MS. ALTERSOHN: I wanted to address first,
22 Mr. Rader mentioned your Honor's prior order with regard to
23 the motion to stay and whether or not the issues decided
24 there would be dispositive -- whether or not a change in
25 the claim construction would be dispositive. It is the

17

1 defendants' position that based on the Federal Circuit's
2 decision that it has been shown that the case would be
3 dispositive. That there are two important points to mention
4 that came out of the Federal Circuit's decision.
5 First of all, the Federal Circuit rejected
6 some critical aspects of the claim construction that had
7 been advanced by St. Clair and actually agreed with Fuji's
8 construction for the multiple file format terms. Those
9 terms are nearly identical to the claim construction that
10 was argued by the defendants in these cases. That in view
11 of the current claim construction by the Federal Circuit,
12 the Federal Circuit then went on to direct a judgment of
13 noninfringement as a matter of law of all asserted claims in
14 favor of Fuji.
15 It is the defendants' position based solely on
16 the Federal Circuit's decision that St. Clair's contention
17 in these cases are indistinguishable from its contentions
18 against the defendants in Fuji and, for the same reason, the
19 outcome should be the same.
20 So, your Honor, as we submitted in our letter,
21 what we're seeking here is the same opportunity to quickly
22 dispose of these cases now, which Mr. Rader admitted has
23 been going on with a number of defendants for six/seven
24 years at this point.
25 It's somewhat puzzling how St. Clair could

18

1 contend that the Federal Circuit's decision on that claim
2 construction that it fought against for seven years somehow
3 now makes its case even stronger and, at the same time, it's
4 now unnecessarily trying to reopen fact discovery, expert
5 discovery when it sounded like they have admitted right now
6 that they could even give us preliminary expert reports
7 based on the available information, what they have, and
8 would be able to respond to summary judgment motions with a
9 possibility of maybe wanting to submit a 56(d) affidavit to
10 the extent there are any issues raised by the defendants'
11 motion that they need additional facts.
12       We're unclear what those facts could be at this
13 point, but it sounds like the proper vehicle is that we
14 could submit and dispose of this case on summary judgment
15 at this point; and if the need arises that St. Clair feels
16 there are additional facts that arise by the defendants'
17 papers that it hasn't had the opportunity to take, that it
18 could do that through a 56(d) affidavit.
19       THE COURT: Ms. Altersohn, let me interrupt you
20 for a second.
21       So just to be clear, notwithstanding what you
22 heard from Mr. Rader and how St. Clair would intend to respond
23 to a motion for summary judgment from the defendants, it is
24 the defendants' preference to get leave to go ahead and file
25 that motion for summary judgment, recognizing that what you

19

1 are going to get in response apparently is some sort of
2 technical expert report and other perhaps suggestions that
3 additional discovery is necessary at that point. So just
4 to be clear, you would like to file the motion and see what
5 response you get rather than have discovery and then file
6 the motion; correct?
7       MS. ALTERSOHN: Correct, your Honor. It's the
8 defendants' position that when this case was stayed pending
9 the outcome of the Federal Circuit's decision, the cases
10 were essentially ready for trial. Discovery was completed,
11 expert reports were exchanged, and all the pretrial papers
12 were even submitted to the Court.
13       During that whole process, St. Clair, they
14 only advanced one theory of infringement. That was the
15 accused product infringed because it permits a user to
16 make a selection between a still and a video. The Federal
17 Circuit determined that theory falls as a matter of law.
18 The defendants plan to submit summary judgment papers on
19 that basis, based on the Federal Circuit's decision.
20       I mean we view this, that the Federal Circuit's
21 decision shouldn't be any different than if the Court issued
22 its claim construction order on the eve of trial. In that
23 scenario, the parties would have been expected to proceed
24 based on the positions they have advanced to date, and that
25 would not necessitate a need for additional discovery.

20

1       MR. MASSA: Your Honor, I'm sorry. This is
2 Dominic Massa on behalf of RIM. If I just might interject.
3       I just wanted to provide a couple of specific
4 dates to really highlight this argument and to highlight why
5 St. Clair's suggestion they would provide an expert report
6 in opposition to summary judgment is inappropriate.
7       In the action which RIM is involved and most of
8 the defendants, the expert reports were submitted in January
9 of 2010. Judge Farnan did not enter the claim construction
10 order until July of 2010. So the expert reports submitted
11 by St. Clair purposefully did not address the defendants'
12 claim construction position, although they were aware of
13 that position for over seven years in some instances. They
14 chose to only enter an expert opinion of infringement under
15 their own construction.
16       Under Rule 26, they were obligated to provide
17 all their infringement theories, particularly because claim
18 construction was an open issue until July of 2010. So we
19 would submit that they cannot change their infringement
20 theory now and that a supplemental expert report providing
21 an entirely new theory at this point would be inappropriate.
22       THE COURT: Ms. Altersohn.
23       (Unidentified Speaker): Your Honor --
24       THE COURT: I want to go back to Ms. Altersohn
25 unless she is done.

21

1       Ms. Altersohn, did you want to address any of
2 the other issues? I know I asked you a question.
3       MS. ALTERSOHN: I'm sorry, your Honor. One
4 other point that I would like to raise is St. Clair I don't
5 think has given a good reason, much less good cause, for
6 why it needs to reopen fact discovery. The defendants
7 have expended literally millions of dollars fighting these
8 cases for six/seven years now. St. Clair has had the ample
9 opportunity to take extensive discovery from defendants,
10 including access to the defendants' source code, technical
11 documents, technical employees.
12       There is no question of fact here as to the
13 operation of these products. For the defendants to now have
14 to suffer the burden and expense of additional discovery
15 because St. Clair chose to only rest its entire case on
16 its own claim construction as opposed to the alternative
17 constructions, as Mr. Massa mentioned they were well aware
18 of, that should not fall on the defendants. It would be
19 unfair.
20       THE COURT: Ms. Altersohn, before I turn it over
21 to your colleague, address for me where we are on recusal.
22 I'm not sure that you can just go ahead and withdraw your
23 motion at this point given the substantive issues that you
24 raised, but tell me what your view is as to where we are on
25 the recusal.

---

**22**

1    MS. ALTERSOHN: Your Honor, the Nokia defendants
2  joined that motion, so I'll leave it to co-counsel.
3    THE COURT: All right. I will give co-counsel a
4  minute or so to address whatever they wish. Mr. Massa, I
5  guess you already have spoken up, so is there anything else
6  you wish to address?
7    MR. MASSA: No. Thank you, your Honor.
8    I apologize for speaking out of order there.
9    THE COURT: Who wants to go next?
10    MR. ROUTH: Your Honor, this is Steve Routh for
11  Fujifilm.
12    THE COURT: Go ahead.
13    MS. ROUTH: Fujifilm is in a little different
14  position than the other defendants. We agree with
15  everything Ms. Altersohn said. However, we have 120-some
16  accused products that have been accused by St. Clair in
17  this case. None of them are camera phones or smart phones,
18  they're all digital cameras. We understand that St. Clair
19  now concedes there is no infringement by digital cameras or
20  by any of the Fujifilm digital cameras. So we submit for
21  the Fujifilm case, the only appropriate thing that needs to
22  be done now is for judgment to be entered in favor of
23  Fujifilm. We don't need a summary judgment procedure.
24    On the issue of recusal, your Honor, I apologize.
25  I have not researched the issue of withdrawal, but we have

---

**23**

1  withdrawn the motion. We don't intend to pursue the motion.
2  The reason as stated in the withdrawal is that the Federal
3  Circuit's decision fundamentally changes the posture in the
4  case in a way that alleviates the concerns that my client
5  had that led to the motion for recusal.
6    THE COURT: But, Mr. Routh, what if it doesn't?
7  We've heard from Mr. Rader that he has a theory that
8  infringement at least is still alive and well. So assume
9  for the moment that he is right about that. Obviously, I'm
10  not saying. I don't know.
11    Would I then anticipate that I will get the
12  recusal motion again down the road if it turns out Mr. Rader
13  is correct that his client still can proceed on this
14  infringement theory?
15    MR. ROUTH: No, your Honor, not from Fujifilm.
16  I want to make this point clear. What has changed in our
17  mind is not the nature of the proceedings that are required
18  but the fundamental question that is before the Court.
19    When we filed the motion to recuse, the Court
20  was going forward to a trial on a claim construction that
21  the Court had superintendent mediations on and settlements,
22  and the Court had received information relating to infringe-
23  ment under that claim construction and a superintended
24  confession by other defendants on that claim construction.
25    The concern was that in proceeding to a trial

---

**24**

1  against Fujifilm on that same claim construction, the
2  Court might, without intent, have or be perceived as having
3  understandings and views as to how a defendant should be
4  behaving in that circumstance or what the outcome should be
5  under some rough sense of justice.
6    The claim construction has now changed. The
7  Court is no longer, I wouldn't expect, looking at this case
8  and saying, in any way, shape or form, why wouldn't Fujifilm
9  see things the way that another defendant might or make
10  concessions that another defendant made because we now have
11  a claim construction that changes fundamentally the posture
12  of the case.
13    From our perspective, we no longer have --
14  it's not simply that we think there is less needed from the
15  Court. That is really not it at all. It's that the Court
16  would no longer operate with those mediations as the back-
17  drop of ours, because we have a completely different claim
18  construction. It would almost be as if there was a
19  different patent in the case. We wouldn't view that as
20  having any relevance to the Court's ability to preside
21  over the case at all. That is why we have withdrawn the
22  motion and have no intent to pursue it regardless of what
23  proceedings the Court decides are necessary to resolve any
24  issues with Fujifilm.
25    THE COURT: Of course, the standard on your

---

**25**

1  recusal motion is what a reasonable objective observer would
2  think about the fairness of the proceedings.
3    I take it, your further position at this point
4  is that such a reasonable observer would agree with Fuji
5  that in light of the new claim construction, that reasonable
6  observer would no longer have a basis to question the
7  impartiality of proceedings in front of me?
8    MR. ROUTH: Yes. That is our position, your
9  Honor.
10    THE COURT: Finally, Fuji, do you have outstanding
11  I guess counterclaims or claims pending against the plaintiff?
12    MR. ROUTH: We have declaratory judgment
13  counterclaims that we would dismiss with dismissal of the
14  plaintiff's claims.
15    THE COURT: Thank you.
16    Are there any other defendants that wish to be
17  heard?
18    I'll take silence as a no.
19    Mr. Rader, briefly, do you have anything you
20  wish to add?
21    MR. RADER: Yes. First, I wanted to mention
22  that the appeal decision from the CAFC was in connection
23  with Fuji I, which is obvious, but the only product that
24  was involved in that appeal were digital cameras. We have
25  already looked at the order your Honor entered in March of

## 26

1  2010 which potentially contemplates that if there was a
2  change in the claim construction that had been in existence
3  through three trials, and all of which found infringement,
4  that there would be an opportunity for St. Clair to present
5  an alternative theory of infringement.
6      Obviously, we have told the Court and the
7  defendants that, based on the claim interpretation that
8  the CAFC has declared, we're not going to proceed against
9  digital cameras but instead we believe very much we have a
10  claim of infringement against smart phones and camera phones.
11      Another point, your Honor. In the February 2010
12  order of Judge Farnan, that was preceded by -- as you well
13  know, that was preceded in November of 2009 by your own
14  report and recommendation on claim construction which was
15  the same as what you had earlier given. So when St. Clair
16  filed its expert report, again, it was looking at the same
17  claim construction that had been used consistently by the
18  Court through three trials. Therefore, there was no reason
19  for St. Clair to espouse a different theory of infringement
20  in its expert reports of January 2010 after receiving your
21  November 2009 confirmation that the same claim construction
22  was going to apply.
23      Furthermore, as I pointed out before, these
24  cases that we're talking about here today weren't even filed
25  until after the Canon and Fujifilm I verdicts from the

## 27

1  jury's finding infringement had been rendered. These cases
2  were filed then in November of 2004 and then, thereafter, I
3  mean we had this issue of the title challenge and the PTO
4  and examination process.
5      So the claim construction, there was no reason
6  for any of us to believe, which is what you said and what
7  we said and even what the other side alluded to in their
8  position, there is no reason for us to believe that there
9  was going to be any change, but if there was going to be a
10  change, that we would have the opportunity to present
11  another theory of infringement if it existed at that time.
12  We suggest that it does.
13      So I think those are our additional points we
14  would want to make, your Honor.
15      THE COURT: With respect to Fuji, Mr. Rader, you
16  are prepared to work with them to propose an order with
17  respect to a final judgment in their case; is that correct?
18      MR. RADER: That's correct, your Honor. I want
19  to apologize to the Court and to Fujifilm. As can be
20  appreciated, we're coming into this just recently. It was
21  my belief that in the Fujifilm II case, that it wasn't just
22  digital cameras; but we have -- I already talked to Steve
23  about the confirmation and verification of that, and I
24  think that should be a very easy thing to do, and we can,
25  upon that, dismiss the claims and counterclaims.

## 28

1      THE COURT: Well, this is all very helpful. Let
2  me tell you how we're going to proceed here.
3      First, with respect to Fuji, in light of the
4  Federal Circuit ruling, I am directing Fuji and St. Clair
5  to work together and to get a proposed form of order to the
6  Court by the end of this week, which I anticipate would take
7  care of that dispute between them which it seems has -- and
8  it seems to be agreed -- has been resolved by the Federal
9  Circuit.
10      Next, as I sort of suggested in my questioning,
11  the issue of recusal in my mind cannot be just made to
12  disappear simply by virtue of the defendants now seeking to
13  withdraw their recusal motion.
14      Having reviewed the recusal papers when they
15  were filed, I think it is fair to say at minimum that it
16  was a nonfrivolous motion and, therefore, may need some
17  attention from the Court notwithstanding the recent
18  developments.
19      But I, just like counsel on the phone, I don't
20  know what law or precedent there is for withdrawing a
21  recusal motion, and I'm going to need the parties to look
22  into that and give me some assistance on that. So what I
23  am directing that the parties do is file letter briefs
24  with respect to whether or not the recusal motion can, and
25  should be, withdrawn in the circumstances here. One of

## 29

1  those circumstances being, as I understand it, that all the
2  parties now wish to withdraw that motion.
3      I would like to have an opening letter brief not
4  to exceed five pages due on May 2nd, and an answering letter
5  brief not to exceed three pages one week after that May 9th.
6      All parties are hereby authorized to file these
7  letter briefs. If you all can do it in one five-page and
8  three-page -- in fact, if you all do it in one five-page,
9  there is probably not that much to reply to, now that I
10  come to think of it. But if you are all on the same page,
11  literally, then it can be a single letter, but all parties,
12  all sides are authorized to file their own five-page letter
13  and then to respond with a three-page letter. After I see
14  what you come up with, I'll make a determination as to what
15  further proceedings are necessary on recusal.
16      In the meantime, given that nobody objects to me
17  determining how we're going to proceed, I do want to tell
18  you how we're going to proceed with respect to determining
19  what impact the Federal Circuit decision has here. I think
20  the best mechanism for doing that is, and I hereby order,
21  that defendants are granted leave to file a motion for
22  summary judgment which should address the impact of the
23  Federal Circuit decision in the Fuji case on the matters
24  that are before this Court.
25      In addressing that, I would expect that the

30

1  motion will also address the argument that has been made
2  here today that given the status of these cases at the time
3  that the Federal Circuit was looking at the related Fuji
4  case, that in defendants' view the plaintiffs are stuck with
5  the discovery and the infringement contentions that they had
6  in front of the Court previously.  In response, I imagine
7  and expect that the plaintiff will argue to the contrary.
8           I'm going to leave it to the parties to meet and
9  confer after this call and figure out the timing that they
10  wish to propose for the filing of this motion for summary
11  judgment and briefing on it.  I want to hear back from the
12  parties either with a jointly proposed order or with your
13  competing proposed orders no later than the May 2nd date
14  that I mentioned before.
15          I don't want to have any more argument but want
16  to make sure that you understand what it is I'm looking for
17  from you all.  Mr. Rader?
18          MR. RADER:  I believe I understand, your Honor.
19  You want the submission jointly from us as to the proposal
20  on the briefing schedule by May 2.
21          THE COURT:  Correct.
22          MR. RADER:  All right.
23          THE COURT:  Ms. Altersohn, any questions?
24          MS. ALTERSOHN:  No, your Honor.  Thank you.
25          THE COURT:  Anybody else, any questions?

31

1           MR. ROUTH:  Your Honor, it's Steve Routh.
2           I understand you also directed St. Clair and
3  Fujifilm to submit a proposed order to enter proposed
4  judgment by the end of the week.
5           THE COURT:  That's correct.
6           MR. ROUTH:  I understand that refers to the
7  Fujifilm II case, the 2008 initiated case; is that correct?
8           THE COURT:  That's my understanding, yes.
9           MR. ROUTH:  I also the Court has also had
10  assigned to it on remand from the Federal Circuit the 2003
11  Fujifilm case.  I would like to ask if the Court is
12  expecting the parties to submit anything on that case or
13  whether judgment now will be entered pursuant to the mandate
14  without further submission?
15          THE COURT:  You should address that in your
16  submission at the end of this week, please.
17          MR. ROUTH:  Thank you, your Honor.
18          THE COURT:  Anybody else, any questions?
19          Thank you all very much for your time.  Good-bye.
20          (Telephone conference ends at 3:02 p.m.)
21
22
23
24
25

| 0 | A |
|---|---|
| **04-1436-LPS** [2] - 1:6, 6:24 | **ability** [1] - 14:17, 24:20 |
| **06-403-LPS** [1] - 1:11 | **able** [4] - 8:8, 11:8, 15:14, 18:8 |
| **06-404-LPS** [1] - 1:16 | **access** [1] - 21:10 |
| **08-371-LPS** [1] - 2:4 | **accused** [4] - 8:16, 19:15, 22:16 |
| **08-373-LPS** [1] - 2:9 | **Action** [1] - 6:24 |

| 1 |
|---|
| **120-some** [1] - 22:15 |
| **14th** [1] - 7:1 |
| **15** [1] - 10:12 |

| 2 |
|---|
| **2** [2] - 1:25, 30:20 |
| **20** [1] - 1:20 |
| **2003** [1] - 31:10 |
| **2004** [1] - 27:2 |
| **2005** [1] - 9:15 |
| **2008** [1] - 31:7 |
| **2009** [5] - 10:1, 10:12, 10:18, 26:13, 26:21 |
| **2010** [7] - 7:20, 20:9, 20:10, 20:18, 26:1, 26:11, 26:20 |
| **2011** [2] - 1:20, 7:1 |
| **26** [1] - 20:16 |
| **28** [1] - 7:20 |
| **2:19** [1] - 5:4 |
| **2nd** [2] - 29:4, 30:13 |

| 3 |
|---|
| **3:02** [1] - 31:20 |

| 5 |
|---|
| **56(d** [2] - 18:9, 18:18 |
| **56(f** [1] - 14:23 |

| 6 |
|---|
| **6** [2] - 8:3, 8:11 |

| 7 |
|---|
| **7** [3] - 8:12, 11:6, 11:13 |
| **761** [1] - 7:21 |

| 9 |
|---|
| **9th** [1] - 29:5 |

**ACTION** [5] - 1:3, 1:8, 1:13, 2:1, 2:6
**action** [1] - 20:7
**actions** [2] - 6:25, 8:8
**add** [3] - 9:9, 13:5, 25:20
**additional** [6] - 18:11, 18:16, 19:3, 19:25, 21:14, 27:13
**address** [10] - 9:16, 16:21, 20:11, 21:1, 21:21, 22:4, 22:6, 29:22, 30:1, 31:15
**addressed** [3] - 6:25, 12:18, 14:6
**addressing** [2] - 7:25, 29:25
**admitted** [2] - 17:22, 18:5
**advanced** [3] - 17:7, 19:14, 19:24
**affidavit** [2] - 18:9, 18:18
**afternoon** [13] - 5:5, 5:7, 5:11, 5:16, 5:18, 5:22, 6:1, 6:3, 6:7, 6:12, 6:19, 6:20, 16:13
**AG** [1] - 1:11
**agree** [2] - 22:14, 25:4
**agreed** [2] - 17:7, 28:8
**ahead** [5] - 7:13, 16:20, 18:24, 21:22, 22:12
**al** [6] - 1:6, 1:11, 1:16, 2:4, 2:9, 6:24
**alive** [1] - 23:8
**allegedly** [1] - 8:21
**alleviates** [1] - 23:4
**Allison** [2] - 5:21, 16:14
**ALLISON** [1] - 3:12
**allow** [2] - 12:3, 14:13
**alluded** [1] - 27:7
**almost** [1] - 24:18
**alternative** [6] - 8:17, 9:2, 10:5, 11:2, 21:16, 26:5
**Altersohn** [6] - 5:21, 16:14, 18:19, 20:22,

20:24, 21:1, 21:20, 22:15, 30:23
**ALTERSOHN** [7] - 3:12, 16:13, 16:21, 19:7, 21:3, 22:1, 30:24
**America** [1] - 4:15
**amount** [1] - 13:11
**amounts** [1] - 23:9
**ample** [1] - 21:8
**AND** [1] - 1:1
**ANDERSON** [1] - 3:3
**Anderson** [1] - 6:5
**ANDREW** [1] - 3:18
**Angeles** [2] - 4:10, 6:18
**answering** [1] - 29:4
**anticipate** [2] - 23:11, 28:6
**apologize** [3] - 22:8, 22:24, 27:19
**appeal** [8] - 8:2, 8:6, 9:18, 10:11, 10:13, 10:14, 25:22, 25:24
**appealed** [1] - 9:21
**Appeals** [4] - 10:25, 11:11, 11:12, 12:12
**APPEARANCES** [3] - 2:11, 3:1, 4:1
**apply** [2] - 14:16, 26:22
**appreciated** [1] - 27:20
**appropriate** [3] - 13:17, 15:4, 22:21
**appropriately** [1] - 14:6
**April** [2] - 1:20, 7:1
**architecture** [4] - 11:16, 11:24, 12:2, 12:8
**area** [1] - 16:8
**argue** [2] - 11:8, 30:7
**argued** [1] - 17:10
**argument** [6] - 14:18, 14:20, 14:21, 20:4, 30:1, 30:15
**arguments** [1] - 8:20
**arise** [1] - 18:16
**arises** [1] - 18:15
**ARSHT** [1] - 3:9
**articulated** [1] - 12:25
**ASHBY** [2] - 4:6, 4:17
**Ashby** [1] - 6:13
**aspects** [2] - 15:19, 17:6
**asserted** [1] - 17:13
**assigned** [1] - 31:10
**assistance** [1] - 28:22
**assume** [1] - 23:8
**attack** [1] - 13:19

**attention** [1] - 28:17
**authorized** [2] - 29:6, 29:12
**available** [2] - 13:10, 18:7
**aware** [2] - 20:12, 21:17

| B |
|---|

**background** [3] - 9:3, 9:10, 10:22
**based** [10] - 10:6, 11:15, 13:10, 16:2, 17:1, 17:15, 18:7, 19:19, 19:24, 26:7
**basis** [5] - 10:13, 12:11, 13:3, 19:19, 25:6
**BEFORE** [1] - 1:22
**beginning** [1] - 5:4
**behalf** [9] - 2:21, 3:20, 4:5, 4:14, 5:24, 7:2, 16:15, 16:16, 20:2
**behaving** [1] - 24:4
**belief** [2] - 11:17, 27:21
**best** [4] - 7:19, 11:5, 11:13, 29:20
**better** [2] - 7:5, 15:21
**between** [2] - 19:16, 28:7
**Bloomfield** [1] - 2:20
**Bluetooth** [1] - 12:8
**boston** [1] - 4:4
**Bove** [1] - 6:8
**BOVE** [1] - 3:23
**Bradley** [1] - 5:17
**BRADLEY** [1] - 2:19
**Brady** [1] - 6:8
**BRADY** [2] - 3:23, 6:7
**Brian** [1] - 2:24
**brief** [2] - 29:3, 29:5
**briefing** [2] - 30:11, 30:20
**briefly** [1] - 25:19
**briefs** [2] - 28:23, 29:7
**brings** [1] - 19:16
**broad** [1] - 12:10
**brought** [1] - 9:12
**burden** [1] - 21:14
**BVI** [1] - 4:15
**BY** [16] - 2:13, 2:16, 2:18, 3:3, 3:6, 3:9, 3:12, 3:16, 3:18, 3:23, 4:3, 4:7, 4:9, 4:12, 4:18, 4:20
**bye** [1] - 31:19

| C |
|---|

**cable** [1] - 12:8
**CAFC** [5] - 11:5, 13:3, 14:5, 25:22, 26:8
**California** [3] - 3:6, 3:19, 4:10
**camera** [6] - 11:20, 12:13, 13:4, 13:12, 12:17, 26:10
**cameras** [6] - 22:18, 22:19, 22:20, 25:24, 26:9, 27:22
**Canon** [3] - 9:6, 9:11, 26:25
**Captions** [1] - 1:25
**card** [1] - 12:6
**care** [1] - 28:7
**case** [30] - 5:9, 7:8, 7:21, 8:15, 9:3, 9:4, 9:6, 9:7, 9:12, 12:13, 17:2, 18:3, 18:14, 19:8, 21:15, 22:17, 22:21, 23:4, 24:7, 24:12, 24:19, 24:21, 27:17, 27:21, 29:23, 30:4, 31:7, 31:11, 31:12
**cases** [15] - 5:13, 5:18, 6:23, 7:22, 8:1, 9:21, 14:11, 17:10, 17:17, 17:22, 19:9, 21:8, 26:24, 27:1, 30:2
**cellphones** [1] - 13:12
**certainly** [3] - 12:13, 14:19, 15:5
**certification** [1] - 8:1
**challenge** [2] - 15:19, 27:3
**challenges** [1] - 9:22
**chambers** [1] - 5:17
**change** [5] - 16:24, 20:19, 26:2, 27:9, 27:10
**changed** [3] - 10:25, 23:16, 24:6
**changes** [2] - 23:3, 24:11
**CHARLES** [1] - 2:19
**Charlie** [1] - 5:17
**Chicago** [2] - 4:13, 6:18
**chose** [2] - 20:14, 21:15
**Circuit** [16] - 7:8, 8:5, 8:14, 10:25, 11:18, 14:16, 17:5, 17:11, 17:12, 19:17, 28:4,

28:9, 29:19, 29:23, 30:3, 31:10
**Circuit's** [9] - 14:10, 17:1, 17:4, 17:16, 18:1, 19:9, 19:19, 19:20, 23:3
**circumstance** [1] - 24:4
**circumstances** [2] - 28:25, 29:1
**citations** [1] - 8:25
**Civil** [1] - 6:24
**CIVIL** [5] - 1:3, 1:8, 1:13, 2:1, 2:6
**claim** [38] - 8:6, 9:6, 9:8, 9:19, 9:25, 10:6, 10:14, 10:21, 11:1, 11:4, 11:14, 11:19, 13:2, 16:25, 17:6, 17:9, 17:11, 18:1, 19:22, 20:9, 20:12, 20:17, 21:16, 23:20, 23:23, 23:24, 24:1, 24:6, 24:11, 24:17, 25:5, 26:2, 26:7, 26:10, 26:14, 26:17, 26:21, 27:5
**claims** [7] - 8:14, 9:24, 13:25, 17:13, 25:11, 25:14, 27:25
**CLAIR** [5] - 1:3, 1:8, 1:13, 2:1, 2:6
**Clair** [35] - 2:21, 5:9, 5:18, 6:23, 6:24, 7:14, 7:16, 7:19, 8:4, 8:8, 8:10, 8:21, 8:24, 9:11, 9:18, 10:12, 10:18, 11:1, 13:8, 17:7, 17:25, 18:15, 18:22, 19:13, 20:11, 21:4, 21:8, 21:15, 22:16, 22:18, 26:4, 26:15, 26:19, 28:4, 31:2
**Clair's** [2] - 17:16, 20:5
**clear** [5] - 8:15, 11:10, 18:21, 19:4, 23:16
**clearly** [4] - 10:2, 10:16, 10:24, 14:1
**client** [2] - 23:4, 23:13
**clue** [1] - 16:11
**co** [4] - 5:14, 16:16, 22:2, 22:3
**CO** [1] - 1:6
**co-counsel** [4] - 5:14, 16:16, 22:2, 22:3
**code** [1] - 21:10
**colleague** [1] - 21:21
**Columbia** [1] - 4:21
**coming** [2] - 9:24,

27:20
**commented** [2] - 8:19, 15:25
**Communications** [1] - 3:21
**compact** [1] - 13:23
**competing** [1] - 8:14
**completed** [1] - 19:10
**completely** [2] - 12:24, 24:17
**Computer** [1] - 4:14
**computer** [3] - 11:24, 12:2, 12:8
**CONAWAY** [1] - 3:15
**Conaway** [1] - 5:23
**conceded** [1] - 8:21
**concedes** [1] - 22:19
**concern** [1] - 23:25
**concerns** [1] - 23:4
**concessions** [1] - 24:10
**confer** [1] - 30:9
**CONFERENCE** [1] - 1:20
**conference** [3] - 5:4, 7:4, 31:20
**confession** [1] - 23:24
**confirmation** [2] - 26:21, 27:23
**connection** [4] - 8:3, 12:9, 13:13, 25:22
**Connolly** [1] - 6:8
**CONNOLLY** [1] - 3:23
**consistently** [1] - 26:17
**construction** [42] - 8:9, 8:22, 9:2, 9:5, 9:6, 9:8, 9:19, 10:1, 10:6, 10:14, 10:21, 11:1, 11:4, 11:14, 11:18, 11:19, 13:2, 16:25, 17:6, 17:8, 17:9, 17:11, 18:2, 19:22, 20:9, 20:12, 20:15, 20:18, 21:16, 23:20, 23:23, 23:24, 24:1, 24:6, 24:11, 24:18, 25:5, 26:2, 26:14, 26:17, 26:21, 27:5
**constructions** [2] - 8:17, 21:17
**construes** [2] - 8:6, 8:14
**CONSULTANTS** [5] - 1:3, 1:8, 1:13, 2:1, 2:6
**contemplates** [1] - 26:1
**contend** [1] - 18:1
**contended** [2] - 8:4,

8:10
**contention** [3] - 13:14, 14:1, 17:16
**contentions** [2] - 17:17, 30:5
**Continued** [2] - 3:1, 4:1
**continued** [1] - 1:25
**continuing** [1] - 13:3
**contrary** [1] - 30:7
**Corp** [3] - 3:21, 4:15
**CORPORATION** [1] - 2:9
**Corporation** [3] - 3:14, 4:14, 4:16
**correct** [8] - 19:6, 19:7, 23:13, 27:17, 27:18, 30:21, 31:5, 31:7
**CORROON** [1] - 3:3
**Cottrell** [1] - 7:2
**counsel** [10] - 2:21, 4:22, 5:9, 5:13, 5:14, 6:13, 16:16, 22:2, 22:3, 28:19
**Counsel** [5] - 3:7, 3:13, 3:20, 4:5, 4:14
**counterclaims** [3] - 25:11, 25:13, 27:25
**couple** [1] - 20:3
**course** [3] - 8:23, 9:1, 24:25
**COURT** [33] - 1:1, 5:5, 5:10, 5:15, 5:19, 6:3, 6:11, 6:20, 14:9, 15:24, 16:5, 16:10, 16:19, 18:19, 20:22, 20:24, 21:20, 22:3, 22:9, 22:12, 23:6, 24:25, 25:10, 25:15, 27:15, 28:1, 30:21, 30:23, 30:25, 31:5, 31:8, 31:15, 31:18
**court** [2] - 6:22, 14:11
**Court** [46] - 7:1, 7:6, 7:24, 8:3, 8:7, 8:10, 8:14, 8:23, 9:10, 9:19, 10:15, 10:25, 11:7, 11:10, 11:12, 11:21, 12:12, 12:16, 12:20, 13:24, 14:4, 15:11, 15:21, 15:22, 19:12, 19:21, 23:18, 23:19, 23:21, 23:22, 24:2, 24:7, 24:15, 24:23, 26:6, 26:18, 27:19, 28:6, 28:17, 29:24, 30:6, 31:9, 31:11
**Court's** [3] - 9:25, 10:8, 24:20

**cover** [1] - 7:18
**covered** [1] - 12:16
**critical** [1] - 17:6
**current** [1] - 11:7
**CUTLER** [1] - 4:2
**Cutler** [1] - 6:9

**D**

**damages** [1] - 13:16
**data** [1] - 11:16
**date** [2] - 19:24, 30:13
**dated** [1] - 7:20
**dates** [1] - 20:4
**DAY** [3] - 4:7, 4:18, 6:12
**DC** [1] - 6:16
**deal** [1] - 10:20
**dealing** [1] - 10:23
**December** [2] - 10:12, 10:18
**decided** [1] - 16:23
**decides** [1] - 24:23
**decision** [18] - 11:7, 11:10, 11:15, 12:20, 14:5, 14:10, 15:22, 17:2, 17:4, 17:16, 18:1, 19:9, 19:19, 19:21, 23:3, 25:22, 29:19, 29:23
**declaratory** [1] - 25:12
**declared** [1] - 26:8
**defendant** [4] - 16:10, 24:3, 24:9, 24:10
**defendants** [35] - 5:24, 6:14, 7:9, 7:12, 7:18, 8:20, 9:17, 12:19, 12:23, 13:9, 13:18, 13:25, 14:14, 14:23, 15:10, 15:16, 16:11, 16:16, 17:10, 17:18, 17:23, 18:23, 19:18, 20:8, 21:6, 21:9, 21:13, 21:18, 22:1, 22:14, 23:24, 25:16, 26:7, 28:12, 29:21
**Defendants** [5] - 1:7, 1:12, 1:17, 2:5, 2:10
**defendants'** [10] - 8:16, 17:1, 17:15, 18:10, 18:16, 18:24, 19:8, 20:11, 21:10, 30:4
**DELAWARE** [1] - 1:1
**Delaware** [4] - 1:19, 5:8, 5:12, 6:13
**DeMarchi** [2] - 3:6, 6:5
**denies** [1] - 8:24
**described** [2] - 10:17, 15:4

**describing** [1] - 11:13
**description** [1] - 12:10
**desired** [1] - 11:15
**detailed** [1] - 15:6
**details** [1] - 15:3
**determination** [1] - 29:14
**determine** [1] - 13:11
**determined** [1] - 19:17
**determining** [2] - 29:17, 29:18
**developments** [2] - 7:7, 28:18
**device** [1] - 12:7
**devices** [1] - 8:17
**Diego** [1] - 3:19
**different** [10] - 8:9, 10:2, 10:6, 11:25, 12:2, 19:21, 22:13, 24:17, 24:19, 26:19
**differently** [2] - 8:6, 8:14
**digital** [6] - 22:18, 22:19, 22:20, 25:24, 26:9, 27:22
**direct** [1] - 17:12
**directed** [1] - 31:2
**directing** [2] - 28:4, 28:23
**directly** [2] - 7:17, 12:20
**disappear** [1] - 28:12
**discovery** [17] - 10:5, 13:6, 13:11, 13:15, 14:12, 14:24, 15:13, 18:4, 18:5, 19:3, 19:5, 19:10, 19:25, 21:6, 21:9, 21:14, 30:5
**discussing** [1] - 7:23
**dismiss** [2] - 25:13, 27:25
**dismissal** [1] - 25:13
**dispose** [2] - 17:22, 18:14
**dispositive** [6] - 8:7, 8:16, 14:5, 16:24, 16:25, 17:3
**dispute** [1] - 28:7
**disputed** [1] - 8:18
**disputes** [1] - 14:16
**District** [1] - 4:21
**DISTRICT** [2] - 1:1, 1:1
**docket** [2] - 7:21, 7:22
**documents** [1] - 21:11
**dollars** [1] - 21:7
**Dominic** [2] - 6:8, 20:2
**DOMINIC** [1] - 4:3
**done** [6] - 8:15, 8:24, 10:2, 16:9, 20:25, 22:22

**DORR** [1] - 4:2
**down** [2] - 14:4, 23:12
**downloaded** [1] - 12:7
**drawn** [1] - 13:22
**drew** [1] - 5:23
**drop** [1] - 24:17
**due** [1] - 29:4
**during** [2] - 8:2, 19:13

**E**

**e-mail** [1] - 12:1
**easier** [1] - 14:3
**easy** [1] - 27:24
**effort** [1] - 15:11
**either** [1] - 30:12
**ELECTRONICS** [2] - 1:6, 1:16
**employees** [1] - 21:11
**end** [4] - 15:22, 28:6, 31:4, 31:16
**ends** [1] - 31:20
**enter** [3] - 20:9, 20:14, 31:3
**entered** [6] - 9:12, 10:1, 10:16, 22:22, 25:25, 31:13
**entire** [1] - 21:15
**entirely** [1] - 20:21
**espouse** [1] - 26:19
**ESQ** [21] - 2:13, 2:16, 2:18, 2:19, 2:19, 3:3, 3:6, 3:9, 3:12, 3:16, 3:18, 3:19, 3:23, 4:3, 4:3, 4:7, 4:9, 4:12, 4:18, 4:20, 4:21
**essentially** [1] - 19:10
**et** [6] - 1:6, 1:11, 1:16, 2:4, 2:9, 6:24
**eve** [1] - 19:22
**evidence** [3] - 13:2, 15:17
**examination** [1] - 27:4
**exceed** [2] - 29:4, 29:5
**exchanged** [1] - 19:11
**existed** [1] - 27:11
**existence** [1] - 26:2
**exists** [1] - 14:2
**expect** [4] - 16:17, 24:7, 29:25, 30:7
**expected** [1] - 19:23
**expecting** [1] - 31:12
**expended** [1] - 21:7
**expense** [1] - 21:14
**expert** [18] - 13:1, 13:9, 13:18, 13:20, 15:5, 15:16, 16:8, 18:4, 18:6, 19:2, 19:11, 20:5, 20:8, 20:10, 20:14, 20:20,

26:16, 26:20
**extensive** [1] - 21:9
**extent** [1] - 18:10

**F**

**faced** [1] - 9:1
**fact** [8] - 8:4, 9:9, 9:22, 10:14, 18:4, 21:6, 21:12, 29:8
**facts** [3] - 18:11, 18:12, 18:16
**factual** [2] - 14:15, 15:14
**fair** [1] - 28:15
**fairness** [1] - 25:2
**fall** [1] - 21:18
**falls** [1] - 19:17
**Farnan** [2] - 20:9, 26:12
**favor** [2] - 17:14, 22:22
**February** [1] - 26:11
**Federal** [25] - 7:8, 8:5, 8:13, 10:25, 11:18, 14:10, 14:16, 17:1, 17:4, 17:5, 17:11, 17:12, 17:16, 18:1, 19:9, 19:16, 19:19, 19:20, 23:2, 28:4, 28:8, 29:19, 29:23, 30:3, 31:10
**Fenwick** [1] - 6:6
**FENWICK** [1] - 3:5
**few** [1] - 9:9
**fighting** [1] - 21:7
**figure** [1] - 30:9
**file** [14] - 10:11, 11:23, 11:24, 11:25, 12:3, 12:5, 17:8, 18:24, 19:4, 19:5, 28:23, 29:6, 29:12, 29:21
**filed** [6] - 23:19, 26:16, 26:24, 27:2, 28:15
**filing** [1] - 30:10
**final** [1] - 27:17
**finally** [2] - 10:11, 25:10
**FINGER** [1] - 2:13
**Finger** [1] - 5:12
**first** [8] - 7:11, 7:17, 11:6, 16:20, 16:21, 17:5, 25:21, 28:3
**FISHMAN** [1] - 2:18
**five** [4] - 29:4, 29:7, 29:8, 29:12
**five-page** [3] - 29:7, 29:8, 29:12
**FOERSTER** [1] - 3:18
**Foerster** [1] - 5:24

**following** [2] - 5:3, 12:18
**footnoted** [1] - 8:19
**FOR** [1] - 1:1
**Forbis** [1] - 5:17
**FORBIS** [1] - 2:19
**form** [2] - 24:8, 28:5
**formally** [1] - 13:19
**format** [5] - 11:15, 11:16, 12:1, 12:3, 17:8
**formerly** [2] - 4:14, 4:15
**forward** [2] - 15:16, 23:20
**fought** [1] - 18:2
**front** [2] - 25:7, 30:6
**Fuji** [11] - 7:8, 17:14, 17:18, 25:4, 25:10, 25:23, 27:15, 28:3, 28:4, 29:23, 30:3
**Fuji's** [1] - 17:7
**FUJIFILM** [1] - 2:9
**Fujifilm** [24] - 4:22, 6:14, 8:6, 9:7, 9:11, 10:10, 10:16, 10:19, 22:11, 22:13, 22:20, 22:21, 22:23, 23:15, 24:1, 24:8, 24:24, 26:25, 27:19, 27:21, 31:3, 31:7, 31:11
**full** [1] - 15:1
**fully** [1] - 14:5
**function** [1] - 1:24
**fundamental** [1] - 23:18
**fundamentally** [2] - 23:3, 24:11
**furthermore** [2] - 9:14, 26:23

**G**

**Gaffigan** [1] - 2:24
**GEDDES** [2] - 4:6, 4:17
**Geddes** [1] - 6:13
**given** [6] - 11:1, 21:5, 21:23, 26:15, 29:16, 30:2
**GLENN** [1] - 2:19
**Glenn** [1] - 5:17
**good-bye** [1] - 31:19
**granted** [2] - 15:23, 29:21
**GRAUER** [1] - 2:18
**Green** [1] - 5:8
**GREEN** [1] - 2:15
**Greg** [1] - 5:23
**GREGORY** [1] - 3:19

**grounds** [1] - 14:14
**groups** [1] - 6:13
**guess** [2] - 22:5, 25:11

**H**

**HALE** [1] - 4:2
**Hatcher** [1] - 5:12
**HATCHER** [2] - 2:13, 5:11
**Heaney** [1] - 5:20
**HEANEY** [2] - 3:9, 5:20
**hear** [3] - 7:11, 16:10, 30:11
**heard** [3] - 18:22, 23:7, 25:17
**held** [1] - 5:4
**help** [1] - 15:10
**helpful** [2] - 29:6, 29:20
**hereby** [2] - 29:6, 29:20
**Herrington** [1] - 6:15
**HERRINGTON** [1] - 4:20
**Hewlett** [1] - 3:7
**Hewlett-Packard** [1] - 3:7
**High** [1] - 4:14
**highlight** [2] - 20:4
**Hills** [1] - 2:20
**HOLDINGS** [1] - 2:9
**Honor** [37] - 5:7, 5:11, 5:16, 5:22, 6:2, 6:4, 6:7, 6:12, 6:19, 7:15, 8:12, 10:10, 12:10, 13:7, 14:8, 14:19, 16:7, 16:13, 17:20, 19:7, 20:1, 20:23, 21:3, 22:1, 22:7, 22:10, 22:24, 23:15, 25:9, 25:25, 26:11, 27:14, 27:18, 30:18, 30:24, 31:1, 31:17
**Honor's** [2] - 7:20, 16:22
**HONORABLE** [1] - 1:22
**hopefully** [1] - 16:19
**Horwitz** [1] - 6:4
**HORWITZ** [2] - 3:3, 6:4
**HP** [1] - 6:5
**HTC** [7] - 4:14, 4:15, 4:15, 4:16, 6:14, 6:16
**Huan** [2] - 6:16, 6:17
**HUAN** [1] - 4:9
**Huan-Yi** [2] - 6:16, 6:17

**HUAN-YI** [1] - 4:9
**HUTZ** [1] - 3:23

**I**

**identical** [1] - 17:9
**identify** [1] - 11:6
**II** [2] - 27:21, 31:7
**Illinois** [1] - 4:13
**image** [3] - 11:23, 12:1, 12:3
**imagine** [1] - 30:6
**impact** [3] - 14:10, 29:19, 29:22
**impartiality** [1] - 25:7
**important** [1] - 17:3
**IN** [3] - 1:1, 1:1, 2:4
**inappropriate** [2] - 20:6, 20:21
**Inc** [5] - 3:13, 3:21, 3:21, 4:15, 4:16
**INC** [6] - 1:3, 1:8, 1:13, 1:16, 2:1, 2:6
**included** [1] - 13:7
**including** [3] - 6:23, 7:7, 21:10
**indistinguishable** [1] - 17:17
**information** [4] - 10:22, 13:10, 18:7, 23:22
**informed** [1] - 15:22
**infringe** [2] - 8:17, 23:22
**infringed** [2] - 11:19, 19:15
**infringement** [31] - 8:9, 8:22, 9:4, 9:5, 9:7, 10:6, 10:15, 11:2, 11:21, 12:13, 12:24, 13:3, 13:14, 15:7, 15:8, 15:15, 15:20, 19:14, 20:14, 20:17, 20:19, 22:19, 23:8, 23:14, 26:3, 26:5, 26:10, 26:19, 27:1, 27:11, 30:5
**infringements** [1] - 13:19
**initiated** [1] - 31:7
**input** [1] - 15:5
**instances** [1] - 20:13
**instant** [1] - 8:8
**instead** [2] - 13:5, 26:9
**INTELLECTUAL** [5] - 1:3, 1:8, 1:13, 2:1, 2:6
**Intellectual** [1] - 2:21
**intend** [5] - 13:25,

15:20, 16:11, 18:22, 23:1
**intent** [2] - 24:2, 24:22
**interject** [1] - 20:2
**interlocutory** [1] - 8:2
**interpretation** [1] - 26:7
**interrupt** [1] - 18:19
**involved** [2] - 20:7, 25:24
**issue** [18] - 7:25, 8:18, 10:19, 17:20, 12:17, 13:16, 14:4, 14:9, 14:12, 14:24, 16:1, 16:3, 16:5, 20:18, 22:24, 22:25, 27:3, 28:11
**issued** [2] - 9:2, 19:21
**issues** [6] - 15:14, 16:23, 18:10, 21:2, 21:23, 24:24
**items** [1] - 12:17

### J

**January** [2] - 20:8, 26:20
**Jensen** [1] - 6:15
**JENSEN** [1] - 4:21
**John** [1] - 6:12
**JOHN** [2] - 4:7, 4:18
**Johnson** [1] - 6:17
**JOHNSON** [2] - 4:9, 4:12
**joined** [1] - 22:2
**jointly** [3] - 7:18, 30:12, 30:19
**JPEG** [3] - 11:23, 12:1, 12:5
**Judge** [3] - 5:6, 20:9, 26:12
**judgment** [25] - 12:21, 12:23, 13:1, 13:21, 14:14, 14:22, 15:6, 15:12, 15:15, 15:23, 17:12, 18:8, 18:14, 18:23, 18:25, 19:18, 20:6, 22:22, 22:23, 25:12, 27:17, 29:22, 30:11, 31:4, 31:13
**JULIA** [1] - 3:9
**Julie** [1] - 5:20
**July** [2] - 20:10, 20:18
**jury's** [1] - 27:1
**justice** [1] - 24:5

### K

**KAREN** [1] - 3:16
**Karen** [1] - 5:22

**keep** [1] - 13:23
**Keller** [1] - 5:23
**KELLER** [2] - 3:16, 5:22
**Kevin** [2] - 6:7, 6:9
**KEVIN** [1] - 3:23
**kEVIN** [1] - 4:3
**KING** [1] - 3:11
**King** [2] - 5:21, 16:14
**known** [2] - 4:14, 4:15
**knows** [2] - 10:15, 11:7
**Kyocera** [3] - 3:20, 3:21, 5:25

### L

**Laura** [1] - 5:11
**LAURA** [1] - 2:13
**law** [3] - 17:13, 19:17, 18:20
**LAYTON** [1] - 2:13
**Layton** [1] - 5:12
**least** [2] - 15:5, 23:8
**leave** [4] - 18:24, 22:2, 29:21, 30:8
**led** [1] - 23:5
**left** [1] - 14:15
**LEONARD** [1] - 1:22
**less** [2] - 14:7, 21:5, 24:14
**letter** [12] - 7:1, 7:17, 12:11, 13:7, 17:20, 28:23, 29:3, 29:4, 29:7, 29:11, 29:12, 29:13
**LG** [1] - 1:16
**light** [3] - 7:6, 25:5, 28:3
**likely** [1] - 15:13
**limited** [2] - 13:11, 14:24
**LIN** [1] - 4:9
**Lin** [1] - 6:16
**line** [2] - 5:14, 6:8
**literally** [2] - 21:7, 29:11
**LLP** [7] - 3:3, 3:9, 3:11, 3:15, 4:2, 4:9, 4:12
**LODGE** [1] - 3:23
**look** [2] - 15:9, 28:21
**looked** [1] - 25:25
**looking** [5] - 7:5, 24:7, 26:16, 30:3, 30:16
**Los** [2] - 4:10, 6:17
**LTD** [1] - 1:6

### M

**mail** [1] - 12:1
**mandate** [1] - 31:13
**March** [2] - 7:20, 25:25
**Massa** [4] - 6:9, 20:2, 21:17, 22:4
**MASSA** [3] - 4:3, 20:1, 22:7
**Massachusetts** [1] - 4:4
**matter** [2] - 17:13, 19:17
**matters** [1] - 29:23
**McGonigle** [3] - 2:16, 5:7, 5:8
**mean** [3] - 16:8, 19:20, 27:3
**means** [1] - 11:14
**meantime** [1] - 29:16
**mechanism** [1] - 29:20
**mediations** [2] - 23:21, 24:16
**meet** [1] - 30:8
**memory** [1] - 12:6
**ment** [1] - 23:23
**mention** [2] - 17:3, 25:21
**mentioned** [4] - 14:21, 16:22, 21:17, 30:14
**Merit** [1] - 2:25
**message** [1] - 11:23
**Michigan** [1] - 2:20
**might** [4] - 20:2, 24:2, 24:9, 24:10
**millions** [1] - 21:7
**mind** [2] - 23:17, 28:11
**minimum** [1] - 28:15
**minute** [1] - 22:4
**MMS** [1] - 11:24
**moment** [1] - 23:9
**moreover** [1] - 8:13
**MORRIS** [1] - 3:9
**MORRISON** [1] - 3:18
**Morrison** [1] - 5:24
**most** [3] - 7:7, 16:15, 20:7
**MOTION** [1] - 2:4
**Motion** [2] - 4:5, 6:10
**motion** [35] - 7:9, 7:10, 8:3, 8:5, 12:20, 12:23, 13:1, 13:21, 14:22, 15:6, 15:12, 16:6, 16:23, 18:1, 18:23, 18:25, 19:4, 19:6, 21:23, 22:2, 23:1, 23:5, 23:12, 23:19, 24:22, 25:1,

28:13, 28:16, 28:21, 28:24, 29:2, 29:21, 30:1, 30:10
**motions** [1] - 18:8
**Mountain** [1] - 3:6
**move** [1] - 14:14
**MR** [23] - 5:16, 6:4, 6:7, 6:12, 6:19, 7:15, 14:19, 16:2, 16:7, 20:1, 22:7, 22:10, 23:15, 25:8, 25:12, 25:21, 27:18, 30:18, 30:22, 31:1, 31:6, 31:9, 31:17
**MS** [11] - 5:7, 5:11, 5:20, 5:22, 13:13, 16:21, 19:7, 21:3, 22:1, 22:13, 30:24
**multiple** [1] - 17:8

### N

**nature** [1] - 23:17
**nearly** [1] - 17:9
**necessary** [3] - 19:3, 24:23, 29:15
**necessitate** [1] - 19:25
**need** [8] - 14:12, 16:19, 18:11, 18:15, 19:25, 22:23, 28:16, 28:21
**needed** [1] - 24:14
**needs** [3] - 12:18, 21:6, 22:21
**new** [2] - 20:21, 25:5
**New** [2] - 3:12
**next** [2] - 22:9, 28:10
**NICHOLS** [1] - 3:9
**NO** [5] - 1:3, 1:8, 1:13, 2:1, 2:6
**nobody** [1] - 29:16
**Nokia** [5] - 3:13, 3:14, 5:20, 16:15, 22:1
**none** [1] - 22:17
**nonfrivolous** [1] - 28:16
**noninfringement** [1] - 17:13
**NOTE** [1] - 5:3
**note** [1] - 8:4
**noted** [2] - 8:10, 11:9
**nothing** [1] - 14:15
**notice** [1] - 10:11
**notwithstanding** [2] - 18:21, 28:17
**November** [4] - 10:1, 26:13, 26:21, 27:2
**number** [2] - 7:21, 17:23
**numbers** [1] - 7:22

### O

**object** [1] - 15:5
**objective** [1] - 25:1
**objects** [1] - 29:16
**obligated** [1] - 20:16
**observer** [3] - 25:1, 25:4, 25:6
**obvious** [1] - 25:23
**obviously** [3] - 12:25, 23:9, 26:6
**occasions** [1] - 9:20
**OF** [1] - 1:1
**office** [1] - 6:16
**Office** [1] - 9:23
**OGTROP** [1] - 2:15
**Ogtrop** [1] - 5:8
**one** [10] - 9:20, 11:7, 11:25, 16:12, 19:14, 21:3, 28:25, 29:5, 29:7, 29:8
**oOo** [1] - 5:1
**open** [1] - 20:18
**opening** [1] - 29:3
**operate** [1] - 24:16
**operation** [1] - 21:13
**opinion** [1] - 20:14
**opportunity** [9] - 11:2, 13:18, 15:19, 15:21, 17:21, 18:17, 21:9, 26:4, 27:10
**opposed** [1] - 21:16
**opposition** [1] - 20:6
**order** [20] - 7:20, 7:24, 8:11, 8:12, 8:21, 9:3, 10:14, 14:11, 14:16, 16:22, 19:22, 20:10, 22:8, 25:25, 26:12, 27:16, 28:5, 29:20, 30:12, 31:3
**orders** [1] - 30:13
**Orrick** [1] - 6:15
**ORRICK** [1] - 4:20
**outcome** [3] - 17:19, 19:9, 24:4
**outstanding** [1] - 25:10
**own** [5] - 13:20, 20:15, 21:16, 26:13, 29:12
**ownership** [1] - 9:13

### P

**P.A** [5] - 2:13, 2:15, 3:23, 4:6, 4:17
**p.m** [2] - 5:4, 31:20
**Packard** [1] - 3:7
**page** [11] - 8:3, 8:11, 8:12, 11:6, 11:13, 29:7, 29:8, 29:10,

29:12, 29:13
**Page** [1] - 1:25
**pages** [2] - 29:4, 29:5
**Palm** [2] - 3:21, 5:24
**papers** [4] - 18:17, 19:11, 19:18, 28:14
**part** [1] - 14:25
**particular** [1] - 11:16
**particularly** [2] - 7:7, 20:17
**parties** [13] - 7:3, 10:7, 10:8, 14:3, 19:23, 28:21, 28:23, 29:2, 29:6, 29:11, 30:8, 30:12, 31:12
**parties'** [1] - 7:5
**PASTERNAK** [2] - 4:12, 6:19
**Pasternak** [1] - 6:17
**patent** [1] - 24:19
**Patent** [1] - 9:23
**patents** [2] - 9:13, 9:24
**PATRICIA** [1] - 2:16
**Patty** [1] - 5:8
**PC** [2] - 12:2, 12:6
**pending** [3] - 7:9, 19:8, 25:11
**perceived** [1] - 24:2
**perhaps** [1] - 19:2
**permits** [1] - 19:15
**perspective** [1] - 24:13
**phone** [3] - 11:24, 16:17, 28:19
**phones** [12] - 11:20, 12:14, 13:4, 13:12, 13:13, 22:17, 26:10
**PICKERING** [1] - 4:2
**place** [3] - 7:19, 10:17, 11:5
**Plaintiff** [6] - 1:4, 1:9, 1:14, 2:2, 2:7, 2:21
**plaintiff** [4] - 5:13, 7:11, 25:11, 30:7
**plaintiff's** [1] - 25:14
**plaintiffs** [1] - 30:4
**plan** [1] - 19:18
**PLLC** [1] - 2:18
**point** [19] - 9:17, 10:4, 10:9, 11:6, 11:9, 11:22, 12:22, 14:4, 17:24, 18:13, 18:15, 19:3, 20:21, 21:4, 21:23, 23:16, 25:3, 26:11
**pointed** [3] - 8:23, 26:23
**points** [3] - 9:9, 17:3, 27:13
**portion** [1] - 7:19

**position** [11] - 11:21, 15:1, 17:1, 17:15, 19:8, 20:12, 20:13, 22:14, 25:3, 25:8, 27:8
**positions** [2] - 9:16, 19:24
**possibility** [1] - 18:9
**possible** [3] - 11:3, 13:24, 15:10
**posture** [2] - 23:3, 24:11
**potentially** [3] - 10:8, 13:13, 26:1
**Potter** [1] - 6:5
**POTTER** [1] - 3:3
**preceded** [2] - 26:12, 26:13
**precedent** [1] - 28:20
**preclude** [1] - 15:15
**preface** [2] - 13:6, 13:7
**preference** [2] - 14:13, 18:24
**preliminary** [3] - 13:9, 13:14, 18:6
**prepared** [1] - 27:16
**present** [7] - 10:5, 13:8, 15:20, 15:21, 16:4, 26:4, 27:10
**presentations** [1] - 8:2
**presented** [2] - 7:18, 15:18
**presents** [1] - 12:12
**preside** [1] - 4:20
**pretrial** [1] - 19:11
**previously** [1] - 30:6
**procedure** [1] - 22:23
**proceed** [8] - 7:6, 15:16, 19:23, 23:13, 26:8, 28:2, 29:17, 29:18
**proceeding** [2] - 9:23, 23:25
**proceedings** [5] - 23:17, 24:23, 25:2, 25:7, 29:15
**process** [9] - 8:5, 9:14, 13:17, 13:23, 14:3, 15:12, 15:23, 19:13, 27:4
**product** [2] - 19:15, 25:23
**products** [2] - 21:13, 22:16
**proper** [2] - 12:22, 18:13
**Property** [1] - 2:21
**PROPERTY** [5] - 1:3, 1:8, 1:13, 2:1, 2:6

**proposal** [2] - 13:5, 30:19
**propose** [2] - 27:16, 30:10
**proposed** [5] - 28:5, 30:12, 30:13, 31:3
**proposing** [1] - 15:18
**protracted** [1] - 13:23
**prove** [2] - 8:8, 8:22
**provide** [3] - 20:3, 20:5, 20:16
**provides** [1] - 13:3
**providing** [1] - 20:20
**Prussia** [1] - 6:9
**PRUSSIA** [1] - 4:3
**PTO** [3] - 9:14, 10:2, 27:3
**PTO's** [1] - 8:22
**purposefully** [1] - 20:11
**pursuant** [1] - 31:13
**pursue** [3] - 11:2, 23:1, 24:22
**put** [3] - 11:22, 11:23, 12:1
**puzzling** [1] - 17:25

## Q

**questioning** [1] - 28:10
**questions** [3] - 30:23, 30:25, 31:18
**quickly** [1] - 17:21

## R

**Rader** [11] - 5:17, 7:16, 15:24, 16:22, 17:22, 18:22, 23:7, 23:12, 25:19, 27:15, 30:17
**RADER** [11] - 2:18, 2:18, 5:16, 7:15, 14:19, 16:2, 16:7, 25:21, 27:18, 30:18, 30:22
**raise** [3] - 14:25, 15:14, 21:4
**raised** [2] - 18:10, 21:24
**rather** [2] - 10:20, 19:5
**reach** [1] - 14:11
**ready** [1] - 19:10
**really** [3] - 14:15, 20:4, 24:15
**reason** [8] - 10:4, 10:12, 17:18, 21:5, 23:2, 26:18, 27:5, 27:8

**reasonable** [3] - 25:1, 25:4, 25:5
**reasonably** [1] - 10:18
**received** [1] - 23:22
**receiving** [1] - 26:20
**recent** [2] - 7:7, 28:17
**recently** [1] - 27:20
**recognition** [1] - 9:25
**recognizing** [1] - 18:25
**recommendation** [2] - 12:15, 26:14
**record** [3] - 6:23, 8:24, 14:16
**recusal** [15] - 7:10, 15:25, 16:4, 21:21, 21:25, 22:24, 23:5, 23:12, 25:1, 28:11, 28:13, 28:14, 28:21, 28:24, 29:15
**recuse** [2] - 7:9, 23:19
**reexamination** [3] - 9:14, 9:23, 10:3
**refers** [1] - 31:6
**regard** [1] - 16:22
**regarding** [2] - 9:10, 9:12
**regardless** [1] - 24:22
**Registered** [1] - 2:25
**Reilly** [1] - 5:23
**REILLY** [1] - 3:19
**rejected** [1] - 17:5
**related** [2] - 6:25, 30:3
**relating** [1] - 23:22
**relevance** [1] - 24:20
**relevant** [2] - 10:10, 10:23
**remaining** [1] - 5:13
**remand** [1] - 31:10
**remember** [1] - 9:10
**removable** [2] - 12:6, 12:7
**render** [1] - 11:5
**rendered** [1] - 27:1
**reopen** [2] - 18:4, 21:6
**reply** [1] - 29:9
**report** [9] - 13:9, 15:7, 19:2, 20:5, 20:20, 26:14, 26:16
**Reporter** [1] - 2:25
**reporter** [1] - 6:22
**REPORTER'S** [1] - 5:3
**reports** [6] - 13:18, 18:6, 19:11, 20:8, 20:10, 26:20
**represent** [1] - 16:14
**representing** [1] - 13:24
**request** [1] - 7:10
**required** [2] - 14:24, 23:17

**Research** [2] - 4:5, 6:9
**RESEARCH** [1] - 2:4
**researched** [1] - 22:25
**resolve** [1] - 24:23
**resolved** [1] - 28:8
**resources** [1] - 10:8
**respect** [8] - 12:13, 13:4, 13:15, 27:15, 27:17, 28:3, 28:24, 29:18
**respond** [5] - 13:1, 15:6, 18:8, 18:22, 29:13
**response** [4] - 14:22, 19:1, 19:5, 30:6
**rest** [1] - 21:15
**reviewed** [1] - 28:14
**Rich** [1] - 6:4
**RICHARD** [1] - 3:3
**Richards** [1] - 5:12
**RICHARDS** [1] - 2:13
**RIM** [2] - 20:2, 20:7
**risk** [1] - 13:13
**road** [1] - 23:12
**rough** [1] - 24:5
**ROUTH** [10] - 4:20, 22:10, 22:13, 23:15, 25:8, 25:12, 31:1, 31:6, 31:9, 31:17
**Routh** [4] - 6:15, 22:10, 23:6, 31:1
**Rule** [2] - 14:23, 20:16
**ruled** [1] - 11:18
**ruling** [6] - 7:8, 8:7, 8:15, 11:12, 13:2, 28:4

## S

**SAMSUNG** [1] - 1:6
**Samsung** [3] - 5:9, 6:24, 7:21
**san** [1] - 3:19
**scenario** [1] - 19:23
**schedule** [1] - 30:20
**scheduling** [2] - 12:16, 12:17
**second** [1] - 18:20
**secondly** [1] - 11:12
**see** [3] - 19:4, 24:9, 29:13
**seeking** [2] - 17:21, 28:12
**seem** [2] - 15:4, 15:13
**SEITZ** [1] - 2:15
**Seitz** [1] - 5:8
**selection** [1] - 19:16
**selects** [1] - 11:15
**sense** [1] - 24:5
**separate** [1] - 9:20

settlements [1] - 23:21
seven [2] - 18:2, 20:13
several [1] - 9:13
shape [1] - 24:8
showing [1] - 13:2
shown [1] - 17:2
side [1] - 27:7
sides [1] - 29:12
SIEMENS [1] - 1:11
signature [1] - 7:2
silence [1] - 25:18
simple [1] - 15:1
simply [2] - 24:14, 28:12
single [1] - 29:11
six/seven [2] - 17:23, 21:8
sketched [2] - 14:18, 14:20
smart [6] - 11:20, 12:14, 13:4, 13:13, 22:17, 26:10
solely [1] - 17:15
somewhat [1] - 17:25
Sony [1] - 9:4
sorry [3] - 13:12, 20:1, 21:3
sort [2] - 19:1, 28:10
sounded [1] - 18:5
sounds [1] - 18:13
source [1] - 21:10
Spalding [2] - 5:21, 16:14
SPALDING [1] - 3:11
speaker [1] - 6:1
Speaker [1] - 20:23
speaking [3] - 7:13, 7:16, 22:8
specific [3] - 8:20, 12:3, 20:3
specifically [3] - 7:24, 8:13, 8:19
spoken [1] - 22:5
St [37] - 2:21, 5:9, 5:18, 6:23, 7:13, 7:16, 7:18, 8:4, 8:8, 8:10, 8:21, 8:23, 9:11, 9:18, 10:12, 10:18, 11:1, 13:8, 17:7, 17:16, 17:25, 18:15, 18:22, 19:13, 20:5, 20:11, 21:4, 21:8, 21:15, 22:16, 22:18, 26:4, 26:15, 26:19, 28:4, 31:2
ST [5] - 1:3, 1:8, 1:13, 2:1, 2:6
standard [1] - 24:25
STARGATT [1] - 3:15
Stark [1] - 5:6

STARK [1] - 1:22
start [1] - 7:19
started [1] - 9:15
states [1] - 11:14
STATES [1] - 1:1
status [2] - 7:4, 30:2
stay [2] - 7:25, 16:23
stayed [1] - 19:8
Sten [1] - 6:15
STEN [1] - 4:21
sTEPTOE [2] - 4:9, 4:12
Steptoe [1] - 6:17
Steve [4] - 6:15, 22:10, 27:22, 31:1
STEVEN [1] - 4:20
still [5] - 8:8, 14:17, 19:16, 23:8, 23:13
stored [1] - 12:6
stronger [1] - 18:3
structure [1] - 13:15
stuck [1] - 30:4
submission [3] - 30:19, 31:14, 31:16
submit [7] - 18:9, 18:14, 19:18, 20:19, 22:20, 31:3, 31:12
submitted [4] - 17:20, 19:12, 20:8, 20:10
substantive [1] - 21:23
suffer [1] - 21:14
suggest [2] - 12:19, 27:12
suggested [1] - 28:10
suggesting [1] - 13:22
suggestion [1] - 20:5
suggestions [2] - 7:6, 19:2
suit [1] - 9:13
summarizes [1] - 14:7
summary [19] - 12:21, 12:23, 13:1, 13:21, 14:14, 14:22, 15:6, 15:12, 15:15, 15:23, 18:8, 18:14, 18:23, 18:25, 19:18, 20:6, 22:23, 29:22, 30:10
superintended [1] - 23:23
superintendent [1] - 23:21
supplemental [1] - 20:20
supported [1] - 14:1
SUTCLIFFE [1] - 4:20
Sutcliffe [1] - 6:16

T

TAYLOR [1] - 3:15
Tech [1] - 4:14
technical [5] - 15:3, 15:19, 19:2, 21:10, 21:11
TELEPHONE [1] - 1:20
telephone [2] - 5:3, 31:20
terms [3] - 8:6, 17:8, 17:9
TERRANCE [1] - 2:18
Terry [2] - 5:17, 7:16
testimony [2] - 13:1, 13:20
text [1] - 11:23
THE [34] - 1:1, 1:1, 5:5, 5:10, 5:15, 5:19, 6:3, 6:11, 6:20, 14:9, 15:24, 16:5, 16:10, 16:19, 18:19, 20:22, 20:24, 21:20, 22:3, 22:9, 22:12, 23:6, 24:25, 25:10, 25:15, 27:15, 28:1, 30:21, 30:23, 30:25, 31:5, 31:8, 31:15, 31:18
theories [1] - 20:17
theory [15] - 10:5, 11:2, 12:24, 13:16, 13:19, 14:1, 19:14, 19:17, 20:20, 20:21, 23:7, 23:14, 26:5, 26:19, 27:11
thereafter [1] - 27:2
therefore [2] - 26:18, 28:16
thirdly [1] - 12:5
THOMAS [1] - 4:12
Thomas [1] - 6:17
three [7] - 7:22, 9:20, 26:3, 26:18, 29:5, 29:8, 29:13
three-page [2] - 29:8, 29:13
timing [1] - 30:9
title [2] - 9:22, 27:3
today [6] - 7:23, 14:18, 14:20, 16:3, 26:24, 30:2
together [1] - 28:5
Tom [1] - 6:18
transmitted [1] - 12:3
trial [6] - 9:20, 15:18, 19:10, 19:22, 23:20, 23:25
trials [2] - 26:3, 26:18
try [1] - 15:9

trying [1] - 18:4
Tuesday [1] - 1:20
TUNNELL [1] - 3:9
turn [3] - 7:12, 11:4, 21:20
turned [1] - 10:24
turns [1] - 23:12
two [4] - 6:13, 9:21, 11:7, 17:3
two-to-one [1] - 11:7

U

U.S.D.C.J [1] - 1:22
unclear [1] - 18:12
under [9] - 7:1, 8:9, 8:17, 8:22, 14:22, 20:14, 20:16, 23:23, 24:5
understandings [1] - 24:3
understood [1] - 10:24
unequivocal [1] - 11:10
unfair [1] - 21:19
Unidentified [2] - 6:1, 20:23
UNITED [1] - 1:1
unless [1] - 20:25
unnecessarily [1] - 18:4
unscathed [1] - 9:24
up [3] - 16:18, 22:5, 29:14
update [1] - 13:16
USA [1] - 4:16
USB [1] - 12:8
user [2] - 11:14, 19:15

V

Van [1] - 5:8
VAN [1] - 2:15
various [1] - 6:23
vehemently [1] - 8:24
vehicle [1] - 18:13
verdict [5] - 9:4, 9:5, 9:7, 10:15, 10:20
verdicts [2] - 9:11, 26:25
verification [1] - 27:23
versus [1] - 6:24
video [1] - 19:16
view [5] - 17:10, 19:20, 21:24, 24:19, 30:4
View [1] - 3:6
views [1] - 24:3
Virginia [1] - 6:5

VIRGINIA [1] - 3:6
virtue [1] - 28:12

W

wants [1] - 22:9
Washington [1] - 4:21
waste [2] - 10:7, 10:8
week [4] - 28:6, 29:5, 31:4, 31:16
West [1] - 6:6
WEST [1] - 3:5
whereas [2] - 12:1, 15:18
whole [1] - 19:13
willing [2] - 13:8, 14:2
WILMER [1] - 4:2
Wilmer [1] - 6:9
Wilmington [1] - 1:19
Wireless [1] - 3:20
wish [6] - 22:4, 22:6, 25:16, 25:20, 29:2, 30:10
withdraw [4] - 16:6, 21:22, 28:13, 29:2
withdrawal [1] - 16:3, 22:25, 23:2
withdrawing [1] - 28:20
withdrawn [5] - 7:10, 16:9, 23:1, 24:21, 28:25
withstood [2] - 9:22, 9:23
WOODMANSEE [1] - 3:18
Woodmansee [1] - 5:23

Y

years [5] - 9:14, 17:24, 18:2, 20:13, 21:8
Yi [2] - 6:16, 6:17
YI [1] - 4:9
York [2] - 3:12
YOUNG [1] - 3:15
Young [1] - 5:23

# EXHIBIT 2

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

———————

ST. CLAIR INTELLECTUAL PROPERTY
CONSULTANTS, INC.,
*Plaintiff-Cross Appellant,*

v.

CANON INC. AND CANON U.S.A., INC.,
*Defendants,*

**and**

FUJI PHOTO FILM CO. LTD. (NOW FUJIFILM
CORPORATION), FUJI PHOTO FILM U.S.A. INC.
(NOW FUJIFILM NORTH AMERICA
CORPORATION), AND FUJIFILM AMERICA INC.
(NOW FUJIFILM HOLDINGS AMERICA
CORPORATION),
*Defendants-Appellants.*

———————

2009-1052, 2010-1137, -1140

———————

Appeals from the United States District Court for the
District of Delaware case no. 03-CV-0241, Judge Joseph J.
Farnan, Jr.

———————

Decided: January 10, 2011

———————

RONALD J. SCHUTZ, Robins, Kaplan, Miller & Ciresi L.L.P, of Minneapolis, Minnesota, argued for plaintiff-cross appellant. With him on the brief were JAKE M. HOLDREITH, BECKY R. THORSON, SETH A. NORTHROP and TREVOR J. FOSTER. Of counsel was DAVID P. SWENSON.

STEVEN J. ROUTH, Orrick, Herrington & Sutcliffe LLP, of Washington, DC, argued for defendants-appellants. With him on the brief were STEIN A. JENSEN; and E. JOSHUA ROSENKRANZ and ALEX V. CHACHKES, of New York, New York; and WILLIAM H. WRIGHT, of Los Angeles, California.

---

Before DYK, MAYER, and MOORE, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* DYK.

Dissenting opinion filed by *Circuit Judge* MOORE.

DYK, *Circuit Judge.*

Fuji Photo Film Co. Ltd., Fuji Photo Film U.S.A. Inc., and Fujifilm America Inc. (collectively "Fuji") appeal a judgment that Fuji infringed four patents owned by St. Clair Intellectual Property Consultants, Inc. ("St. Clair"). These are United States Patent Nos. 5,138,459 ("'459 patent"), 6,094,219 ("'219 patent"), 6,233,010 ("'010 patent"), and 6,323,899 ("'899 patent"). We hold that the district court erred in construing the asserted claims, and, accordingly, we reverse the judgment of infringement.

## BACKGROUND

In 2003, St. Clair sued Fujifilm and seven other digital camera manufacturers for infringing the patents-in-suit. All four patents share a common specification and cover electronic "still video cameras" that save digital photographs in user-determined memory formats for use

on personal computers ("PCs").   Primarily at issue was
claim 16 of the '459 patent, which provides in relevant
part:

> A process for storing an electronically sensed
> video image comprising the steps of: . . . recording
> in selectable addressible memory means at least
> one of a plurality of different digital output data
> format codes where each of said plurality of out-
> put data format codes corresponds respectively to
> one of a like *plurality of different data formats for
> different types of computer apparatus.*

'459 Patent col.15 l.23–col.16 l.4 (emphasis added).   St.
Clair also asserted dependant claim 17 of the '459 patent.
Claim 10 of the '219 patent similarly provides the identi-
cal "plurality of different data formats for different types
of computer apparatus" language.   The parties disputed
whether this phrase was limited to formats related to
different computer architectures (e.g., IBM or Apple PCs)
or if it could also include formats related to different
computer applications (e.g., software that can run GIFF
or PICT).   Fuji contended that the "different types of
computer apparatus" language refers to different types of
architecture (i.e., different operating systems combined
with hardware) such as IBM and Apple PCs, and not to
different applications that can run on multiple types of
architectures.   In its August 31, 2004, *Markman* order,
the district court rejected Fuji's construction, construing
the disputed claim term as follows:

> (1) a 'data format' is the arrangement of digital
> data in a file including image, audio, text or other
> data and includes, at least, MPEG, JPEG, GIF,
> TIFF, PICT, BMP, JFIF, DCF, TXT, DOC, WPD
> and WAV, and (2) a 'computer apparatus' is a
> *computer and any operating system or application*

*software loaded on the computer.* Computer apparatus are 'different types' within the meaning of the claims if they are loaded with different application software, even if they are otherwise the same.

*St. Clair Intellectual Prop. Consultants, Inc. v. Canon, Inc.*, No. 03-241, slip op. at 9–10, 2004 WL 1941340, at *4 (D. Del. Aug. 31, 2004) (emphasis added). Under the district court's construction, the accused Fuji cameras infringed claims 16 and 17 of the '459 patent and claim 10 of the '219 patent because the cameras can save pictures under multiple file formats accessible by various software programs running on both IBM and Apple PCs. Fuji's cameras did not infringe under Fuji's proposed construction of the claims.

A similar dispute arose with respect to claim 1 of the '010 patent and claims 1 and 3 of the '899 patent. Though those claims use somewhat different language, the district court concluded that "the parties agree[d]" to construe the asserted claims consistently across all four patents, with the result that the Fuji cameras also infringed those claims. *St. Clair*, 2004 WL 1941340, at *4. As St. Clair's expert acknowledged at trial, however, none of the accused Fuji cameras has "different formats for different types of computer apparatus where the different types of computer apparatus are IBM on the one hand and Apple on the other." J.A. 7629.

During the *Markman* proceedings, the district court also addressed a separate claim construction issue— whether the claim term "plurality of different data formats" included movie formats. This limitation or variations thereof appear in claim 16 of the '459 patent; claims 1, 10, and 16 of the '219 patent; claim 1 of the '010 patent; and claims 1 and 3 of the '899 patent. St. Clair contended

that movie formats were covered under the district court's construction of "data formats" in claim 16. Fuji disagreed, arguing that the invention only covered "still pictures" and not movies. The district court's *Markman* order found that "neither the specification nor the language of the claims impose[d] a still picture limitation." *St. Clair*, 2004 WL 1941340, at *7. Under this construction, the accused Fuji cameras, which had both a still picture and movie mode, were found to satisfy the "plurality of different data formats" limitation of the asserted claims.

In October 2004, under the district court's claim construction, a jury found that each of the asserted claims was valid and infringed by Fuji's products. In September 2005, the district court denied Fuji's motion for judgment as a matter of law. However, on June 19, 2006, before the entry of judgment, the case was stayed. In 2008, the district court lifted the stay and entered judgment on the 2004 verdicts. On November 19, 2009, the court denied St. Clair's motion for a new trial on damages and entered an Amended Judgment. Fuji timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## DISCUSSION

The parties agree that if Fuji's construction of the claims is correct, there is no infringement. Claim construction is a question of law, which we review de novo. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448 (Fed. Cir. 1998) (en banc).

## I

Under the district court's construction of "computer apparatus," claims 16 and 17 of the '459 patent and claim 10 of the '219 patent encompass all permutations of hardware, operating systems, and "different application software." *St. Clair*, 2004 WL 1941340, at *3. As St.

Clair's expert stated during trial, a data format would be "for" a different type of computer apparatus "if it's possible to have a computer that can read that format and another computer that cannot." J.A. 7636.

In light of the claim language and the ubiquitous and consistent correspondence between data formats and computer architectures throughout the specification and prosecution history, we hold that the term "computer apparatus" refers to computer architecture. Each data format code "corresponds respectively to one of a like plurality of different data formats for different types of computer apparatus" only if "each data format" corresponds on a one-to-one basis to a different type of computer architecture (e.g., in the way that GIFF corresponds to IBM and PICT corresponds to Apple). Under this construction, there is no infringement of claims 16 and 17 of the '459 patent or claim 10 of the '219 patent.

*Claim language.* On its face, the term "computer apparatus" appears to refer to computer architecture. The phrase "different data formats for different types of computer apparatus" appears to refer to data formats that correspond to particular computer architectures.

*Specification.* In 1990, the problem the inventors sought to solve was one of computer architecture incompatibility, not data format incompatibility. Back then, the proprietary nature of PC development—under which IBM and Apple PCs were manufactured with different and incompatible processors, operating systems, and memory schemes—meant that digital images formatted for use on an IBM PC could not be used on an Apple PC without converting that data. This presented a computer architecture incompatibility problem.

Here, the specification uniformly describes the solution to this problem as involving the selection of data

formats that correspond to particular computer architectures. We have held that the consistent use of a claim term in the specification suggests that the scope of a claim is limited. *See Nystrom v. Trex Co.*, 424 F.3d 1136, 1144–45 (Fed. Cir. 2005). The specification expressly allows a user to select data formats for use with particular computer architectures, citing IBM and Apple PCs as exemplar architectures. The Abstract provides in relevant part:

> An electronic still camera . . . [that] selectively formats the compressed digital image *to a compatible format for either the IBM Personal Computer and related architectures or the Apple Macintosh PC architecture as selected by the operator* so that the digital image can be directly read into most word processing, desktop publishing, and data base software packages including means for executing the appropriate selected decompression algorithm.

'459 Patent, at [57] (emphasis added). When a user selects a format, he makes a decision based on the desired architecture—not a particular data format. Moreover, the specification describes the two preferred data formats, GIFF and PICT, consistently as being "PC compatible formats" that are respectively associated with IBM and Apple PCs. *See, e.g.*, '459 Patent col.10 ll.9–10; col.11 ll.32–44.

The "format switch," labeled (17) in the figures, was the inventive solution for allowing users to select between different data formats. '459 Patent col.11 ll.32–36. Using this switch, a user can select "IBM" to choose the preferred GIFF format corresponding to IBM PCs; "Apple" to choose the preferred PICT format corresponding to Apple PCs; or "Other" for architectures other than IBM and

Apple. '459 Patent col.4 l.68–col.5 l.4 & col.12 ll.53–60. Figures depicting "format switch (17)" consistently show a one-to-one correspondence between computer architecture and format code. For example, Figure 2A shows three modes for "format signals (57)": "Apple = 00"; "IBM = 01"; "Other = 10." '459 Patent col.3 ll.8–11; *see also id.* fig.6 (showing control panel logic with two format choices: IBM or Apple); *id.* fig.14A (listing options for format switch (17) as "Apple V1"; "IBM V2"; and "Other PC V3"); *id.* fig.14B (showing how format switch (17) controls the selection of an "image data" format that corresponds with the desired PC format and memory format for the selected PC architecture). These figures thus disclose how the data format codes must correspond to computer architecture.

***Prosecution history.*** In construing claim terms, "the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005).

During prosecution, the inventors described the problem to be solved as one of computer architecture incompatibility:

Applicants' claimed improvement . . . solves a long felt need by providing a low cost and efficient solution for achieving flexible and selectable data format compat[i]bility between the output of an electronic still camera and the input to any one of a *plurality of personal computer-type apparatus.* . . . [T]he prior art . . . has required relatively expensive and cumbersome, multi-step conversion processes to achieve input data format compat[i]bility with any one of a *plurality of types of personal computers manufactured* by different

companies, *e.g. IBM PC, Apple, Sun Micro Systems, Digital Equipment, etc. . . .*

As is well known to those skilled in the information processing and computer arts, *different types of personal computers, e.g. IBM PC, Apple Macintosh, DEC, Sun Microsystems, etc.* each have widely *different, non-compatible* input/output data formats, line I/O discipline and instruction command sets and therefore the input/output data formats for one type [of] apparatus is *not usable with or inputable into another manufacturer's apparatus. Since there is no industry standard generally recognized by all PC manufacturers,* . . . machines of one manufacturer cannot exchange data or be interconnected with or communicate with machines of another manufacturer. Therefore, *data formatted for one such PC-type machine must be converted to be compatible with another machine.*

J.A. 1557–59 (emphases added). In other words, the invention "solve[d] a long felt need" by allowing data format compatibility with a "plurality of types of personal computers manufactured by different [personal computer] companies, IBM PC, Apple, Sun Micro Systems, Digital Equipment, etc." J.A. 1558. Similarly thereafter, in the words of the inventors, the patents-in-suit "solve[d] a long felt need":

[B]efore Applicants' improvement there has not been commercially available a simple apparatus or process which permits the electronic still camera to *designate or select* one of a plurality of digital data formats as the camera is being utilized *to ensure direct data format compat[i]bility for input*

into a selected model personal computer appara-
tus.

J.A. 1557, 1559–60 (emphases added). In sum, to address
the architecture incompatibility problem, the applicants
created a camera that could output a plurality of formats
for computers "manufactured by different companies, e.g.
IBM PC, Apple, Sun Micro Systems, Digital Equipment,
etc." J.A. 1558. Only by construing "different types of
computer apparatus" to mean "different types of computer
architecture" can we remain faithful to the invention
actually described in the prosecution history.

Because the accused Fuji cameras output data for-
mats that are not tailored to specific computer architec-
tures, Fuji does not infringe claims 16 and 17 of the '459
patent or claim 10 of the '219 patent.

II

However, St. Clair contends that the asserted claims
of the '010 and '899 patents use different claim language
than the asserted claims of the '459 and '219 patents, and
that those claims should be construed differently. Though
the district court found that "the parties agree[d]" to
construe the asserted claims consistently across all four
patents, *St. Clair*, 2004 WL 1941340, at *4, the record
seems to support St. Clair's contention that it neither
agreed nor disagreed to affirmatively use claim 16 as a
representative claim.

Nonetheless, we conclude that the asserted claims of
the '010 and '899 patents are limited to selecting formats
for different types of computer architecture. Each patent
shares the same specification and uses similar, and often
identical, terminology. St. Clair's brief also recognizes
that the asserted claims of the other patents include
"variations of [the] language" used in claim 16. Plaintiff-

11                                ST. CLAIR PROPERTY v. CANON INC

Cross Appellant's Br. 24.  These "variations" are as fol-
lows:

- '010 Patent, Claim 1: "formatting said
  digital image signal in *one of a plural-
  ity of computer formats*." '010 Patent
  col.12 ll.59–60 (emphasis added).

- '899 Patent, Claim 1: "formatting the
  digital image signal in *one of a plural-
  ity of computer image file formats*."
  '899 Patent col.12 ll.48–49 (emphasis
  added).

- '899 Patent, Claim 3: "formatting the
  digital image signal in the selected
  *computer image file format*." '899 Pat-
  ent col.12 ll.60–61 (emphasis added).

The fact that the specification describes only a single
invention, and does not differentiate between the scope of
claims using very different language, suggests that the
limitations in claim 1 of the '010 patent and claims 1 and
3 of the '899 patent should have the same meaning as the
"different data formats for different types of computer
apparatus" language in claims 16 and 17 of the '459
patent and claim 10 of the '219 patent.

Fuji's construction is also supported by remarks made
by the examiner during reexamination.[1]  Reexamination

---

[1]     St. Clair argues that Fuji waived consideration of
the reexamination materials because it failed to raise in
its opening brief the issue of the district court striking the
reexamination materials from the record.  *See, e.g., In re
Cygnus Telecomm. Tech. LLC*, 536 F.3d 1343, 1356 (Fed.
Cir. 2008).  However, Fuji clearly relied on the examiner's
statements in its briefs in this court, and this court can
take judicial notice of the reexamination record.  *See
Standard Havens Prods., Inc. v. Gencor Indus. Inc.*, 897

statements "are relevant prosecution history when inter-
preting claims." *E.I. du Pont de Nemours & Co. v. Phil-
lips Petroleum Co.*, 849 F.2d 1430, 1439 (Fed. Cir. 1988).
The reexamination procedure serves an important role in
providing a district court with an "expert view of the
PTO." *Gould v. Control Laser Corp.*, 705 F.2d 1340, 1342
(Fed. Cir. 1983). In this case, the reexamination occurred
against the backdrop of an earlier *Sony* litigation involv-
ing the same claim terms. *See St. Clair Intellectual Prop.
Consultants, Inc. v. Sony Corp.*, No. 01-557, 2002 WL
31051605 (D. Del. Sept. 3, 2002). In *Sony*, the district
court defined the term "data format" to mean "the ar-
rangement of digital data in a file, including image, audio,
text or other data and includes, at least, MPEG, JPEG,
GIF, TIFF, PICT, BMP, JFIF, DCF, TXT, DOC, WPD and
WAV." *Id.* at *2. The court construed the term "computer
apparatus" to mean "a computer and any operating sys-
tem or application software loaded on the computer." *Id.*
at *3. During reexamination, five different examiners,
including three different Supervisory Patent Examiners,
rejected the *Sony* court's interpretation of the claim
language. In addition to concluding that claims 16 and 17
of the '459 patent and claim 10 of the '219 patent were
limited to different data formats for different types of
computer architecture, the examiners, rejecting the *Sony*
court's construction, concluded that the "computer archi-
tecture" construction also applied to the '010 and '899
patents:

- **'010 Patent:** "[T]he claim limitation '.
  . . formatting said digital image signal
  in one of a plurality of computer for-
  mats' is interpreted *to mean format-*

---

F.2d 511, 514 n.3 (Fed. Cir. 1990) (taking notice of the
"adjudicative fact" of an office action on reexamination
rejecting the patentee's claims).

> *ting the image signal as one of an IBM PC/Clone, Apple Macintosh, or other PC format.* Office Action in Ex Parte Reexamination of '010 Patent, J.A. 9584.

- **'899 Patent**: "[T]he claim limitation 'formatting the digital image signal in one of a plurality of computer image file formats' is interpreted *to mean formatting the image signal as one of an IBM PC/Clone, Apple Macintosh, or other PC format.*" Office Action in Ex Parte Reexamination of '899 Patent, J.A. 9543.

Because an examiner in reexamination can be considered one of ordinary skill in the art, his construction of the asserted claims carries significant weight.

St. Clair contends, however, that the examiner actually accepted its construction of the claims in connection with the examination of the '899 patent. St. Clair's argument relies on the fact that the examiner acknowledged that at least one data format, the TIF image file format, was "platform independent and could be used in either an IBM PC/Clone or Apple Macintosh computer." J.A. 9544. This statement suggested to St. Clair that "the examiner did not believe that the claims were limited to formats that could only be read by one architecture." Plaintff-Cross Appellant's Br. 49. This argument does not withstand scrutiny. The examiner was responding to a contention that the Kühberger prior art was anticipatory. While the examiner's reasons for refusing to find anticipation were not entirely clear, the examiner plainly found that the patents-in-suit did something different because they did not disclose selecting among different data

formats. In doing so, he did not suggest that the non-platform-specific TIF format was the type of format that the claims were designed to accommodate. And the examiner thereafter made clear that the language of the '459 patent meant

> the image file formats provided for selection (PICT II or GIFF) are in one-to-one correspondence with a particular type of computer system (Apple Macintosh or IBM PC) respectively . . . . In other words, [the applicants] DO NOT provide selecting between various subspecies of the same computer species (e.g. Species 1–A, Species 1–B, or Species 1–C), rather [the applicants] DO provide selecting between various computer species (e.g. Species 1, Species 2, or Species etc.).

J.A. 9612. The examiner explicitly rejected the *Sony* claim construction on which the district court relied and applied this construction not just to the '459 and '219 patents, but also the '010 and '899 patents, specifically stating that, with respect to the '899 and '010 patents, the "[e]xaminer is in agreement with the comments made by the Requester . . . that . . . a very different interpretation tha[n] that adopted by the [*Sony*] court must be made." J.A. 9542, 9583.

We also find that, although St. Clair submitted "Comments on Statement for Reasons for Patentability and/or Conformation" disagreeing with the examiner's construction, St. Clair's comments "do[ ] not, indeed cannot, change the examiner's Reasons for Allowance." *Biogen, Inc. v. Berlex Labs., Inc.*, 318 F.3d 1132, 1139 (Fed. Cir. 2003); *see also* 37 C.F.R. § 1.104(e) ("Failure by the examiner to respond to any statement commenting on reasons for allowance does not give rise to any implication.").

We conclude that the similar terms in the '010 and '899 patents should be construed as limited to different computer architectures.

## III

A second claim construction issue with respect to claim 16 concerns the "plurality of data formats" limitation. St. Clair argues that "different data formats" are not limited to "still" pictures, but include moving images. While the camera must produce a still image, the district court construed the term "data formats" to also include a movie mode. Because certain Fuji cameras have both a still picture data format and a movie data format, under the district court's construction, these cameras would satisfy the "plurality of different data formats" limitation. The district court pointed to two references in the specification to show that the data formats contemplated by the inventors included movie formats: (1) a reference to camera circuitry that allows "for approximately 20 images to be captured in a one second period," '459 Patent col.8 ll.35–37; and (2) references to the MPEG and DVI compression techniques, which were designed to compress sequential images, *id.* col.10 ll.49–59.

However, we agree with Fuji's argument that the use of the words "still" and "image" throughout the patents-in-suit limits the claims to a single image or picture. *See, e.g., id.* fig.2; col.1 ll.7–25. The word "still" is included in the title, the Abstracts of the '459 and '219 patents, the Summary of the Invention, and throughout the specification. In contrast, the word movie does not appear once in the specification or the prosecution history. In addition, all the terms describing formatting issues refer to images. *See, e.g.,* '219 Patent col.12 ll.48–49 (formatting *"each* digitized captured *image"*) (emphases added). Though the specification describes an invention able to capture "ap-

proximately 20 *images* . . . in a one second period," this appears to refer to a mode of capturing multiple, but singular still images in sequence. '459 Patent col.8 ll.35–37 (emphasis added); *see also id.* col.2 ll.32–34 ("An additional object of this invention [is] to . . . rapidly capture a series of *images* automatically as well as *singularly*.") (emphases added).

Finally, we note that, even if the MPEG and DVI compression techniques referenced in the specification are designed for movie formats, these ambiguous references cannot overcome the explicit limitation to still picture formats elsewhere in the specification. Accordingly, we hold that movie formats do not satisfy the "plurality of data formats" limitation.

## IV

Under the correct claim construction, judgment as a matter of law of non-infringement should have been granted. In view of this disposition, there is no need to address issues concerning damages.

**REVERSED**

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**ST. CLAIR INTELLECTUAL PROPERTY CONSULTANTS, INC.,**
*Plaintiff-Cross Appellant,*

v.

**CANON INC. AND CANON U.S.A., INC.,**
*Defendants,*

AND

**FUJI PHOTO FILM CO. LTD. (NOW FUJIFILM CORPORATION), FUJI PHOTO FILM U.S.A. INC. (NOW FUJIFILM NORTH AMERICA CORPORATION), AND FUJIFILM AMERICA INC. (NOW FUJIFILM HOLDINGS AMERICA CORPORATION),**
*Defendants-Appellants.*

---

2009-1052, 2010-1137, -1140

---

Appeals from the United States District Court for the District of Delaware case No. 03-CV-0241, Judge Joseph J. Farnan, Jr.

---

MOORE, *Circuit Judge*, dissenting.

Respectfully, I dissent. I would affirm the district court's construction of all but one claim term and affirm the judgment of infringement in favor of the patentee. While I agree with the district court's construction under a de novo standard of review, I note that were any deference given, this would surely be a case in which the lower court construction should be affirmed. Because my colleagues deviate from the plain meaning of these claim terms, I respectfully dissent.

I.

With regard to claim 16 of the '459 patent and elsewhere where this term appears,[1] the majority holds that the term "plurality of different data formats" is limited to still images – that it does not include multiple or moving images. The district court held that the plain meaning of this language included both still image file formats and moving (movie) image file formats. The district court held that the plain and ordinary meaning of "data format" is "the arrangement of digital data in a file, including image, audio, text or other data and includes, at least, MPEG, JPEG, GIF, TIFF, PICT, BMP, JFIF, DCF, TXT, DOC, WPD and WAV." I see no error in the district court's construction (and Fujifilm does NOT appeal that construction). The term "plurality of different data formats" is broad and the plain meaning would certainly include movie file formats such as MPEG. Moreover, the specification EXPRESSLY names MPEG and DVI compression (used for movies) as "an alternative em-

---

[1] This term or a similar one appears in claim 16 of the '459 patent, claims 1, 10 and 16 of the '219 patent, claim 1 of the '010 patent and claims 1 and 3 of the '899 patent. All four patents have the same specification.

bodiment of the present invention." '459 patent col. 10 ll. 46-59; *see also id.* col. 8 ll. 35-37.

The majority bases its narrowing of the plain meaning on the repeated use of the words still and image in the patent. Even though still appears often, the specification also lists MPEG and DVI as an alternative embodiment. Unlike *SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.,* 242 F.3d 1337 (Fed. Cir. 2001), or other such cases, there is no narrowing language in this specification to justify narrowing the claim scope. Here, the claim language at issue is "plurality of different data formats." The plain meaning of this language includes MPEG (which all parties agree is a data format), and the specification discloses MPEG/DVI as an alternative embodiment of the invention. I believe the district court's construction was correct and I would affirm the determination of infringement of this claim.

## II.

Fujifilm also appealed the construction of the following terms: "a plurality of computer image file formats" in claims 1 and 3 of the '899 patent; "plurality of computer formats" in claim 1 of the '010 patent; "a plurality of different data file formats for different types of computer apparatus" in claim 10 in the '219 patent; "a plurality of different data formats for different types of information handling systems [apparatus]" in claims 1 [and 16] of the '219 patent; and "plurality of different data formats for different types of computer apparatus" in claim 16 of the '459 patent. Based on the district court's construction, a jury found infringement.

As an initial matter, the majority erred because it claims that "the district court concluded that the parties

agreed to construe the claims consistently across all four patents." Maj. Op. at 4, 10.  The record shows no such agreement and no such statement by the district court.  The district court stated that "the parties agree that the terms and phrases of the various patents should be construed consistently."  Read in context, the district court was explaining that the parties agreed to construe *similar* terms and phrases consistently, not entire claims or dissimilar phrases.  The district court gives an example of phrases that the parties agreed should have the same construction: "plurality of different data formats for different types of computer apparatus" and "a plurality of different data formats for different types of information handling systems."  I can agree that these phrases are similar.

I cannot agree, however, that a "plurality of different data formats for different types of computer apparatus" is similar to "a plurality of computer file formats," and St. Clair clearly argues that they should be construed differently. Appellee's Br. 24.  I believe therefore that St. Clair is entitled to have this court independently construe each term.  For me, at least, such a process leads to different constructions.

For claims which contain the language "a plurality of different file formats for different types of computer apparatus" or "a plurality of different data formats for different types of information handling systems," I agree with the majority, these terms refer to a data format for use with a particular architecture. The term "plurality of different file formats" includes all the different files formats discussed above and the term "for different types of computer apparatus" implicates the different computer architectures. Therefore these claims are limited to different file formats for different architectures by their plain language.

This "for different types of computer apparatus" limitation, however, does not appear in the claims at issue in the '010 and '899 patents. Those claims recite formatting a digital image signal "in one of a plurality of computer formats" and "in one of a plurality of computer image file formats." Because the inventors omitted the "for different types of computer apparatus" limitation, the plain language of those claims is broader. In my opinion, neither the specification nor the prosecution history supports importing such a limitation into these claims.

I do not agree that the specification includes clearly narrowing language as in *SciMed*. On the contrary, the specification explains that JPEG "was developed in 1985 in response to the lack of interoperability between image and processing equipment due to numerous proprietary standards held by each manufacturer." '459 patent col. 10 ll. 33-39. In addition to its express disclosure of the platform-independent JPEG and MPEG standards, the specification discusses PICT and GIF formats. As Fujifilm's own expert explained, although PICT files were "most often" used by Apples and "some applications" on IBMs could read GIFs, those file types were not exclusively limited to particular architectures. He further explained that, at the time of filing, some applications for both Apples and IBMs could read those file formats.

I also do not agree with the majority's reliance on the reexamination history because St. Clair did not clearly disavow claim scope during reexamination. On the contrary, during reexamination of the '010 and '899 patents, St. Clair traversed the examiner's narrow claim construction prior to overcoming the asserted art. During reexamination of the '459 and '219 patents, the examiner confirmed all claims on the first office action. Hence, St. Clair argued nothing in these reexaminations that could be construed as

a disavowal.  In fact, in a post-allowance submission, St. Clair made clear its view that these terms were not limited in the manner the majority now does.

Thus, I conclude that the majority erred in its construction of a "plurality of computer image formats."  First, it erred in not construing that term separately from the for different architectures term.  Second, it erred by importing a limitation regarding computer architecture into a claim which had no such limitation.  As I believe the district court construction of these file format terms is correct, I would affirm the judgment of infringement.